• AO 440 (Rev. 04/08) Civil Summons

# UNITED STATES DISTRICT COURT

for the
Northern District of California

| | |
|---|---|
| XS HOLDING B.V, derivatively on behalf of Xslent Technologies, LLC and XET Holding Co., LLC, and separately on its own behalf, | ) ) ) ) |
| Plaintiff | ) |
| v. | ) ) |
| COOL EARTH SOLAR, INC., a Delaware corporation; ROB LAMKIN, an individual; LAWRENCE ASUNCION, an individual; SOLAR COMPONENTS LLC, a Delaware limited liability company; NATHAN SCHULHOF, an individual; M. JAMES BULLEN, an individual; MARTIN N. LETTUNICH, an individual; STEFAN MATAN, an individual; and XSLENT, LLC, a Nevada limited liability company and ATIRA TECHNOLOGIES, LLC, a Nevada limited liability company; | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendant | ) |

Civil Action No. C08-02282 RMW

**Summons in a Civil Action**

**(First Amended Derivative Complaint And Complaint For
Interference With Contract, Conversion, Declaratory And Injunctive Relief)**

American LegalNet, Inc.
www.FormsWorkflow.com

• AO 440 (Rev. 04/08) Civil Summons

To: *(Defendant's name and address)*

COOL EARTH SOLAR, INC.
Attn:  Eric Cummings
7665 Hawthorne Place
Livermore, CA  94550

ROB LAMKIN
7665 Hawthorne Place
Livermore, CA  94550

LAWRENCE ASUNCION
7665 Hawthorne Place
Livermore, CA  94550

SOLAR COMPONENTS LLC
121 Valley Street
Manchester, NH  03103

NATHAN SCHULHOF

M. JAMES BULLEN

MARTIN N. LETTUNICH
233 Oak Meadow Drive
Los Gatos, CA  95032-7650

STEFAN MATAN
487 Lea Court
Novato, CA  94945

A lawsuit has been filed against you.

     Within <u>20</u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, whose name and address are:

Paul J. Riehle
Sedgwick, Detert, Moran & Arnold LLP
1 Market Plaza, Steuart Tower, 8th Flr.
San Francisco, CA  94105

American LegalNet, Inc.
www.FormsWorkflow.com

• AO 440 (Rev. 04/08) Civil Summons

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_____

Name of clerk of court

Date: _____    _____

Deputy clerk's signature

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)*

American LegalNet, Inc.
www.FormsWorkflow.com

• AO 440 (Rev. 04/08) Civil Summons (Page 2)

## Proof of Service

I declare under penalty of perjury that I served the summons and complaint in this case on _____,_____
by:

      (1) personally delivering a copy of each to the individual at this place, _____
      _____; or

      (2) leaving a copy of each at the individual's dwelling or usual place of abode with _____
        who resides there and is of suitable age and discretion; or

      (3) delivering a copy of each to an agent authorized by appointment or by law to receive it whose name is
      _____; or

      (4) returning the summons unexecuted to the court clerk on _____; or

      (5) other *(specify)* _____
      _____
      _____. _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00._____

Date: _____

                                              _____
                                               Server's signature

                                            _____
                                              Printed name and title

                                            _____
                                              Server's address

American LegalNet, Inc.
www.FormsWorkflow.com

1   SEDGWICK, DETERT, MORAN & ARNOLD LLP
     PAUL RIEHLE  (Bar No. 115199)
2   RANDALL BLOCK  (Bar No. 121330)
     JIA-MING SHANG  (Bar No. 233326)
3   One Market Plaza, Steuart Tower, 8th Floor
     San Francisco, California  94105
4   Telephone: (415) 781-7900
     Facsimile:  (415) 781-2635
5

6   Attorneys for Plaintiff
     XS HOLDING B.V., a Dutch Corporation
7

8                  UNITED STATES DISTRICT COURT

9

10

11   XS HOLDING B.V, derivatively on behalf     CASE NO. C08 02282 RMW
     of Xslent Technologies, LLC and XET
12   Holding Co., LLC, and separately on its own   **FIRST AMENDED DERIVATIVE**
     behalf,       **COMPLAINT AND COMPLAINT FOR**
13                **INTERFERENCE WITH CONTRACT,**
             **CONVERSION, DECLARATORY AND**
14         Plaintiff,    **INJUNCTIVE RELIEF**
15        v.

16   COOL EARTH SOLAR, INC., a Delaware
     corporation; ROB LAMKIN, an individual;   **[DEMAND FOR JURY TRIAL]**
17   LAWRENCE ASUNCION, an individual;
     SOLAR COMPONENTS LLC, a Delaware
18   limited liability company; NATHAN
     SCHULHOF, an individual; M. JAMES
19   BULLEN, an individual; MARTIN N.
     LETTUNICH, an individual; STEFAN
20   MATAN, an individual; and XSLENT, LLC,
     a Nevada limited liability company and
21   ATIRA TECHNOLOGIES, LLC, a Nevada
     limited liability company;
22

23         Defendants.
24

25                 NORTHERN DISTRICT OF CALIFORNIA

26

27

28

                                    1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT      CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1    Plaintiff XS HOLDING B.V. ("XS Holding"), a Dutch corporation, derivatively on behalf

2    of XET Holding Co., LLC ("XET") and XSLENT TECHNOLOGIES, LLC ("XT"), and directly

3    on its own behalf, alleges the following against defendant COOL EARTH SOLAR, INC.

4    ("CESI"), defendant Rob Lamkin, defendant Lawrence Asuncion, defendant SOLAR

5    COMPONENTS LLC, defendant Nathan Schulhof, defendant M. James Bullen, defendant

6    MARTIN N. LETTUNICH ("Lettunich"), defendant XSLENT, LLC ("Xslent"), defendant

7    ATIRA TECHNOLOGIES, LLC ("Atira") and defendant STEFAN MATAN.

8                                  **NATURE OF THE ACTION**

9        1.    This is a derivative action brought by XS Holding, a limited liability company

10   member of both XET and XT (together, the "Companies").  This action is brought on behalf of the

11   Companies against two of their managers, Lettunich and Matan, and against the other defendants,

12   to remedy defendants' efforts to take valuable intellectual property and other assets from the

13   Companies, and to remedy other wrongs which the Companies have suffered at the hands of

14   Lettunich, Matan and the others.  Prominent among the assets which defendants have sought to

15   take from the Companies is certain solar energy technology from XET.  Lettunich's and Matan's

16   actions constitute breach of their fiduciary duties, abuse of control, gross mismanagement, waste of

17   corporate assets and unjust enrichment.  Lettunich, a lawyer who has advised XET and XT in

18   addition to serving as a manager, has also committed legal malpractice both in that his actions

19   constitute self dealing in violation of the rules of conduct binding on all lawyers and they fall and

20   fell below the standard of care which lawyers owe to their clients.

21       2.    This is also a direct action by XS Holding against  CESI, Rob Lamkin, Lawrence

22   Asuncion, Solar Components LLC, Nathan Schulhof, and M. James Bullen, for interference with

23   contract, conversion of assets, and declaratory relief.  As a result of these defendants' actions, XS

24   Holding is entitled to damages and injunctive relief.

25       3.    XET and XT are entitled to damages, an accounting, a constructive trust against all

26   of the intellectual and other property taken from them, and all profits resulting therefrom, a

27   declaration of rights and obligations and injunctive relief.

28

SF/1508075v1

1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT           CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

**SUMMARY OF THE ACTION**

4.     In late 2006 and early 2007, Lettunich and Matan convinced Brian Caffyn and his affiliated companies to invest in a group of companies to develop solar energy and other technologies.  Caffyn was a successful entrepreneur, who had developed alternative energy companies in both the United States and Europe.  Little did Caffyn know, but Lettunich and Matan were plotting to divest XS Holding of its interests in the companies XET and XT before the ink had dried on the XET and XT operating agreements.  Indeed, by that time, Lettunich had ***already*** secretly tried to take certain technology owned, or which was supposed to have been owned, by the Companies for his personal benefit.  Within months of formation of the Companies, he transferred $1 million to himself and $1.4 million to a company he controlled - and it appears that much of that money was transferred with no valid business purpose related to XT or XET - and he did so without authority.  Caffyn's companies had invested millions of dollars in XET and XT when Caffyn found out about Lettunich's duplicitous plans and fraudulent actions.

5.     Lettunich, to avoid scrutiny of his actions, and to carry out his plan to usurp the Companies' business opportunities for himself and entities and persons with which he was affiliated, together with Matan, took action designed to divest XS Holding of its interests in the Companies, and to prevent Mr. Caffyn from exercising any control over the Companies, and over XET in particular.  In so doing, Lettunich and Matan have failed fully to develop the solar energy technology products which XET was formed to create, and they have prevented XET from doing so as well.

6.     Lettunich and Matan have now purported on XET's behalf to enter into a number of agreements designed to siphon off XET's and XT's valuable technology.  Acting as XET's managers, yet without authority to take the actions described below, Lettunich and Matan have purported for a minimum of 10 years to license XET's technology for a fraction of its value to a company named Solar Components LLC, whose principals include Bullen and Schulhof.  The license agreement was executed without authority on XET's behalf, it is not in the best interest of XET, it is rife with impropriety, gross mismanagement and corporate waste by Lettunich and

2

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

CASE NO. C08-02282 RMW

Matan.  Solar Components, Bullen and Schulhof knew of the XET and XT operating agreements, and by their actions, they have wrongfully and intentionally interfered with XS Holding's rights under the XET and XT operating agreements and converted XET's and XT's technology.

7.      Lettunich and Matan also caused XET and other companies to enter into a so-called option agreement designed to convey all of XET's assets, including the XET Solar AC and DC Technology and the PvPC Technology, to Lawrence Asuncion and Rob Lamkin.  That so-called option was executed without authority on XET's behalf, it is not in the best interests of XET, it is rife with impropriety, gross mismanagement and corporate waste by Lettunich and Matan, intentional interference by Asuncion and Lamkin with XS Holding's rights under the XET and XT operating agreements, and a conversion of XET's rights to its intellectual property.

8.      Finally, Lettunich and Matan caused XET to enter into a convertible promissory note and guaranty with CESI, which allows CESI to convert an unreasonably small debt obligation into an irrevocable license for certain XET technology.  This note and guaranty were executed without authority on XET's behalf, they are not in the best interests of XET, they are rife with impropriety, gross mismanagement and corporate waste by Lettunich and Matan, intentional interference by CESI, Bullen and Schulhof with XS Holding's rights under the XET and XT operating agreements, and a conversion of XET's rights to its intellectual property.

## PARTIES

9.      Plaintiff XS Holding is a Dutch corporation with its principal place of business in Amsterdam, The Netherlands. At all times material, XS Holding was and remains a minority member in XET and XT, with 10% of the total membership units in each entity.

10.     Defendant CESI is a Delaware corporation which, XS is informed and believes, does business within the boundaries of the Northern District of California.

11.     Defendant Rob Lamkin is an individual who, XS is informed and believes, resides or does business within the boundaries of the Northern District of California.

12.     Defendant Lawrence Asuncion is an individual who, XS is informed and believes, resides or does business within the boundaries of the Northern District of California.

SF/1508075v1

3

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT       CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

13.     Defendant SOLAR COMPONENTS LLC is a Delaware limited liability company that does business within the boundaries of the Northern District of California.

14.     Defendant  M. James Bullen is an individual who, XS is informed and believes, resides or does business within the boundaries of the Northern District of California. Mr. Bullen has until recently (or maybe still is) an officer of XET and has been an officer of various other Lettunich and Matan controlled entities. Mr. Bullen has at least one agreement with Mr. Lettunich for compensation for one of these entities and the license arrangement appears to be an alternative payment to Mr. Bullen as compensation in lieu of that agreement, and perhaps others.

15.     Defendant Nathan Schulhof is an individual who, XS is informed and believes, resides or does business within the boundaries of the Northern District of California. Mr. Schulhof has been an officer of at least one predecessor entity of XET and has worked with Mr. Lettunich and Mr. Matan for several years including on fundraising for XET. Mr. Schulhof has an agreement for warrants and this license may be an alternative payment to Mr. Schulhof.

16.     Defendant Lettunich is an individual residing in Los Gatos, California.  At all times material, Lettunich was a manager of XET and XT, and owed those Companies fiduciary duties. Lettunich is also an attorney licensed to practice law in the State of California, and he advised XET and XT as their counsel. Lettunich at all times pertinent has been a manager of and exercised control over Xslent and Atira.

17.     Defendant Matan is an individual residing in Marin County, California.  At all times material, Matan was a manager of XET and XT, and owed those Companies fiduciary duties. Matan at all times pertinent also was a manager of Xslent and Atira.

18.     Defendant Atira is a limited liability company organized under the laws of Nevada, with its principal place of business in Santa Clara County, California.  Atira currently is a member of XT and an ultimate member of XET.  Atira claims, at all times pertinent, that it has been a member of XT.

19.     Defendant Xslent is a limited liability company organized under the laws of the Nevada, with its principal place of business in Santa Clara County, California.  Xslent is a member

SF/1508075v1

4

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT                    CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  of XT and an ultimate member of XET.

2      20.      XS Holding, Atira, and Xslent, directly or indirectly, comprise all the membership

3  units of XET and XT.

4                                    **JURISDICTION**

5      21.      Jurisdiction is proper under 28 U.S.C. §1332 in that complete diversity of

6  citizenship exists between Plaintiff and Defendants and the amount in controversy, exclusive of

7  interest and costs, is in excess of $75,000.

8      22.      Personal jurisdiction exists over each and every defendant under 28 U.S.C.

9  §1391(b) in that all defendants reside within this judicial district and a substantial part of the events

10 giving rise to this action occurred within this judicial district.

11     23.      Venue is proper in the Northern District of California under 18 U.S.C. §1965(a) in

12 that defendants are found, have agents, or transact affairs in this judicial district.

13                              **INTRADISTRICT ASSIGNMENT**

14     24.      Plaintiffs request intradistrict assignment of this case to the United States District

15 Court in San Jose as a some of the parties have their principal places of business in Santa Clara

16 County.

17                          **LETTUNICH PLUNDERS THE COMPANIES**

18     25.      Beginning in late 2006, Brian Caffyn, Lettunich and Matan, as well as others, began

19 discussions and negotiations regarding the formation of certain technology companies, including a

20 company to develop solar energy.  Based upon the claims and representations of Lettunich and

21 Matan, Mr. Caffyn caused  $500,000 to be invested in the ventures in December 2006.  Mr. Caffyn

22 and his affiliates decided to invest significant amounts of money based on the representations and

23 assurances from Lettunich and Matan regarding the performance of the technology and the role

24 that Mr. Caffyn would play in managing the businesses, particularly the solar technology company.

25

26     26.      Between December 2006 and April 2007, Mr. Caffyn's affiliated companies loaned

27 $1.9 million (inclusive of $500,000 lent in December 2006) to Lettunich for the sole purpose of

28

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT        CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  investment in developing the solar and software technologies that ultimately were incorporated into

2  XET and XT respectively.  As set forth in Sections 3.1 and 3.12 of the Companies operating

3  agreements, the loans totaling $1.9 million were assumed by XET ($763,000) and XT

4  ($1,137,000) and the loans were applied and set off XS Holding's capital contributions to XET and

5  XT.  On information and belief, much of the $1.9 million was taken by Lettunich for his personal

6  use.

7      27.    In or about April 2007, without approval of the XT Board of Managers, Lettunich

8  caused XT to transfer $1 million to himself.  Lettunich has maintained that he was entitled to the $1

9  million based on Section 3.1.1 of the XT operating agreement.  That section provides that XT

10  would assume preexisting loans (which Lettunich verbally represented were a small portion of the

11  funds he had invested in the predecessor companies of XT and XET) from Lettunich according to

12  documentation to be provided of such loans and a schedule to be prepared by Lettunich.

13  Lettunich has never prepared the schedule required by 3.1.1.  No loans have ever been assumed.

14  Lettunich took the $1 million anyway.

15      28.    Between April 2007 and June 30, 2007, Lettunich caused XT to transfer $1.4

16  million to Xslent, LLC, a company that Lettunich then controlled.  The money was transferred

17  without the knowledge or approval of the XT Board of Managers.  Lettunich has claimed some of

18  the money was transferred to pay salaries at XT, and it follows that amounts transferred for XT

19  salaries would have been approved.  Other transfers, however, included an undocumented

20  $177,000 for "Martin Lettunich expense reimbursements", and $775,000 was transferred to Xslent

21  on April 30, 2007, which could not have been for salaries given that XT's monthly salary profile

22  was just a fraction of that amount and XT was formed only 23 days earlier.  Lettunich has provided

23  no documentation or back up for these transfers despite repeated requests.

24      29.    Contemporaneous with the creation of XET and XT, Lettunich was scheming to

25  transfer assets of the Companies to Worldspace, LLC, a company that he solely owned and which

26  Matan was to have an interest in.

27                    **THE OPERATING AGREEMENTS**

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

30.     On or about April 7, 2007, XS Holding and XT entered into an agreement entitled "Operating Agreement for XET Holding Co., LLC" (the "XET operating agreement").  XET is comprised of Class A Member XT and Class B Member XS Holding.  Mr. Caffyn executed the XET operating agreement on behalf of XS Holding.  Lettunich and Matan signed on behalf of XT.  A true and correct copy of the fully executed XET Operating Agreement is attached hereto as **Exhibit 1.**

31.     On or about April 7, 2007, XS Holding, Xslent and "Atira, LLC" entered into an agreement entitled "Operating Agreement for Xslent Technologies LLC" (the "XT operating agreement").  According to the signature page of the XT Operating Agreement, XT is comprised of Class A Member "Atira, LLC," Class A Member Xslent and Class B Member XS Holding.  Mr. Caffyn executed the XT Operating Agreement on behalf of XS Holding and Lettunich signed the XT operating agreement on behalf of Xslent and "Atira, LLC."  A fully executed copy of the XT operating agreement is attached hereto as **Exhibit 2**.

32.     As partial compensation for being the sole provider of the operating capital, Mr. Caffyn negotiated with Lettunich and Matan, as well as others, for the following rights and protections (among other rights and protections), which are memorialized in the Companies' operating agreements:  (1) for the Companies to take any of certain "Major Actions" as set forth under Section 4.12 of the XET and XT operating agreements, XS Holding must give its written consent; (2) XS Holding has two votes on each of the Companies' Boards of Managers; (3) Mr. Caffyn would be CEO/President of XET and (4) the investment would be made over time and XS was not obliged to make any investments beyond the initial investment of $6 million in total. As a counterbalance to these extensive rights of XS even in the event of XS  not fully funding all of the originally envisioned investment in XET, Mr. Lettunich negotiated in a related document, the Members Agreement attached as **Exhibit 3**, that if XS stopped funding, XT would have the ability to repay XS in full within 90 days and repay XS at par, and thereby eliminate all of XS's rights in the event that XS did not complete the full investment of $7.5 million in XET.  The rights included in the Operating Agreement terms outlined above, counterbalanced with the buyback

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

CASE NO. C08-02282 RMW

1  rights of XT outlined in the Members Agreement, were negotiated together to provide both parties

2  with the rights needed to move forward – the full set of options and rights cannot be taken out of

3  context of the full set of agreements.

4      33.    The reason Mr. Caffyn wanted XS Holding to have two votes was so that he could

5  have control by convincing only one of the other three managers – Lettunich, Matan and a third

6  manager, David Tinsley – of his view on any given issue confronting the Board of Managers of the

7  Companies.  Lettunich, Matan, and Tinsley each represented that they would vote their position as

8  manager of each company personally.  Immediately before signing, they specifically represented

9  they were  able to act individually.  In fact, they had secretly agreed to vote together as a block so

10  that Mr. Caffyn was deprived from the outset of the right to control the Companies' activities with

11  the agreement of only one of the other three managers.

12      34.    Section 5.1(b) of the operating agreements guaranteed to XS Holding two votes on

13  the Boards of Managers of XET and XT, provided that XS Holding held at least 5% of the equity

14  interests in the Companies.  XS Holding has held at least 5% of the equity interests in both

15  Companies at all relevant times.

16      35.    Section 4.12 of the operating agreements provides, among other things, that

17  regardless of any conflict with any other part of the Agreements, XS Holding retains veto power

18  over any Major Actions – even in the event that XS Holding decided not to continue funding, as

19  was its option.  This broad set of veto rights was balanced by the Members Agreement that allowed

20  XT to buy back XS Holding's membership units if XS Holding did not fully fund, counterbalancing

21  these veto rights of necessary.

22      36.    Section 5.8E of the XET operating agreement provided that Brian Caffyn would be

23  CEO/President of XET.

24      37.    XS Holding has contributed more than $10,000,000 to the Companies (inclusive of

25  $1.75 million improperly returned to XS Holding by Lettunich and Matan in August 2007).  XS

26  Holding began funding the Companies before the Agreements were consummated in April of 2007

27  and has continued doing so through August 2007, at which time Lettunich and Matan improperly

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1   returned $1.75 million that XS had invested and claimed XS had lost its negotiated protections.

2       38.    The XET and XT operating agreements provide, among other things, that:

3   (a) within two days of execution, Xslent and Atira Technologies were to contribute their

4   intellectual property to XT (Section 3.1.1); (b) "no Manager, acting alone, shall be authorized to

5   sign checks, documents, contracts or other instruments on behalf of the Compan[ies], except as

6   authorized by the Board of Managers" (Section 5.1C); (c) "A majority of the authorized number of

7   votes of the Managers constitutes a quorum of the Managers for the transaction of business.

8   Except to the extent that [the Agreements] expressly require[ ] the approval of all Managers, every

9   act or decision done or made by a majority of the votes of the Managers present at a meeting duly

10  held at which a quorum is present is the act of the  Managers." (Section 5.1D); (d) "Any action

11  required or permitted to be taken by the Managers may be taken by the Managers without a

12  meeting, if a majority of the votes of the Managers individually or collectively consent in writing to

13  such action."  (Section 5.1D); (e) "Actions may be taken by the Managers without a meeting, and

14  without action by written consent in lieu of a meeting, if otherwise approved by a majority of the

15  Managers." (Section 5.1D);  (f) "Any Manager, *other than Mr. Caffyn . . .* may be removed at any

16  time, with or without cause." (Section 5.2C)(Emphasis added.)  (g) Board of  Managers approval

17  is required to "Sue on, defend, or compromise any and all claims or liabilities in favor of or against

18  the Company." (Section 5.3A(v)); Board of Managers approval is required to retain legal counsel

19  (Section 5.3A(vi)); (g) the Secretary prepare and maintain the minutes for Board of Managers

20  meetings (Section 5.8(g));  (h)  the Managers owe the Companies and the Members the duties of

21  loyalty and care (Section 5.10 );  (i) Members and Managers have the right to inspect and obtain

22  the records of the Companies, including, but not limited to, the following:  financial statements

23  (Section 10.1F); "books and records as they relate to the internal affairs of the Compan[ies]

24  (Section 10.1G); and income statements (Section 10.2B(iii)).

25      39.    In late May or early June 2007, Mr. Caffyn, as a manager of XT, asked for a budget

26  and other financial information from Lettunich, as well as information about the Companies' IP

27  registrations with the U.S. Patents and Trademark Office.  Lettunich, who by then had already

28

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT    CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  taken millions of dollars, Matan and others responded by making a series of material

2  misrepresentations to Mr. Caffyn in an effort to remove him from the CEO/President position at

3  XET and eviscerate XS Holding's minority rights under the operating agreements.

4      40.    Based upon false pretense and fraudulent intent, Lettunich and Matan urged

5  Mr. Caffyn to step down as CEO/President and resign as Manager for both Companies, which Mr.

6  Caffyn said he would do provided certain conditions were met.

7      41.    Mr. Caffyn's conditions for resigning and continuing funding included

8  (a) amendment of the Agreements to provide that the Class B member (Mr. Caffyn's company XS

9  Holding) would have two votes at Board of Manager meetings even if the manager was not

10  Mr. Caffyn, (b) the Board of Managers' appointment of a competent CEO/President to replace

11  Mr. Caffyn, and/or (c) a going forward business arrangement (*e.g.,* a licensing agreement to sell

12  XET products in Europe).  Rather than fulfilling these conditions, Lettunich and Matan failed to

13  amend the agreements on the two vote issue, Lettunich presumed to take the XET CEO/President

14  position himself and he, in concert with Matan, persisted with a scheme to take the Companies'

15  intellectual property for the benefit of a company that Lettunich owned and that Matan was to

16  acquire an interest in.

17      42.    To that end, on June 28, 2007, Lettunich and Matan purported to hold a meeting of

18  the Board of Managers of XET and XT, and purported to issue minutes from that meeting.  In fact,

19  no Board of Managers meetings occurred on that date because there was no quorum as required by

20  Section 5.1 D of the operating agreements.  During the purported meeting, Lettunich, in concert

21  with Matan, falsely represented that Mr. Tinsley and Mr. Caffyn had resigned as Managers of XET

22  and XT when in fact they had not resigned.  Lettunich's and Matan's misrepresentations

23  constituted a breach of their fiduciary duties, as well as a breach of Section 5.10, and other

24  provisions, of the operating agreements.

25      43.    On July 3, 2007, XS Holding notified Lettunich of a possible material breach of

26  Section 3.1.1 of the Agreements for failing to cause Xslent and Atira Technologies IP to be

27  contributed to XT.

28

10

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

44.     On July 6, 2007 Mr. Caffyn sent a memorandum to Lettunich and Matan (a) requesting a budget at the next XT and XET Board of Managers meetings because none had been prepared thus far; (b) requesting an explanation regarding why Mr. Tinsley resigned as reflected in the Board of Managers meeting minutes of June 28, 2007; and (c) reflecting that Mr. Caffyn would resign as Manager if certain conditions were met.

45.     From that point onward, Lettunich and Matan engaged in a series of *ultra vires acts* designed to divest XS Holding of its interests and Mr. Caffyn of any control.  On July 6, 2007, to avoid the disclosure of their self-dealing and to seize power of the Companies,  Lettunich purported to send Capital Notices under Sections 3.1.2 and 3.5 of the Agreements stating that XS Holding was late in making its capital contributions.  Section 3.5 of the Agreements provides that if a Class B Member does not timely make the capital contributions required by Section 3.1.2, then the Class A Members or Managers may personally deliver or send by U.S. Mail to the Class B Member written notice of the failure to contribute, "giving him or her fourteen (14) days from the date such notice is given to contribute the entire amount the capital contribution required at that time."  The XET Capital Notice sent by Lettunich was signed only by him as "Chairperson and Manager" of XT.  Section 3.5 goes on to state that if the Class B Member does not contribute during that 14 day period, "a majority of the Class A Members or majority of the Managers (other than Brian Caffyn) may elect any one or more of [a number of] remedies within 60 days after the failure to contribute" including causing Class B Member XS Holding to lose its consent rights under Section 4.12 and its ability to "elect" a Manager.

46.     Sending the Capital Notices and then claiming them to be effective and to cause XS to lose its Section 4.12 rights and rights to two votes constituted *ultra vires acts* in violation of Article V and Section 4.12 of the operating agreements.  Section 4.12 provides in relevant part as follows:  "In the event of any conflict between this Section 4.12 and the other provisions of this Agreement, this Section 4.12 shall control."  Indeed, Mr. Caffyn insisted on the inclusion of the preemption provision in Section 4.12 in the final Agreements in order to nullify other provisions of the Agreements that purported to limit the powers and rights of Class B Member XS Holding and

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

CASE NO. C08-02282 RMW

1  its Manager Mr. Caffyn because he was providing all of the funds from the initial partners into the

2  new ventures and as part of the bargain for giving Lettunich the right to buy him out at par if he did

3  not fully fund the projected investment amount.  Moreover, as to XET, the notice is defective

4  because for XT to act – here to sign the Capital Notice – Section 5.10 D requires a majority vote at

5  a meeting with the Board of Managers or a majority of the votes of the managers; here, neither

6  occurred.  Indeed, the day before the Capital Notices were sent, Lettunich's own counsel –

7  Bernard Vogel III – confirmed that written XT Manager approval was required to properly issue

8  the XET Capital Notice when he advised Lettunich by e-mail that the "Xslent Technologies, LLC

9  Managers will have to sign a written consent authorizing this Capital Notice."  Finally, in all events,

10  performance by XS Holding was excused by Lettunich's and Matan's prior material

11  misrepresentations and *ultra vires* acts in violation of the operating agreements.

12       47.      On July 13, 2007, just after beginning to attempt to strip Mr. Caffyn and XS

13  Holding of their main rights and protections under the operating agreements, without the

14  knowledge of Mr. Caffyn as a Manager of XS, and in furtherance of Lettunich's and Matan's

15  scheme to seize control of the Companies, Lettunich and Matan purported to terminate Mr. Tinsley

16  from his position with XT.  That alleged termination was *ultra vires* and a violation of

17  Section 4.12 J of the XT Operating Agreement, which provide that Mr. Tinsley cannot be

18  terminated without the consent of the Class B Member.  No consent was requested and it would

19  not have been given under the circumstances.  The purported termination also was *ultra vires* and

20  constituted a breach of Section 5.1 B of the XT Operating Agreement because Mr. Tinsley's

21  termination was not effectuated by a vote of the majority of the Board of Managers.  Additionally,

22  the alleged termination was a breach of Lettunich's and Matan's fiduciary duties, and therefore

23  contrary to Section 5.10 of the Agreement.

24       48.      On or about August 5, 2007, Mr. Caffyn learned from Mr. Tinsley that Mr. Tinsley

25  had not resigned as a Manager contrary to the record presented in minutes of the purported June

26  28, 2007 Board of Managers meetings.  In fact, Lettunich has admitted that Mr. Tinsley has never

27  resigned in writing as a manager from XET and XT as required by Section 5.2B of the

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1    Agreements.

2        49.    On August 12, 2007, while believing in the primacy of his and XS Holding's Section

3    4.12 rights, not believing that he or XS Holding was in breach of the Agreements, believing that no

4    3.5 rights to reduce XS Holding's rights had been effected and believing that they would not be

5    valid if then attempted to be exercised and concerned about what other wrongful acts Lettunich

6    had committed and that Lettunich would run the Companies into the ground, Mr. Caffyn requested,

7    and  Mr. Tinsley, a Manager of XT and XET as well as of Xslent and Atira Technologies, agreed

8    to waive any remedies which might be claimed under Section 3.5 of the Operating Agreements so

9    long as XS Holdings agreed to fund its outstanding Capital Contributions.

10

11       50.    On August 13, 2007, XS Holding made capital contributions of $750,000 to XET

12   and $1 million to XT to fully fund according to the original investment schedule in the operating

13   agreements.

14       51.    On August 14, 2007, Lettunich, in concert with Matan, attempted to return to

15   Mr. Caffyn and XS Holding the $1.75 million in capital contributions paid by XS Holding despite

16   the fact that Lettunich and Matan claimed that XET and XT were, and continue to be, in danger of

17   running out of capital.  The reason that Lettunich and Matan attempted to return the funds was to

18   advance their position in the battle over control of the Companies.  The attempted return

19   constituted a breach of Lettunich's and Matan's fiduciary duties, and therefore a breach of

20   Section 5.10 of the Agreements.

21       52.    On August 15, 2007 – two days after XS Holding made capital contributions

22   totaling $1.75 million – and in furtherance of their scheme, Lettunich and Matan sent by e-mail a

23   "Notice of Elections Under Section 3.5 to Class B Member" ("Notices of Elections") on behalf of

24   both XT and XET.  Contrary to Section 4.12, these notices purported to strip XS Holding and

25   Mr. Caffyn of their rights and protections, including (1) XS Holding's Section 4.12 rights, and

26   (2) XS Holding's ability to "elect" a Manager.  The sending of the notices also constituted a breach

27   of Lettunich's and Matan's fiduciary duties, and therefore a breach of Section 5.10 of the

28

13

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1    Agreements.  The Notices of Elections were ineffective to cause XS Holdings to lose its consent

2    rights and its ability to "elect" a Manager.  On August 16, 2007, the Notices of Election were sent

3    by U.S. Mail.  Moreover, as to XET, since the Capital Notice was defective, so too is the Notice of

4    Election.  Further, performance by XS Holding was excused by Lettunich's and Matan's

5    misrepresentations and each of their prior material breaches of the operating agreements.  In

6    addition, there is no available remedy under Section 3.5 of the Agreements to strip Mr. Caffyn of

7    his two votes because XS Holding had funded and held at least a 5% interest in the Companies.

8    Also, the Notices of Election were not effective in any event until after the August 16, 2007 Board

9    of Managers meetings at which Mr. Caffyn was elected Chairman, President and CEO and

10   Lettunich was removed from those positions; according to Section 14.14 of the Agreements,

11   "Notice" is effective the earlier of receipt by U.S. Mail or three days after mailing.

12        53.    Also on August 15, 2007, Lettunich and Matan purported to remove Mr. Tinsley as

13   manager of XET and XT.  That claimed removal was contrary to Section 4.12 of the Agreements,

14   which require the Class B Member's consent to discharge Mr. Tinsley.  Moreover, the purported

15   removal of Mr. Tinsley as a Manager was not effective until after the August 16, 2007 Board of

16   Managers meeting because it was sent by U.S. Mail on August 16; under Section 14.14, the

17   "Notice" was effective when received by mail or three days after mailing.

18        54.    On August 15, 2007, counsel for XS Holding sent to XT and Xslent a litigation

19   hold letter notifying Xslent to preserve all documents relevant to potential disputes between XT,

20   XET, Atira Technologies, Xslent, XS Holding and others.

21        55.    On August 16, 2007, there was a meeting of the Board of Managers of XET and a

22   meeting of the Board of Managers of XT.  All four Managers were present at each meeting:  Mr.

23   Caffyn with two votes, Mr. Tinsley, Mr. Lettunich and Mr. Matan.  By a vote of a majority of the

24   votes of the Managers, Mr. Caffyn was approved as CEO/President and Chairman of XET and of

25   XT.  In further effort to avoid their misdeeds coming to light, Lettunich and Matan denied that the

26   meeting and vote were effective to make Mr. Caffyn CEO/President and Chairman of the Board of

27   both of the Companies.

28

14

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT            CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

56.     Thereafter, Lettunich and Matan caused the $750,000 capital contribution to XET and the $1 million capital contribution to XT to be returned by wire to XS Holding despite the fact that Lettunich claimed that XT was, and continues to be, in danger of running out of capital. Ironically, Lettunich has continued to maintain in pending litigation that XS is acting to "starve out" the companies.  These actions were *ultra vires* and in violation of the XET and XT operating agreement because no Capital Notice was given, the act was not approved by the managers as required by Section 5.1D of the operating agreements, it was not approved by the Class B Member as required under Section 4.12, and was a breach of fiduciary duty under Section 5.10.

57.     Lettunich and Matan retained the Silicon Valley Law Group purportedly on behalf of XET and XT.  That act was *ultra vires* and a breach of Sections 5.3A(v), (vi) of the operating agreements because it was not approved by a majority of the Board of Managers of either of the Companies. This was also a clear conflict of interest because SVLG had previously represented Mr. Lettunich and Xslent and Atira Technologies and was the recipient of improper payments from XT for the legal work in forming XT and XET, which were the responsibility of Xslent and Atira Technologies.

58.     As a result of the actions of Lettunich and Matan, the XT intellectual property was not fully developed and had to be transferred to a new company, Big Kahuna Technologies, LLC, in the hopes of salvaging the commercialization of that intellectual property.

59.     Lettunich and Matan have refused to provide Mr. Caffyn and XS Holding financial and other documentation of XET and XT (including K-1's) despite Mr. Caffyn's repeated requests as a Manager, and under XS Holding's rights to do so as a Member, of those entities.  Those failures to provide access to the Companies' records constitute a violation of Sections 10.1 and 10.2 of the operating agreements and are a breach of Lettunich's fiduciary duties, and therefore a breach of Section 5.10 of the Agreements.

**THE SOLAR COMPONENT'S LICENSE AGREEMENT**

60.     On March 31, 2008, Lettunich communicated his intention to bind XET to a licensing agreement with Solar Components, LLC for the use of solar extraction technology

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT      CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  developed and held by XET.  Caffyn warned Lettunich and Matan that the licensing agreement had

2  the flavor of a "non-commercial deal" and objected to the licensing agreement.

3    61.    Acting as XET's managers, yet without authority to take the actions described

4  below, Lettunich and Matan have purported for a minimum of 10 years to license XET's

5  technology for a fraction of its value to a company named Solar Components LLC, whose

6  principals include Bullen and Schulhof.  The license agreement was executed without authority on

7  XET's behalf, it is not in the best interest of XET, it is rife with impropriety, gross mismanagement

8  and corporate waste by Lettunich and Matan.

9    62.    Solar Components, Bullen and Schulhof knew of the XET and XT operating

10  agreements, and by their actions, they have wrongfully and intentionally interfered with XS

11  Holding's rights under the XET and XT operating agreements and converted XET's and XT's

12  technology.

13    63.    As current managers of XET, Lettunich and Matan have a fiduciary duty to ensure

14  that contracts entered into by XET benefit the company, and not the separate and individual

15  interests of its managers or members.  The current contract is tantamount to "giving away" XET's

16  IP while providing few benefits to XET going forward and may be related to other obligations

17  Lettunich has incurred for other entities rather than the benefit of XET.

18    64.    The basic terms of the agreement are that, in exchange for a license, Solar

19  Components would make a minimal, up-front payment and thereafter pay a royalty of 10% of its

20  Gross Revenue to XET.  Despite a provision ostensibly granting XET "a Fifteen percent (15%)

21  equity stake in" Solar Components, there are *no* provisions for XET's specific ownership or

22  ownership rights, such as the right to have a manager on its board. The agreement also obligates

23  XET to spend time on areas of technology outside of its primary initial focus and thereby reduce

24  the efforts of the core engineering team on its initial product launch.

25    65.    In addition to fundamental problems with the commercial terms of the licensing

26  agreement, Solar Components is a new startup with no major source of funding.  Of particular

27  concern is Solar Components's ability to make any significant royalty payments to XET if its gross

28

16

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT    CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1    revenues – the yardstick by which royalties are calculated – are low or non-existent.

2    66.    Additionally, entrusting XET's IP to a startup with uncertain prospects and on such

3    negative terms creates an unfavorable perception of the IP among XET's potential customers.  In

4    the event of Solar Component's collapse or shutdown, XET would be hard pressed to explain the

5    benefits of its IP to other customers.

6    67.    XS Holding is informed and believes and thereon alleges that the licensing

7    agreement is cover for self dealing by Lettunich directly or through companies he controls with

8    Matan.

9    **THE SO-CALLED "OPTION" OR "*LOCKOUT*" AGREEMENT**
      **WITH LAMKIN AND ASUNCION**

10

11    68.    On or about April 18, 2008, Lettunich and Matan purported to enter into and

12    execute on behalf of XET an "Agreement of Terms of Option Agreement."  The "Agreement of

13    Terms of Option Agreement" commits the parties to "negotiate in good faith the terms and

14    conditions of a definitive Option Agreement."  Paragraphs 13 and 14 of the "Agreement of Terms

15    of Option Agreement" constitute the "Lockout Contract."

16    69.    Paragraph 14 of the Lockout Contract provides that after entering into the

17    agreement and during the period of negotiation for a definitive Option Agreement, "[XET and X-

18    Energy] will [not] … participate in any negotiations with, any corporation…regarding any

19    acquisition of [XET or X-Energy], any merger or consolidation with or involving [XET or X-

20    Energy], or any acquisition of any material portion of the stock or assets of [XET or X-Energy]."

21    Any discussions of the same name currently in progress must also be discontinued. The freeze or

22    lockout of XET's ability to engage in discussions with any other entity lasts for approximately

23    three months. Assuming an April execution, XET would be "locked out" of any discussions with

24    other companies until July 2008.

25    70.    Paragraph 13 recites as consideration for XET's forbearance from any negotiations,

26    as set forth in paragraph 14, "the loan from Cool Earth Solar, Inc. ("CESI") in the amount of

27    $530,000."  This "loan" is a reference to the Promissory Note described below.

28

SF/1508075v1

17

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT    CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

71.    Because consideration for the Lockout Contract is the execution of the Promissory Note, its terms operate in tandem.

72.    The remainder of the Agreement of Terms of Option Agreement (i.e., paragraphs 1 through 12) are "proposed terms" of a "definitive Option Agreement" yet to be finalized between the parties.  The tentative terms are described as follows.

73.    Under the proposed Option Contract, XET, among other companies, would grant Asuncion and Lamkin a one year option to purchase all of its assets.  Asuncion and Lamkin would pay XET $2.3 million for this option.  The Option Contract identifies XET's intellectual property for "solar AC and DC Technology and the PvPC Technology" as specific assets targeted, but is clear that all assets are included.  The price for the purchase of these assets would be $100 million if the option is exercised within one year.

74.    The proposed Option Contract acknowledges pending litigation and claims that the pending litigation may result in XET's IP being transferred to Atira.  In such an event, and despite not being a party to the Option Contract, Atira agrees to "honor" the Option Contract and transfer XET's and Xslent Energy's IP.  The proposed Option Contract does not provide Atira any consideration for its agreement to transfer any IP received from XET.

75.    Paragraph 7 of the proposed Option Contract provides that if the option is not exercised, the "Option Price [of $2.3 million] shall be converted to 600,000 Class C Units of XET Holding Company, LLC and issued to Optionees."  Thus, if exercised, Asuncion's and Lamkin's "option" is more of an equity investment than a genuine option payment.

76.    Section 8 of the Option Contract allows Asuncion and Lamkin to assign the agreement without XET's consent.

77.    Under Section 12 of the Option Contract, XET is barred from entering into "licensing agreements, security agreements, or other commercial arrangements regarding or affecting the XET Solar Technology…or any other intellectual property or assets" for one full year upon execution of the Option Contract.  In addition to an Option Agreement, this agreement effectively turns over all licensing and commercial transactions to Lamkin and Asuncion, with an

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  agreement to split the revenue for all such transactions 50/50. Furthermore, XET is effectively

2  banned from all commercial transactions and becomes dependent on Lamkin and Asuncion for all

3  future income during the Option Period.

4      78.    If or when a definitive option is reached, paragraph 3 of the Option Contract

5  requires "all the assets [of XET to be] … more fully described in an Asset Purchase Agreement" to

6  be attached as an exhibit to the final option agreement.

7      79.    ISG Solar LLC ("ISGS") is also a party to this agreement. ISGS is an entity

8  majority controlled by Atira and managed by Lettunich. ISGS's minority shareholder is ISG

9  Technologies, of which Asuncion is a shareholder. ISG and other ISGS shareholders have been in

10  dispute with Lettunich over the PvPC technology and Lettunich mismanagement of this company.

11  Asuncion and other ISGS minority shareholders have made claims that the XET technology was

12  originally developed and paid for by ISGS and that the compensation of 3% of ISGS into XET

13  units for the PvPC technology was not adequate. This arrangement may be in part an attempt to

14  settle this dispute related to Atira, Lettunich and Matan at the expense of XET.

15      80.    The Agreement of Terms of Option Agreement was never lawfully approved by

16  XET. Indeed, Lettunich and Matan had no authority to sign the Option Agreement on XET's

17  behalf.

18      81.    Finally, the express terms of the XET operating agreement require XS Holding's

19  consent to the Agreement of Terms of Option Agreement. XS Holding has not consented to the

20  agreement.

21      82.    As described in greater detail below, the Agreement of Terms of Option Agreement

22  constitutes a wholesale transfer of XET's valuable intellectual property without adequate or

23  reasonable consideration, is unfair to XET and, XS Holding in informed and believes, constitutes

24  self-dealing by Lettunich and Matan.

25      83.    XS Holding is informed and believes and thereon alleges that Lettunich is seeking to

26  underprice XET's assets in exchange for forgiveness of other obligations or potential liabilities, or

27  those of companies in which he has an interest, namely ISGS.

28

SF/1508075v1

19

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

84.    Finally, the express terms of the XET operating agreement require XS Holding's consent to the licensing agreement.  XS Holding has not consented to the agreement.

**THE CONVERTIBLE PROMISSORY NOTE AND GUARANTY**

85.    On or about April 21, 2008, Lettunich and Matan purported to enter into and execute on behalf of XET an agreement entitled "Convertible Promissory Note and Guaranty" ("Promissory Note").  CESI is the payee under the Promissory Note.

86.    Lettunich and Matan justified the loan due to lack of funds for XET which, ironically, was caused by their improper return of $1.75 million to XS.  Lettunich returned the money despite knowing that XS was prepared to fund XET so long as it is not improperly managed by Lettunich and is controlled, as originally agreed, by a 4 member board composing 5 votes, and where XS would have two votes.

87.    Among other things, the Promissory Note is "convertible" if XET is unable to repay the alleged debt on time.  It purports to give, free of charge, CESI an *irrevocable* license to *all* of XET's current *and* future IP if $530,000 of the total amount owing is not repaid on time or, indeed,  if XET misses a single loan payment.

88.    As alleged above, however, the "Agreement of Terms of Option Agreement" prevents XET from generating any money before the $530,000 loan comes due.   As such, the two contracts operating in tandem so that XET will not be able to pay back its $530,000 loan and that its technology may be transferred to third parties.

89.    Finally, the express terms of the XET operating agreement require XS Holding's consent to the Promissory Note and Guaranty.  XS Holding has not consented to the Promissory Note and Guaranty.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

90.    By reason of their positions as managers of XET and XT and because of their claimed ability to control the business affairs of these companies, Lettunich and Matan owed XET and XT and their members fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage XET and XT in a fair, just,

SF/1508075v1

20

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  honest and equitable manner. Lettunich and Matan were and are required to act in furtherance of

2  the best interests of XET and XET and their members so as to benefit all members equally and not

3  in furtherance of their personal interest or benefit.

4      91.    Lettunich and Matan, as managers of XET and XT, owe the companies and their

5  members the fiduciary duty to exercise good faith and diligence in the administration of the affairs

6  of the companies and in the use and preservation of its property and assets, and the highest

7  obligations of fair dealing.

8      92.    Lettunich and Matan, because of their positions of control and authority as

9  managers of XET and XT, were able to and did, directly and/or indirectly, exercise control over the

10  wrongful acts complained of herein. Because of their advisory, executive, managerial and

11  directorial positions with XET and XT, Lettunich and Matan had access to information about the

12  financial condition of the companies. As managers of the companies, Lettunich and Matan had a

13  duty promptly to disseminate to the other managers of XET and XT accurate and truthful

14  information with regard to the Companies' financial condition.

15      93.    At all times relevant hereto, Lettunich and Matan were the agents of each other and

16  of XET and XT, and were at all times acting within the course and scope of such agency.

17      94.    To discharge their duties, Lettunich and Matan were required to exercise reasonable

18  and prudent supervision over the management, policies, practices and controls of the financial

19  affairs of the companies. By virtue of such duties, Lettunich and Matan were and are required to,

20  among other things:

21      (a)    Ensure that the companies complied with their legal obligations and

22  requirements, including acting only within the scope of their legal authority;

23      (b)    Conduct the affairs of the companies in an efficient, business-like manner

24  so as to make it possible to avoid wasting the companies' assets;

25      (c)    Properly and accurately report to XS Holding regarding the true financial

26  condition of the Companies at any given time, including making accurate statements about the

27  Companies' financial results, and ensuring that the companies maintained an adequate system of

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT        CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  internal controls such that the companies' financial reporting would be true and accurate at all

2  times;

3          (d)      Ensure that the Companies adhere to their contractual obligations and, in

4  particular, ensure that the provisions of the XET and XT operating agreements were adhered to.

5          95.      The conduct of Lettunich and Matan complained of herein involves a knowing and

6  culpable violation of their obligations as managers of the companies, the absence of good faith on

7  their part, and a reckless disregard for their duties to XET and XT and their members.

8          96.      Lettunich's and Matan's conduct as described above was without authority, and

9  therefore *ultra vires*.

10         97.      Much of this conduct Lettunich, in concert with Matan, constitutes undisclosed,

11  massive self-dealing with respect to the Companies.  These acts of self-dealing were without the

12  prior approval of the Managers or of a majority interest of Managers, and are thus in breach of

13  Sections 4.6 and 5.6 of both Agreements, as well as Section 4.12Q of the XET operating

14  agreement and Section 4.12K of the XT operating agreement.

15              **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

16         98.      In committing the wrongful acts alleged herein, Lettunich and Matan have pursued,

17  or joined in the pursuit of, a common course of conduct, and have acted in concert with and

18  conspired with one another in furtherance of their common plan or design.  In addition to the

19  wrongful conduct herein alleged as giving rise to primary liability, Lettunich and Matan further

20  aided and abetted and/or assisted each other in breach of their respective duties.

21         99.      During all times relevant hereto, Lettunich and Matan individually and collectively

22  initiated a course of conduct that was designed to and did:  (i) transfer millions of dollars from the

23  Companies to Lettunich and possibly Matan; (ii) undermine the companies' efforts to develop

24  cutting edge technology; (iii) conceal the improper actions from the other members of the

25  Companies; (iv) fail to maintain accurate books and records; (v) deceive the other members of the

26  companies regarding their true intentions; and (vi) usurp the Companies' business opportunities for

27  themselves.  In furtherance of this plan, conspiracy and course of conduct, Lettunich and Matan

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1    individually and collectively took the actions set forth herein.

2        100.    Lettunich and Matan engaged in a conspiracy, common enterprise and/or common

3    course of conduct.  During such time, Lettunich and Matan caused companies to conceal the true

4    facts that they were seeking to usurp the companies' business opportunities for themselves.

5        101.    The purpose and effect of Lettunich's and Matan's conspiracy, common enterprise,

6    and/or common course of conduct was, among other things, to take the substantial business

7    opportunities of the Companies for themselves, and to disguise the violations of law, breaches of

8    fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust

9    enrichment.

10                        **DAMAGES TO XET AND XT**

11        102.    As a result of Lettunich's and Matan's improprieties, the Companies have incurred

12    and will continue to incur damages, and will need to expend significant sums of money including

13    the following:

14        (a)    Millions of dollars in money that has been transferred from the Companies,

15    or never invested by Lettunich in developing the Companies technology as Lettunich had

16    promised;

17        (b)    The value of business opportunities lost as a result of Lettunich's and

18    Matan's actions;

19        (c)    Costs incurred to recover assets and business opportunities rightfully

20    belonging to XET and XT, including legal fees paid to outside counsel, accounting firms and

21    experts;

22        (d)    Costs of potential liability to third parties who might have dealt in good

23    faith to obtain the Companies' business opportunities; and

24        (e)    Costs incurred from the Companies' reduced ability to borrow funds or

25    raise capital as a result of the actions of Lettunich and Matan.

26                **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

27        103.    XS Holding brings this action derivatively in the right and for the benefit of XET

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  and XT to redress injuries suffered, and to be suffered, by the companies as a direct result of the

2  conversion of assets and transfer of funds, breaches of fiduciary duty, abuse of control, gross

3  mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting

4  thereof, by Lettunich and Matan.  XET and XT are named as nominal defendants solely in a

5  derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would

6  not otherwise have.

7      104.    XS Holding will adequately and fairly represent the interests of XET and XT in

8  enforcing and prosecuting its rights.

9      105.    XS Holding is and at all relevant times was the owner of membership interests in

10  XET and XT.

11     106.    The managers of XET and XT at all relevant times included Lettunich and Matan.

12  XS Holding did not make any demand on Lettunich or Matan or on XET or XT to institute this

13  action because such a demand would have been a futile, wasteful and useless act.

14     107.    Through their actions, Lettunich and Matan are responsible for approving and

15  directing the Companies to pursue their business opportunities.  They have taken these

16  opportunities for themselves and others.  This is a further reason why they would not have brought

17  such a suit.

18     108.    Not surprisingly, Lettunich and Matan have failed to cause XET and XT to pursue

19  the claims since they, in large part, are the perpetrators of the wrongdoing.

20     109.    XS Holding has no adequate remedy at law to recover for the wrongdoing alleged

21  herein.

22                          **FIRST CAUSE OF ACTION**

23                  **Against Lettunich and Matan for Conversion**

24     110.    XS Holding incorporates by reference and realleges each and every allegation

25  contained above as though fully set forth herein.

26     111.    Lettunich and Matan took money and other assets from XET and XT without

27  authorization or right.

28

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

112.     As perpetrators of the scheme to take XET's and XT's funds, assets and intellectual property for themselves and others not entitled to them, Lettunich and Matan knew their actions were wrongful.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the companies' business interests.

## SECOND CAUSE OF ACTION

### Against Lettunich and Matan for Breach of Fiduciary Duty

113.     XS Holding incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

114.     As fiduciaries, Lettunich and Matan have at all times relevant to this case owed and they still owe the Companies the highest obligations of good faith, fair dealing, loyalty and due care.

115.     In taking the actions enumerated herein, Lettunich and Matan violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

116.     As perpetrators of the scheme to take XET's and XT's funds, assets and intellectual property for themselves and others not entitled to them, Lettunich and Matan knew their actions were wrongful.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the companies' business interests.

117.     As a direct and proximate result of Lettunich's and Matan's failure to perform their fiduciary obligations, XET and XT have sustained significant damages.  As a result of the misconduct alleged herein, Lettunich and Matan are liable to the Companies.

## THIRD CAUSE OF ACTION

### Against Lettunich and Matan for Abuse of Control

118.     XS Holding incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

119.     The misconduct perpetrated by Lettunich and Matan as alleged herein constitutes an abuse of their ability to control and influence the companies, for which they are legally responsible.

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT     CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1    120.    As a direct and proximate result of their abuse of control, XET and XT have

2  sustained significant damages.

3    121.    As a result of the misconduct alleged herein, Lettunich and Matan are liable to the

4  companies.

### FOURTH CAUSE OF ACTION

### Against Lettunich and Matan for Gross Mismanagement

7    122.    Plaintiffs incorporate by reference and reallege each and every allegation contained

8  above, as though fully set forth herein.

9    123.    By their actions alleged herein, Lettunich and Matan abandoned and abdicated their

10  responsibilities and fiduciary duties with regard to prudently managing the assets and business of

11  XET and XT in a manner consistent with prudent business judgment.

12    124.    As a direct and proximate result of their gross mismanagement and breaches of duty

13  alleged herein, XET and XT have sustained significant damages.

14    125.    As a result of the misconduct and breaches of duty alleged herein, Lettunich and

15  Matan  are liable to the companies.

### FIFTH CAUSE OF ACTION

### Against Lettunich and Matan for Waste of Corporate Assets

18    126.    XS Holding incorporates by reference and realleges each and every allegation

19  contained above, as though fully set forth herein.

20    127.    As a result of the improprieties alleged herein, and by failing to properly consider

21  the interests of the Companies and their members, Lettunich and Matan have caused XET and XT

22  to waste valuable business assets.

23    128.    As a result of the waste of corporate assets, Lettunich and Matan are liable to the

24  Companies.

### SIXTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

27    129.    Plaintiffs incorporate by reference and reallege each and every allegation contained

28

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT        CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  above, as though fully set forth herein.

2      130.    By their wrongful acts and omissions, defendants were unjustly enriched at the

3  expense of and to the detriment of XET and XT.  These wrongful acts included the approval of the

4  sale, license or optioning of XET's and XT's valuable intellectual property and other assets for the

5  interests of Lettunich, Matan and the other defendants.

6      131.    XS Holding, as a member and representative of XET and XT, seeks restitution from

7  these defendants, and each of them, on XET's behalf, and seeks an order of this Court disgorging

8  all assets, intellectual property, profits, benefits and other compensation obtained by these

9  defendants, and each of them, from their wrongful conduct and fiduciary breaches.

10                          **SEVENTH CAUSE OF ACTION**

11                  **Against Lettunich and Matan for an Accounting**

12      132.    XS Holding incorporates by reference and realleges each and every allegation

13  contained above as though fully set forth herein.

14      133.    At all relevant times, Lettunich and Matan, as managers of the companies, owed

15  them and their members fiduciary duties of good faith, care, candor and loyalty.

16      134.    In breach of their fiduciary duties owed to XET and XT and their members,

17  Lettunich and Matan took the actions alleged herein.  By this wrongdoing, Lettunich and Matan

18  breached their fiduciary duties owed to XET and XT.

19      135.    Lettunich and Matan possess (however wrongfully) complete control over the

20  Companies and their books and records.

21      136.    As a result of the misconduct of Lettunich and Matan, XET and XT have been

22  substantially injured and damaged financially and are entitled to a recovery as a result thereof.

23      137.    Plaintiffs demand an accounting be made of all transactions approved and/or

24  executed by Lettunich and Matan, , including, without limitation, the disposition of any proceeds

25  received by them as a result of the transactions.

26

27

28

27

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

**EIGHTH CAUSE OF ACTION**

**Against Lettunich for Legal Malpractice**

138.    XS Holding incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

139.    As a lawyer for XET and XT, Lettunich owed those Companies fiduciary and other duties to refrain from self dealing transactions without obtaining their informed written consent and without ensuring that the transactions are fair and reasonable for the Companies in all respects. Moreover, Lettunich is required to meet the standard of care in all advice given and other work conducted on the Companies behalves.

140.    In connection with the actions and transactions purportedly on behalf of XET and XT  described above, Lettunich failed to seek informed written consent and the transactions were not fair and reasonable to XET and XT.  Moreover, the counsel given to the Companies in connection with the actions purportedly taken by XET and XT fell below the standard of care.

**NINTH CAUSE OF ACTION**

**Against All Defendants for Conversion of XET's Intellectual Property**

141.    XS Holding incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    The transactions alleged above by which intellectual property and other assets of XET and XT were transferred were manifestly unlawful and unfair to XET and XT, and should, therefore, be rescinded, with all sums, proceeds and profits under such contracts returned to the Companies and all such executory contracts cancelled and declared void.

**TENTH CAUSE OF ACTION**

**Against Cool Earth Solar, Inc., Rob Lamkin, Lawrence Asuncion, Solar Components, LLC, Nathan Schulhof and M. James Bullen for Intentional Interference with Contract**

143.    XS Holding incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

144.    CESI, Rob Lamkin, Lawrence Asuncion, Solar Components, LLC, Nathan Schulhof

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1   and M. James Bullen intentionally interfered with the XET and XT operating agreements, and have

2   caused XT, Atira and Xslent to breach their obligations under those contracts.

3       145.    As a result, the Companies have suffered damages as alleged herein.

4                           **ELEVENTH CAUSE OF ACTION**

5                    **Against All Defendants for Declaratory Relief**

6       146.    XS Holding realleges and incorporates by reference each of the allegations

7   contained above as though fully set forth herein.

8       147.    The property, assets or other rights obtained by defendants from XET were

9   obtained wrongfully, and without XET's or XT's authority or rightful consent.

10      148.    XS Holding is informed and believes and thereon alleges that defendants, and each

11  of them, contend to the contrary.

12      149.    As such, XS Holding is entitled to a declaration that the property, assets or other

13  rights obtained by defendants from XET as alleged herein was obtained unlawfully, and that XET is

14  entitled to return of the property or rescission of any contracts.

15                          **TWELFTH CAUSE OF ACTION**

16                   **Against All Defendants for Injunctive Relief**

17      150.    XS Holding realleges and incorporates by reference each of the allegations

18  contained above as though fully set forth herein.

19      151.    The acts of all defendants as alleged above, resulting in the divestment of XS

20  Holding of its rights to interests in XET and XT, and in the transfer of the Companies' assets to

21  others, are unlawful, and were conducted without authority.

22      152.    An injunction should issue, barring defendants from any and all acts in furtherance

23  of such divestment or transfer of assets, or from violating the provisions of the Companies'

24  operating agreements.

25                          **THIRTEENTH CAUSE OF ACTION**

26                   **Against All Defendants for Constructive Trust**

27      153.    XS Holding incorporates by reference and realleges each and every allegation

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1  contained  above as though fully set forth herein.

2      154.    As a result of the acts alleged herein, defendants caused valuable assets belonging to

3  XET and XT to be sold, optioned or licensed so that the companies no longer have their full value.

4

5      155.    The companies have the right to the return of these assets because their transfer was

6  illegally authorized by Lettunich and Matan and illegally taken by the other defendants.

7      156.    Defendants profited from the illegal transactions.

8      157.    Accordingly, plaintiffs seek a declaratory judgment that the illicit transactions, and

9  all proceeds derived from exercise thereof and any assets or other property acquired in connection

10  therewith, are and have been held in constructive trust for the companies' benefit from the date

11  they were executed.

12                                    **PRAYER**

13      WHEREFORE, Cross-Complainants pray for judgment as follows:

14      1.    For general damages, special damages, consequential damages, restitution and

15  disgorgement according to proof, including, but not limited to lost opportunity and lost profit

16  damages;

17      2.    For declaratory relief that the conduct by Lettunich and Matan as set forth above

18  was *ultra vires*, constituted gross mismanagement and corporate waste;

19      3.    For the issuance of a preliminary and permanent injunction prohibiting Lettunich

20  and Matan from engaging in any further *ultra vires* acts as set forth above;

21      4.    For the issuance of a preliminary and permanent injunction prohibiting all of the

22  defendants from retaining any of XET's and XT's intellectual property;

23      5.    For the issuance of a preliminary and permanent injunction prohibiting Cool Earth

24  Solar, Inc. and Solar Components, LLC from entering into transactions with XET without XS's

25  approval, or performing or taking advantage of any rights or interests purportedly obtained as a

26  result of transactions already entered into;

27      6.    For a judicial declaration as set forth above;

28

SF/1508075v1

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT        CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

1    7.    For costs of suit;

2    8.    For attorneys' fees and the disbursements of counsel;

3    9.    For an order that XS Holding, XET and XT are entitled to prejudgment interest of

4 ten percent (10%) or the maximum amount allowed by law;

5    10.    For a constructive trust on all XET and XT property and assets, and the profits

6 earned therefrom;

7    11.    For exemplary damages; and

8    12.    For other and further relief as the Court may deem just and proper.

9    DATED:  May 7, 2008              SEDGWICK, DETERT, MORAN & ARNOLD LLP

10

11                                    By:_____\S_____

12                                        Paul Riehle  Bar No. 115199
                                          Jia-Ming Shang  Bar No. 233326
                                          Attorneys for Plaintiff
13                                        Plaintiffs XS Holding B.V.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

FIRST AMENDED DERIVATIVE COMPLAINT AND COMPLAINT          CASE NO. C08-02282 RMW
FOR INTERFERENCE WITH CONTRACT, CONVERSION,
DECLARATORY AND INJUNCTIVE RELIEF

## VERIFICATION

I, Brian Caffyn, am the Managing Director of Plaintiff XS Holding B.V. and authorized to make the following verification on its behalf. I swear under penalty of perjury under the laws of the United States of America that I have read the foregoing allegations and am informed and believe them to be true.

Dated: MAY 7, 2008

Brian Caffyn

# EXHIBIT 1

# OPERATING AGREEMENT
## FOR
## XET HOLDING CO., LLC
#### a Delaware Limited Liability Company

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR
QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY
NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED,
PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER
APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE
OPINION   OF   COUNSEL   SATISFACTORY   TO   THE   COMPANY,   SUCH
QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF
THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT
TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH
HEREIN.



BV00285

**OPERATING AGREEMENT
FOR
XET HOLDING CO., LLC**

   **This Operating Agreement** (this "Agreement") is made as of April _7th_, 2007, by and among the parties listed on the signature pages hereof.

Recitals

   A.   The members identified below have formed the limited liability company named above (the "Company") under the laws of the State of Delaware.

   B.   The parties desire to adopt and approve an operating agreement for the Company.

Agreement

   Based upon the mutual covenants below, with the intent to be legally bound, the parties agree as follows:

**ARTICLE I
DEFINITIONS**

   Capitalized terms used in this Agreement shall have the meanings specified below or elsewhere in this Agreement and when not so defined shall have the meanings specified in the Act:

1.1 "Act" shall mean Delaware Liability Company Act, 6 Del. C. Section 18-101 et seq., as amended from time to time. It is the intention of the parties hereto that in the event that there is any conflict between the terms and conditions of this Agreement and the Act, that the terms of this Agreement shall control to the extent permitted by the Act; and if not so permitted, then the terms of the Act shall control.

1.2 "Affiliate" of a Member or Manager shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member or Manager, as applicable. The term "control," as used above shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.3 "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

BV00286

1.4 "<u>Assignee</u>" shall mean the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Article VIII.

1.5 "<u>Capital Account</u>" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.6 "<u>Capital Contribution</u>" shall mean the total amount of cash contributed by a Member and, if the Managers determine to accept capital contributions in such other forms, the fair market value of property contributed and/or services rendered or to be rendered to the Company by a Member.

1.7 "<u>Certificate of Formation</u>" shall mean the Certificate of Formation of the Company to be filed with the Office of the Delaware Secretary of State in accordance with the Act. Delaware Secretary of State means the Office of the Secretary of State of the State of Delaware.

1.8 "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.9 "<u>Company</u>" shall mean the Delaware Limited Liability Company named on the first page of this Agreement.

1.10 "<u>Company Minimum Gain</u>" shall have the meaning ascribed to the term "Minimum Gain" in the Regulations Section 1.704-2(d).

1.11 "<u>Corporations Code</u>" shall mean Chapter 86 of the Delaware Revised Statutes, as amended from time to time, and the provisions of succeeding law.

1.12 "<u>Dissolution Event</u>" shall have the meaning ascribed to that term in Section 11.1.

1.13 "<u>Distributable Cash</u>" shall mean the amount of cash which the Managers deem available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Managers deem necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.14 "<u>Economic Interest</u>" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management or any right to information concerning the business and affairs of Company.

1.15 "<u>Effective Date</u>" shall have the meaning ascribed to that term in Section 2.1.

1.16 "<u>Fiscal Year</u>" shall mean the Company's fiscal year, which shall be the calendar year.

1.17 "<u>Majority Interest</u>" shall mean those Members who hold a majority of the Units which all Members hold.

BV00287



1.18 "Managers" shall mean each of the person(s) identified as the Managers in Section 5.1(a) hereto, on Exhibit A, or any other persons that succeed any of them as a manager of the Company from time to time.

1.19 "Member" shall mean each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Certificate or this Agreement or is an Assignee who has become a Member in accordance with Article VIII, and (b) has not ceased to be a Member in accordance with Article IX or for any other reason. There shall be three (3) classes of Members: Class A Members, Class B Member and Class C Members. A single Person may hold some or all of the classes of Membership Interests. The term "Members" means, collectively, Class A Members, Class B Member and Class C Members.

1.20 "Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.21 "Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.22 "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management of the Company, and the right to receive information concerning the business and affairs, of the Company.

1.23 "Net Profits" and "Net Losses" shall mean the income, gain, loss and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes.

1.24 "Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.25 "Percentage Interest" shall mean the number of Units held by a Member, as a percentage of the total number of Units held by all Members at any given time.

1.26 "Permitted Transfer" shall have the meaning ascribed to that term in Section 8.4.

1.27 "Person" shall mean an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.28 "Prime Rate" as of a particular date shall mean the prime rate of interest as published on that date in the Wall Street Journal, and generally defined therein as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." If the Wall Street Journal is not published on a date for which the Prime Rate must be determined, the Prime Rate shall be the prime rate published in the Wall Street Journal on the nearest-preceding date on which the Wall Street Journal was published.

BV00288

1.29 "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

1.30 "Required Percentage" shall mean more than fifty percent (50%) of the total Percentage Interests held by all Members.

1.31 "Secretary of State" shall mean the Delaware Secretary of State.

1.32 "Tax Matters Partner" (as defined in Code Section 6231) shall be the person identified as such on Exhibit A, or his or her successor as designated pursuant to Section 10.8.

1.33 "Transfer" or "Transferred" shall mean any sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition voluntarily or involuntarily, by operation of law, with or without consideration, or otherwise (including, without limitation, by way of intestacy, will, gift, bankruptcy, receivership, levy, execution, charging order or other similar sale or seizure by legal process) of all or any portion of any Membership Interest. Without limiting the generality of the foregoing, the sale or exchange of more than twenty percent (20%) of the voting stock of a Member, if a Member is a corporation, or the Transfer of an interest or interests of more than twenty percent (20%) in the capital or profits of a Member (whether accomplished by the sale or exchange of interests or by the admission of new partners or members), if a Member is a partnership or limited liability company, or the cumulative Transfer of such interests in a Member which effectively equal the foregoing (including Transfer of interests followed by the incorporation of a Member and subsequent stock Transfers, or Transfers of stock followed by the liquidation of a Member and subsequent Transfers of interests) will be deemed to constitute a Transfer of the Member's entire Membership Interest.

1.34 "Units" shall mean the units issued by the Company to its Members, which represent their interests in the Company.  Units held by Class A Members are "Class A Units", Units held by Class B Member are "Class B Units"; and Units held by Class C Member are "Class C Units." The term "Units" means, collectively, all Class A Units, Class B Units, and Class C Units.  A single Person may hold some or all of the classes of Membership Interests.

1.35 "Unreimbursed Capital Contribution" of a Member means such Member's total Capital Contributions less distributions to such Member of Distributable Cash pursuant to Section 7.1 and less distributions of assets to such Member upon liquidation of the Company pursuant to Section 11.5.

1.36 "Warrant Agreement" shall mean that certain warrant agreement by and between XET Holding Co., LLC and XS Holding B.V. dated as of the same date hereof.

BV00289

# ARTICLE II
## ORGANIZATIONAL MATTERS

2.1 <u>Formation</u>. The Members have formed a Delaware limited liability company by filing the Certificate with the Secretary of State and entering into this Agreement. This Agreement shall be deemed effective as of the date the Certificate was filed ("Effective Date"). The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different because of any provision of this Agreement than those rights or obligations would be in the absence of such provision, this Agreement shall control to the extent permitted by the Act.

2.2 <u>Name</u>. The name of the Company shall be XET Holding Co., LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managers deem appropriate or advisable. The Managers shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managers consider appropriate or advisable. The Company's name shall be the exclusive property of the Company, and no Member shall have any rights in the name or any derivation thereof.

2.3 <u>Term</u>. The Company's existence commenced on the Effective Date and shall continue until terminated as hereinafter provided.

2.4 <u>Registered Office and Agent</u>. The Company shall continuously maintain an office and registered agent in the State of Delaware as required by the Act. The principal office of the Company shall be as the Managers may determine. The Company also may have such offices, anywhere within and without the State of Delaware, as the Managers from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Certificate or as otherwise determined by the Managers.

2.5 <u>Principal Place of Business</u>. The Company's principal place of business shall be as indicated on Exhibit A. The Company may also have such offices, anywhere within and without the State of Delaware, as the Managers may determine from time to time, or the business of the Company may require.

2.6 <u>Member and Manager Information</u>. The name, address and number of Units held of each Member, and the name and address of each Manager are set forth in Exhibit A. A Member may change his or her address in the Company's books and records upon notice thereof to the Managers.

2.7 <u>Purpose and Business of the Company</u>. The purpose of the Company is (i) to hold the ownership of a subsidiary company which intends to manufacture, market and/or license product and intellectual property based upon the intellectual property portfolio contributed and exclusively licensed to the Company's subsidiary (subject to the license restrictions), and such other activities directly related to and in furtherance of the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Managers, and (ii) engage



BV00290

in any lawful activity for which a limited liability company may be organized under the Act. Notwithstanding the foregoing, without the consent of Members holding the Required Percentage, the Company shall not engage in any business other than the business described in subsection (i) herein.

2.8 Tax Classification. The Members acknowledge that pursuant to Regulation Section 301.7701-3, the Company shall be classified as a partnership for federal income tax purposes until the effective date of any election ("Election") to change its classification on IRS Form 8832, Entity Classification Election. The Members agree the Managers shall have, with the consent of Members holding the Required Percentage, the authority to file and make the Election on behalf of the Company and each Member at such time as the Managers determine such a change is in the Company's best interests.

2.9 No State-Law Partnership. The Company's classification as a partnership will apply only for federal (and, as appropriate, state and local) income tax purposes. This characterization does not create or imply a general partnership, limited partnership or joint venture among the Members for state law or any other purpose. Instead, the Members acknowledge the Company's status as a limited liability company formed under the Act.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1 Capital Contributions. Each Member shall contribute to the Company the money, property and/or services specified below :

    3.1.1. Xslent Technologies, LLC, Class A Member. Within two (2) days of the execution of this Agreement, Xslent Technologies, LLC, a Delaware limited liability company ("Xslent Tech") shall contribute the intellectual property listed on Exhibit B attached hereto and license the XET IP described on Exhibit C, all to the Company's subsidiary XSLENT Energy Technologies, LLC, and assume the loan to Martin N. Lettunich from XS Holdings B.V. ("XS Holdings") or its Affiliate the principal sum of $763,000 (the "ML Loans") which has been guaranteed by Xslent Tech (the "ML Loan Guarantee"). Class A Member shall be issued the number of Class A Units specified on Exhibit A.

    3.1.2 XS Holdings Class B Member. Within two (2) days of the execution of this Agreement, Class B Member shall contribute $2,500,000, and the balance of $5,000,000 due from Class B Member shall (at Class B Member's option) be contributed to the Company in monthly payments of $500,000 at the first day of each month thereafter, commencing May 1, 2007 for a total expected investment of $7,500,000. In partial satisfaction of the initial $2,500,000 Capital Contribution, Class B Member may cause to be applied and set-off, to the extent outstanding principal of the ML Loans. Class B Member shall be issued the number of Class B Units specified on Exhibit A.

    3.1.3 ISG Solar Offering. Company intends to negotiate with the members of ISG Solar,

BV00291 

LLC ("ISG Solar"), a California limited liability company, in order to acquire or purchase certain rights and proprietary technology as the Board of Managers deems appropriate. The Company and its Board of Managers are authorized to make a private offering of Class C Membership Interests on such term and conditions determined by the Board of Managers. The Managers may admit as Members of the Company, such members of ISG Solar whose subscriptions for such Units are accepted by the Managers. The Managers may refuse to admit any Person or Persons as Members for any reason whatsoever. Any Units subsequently subscribed by some or all of ISG Solar's members shall reduce solely the number of Xslent Tech's Class A Units as described herein.

3.1.4 <u>Offering of Company Interests</u>. The Company intends to make a private offering of Class C Membership Interests for cash in an aggregate amount of up to $6,000,000. Any Units subsequently subscribed to Class C members hereunder shall reduce solely the number of Xslent Tech's Class A Units. The Managers may admit as Members of the Company, Persons whose subscriptions for such Interests are accepted by the Managers and who sign this Agreement. The Managers may refuse to admit any Person or Persons as Members for any reason whatsoever. A Person shall become a Member in the Company when the Managers have accepted such Person's subscription and the following conditions are satisfied:



(a)     <u>Capital Contribution</u>. Such Person shall have contributed to the capital of the Company the cash opposite their name on the signature sheet hereto in payment for said Interest. Each Person shall purchase for cash the number of Class C Units set forth opposite such Person's name on the signature sheet hereto. For each Class C Unit purchase, each person shall contribute to the capital of the Company Fifteen Dollars ($15.00).

(b)     <u>Subscription Agreement</u>. Such Person shall have executed and delivered to the Managers a Subscription Agreement in the form specified by the Managers, the terms of which shall include, without limitation, the written acceptance and adoption of the provisions of this Agreement. Any undersubscribed Units will be added to Xslent Tech's ownership as Class A Units.

(c)     <u>Acceptance by Managers</u>.    The Managers shall have accepted the subscription.

(d)     <u>Time for Offering</u>. The offering will continue until it is fully subscribed or, until such time as the Managers may determine to terminate the offering. The Managers reserve the right to increase the amount of the offering, and to close the offering once they have accepted subscriptions for Membership Interests representing Capital Contributions of at least $500,000. The Managers in their sole discretion may extend the offering if doing so is consistent with the needs and objectives of the Company.

3.1.5. <u>Class B Warrants</u>. As additional consideration for subscribing for Units in the Company, Class B shall also be entitled to purchase additional Units in the Company for: (A) up to 500,000 Units of the Company upon its formation based on a valuation of $15 per Unit, (B) up to 500,000 Units equal based on a valuation of $30 per Unit and (C) up to 500,000 Units based on a valuation of $45 per Unit, all of which may be exercised in whole or in part at any time

BV00292

prior to December 31, 2010. Such Warrants shall be exercised pursuant to the Warrant Agreement attached hereto as Exhibit 3.1.5.

3.2 Additional Capital Contributions. No Member shall be required to make any additional Capital Contributions. To the extent approved by the Managers, from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire, and if the Managers determine that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business, including without limitation, expansion or diversification. In that event, the Members will have the opportunity, but not the obligation, to participate in the additional Capital Contribution on a pro rata basis in accordance with the number of Units held by each. Each Member will receive a Capital Account credit in the amount of any additional capital that the Member contributes to the Company, and, subject to Section 3.9, the Member will receive an additional number of Units, which shall be Class A Units, determined by the value of the additional Capital Contribution in relation to the value of the Company as a whole. The value of the Company as a whole will be determined by the Managers at the time the additional Capital Contribution is requested, and the Managers shall inform the Members of such value, and the resulting price per new Class A Unit to be issued. Immediately following these Capital Contributions, the Managers will update the Company's ledger of outstanding Units to reflect the issuance of the additional Class A Units in accordance with this Section.

3.4 Capital Accounts.

    A. Maintenance. Separate capital accounts shall be maintained and be current for distribution and contributions at all times for each Member in accordance with Treasury Regulation Section 1.704-1(b). Each Member's capital account shall consist of the capital that such member has contributed to the Company, increased by any income allocable to that member, and decreased by any loss or deduction allocable to, distributions to, and withdrawals of capital by the Member under this Agreement and in accordance with any applicable requirements of federal income tax law. Such accounts shall be closed at least annually.

    B. Assignment. On the Transfer of all or any part of a Member's Membership Interest as permitted by this Agreement, the Capital Account of the transferor, or portion thereof that is attributable to the Transferred interest, shall carry over to the transferee as prescribed in Regulations Section 1.704-1(b)(2)(iv).

    C. Revaluation. At such times as may be required or permitted by Code Section 704 and any Regulations thereunder, the Capital Accounts shall be revalued and adjusted to reflect the then fair market value of the Company's property. The Capital Accounts shall be maintained in compliance with Regulation Section 1.704-1(b)(2)(iv)(f). All allocations of gain resulting from such revaluation shall be made consistently with regulation Section 1.704-1(b)(2)(iv)(f) and, to the extent not inconsistent therewith, provisions of Section 6.1 on the allocation of Net Profit.

3.5    Class B Member Failure to Make Contributions. If a Class B Member does not timely contribute all of the capital pursuant to section 3.1.2 in accordance with the schedule specified therein, the Class A Member or Managers shall send the Class B Member written notice of such

XET Holding Co., LLC Operating Agreement                 9 of 55


BV00293

failure to contribute, giving him or her fourteen (14) days from the date such notice is given to contribute the entire amount of the capital contribution required at that time ("Capital Notice"). If the Class B Member does not contribute his or her required capital contribution to the Company pursuant to Section 3.1.2, above within said fourteen (14) day period, a majority of the Class A Members or majority of the Managers (other than Brian Caffyn) may elect any one or more of the following remedies within 60 days of such Capital Notice:

3.5.1. Declare some or all of the Warrants of Class B Member described in Section 3.1.5 and in the Warrant Agreement as null and void by way of written notice to the Class B Member within 60 days after such failure to contribute.

3.5.2. The Percentage Interests and the number of Class B Units of Class B Member shall be adjusted, in which event the Class B Member's Percentage Interest and Units shall be a fraction, the numerator of which represents the amount of such Member's Capital Contributions and the denominator of which represents $7,500,000. The total number of the reduction in the Class B Units determined pursuant to the previous sentence shall be added to the Units of Class A Member as Class A Units.

3.5.3. Provided that the Percentage Interest has not been adjusted under Section 3.5.2, above then Class B Member shall have no right to receive any distributions from the Company until the Class B Member has contributed the full $7,500,000 of capital. All withheld distributions to Class B Member shall be deemed applied to the latest capital contribution required under Section 3.1.2., above (ie – the final month shall be paid in first).

3.5.4. Class B Member shall lose its approval rights under Section 4.12 of this Agreement.

3.5.5. Class B Member shall lose its ability to elect a Manager.

Each Member acknowledges and agrees that the remedies described in this Section 3.5 bear a reasonable relationship to the damages which the Members estimate may be suffered by the Company and the other Member by reason of the failure of a Class B Member to make an additional Capital Contribution and the election of any or all of the above described remedies is not unreasonable under the circumstances existing as of the date hereof.

3.6 Withdrawal and Return of Capital. No Member shall be entitled to withdraw or to demand the return of any or all of that Member's Capital Contribution, except as specifically provided in this Agreement.

3.7 No Interest. No Member shall be entitled to receive interest on that Member's Capital Contributions or the balance of that Member's Capital Account without the Managers' prior written consent.

3.8 No Priority Return. Except as otherwise provided in this Agreement, no Member shall have priority over any other Member regarding the return of a Capital Contribution.

3.9 Member Loans.



BV00294

A. Any Member or an Affiliate of a Member may, subject to the other provisions of this Agreement, lend money to the Company with the Managers' prior written consent. The loan shall not be treated as a Capital Contribution by that Member or entitle the Member to an increase in that Member's Percentage Interest. The loan amount shall be a debt due from the Company, repayable out of the Company's assets, and shall be on such terms as the Company and the Member agree. Notwithstanding the foregoing, no Member shall be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

B. Members acknowledge that any Member, Manager or Affiliate of a Member or Manager (each, a " Lender" ) who loans money to the Company pursuant to this Section 3.9 shall have rights (" Rights" ), the exercise of which may be in conflict with the Company's best interests. In that regard, the Members hereby authorize, agree and consent to the Lender's exercise of any of Lender's Rights under any promissory note, security agreement or other loan document, even though the Lender's exercise of those rights may be detrimental to the Company or the Company's business. Further, the Members agree that any Lender's proper exercise of the Rights shall not be deemed a breach of that Lender's fiduciary duties (if any) to the Company.

3.10  Maximum number of Units.  Notwithstanding any other provisions of this Agreement, the Company shall issue no more than the "Authorized Number of Units" established from time to time. The Authorized Number of Units will be automatically increased if any warrants are exercised under section 3.1.5. but otherwise may be changed from time to time only by approval of the Managers and approval of Members holding the Required Percentage. The Authorized Number of Units shall be proportionally adjusted for any split or reverse split of outstanding Units that are affected by the Company from time to time. Upon any change in the Authorized Number of Units, the Managers shall attach an addendum to this Agreement specifying the new Authorized Number of Units.

## ARTICLE IV
## MEMBERS

4.1  Limited Liability.  Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2  Issuance of Additional Membership Interests; Admission of Additional Members.  The Managers may cause the Company to issue Membership Interests to, and to admit any Person as, a Member on such terms and conditions as the Managers deem appropriate, subject to Section 4.12. Such new Members shall be issued a number of Units, and shall make such Capital Contributions, as the Managers determine to be appropriate. The Members understand and agree that, pursuant to this Section, the Managers may cause additional Units in the Company to be issued to employees, consultants, advisors, investors, or other Persons, for such consideration as the Managers deem appropriate, which may consist of cash, property, promissory notes, services rendered, or other consideration.



BV00295

4.3 <u>Withdrawals or Resignations</u>. No Member may withdraw as a Member from the Company, except as may be otherwise provided in a written agreement entered into between the Company and such Member.

4.4 <u>Termination of Membership Interest</u>. Upon (a) the Transfer of a Member's Membership Interest in violation of Article VIII, or (b) the withdrawal, resignation or retirement of a Member in violation of Section 4.3, the Membership Interest of a Member shall be terminated by the Managers and thereafter that Member shall be an Assignee only. Each Member acknowledges and agrees that such termination of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

4.5 Deliberately Not Used

4.6 <u>Transactions with The Company</u>. Subject to any limitations set forth in this Agreement and with the prior approval of the Managers, a Member or an Affiliate of a Member may transact business with the Company so long as the transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those terms and conditions that are generally available in similar transactions from Persons operating at arm's length and, in the case of services, from Persons capable of performing similar services. Subject to other applicable laws, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.



4.7 <u>Remuneration to Members</u>. Except as otherwise specifically provided in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or an Affiliate of a Member is entitled to remuneration for services rendered or goods provided to, or on behalf of, the Company.

4.8 <u>Members Are Not Agents</u>. Pursuant to Section 5.1 and the Certificate, the management of the Company is vested in the Managers. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Certificate and except as expressly required by the Act. No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by a Manager or Managers, have any power or authority to (a) bind or act on behalf of the Company in any way, (b) pledge its credit, (c) execute any instrument on its behalf, or (d) render it liable for any purpose. Each Member shall indemnify, defend and hold harmless the Company and the other Members from and against any and all loss, cost, expense, liability or damage arising from or relating to any action by such Member in contravention of this Section 4.8.

4.9 <u>Voting Rights</u>. Except as expressly provided in this Agreement, the Certificate or as required by law, Members shall have no voting, approval or consent rights and, to the extent permitted by applicable law, each Member waives that Member's right to vote on any matters other than those set forth in Section 5.3B. In all matters in which a vote, approval or consent of the Members is required, a vote, consent or approval of Members holding the Required Percentage shall, subject to the other requirements of this Agreement, be sufficient to authorize or approve such act.

BV00296

Except as otherwise specifically provided in this Agreement, all votes, approvals or consents of the Members may be given or withheld, conditioned or delayed as the Members may determine in their sole and absolute discretion.

4.10 <u>Member Meetings; Written Consents</u>. No annual or regular meetings of the Members are required. However, if such meetings are held, written notice of a meeting of Members shall be sent or otherwise given to each Member not less than ten (10) nor more than sixty (60) days before the date of the meeting and shall otherwise comply with the Act. The notice shall specify the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to a Manager by any person entitled to call a meeting of members, the Managers shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice. Any action that may be taken by Members under this Agreement may be taken by a written consent executed by Members having not less than the aggregate Percentage Interests that would be necessary to take that action at a meeting at which all Members entitled to vote thereon were present and voted. Action taken by written consent shall be effective as of the date set forth in the consent.

4.11 <u>Certificate of Membership Interest</u>.

A. <u>Certificate</u>. A Membership Interest may be represented by a certificate of membership, in the discretion of the Managers. Subject to applicable law, the form and content of the certificate of membership shall be determined by the Managers.

B <u>Cancellation of Certificate</u>. Except as herein provided with respect to lost, stolen, or destroyed certificates, no new certificates of membership shall be issued in lieu of previously issued certificates of membership until former certificates for a like number of Membership Interests shall have been surrendered and canceled. All certificates of membership surrendered to the Company for transfer shall be canceled.

C. <u>Replacement of Lost, Stolen, or Destroyed Certificate</u>. Any Member claiming that his or her certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Managers, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen, or destroyed.

4.12. <u>Class B Member Consent</u>. The parties agree that neither the Company nor its Subsidiaries of Company shall take, or be permitted to take, any of the actions set forth in this Section 4.12 (the "<u>Major Actions</u>") without the prior written consent of the Class B Member. In the event of any conflict between this Section 4.12 and the other provisions of this Agreement, this Section 4.12 shall control.

The following actions constitute Major Actions, whether by the Company or any Subsidiary:



BV00297

A. The amendment to or waiver of any of the provisions of the organizational documents of the Company or any Subsidiary, or this Agreement as it relates to Class B Member rights and preferences and privileges herein;

B. The commencement of any liquidation, dissolution or voluntary bankruptcy, administration, recapitalization or reorganization of the Company or any Subsidiary in any form of transaction, make any arrangements with creditors, or consent to the entry of an order for relief in an involuntary case, or take the conversion of an involuntary case to a voluntary case, or consent to the appointment or taking possession by a receiver, trustee or other custodian for all or substantially all of its property, or otherwise seek the protection of any applicable bankruptcy or insolvency law;

C. The merger or consolidation of the Company or any of its Subsidiaries (other than a merger or consolidation of the Company with any of its wholly-owned Subsidiaries or of any of the Company's wholly-owned Subsidiaries with any other of the Company's wholly-owned Subsidiaries), whether to effect an acquisition, divestiture or otherwise;

D. Entering into any corporate transactions, including any joint venture, investment (other than an investment in, contract with or acquisition of any securities or assets of any of the Company's wholly-owned Subsidiaries), recapitalization, reorganization or contract with any other Person or acquisition of any securities or assets of another Person, whether in a single transaction or series of related transactions, in excess of the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) in any year, ten percent (10%) of the last twelve months total distributions to the Members;

E. Making any loans or advances to or guarantees or granting security in excess of the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) ten percent (10%) of the last twelve months total distributions to the Members in the aggregate for all such loans, advances and guarantees, other than routine advances to cover expenses incurred on behalf of the Company or its Subsidiaries;

F. Other than in the ordinary course of business, any sale, lease or other conveyance of assets of the Company or its Subsidiaries in any transaction or series of related transactions (other than any sale, lease or other conveyance of assets of any wholly-owned Subsidiary of the Company to the Company or any of the Company's other wholly-owned Subsidiaries), in each case outside the ordinary course of business or any assets (other than obsolete inventory or inventory sold in the ordinary course of business), except for sales, leases or other conveyances of assets in a single transaction or series of related transactions with a fair market value (as determined in good faith on a reasonable basis by the Board of Managers and agreed to by the Class B Member) of less than or equal to the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) in any year, ten percent (10%) of the last twelve months total distributions to the Members;

BV00298

G. The issuance of any Equity Interests of the Company other than pursuant to the Warrant Agreement in excess of any amount as is necessary to maintain adequate working capital for the upcoming six (6) months working capital as determined by the Company's accountants;

H. The issuance of any Equity Interests by any of the Company's Subsidiaries, other than the issuance of Equity Interests to the Company or to any of the Company's wholly-owned Subsidiaries;

I. The guarantee, assumption or incurrence of indebtedness for borrowed money by the Company or any of its Subsidiaries (including indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of, or substantially all of its business and assets were acquired by, the Company or such Subsidiary and indebtedness secured by a lien encumbering any asset acquired by the Company or such Subsidiary) in excess of the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) in any year, ten percent (10%) of the last twelve months total distributions to the Members in the aggregate;

J. The repurchase (other than by way of operation under Section 8.8), redemption or other retirement of any Equity Interests of the Company or any of its Subsidiaries or, prior to its stated maturity, any indebtedness for borrowed money, of the Company or its Subsidiaries;

K. Any capital expenditure or purchase, lease or other acquisition of assets by the Company or its Subsidiaries that would cause the aggregate amount of all such capital expenditures, purchases, leases and other acquisitions in any fiscal year to exceed the aggregate amount of all capital expenditures, purchases, leases and other acquisitions set forth in the annual approved budget of the Company for such fiscal year;

L. Material changes to the scope or nature of the Company's and any of its Subsidiaries' business and operations;

M. Entering into any arrangement, contract or order which by its terms would restrict the Company from complying with its obligations under this Agreement;

N. Declaring, making or paying any dividend or other distribution in respect of any fiscal year except as expressly provided for in this Agreement;

O. Selling, encumbering, assigning, licensing or otherwise disposing of any the Company's intellectual property other than in the ordinary course of business;

P. Appointing, discharging, terminating, determining or changing the remuneration including by way of a discretionary bonus or conditions of employment or otherwise of any of Martin Lettunich, David Tinsley or Stefan Matan other than commercially reasonable compensation;

Q. Entering into, cancelling, varying or waiving any rights under or releasing any restrictions contained in any agreements, contracts or arrangements with (i) any of the Beneficial

BV00299

Owners or their Affiliates; or (ii) any Affiliate of the company except for wholly owned subsidiaries of the Company or an Affiliate of which the company is a wholly owned subsidiary;

R. Carrying out any alteration of the tax residence of the Company; and

S. The entering into of any agreement to do any of the foregoing.

T. A change in the number of Managers.

U. Approval of the annual budget for each fiscal year which shall occur prior to the start of each fiscal year (other than the initial budget which will be approved at the first meeting of the Board of Managers), provided that in the event parties can not agree on the budget, the prior years's budget shall be used plus 25% until a new budget is approved.

## ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1 <u>Management of the Company by Board of Managers.</u>



A. <u>Exclusive Management by Managers.</u> Subject to the provisions of the Certificate and this Agreement relating to actions required to be approved by the Members, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Board of Managers. The Company shall initially have four (4) Managers. The initial Managers of the Board of Managers shall be:

> MARTIN N. LETTUNICH
> BRIAN E. CAFFYN
> DAVID C. TINSLEY,
> STEFAN MATAN,

B. <u>Approval Required.</u> If there is more than one Manager, then except as otherwise expressly provided in this Agreement, all actions of the Managers may be taken only by the approval of a majority of the votes of the Board of Managers. Each Manager shall have one (1) vote each, except Brian Caffyn shall have two (2) votes at any meeting of the Board of Managers where more than three Managers attend so long as (i) he is a member of the Board of Managers, (ii) Class B Member owns at least a Percentage Interest of five percent (5%) or more and Class B Member is not in default of its obligation to make its Capital Contribution described in Section 3.1.2, and (iii) Class B Member shall have fully paid all amounts then due under Section 3.1.2 of this Agreement. If Brian Caffyn is not a Member of the Board of Managers by reason of death, incompetence, resignation or for any other reason, the replacement Manager for Brian Caffyn will only have one (1) vote.



BV00300

C. <u>Agency Authority of Managers</u>. Subject to Section 5.3B, no Manager, acting alone, shall be authorized to sign checks, documents, contracts and other instruments on behalf of the Company, except as authorized by the Board of Managers. Subject to Section 5.3B, either the Chairperson, President or officer of the Company authorized by the Board of Managers acting alone, shall be authorized to sign checks, documents, contracts and other instruments on behalf of the Company; provided, however, that (a) prior to taking any actions on behalf of the Company that are outside of the ordinary course of business of the Company, the Managers must approve such action as provided in this Agreement, or (b) the Managers, in their discretion, may direct specific action or require the signature of more than one person on checks over a certain dollar amount.

D. <u>Meetings of Board of Managers</u>. Meetings of the Managers may be called by any Manager, or by the chairperson, president, any vice-president or the secretary, if any such officers have been appointed. All meetings shall be held upon four (4) days notice by mail or forty-eight (48) hours notice delivered personally or by telephone, telegraph or facsimile. A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting. A majority of the votes of the Managers present, whether or not a quorum is present, may adjourn any meeting to another time and place. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment shall be given prior to the time of the adjourned meeting to the Managers who are not present at the time of the adjournment. Meetings of the Managers may be held at any place within or without the State of Delaware which has been designated in the notice of the meeting or at such place as may be approved by the majority of the votes of the Managers. Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers participating in such meeting can hear one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. A majority of the authorized number of votes of the Managers constitutes a quorum of the Managers for the transaction of business. Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the votes of the Managers present at a meeting duly held at which a quorum is present is the act of the Managers. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of Managers, if any action taken is approved by at least a majority of votes of the required quorum for such meeting.

Any action required or permitted to be taken by the Managers may be taken by the Managers without a meeting, if a majority of the votes of the Managers individually or collectively consent in writing to such action, unless this Agreement specifically provides that the particular action requires the unanimous vote of the Managers or approval of the Class B Member, in which case all Managers must consent in writing. Such action by written consent shall have the same force and effect as a majority vote or unanimous vote, as applicable, of such Managers.

BV00301

The provisions of this Section 5.1D govern meetings of the Managers if the Managers elect, in their discretion, to hold a meeting. However, nothing in this Section 5.1D or in this Agreement is intended to require that meetings of Managers be held, it being the intent of the Members that meetings of Managers are not required. Actions may be taken by the Managers without a meeting, and without action by written consent in lieu of a meeting, if otherwise approved by a majority of the Managers.

E. <u>Observers</u>. Class A Member or Class B Member may each designate an observer to attend all meetings of the Board of Managers and committees thereof (an "**Observer**"). The Company shall give to the Observer the same notice given to members of the Board of, and permit the Observer to attend, all meetings of its Board of Managers and all committee meetings thereof. The Observer will be entitled to receive all written materials and other information given to members of the Board of Managers in connection with such meeting at the same time such materials or information are given to such other members of the Board unless legal counsel of the Company believes such written materials and other information should be kept confidential. Observers shall be allowed to participate fully in the meeting except for voting at, and attending, sessions involving litigation and employment termination matters.

5.2 <u>Election of Managers</u>.

A. <u>Number, Term, and Qualifications</u>. The Company shall initially have the number of Managers indicated on Exhibit A. The number of Managers of the Company shall be fixed from time to time by the affirmative vote or written consent of Members holding the Required Percentage, provided that in no instance shall there be less than one Manager. Unless he or she resigns or is removed, each Manager shall hold office until a successor shall have been elected and qualified. Managers shall be elected by the affirmative vote or written consent of Members holding the Required Percentage other than in the case of any replacement to Mr. Caffyn who shall be appointed by the vote of the majority of the Class B Member so long as the Class B Member hold at least 5% of the total voting Units outstanding of the Company. A Manager need not be a Member, an individual, a resident of the State of Delaware, or a citizen of the United States.

B. <u>Resignation</u>. Any Manager may resign at any time by giving written notice to the Members and remaining Managers without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party. The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not (i) affect the Manager's rights as a Member; (ii) constitute a withdrawal of a Member; or (iii) affect any rights a Manager or a Manager's Affiliate may have under any written agreement with the Company.

C. <u>Removal</u>. Any Manager, other than Mr. Caffyn or any subsequent Class B appointed Manager so long as the Class B Member hold at least 5% of the outstanding voting Units of the Company, may be removed at any time, with or without cause, by the affirmative vote of Members holding the Required Percentage at a meeting called expressly for that purpose, or by the written consent of Members holding the Required Percentage. Any removal shall be without



BV00302

prejudice to the rights, if any, of the Manager under any employment contract and, if the Manager is also a Member, shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member. A Manager also may be removed by the affirmative vote or written consent of a majority of the remaining Managers if such Manager becomes incapable of fulfilling his or her obligations under this Agreement because of injury or physical or mental illness and such incapacity shall exist for thirty (30) working days in the aggregate during any consecutive six (6) month period.

D. <u>Vacancies</u>. Any vacancy occurring for any reason in the number of Managers may be filled by the affirmative vote or written consent of Members holding the Required Percentage or by a majority of the votes of the remaining Managers other than in the case of any replacement to Mr. Caffyn who shall be appointed by the vote of the majority of the Class B Member so long as the Class B Member hold at least 5% note this needs to tie back to buyback] of the total voting Units outstanding of the Company.

5.3 <u>Powers of Managers</u>.

A. <u>Powers of Managers</u>. Without limiting the generality of Section 5.1, but subject to Section 5.3B and to the express limitations set forth elsewhere in this Agreement, the Managers shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 18-402 including, without limitation, the power to:

(i) Acquire, purchase, renovate, improve, alter, rebuild, demolish, replace, and own real property and any other property or assets that the Managers determine is necessary or appropriate or in the interest of the business of the Company, and to acquire options for the purchase of any such property;

(ii) Sell, exchange, lease, or otherwise dispose of the real property and other property and assets owned by the Company, or any part thereof, or any interest therein;

(iii) Borrow money from any party including the Managers and their Affiliates; issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend, or change the terms of, or extend the time for the payment of any indebtedness or obligation of the Company, and secure such indebtedness by mortgage, deed of trust, pledge, security interest, or other lien on Company assets;

(iv) Guarantee the payment of money or the performance of any contract or obligation of any Person;

(v) Sue on, defend, or compromise any and all claims or liabilities in favor of or against the Company; submit any or all such claims or liabilities to arbitration; and confess a judgment against the Company in connection with any litigation in which the Company is involved; and

BV00303

(vi) Retain legal counsel, auditors, and other professionals in connection with the Company business and to pay therefor such remuneration as the Managers may determine.

B. Limitations on Power of Managers. Subject to the other requirements of this Agreement the Managers shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding the Required Percentage:

(i) The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a 12-month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution;

(ii) The conversion of the Company into, or the merger of the Company with, another limited liability company or limited partnership;

(iii) The merger of the Company with, or conversion into, a corporation or a general partnership or other Person;

(iv) The establishment of new classes of Members;

(v) An alteration of the primary purpose or business of the Company as set forth in Section 2.7(i);

(vi) Any act which would make it impossible to carry on the ordinary business of the Company;

(vii) Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members;

5.4 Devotion of Time. The Managers are not obligated to devote all of their time or business efforts to the affairs of the Company. The Managers shall devote whatever time, effort, and skill they deem appropriate for the operation of the Company.

5.5 Deliberately not used.

5.6 Transactions between the Company and the Managers. Notwithstanding that it may constitute a conflict of interest, the Managers may, and may cause their Affiliates to, engage in any transaction, including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those terms and conditions that are generally available in similar transactions from Persons operating at arm's length and, in the case of services, from Persons capable of performing similar



services. A transaction between the Managers and/or their Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if a Majority Interest of the Members having no interest in such transaction (other than their interests as Members) affirmatively vote or consent in writing to approve the transaction. Notwithstanding the foregoing, the Managers shall not have any obligation, in connection with any such transaction between the Company and the Managers or an Affiliate of the Managers, to seek the consent of the Members.

5.7 Payments to Managers.

A. Management Fee. Subject to the other provisions of this Agreement the Company may pay the Managers a management fee in consideration for their service as Managers, in such amount and at such times as the Managers may determine from time to time.

B. Services Performed by Managers or Affiliates. The Company shall pay the Managers or Affiliates of the Managers for services rendered or goods provided to the Company to the extent that the Managers are not required to render such services or goods themselves without charge to the Company, and to the extent that the fees paid to such Managers or Affiliates do not exceed the fees that would be payable to an independent responsible third party that is willing to perform such services or provide such goods.

C. Expenses. The Company shall pay or reimburse the Managers for all reasonable and necessary business expenses incurred or paid by the Managers in connection with the Managers' performance of services on the Company's behalf, upon presentation to the Company of invoices or other acceptable documentation substantiating such expenses. Additionally, the Company shall also pay or reimburse the Managers or their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare and file the Certificate and this Agreement.

5.8 Officers.

A. Appointment of Officers. The Managers may appoint officers at any time. The officers of the Company, if deemed necessary by the Managers, may include a chairperson, president, vice president, secretary, chief financial officer, chief technical officer, and any other officers the Managers may designate from time to time. The officers shall serve at the pleasure of the Managers, subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. No officer need be a resident of the State of Delaware or citizen of the United States. If a Manager is not an individual, such Manager's officers may serve as officers of the Company if elected by the Managers. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Managers.

B. Removal, Resignation and Filling of Vacancy of Officers. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without



BV00305

cause, by the Managers at any time. Any officer may resign at any time by giving written notice to the Managers. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

C. <u>Salaries of Officers</u>. The salaries of all officers and agents of the Company shall be determined by the Managers from time to time.

D. <u>Duties and Powers of the Chairperson</u>. The chairperson, if such an officer be appointed, shall, if present, preside at meetings of the Members and the Managers, and exercise and perform such other powers and duties as may be from time to time assigned to him by the Managers or prescribed by this Agreement. If there is no president, the chairperson shall in addition be the chief executive officer of the Company and shall have the powers and duties prescribed in Section 5.8E.

The Company shall initially have a Chairperson, who initially shall be **Martin N. Lettunich**. Unless he resigns or is removed, he shall hold office until a successor shall have been elected Chairperson. Chairperson shall be elected or removed by the affirmative vote or written consent of vote of the majority of the Managers.

E. <u>Duties and Powers of the President</u>. Subject to such supervisory powers, if any, as may be given by the Managers to the chairperson, if there be such an officer, the president shall be the chief executive officer of the Company, and shall, subject to the control of the Managers, have general and active management of the business of the Company and shall see that all orders and resolutions of the Members and Managers are carried into effect. He or she shall have the general powers and duties of management usually vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Agreement. The president shall execute bonds, mortgages and other contracts, except where required or permitted by law to be otherwise signed and executed, and except where the signing and execution thereof shall be expressly delegated by the Managers to some other officer or agent of the Company

The Company shall initially have a President, who initially shall be **Brian Caffyn**. Unless he resigns or is removed, he shall hold office until a successor shall have been elected and qualified. President shall be elected or removed by the affirmative vote or written consent of vote of the majority of the Managers.

F. <u>Duties and Powers of Vice-President</u>. The vice-president, or if there shall be more than one, the vice-presidents in the order determined by a resolution of the Managers, shall, in the absence or disability of the president, perform the duties and exercise the powers of the president and shall perform such other duties and have such other powers as the Managers by resolution may from time to time prescribe.



BV00306

G. Duties and Powers of Secretary. The secretary shall attend all meetings of the Managers and all meetings of the Members, and shall record all the proceedings of the meetings in a book to be kept for that purpose, and shall perform like duties for the standing committees when required. The secretary shall give, or cause to be given, notice of all meetings of the Members [and Managers] and shall perform such other duties as may be prescribed by the Managers. The secretary shall have custody of the seal, if any, and the secretary shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature. The Managers may give general authority to any other officer to affix the seal of the Company, if any, and to attest the affixing by his or her signature. The secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Company's transfer agent or registrar, as determined by resolution of the Managers, a register, or a duplicate register, showing the names of all Members and their addresses, their Percentage Interests, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation. The secretary shall also keep all documents described in Section 10.1 and such other documents as may be required under the Act. The secretary shall perform such other duties and have such other authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The secretary shall have the general duties, powers and responsibilities of a secretary of a corporation. If the Managers choose to appoint an assistant secretary or assistant secretaries, the assistant secretaries, in the order of their seniority, in the absence, disability or inability to act of the secretary, shall perform the duties and exercise the powers of the secretary, and shall perform such other duties as the Managers may from time to time prescribe.

H. Duties and Powers of Chief Financial Officer. The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, Membership Interests and Economic Interests. The books of account shall at all reasonable times be open to inspection by any Manager. The chief financial officer shall have the custody of the funds and securities of the Company, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company, and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managers. The chief financial officer shall disburse the funds of the Company as may be ordered by the Managers, taking proper vouchers for such disbursements, and shall render to the president and the Managers, at their regular meetings, or when Members so require, at a meeting of the members an account of all his or her transactions as treasurer and of the financial condition of the Company. The chief financial officer shall perform such other duties and shall have such other responsibility and authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The chief financial officer shall have the general duties, powers and responsibility of a chief financial officer of a corporation, and shall be the chief financial and accounting officer of the Company. If the Managers choose to elect an assistant treasurer or assistant treasurers, the assistant treasurers in the order of their seniority shall, in the absence, disability or inability to act of the chief financial officer, perform the duties and exercise the powers of the chief financial officer, and shall perform such other duties as the Managers shall from time to time prescribe.



I. Signing Authority of Officers. The officers of the Company shall have such signature authority as the Managers may delegate to each officer from time to time.

5.9 Membership Interests of Managers. Except as otherwise provided in this Agreement, Membership Interests held by the Managers as Members shall entitle each Manager to all the rights of a Member, including without limitation the economic, voting, information and inspection rights of a Member.

5.10 Fiduciary Duties. The only fiduciary duties a Manager owes to the Company and the Members are the duty of loyalty and the duty of care set forth in subsections (i) and (ii) below:

(i) A Manager's duty of loyalty to the Company and the Members is limited to the following:

(a) To account to the Company and hold as trustee for the Company any property, profit, or benefit derived by the Manager in the conduct or winding up of the Company's business or derived from any use by the Manager of Company property, including the appropriation of a Company opportunity, without the consent of the Members;

(b) Except as otherwise provided in this Agreement, to refrain from competing with the Company in the conduct of the Company business before the dissolution of the Company without the consent of the Members.

(ii) A Manager's duty of care to the Company and the Members in the conduct and winding up of the Company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law by the Manager.

5.11 Limitation of Liability.

A. Liability of Manager Limited to Manager's Assets. Under no circumstances will any director, officer, shareholder, member, manager, partner, employee, agent or Affiliate of any Manager, or any member of an Advisory Board established by the Company, have any personal responsibility for any liability or obligation of the Manager (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Manager will be limited to the assets of the Manager as they may exist from time to time.

B. Limited For Company Obligations. A Person who is a Manager or officer or both a Manager and an officer of the Company, or a member of an Advisory Board established by the Company, shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer, or both a Manager and an officer, or Advisory Board member.

BV00308

5.12 <u>Advisory Board.</u> The Managers may establish an advisory board ("Advisory Board"), whose function shall be to provide advice and assistance to the Managers with respect to the business of the Company. The Managers shall be entitled to appoint and remove members of the Advisory Board from time to time, in their discretion. Members of the Advisory Board shall not be Members of the Company, or have any rights of Members, except with respect to any Units that may be issued to such Advisory Board members.

**ARTICLE VI**
**ALLOCATIONS OF NET PROFITS AND NET LOSSES**

6.1 <u>Allocations of Net Profit and Net Loss.</u>

    A. <u>Net Loss.</u> Net Loss shall be allocated to the Member as follows:

        (a) First, to the Members in accordance with, and to the extent of, their Capital Accounts.

        (b) Thereafter, to the Members in accordance with their Percentage Interests.

    B. <u>Net Profit.</u> After giving effect to the special allocations set forth in this Agreement, for any taxable year of the Company, Net Profit shall be allocated to the Members as follows:

        (a) First, Net Profit shall be allocated to the Members in accordance with their Percentage Interests to the extent that Net Loss previously allocated to the Members has not been recovered by virtue of the allocation of Net Profit required by this paragraph.

        (b) Thereafter, the remainder of the Net Profit, if any, shall be allocated in accordance with their Percentage Interest.

    C. <u>Reallocations.</u> Notwithstanding anything to the contrary in Section 6.1A, Net Loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain. Any Net Loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 6.1C). Any loss reallocated under this Section 6.1C shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article VI, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article VI, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI if no reallocation of losses had occurred under this Section 6.1C.

6.2 <u>Special Allocations.</u> Notwithstanding Section 6.1:

BV00309

A. <u>Minimum Gain Chargeback</u>. If there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B. <u>Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt</u>. If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

C. <u>Nonrecourse Deductions</u>. Any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D. <u>Member Nonrecourse Deductions</u>. Those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

E. <u>Qualified Income Offset</u>. If a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and

BV00310

the income, gain, and losses allocated to each Member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.2E if such unexpected adjustments, allocations, or distributions had not occurred.

6.3  Section 754 Adjustments. Regulations Section 1.704-1(b)(2)(iv)(m) may require the Company to adjust the Members' Capital Accounts if the Company adjusts the tax bases of its assets pursuant to Code Sections 734(b) or 743(b) following an election pursuant to Code Section 754. Any such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis). Such gain or loss shall be specially allocated among the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted. Such gain or loss shall also be included in any calculation of the aggregate Net Profit or Net Loss allocated to a Member for the purpose of determining the amount of any subsequent allocation that Member is to receive pursuant to this Agreement.

6.4  Member Services; Interest Payments. Notwithstanding any other provision of this Agreement, if a final determination, assessment, or adjudication is made or conceded to on behalf of the Company that any amount paid to a Member or an Affiliate of a Member for services authorized to be rendered by such Person, or interest authorized to be paid to such Person, under this Agreement is not deductible for income tax purposes during any Fiscal Year of the Company, the Company shall specially allocate items of income and gain, for that Fiscal Year or subsequent Fiscal Years as necessary, to the Member in the amount of the disallowed payment. Notwithstanding any other provision of this Agreement, such items of income and gain shall not be included in any calculation of the aggregate amount of Net Profit and Net Loss allocated to such Member.

6.5  Curative Allocations. The allocations set forth in this Agreement are intended to comply with certain requirements of Regulation Section 1.704-1(b). Because it is not possible to foresee every possible future event during the term of the Company, the Allocations might not be consistent with the manner in which the Members intend to share Company distributions in all situations. Accordingly, the Managers may allocate income, gain, loss and deductions among the Members in a manner to prevent the allocations from distorting the manner in which Company distributions are intended to be shared among the Members. The Managers shall have the discretion to accomplish this result in any reasonable manner.

6.6  Other Allocation Rules.

A.  Unless otherwise herein expressly provided to the contrary, all allocations to the Members pursuant to this Article VI shall be divided among the Members in proportion to their respective Percentage Interests.

B.  For purposes of determining Net Profit, Net Loss, or any other items allocable to any period, Net Profit, Net Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Tax Matters Partner using any permissible method under Section 706 of the Code and the Treasury Regulations thereunder.



BV00311

C. Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Regulations, the Members' interests in Net Profit shall be in accordance with their respective Percentage Interests.

D. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.6 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

6.7 <u>Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest</u>. If any Economic Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, Net Profit or Net Loss for such Fiscal Year shall be assigned pro rata to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member or Assignee based upon his or her respective Economic Interest at the close of such day. However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, an Economic Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month). Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Economic Interests as of the date such sale or other disposition occurs.

6.8 <u>Obligations of Members to Report Allocations</u>. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

BV00312

# ARTICLE VII
## INTERIM DISTRIBUTIONS

7.1 <u>Discretionary Distributions</u>. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Managers shall distribute Distributable Cash to Member pursuant to Section 7.1(a) below and may elect from time to time to distribute Distributable Cash to the Members pursuant to Sections 7.1(b) and 7.1(c) below, which distributions shall be in the following order and priorities:

      (a)    First, the Managers shall distribute Distributable Cash to the Members pro rata based on the number of Units owned by the Members in an amount equal to the product of (i) the Tax Percentage and (ii) the Company's taxable income for such Fiscal Year determined in accordance with Section 703(a) of the Code as reflected on the Schedule K-1's in respect of each Unit (reduced by distributions made to such Member during such Fiscal Year pursuant to this Section 7.1(b) and Section 7.1(c), and any liquidating distributions pursuant to Section 11.5. For purposes hereof, "Tax Percentage" shall mean initially fifty percent (50%) and shall be adjusted from time to time by the Managers in response to changes in the tax rates applicable to individuals under the Code and under the state income tax laws of the State of California and in response to any other factors which cause the distributions under this Section to be less than a Member's tax liability in respect of each Unit;

      (b)    Second, the remaining Distributable Cash after application in accordance with Section 7.1(a) shall be distributed fifty percent (50%) to Class B and Class C in proportion to their Unreimbursed Capital Contribution until each such Class B Member and Class C Members has received total distributions of Distributable Cash equal to such Class B Member's and Class C Members' then Unreimbursed Capital Contributions, and fifty percent (50%) to the Class A Members in proportion to their Percentage Interest; and

      (c)    The balance, if any, to all of the Members in proportion to their Percentage Interest;

All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests on the actual date of distribution. Neither the Company nor any Manager shall incur any liability for making distributions in accordance with this Section 7.1.

7.2 <u>Mandatory Distributions</u>. Subject to applicable law and any limitations contained elsewhere in this Operating Agreement, and to the extent the Company has available Distributable Cash to do so, each tax year of the Company, the Managers shall distribute Distributable Cash to the Members pro rata based on the number of Units owned by the Members in an amount equal to the product of (i) the Tax Percentage and (ii) the Company's taxable income for such Fiscal Year determined in accordance with Section 703(a) of the Code as reflected on the Schedule K-1's in respect of each Unit (reduced by distributions made to such Member during such Fiscal Year pursuant to Sections 7.1(b) and 7.1(c), and any liquidating distributions pursuant to Section 11.5.

BV00313

For purposes hereof, "Tax Percentage" shall mean initially fifty percent (50%) and shall be adjusted from time to time by the Managers in response to changes in the tax rates applicable to individuals under the Code and under the state income tax laws of the State of California and in response to any other factors which cause the distributions under this Section to be less than a Member's tax liability in respect of each Unit.

7.3 Form of Distribution. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. Except as provided in Section 11.4, no Member may be compelled to accept from the Company (a) a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members, or (b) a distribution of any asset in kind.

7.4 Restriction on Distribution.

    A. No distribution shall be made if, after giving effect to the distribution:

        (i) The Company would not be able to pay its debts as they become due in the usual course of business; or

        (ii) The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

    B. The Managers may base a determination that a distribution is not prohibited on any of the following:

        (i) Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances;

        (ii) A fair valuation; or

        (iii) Any other method that is reasonable in the circumstances.

    Except as provided in the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days of the date of authorization.

    C. A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 7.4 or Section 11.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable; and (ii) each Member for the amount the Member

BV00314

received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

7.5 Return of Distributions. Members and Assignees who receive distributions made in violation of the Act or this Agreement shall return such distributions to the Company. Except for those distributions made in violation of the Act or this Agreement, no Member or Assignee shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Assignee or paid by a Member or Assignee for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Assignee.

7.6 Tax Withholding. If any federal, foreign, state or local jurisdiction requires the Company to withhold taxes or other amounts with respect to any Member's allocable share of Net Profits, taxable income or any portion thereof, or with respect to distributions, the Company shall withhold from distributions or other amounts then due to such Member (or shall pay to the relevant taxing authority with respect to amounts allocable to such Member) an amount necessary to satisfy the withholding responsibility. In such a case, the Member for whom the Company has paid the withholding tax shall be deemed to have received the withheld distribution or other amount so paid, and to have paid the withholding tax directly. If it is anticipated that at the due date of the Company's withholding obligation the Member's share of cash distributions or other amounts due is less than the amount of the withholding obligation, the Member to which the withholding obligation applies shall have the option to pay to the Company the amount of such shortfall. In the event a Member fails to make such payment and the Company nevertheless pays the full amount to be withheld, the amount paid by the Company shall be deemed a nonrecourse loan from the Company to such Member bearing interest at the lower of the Prime Rate or the maximum rate permitted by law, and the Company shall apply all distributions or payments that would otherwise be made to such Member toward payment of the loan and interest, which payments or distributions shall be applied first to interest and then to principal until the loan is repaid in full. Each Member agrees to cooperate fully with the Company's efforts to comply with the Company's tax withholding and information reporting obligations and agrees to provide the Company with such information as the Company may reasonably request from time to time in connection with such obligations.

## ARTICLE VIII
## TRANSFER OF INTERESTS

8.1 Restrictions on Transfer. Except as provided in Section 8.4, 8.8 and 8.9, no Member shall Transfer all or any part of that Member's Membership Interest except with the prior written consent of the Members holding the Required Percentage, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreements or the Act), as the Members may determine in their sole and absolute discretion. Transfers in violation of this Article VIII shall be effective only to the extent set forth in Section 8.7. After the consummation of any Transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

BV00315



8.2 <u>Further Restrictions on Transfer of Interests</u>. In addition to other restrictions found in this Agreement, no Member shall Transfer all or any part of that Member's Membership Interest: (i) without compliance with applicable securities laws; (ii) if the Transfer would cause the Company's tax termination within the meaning of Code Section 708(b)(1)(B); or (iii) if the Transfer would cause the Company to be treated as a corporation pursuant to Code Section 7704 or Regulations Section 1.7704-1.

8.3 <u>Substitution of Members</u>. An Assignee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 8.1 and 8.2 are met; (ii) the Members holding the Required Percentage have consented to such substitution in their sole and absolute discretion; (iii) the Assignee executes an instrument satisfactory to the Managers accepting and adopting the terms and provisions of this Agreement; and (iv) the Assignee pays any reasonable expenses in connection with such Assignee's admission as a new Member. The admission of an Assignee as a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

8.4 <u>Permitted Transfers</u>. Subject to compliance with Section 8.2, a Member may Transfer that Member's Membership Interest (a "Permitted Transfer") to any Affiliate of the Member if that Member is in voting control of the Affiliate, and such Affiliate shall be a substitute Member. At such time as the Member is no longer in voting control of such Affiliate, a "Transfer" shall be deemed to have occurred and the consent of the Members holding the Required Percentage shall be required in order for the Affiliate to remain a substitute Member.

8.5 <u>Effective Date of Transfers</u>. Any Transfer of all or any portion of an Economic Interest which complies with this Article VIII shall be effective as of the date provided in Section 6.7 following the date upon which the requirements of Sections 8.1, 8.2 and 8.3 (collectively, "Transfer Requirements") have been met. The Company shall provide the Members with written notice of such Transfer as promptly as possible after the Transfer Requirements have been met. Any transferee of a Membership Interest shall take subject to the restrictions on Transfer imposed by this Agreement.

8.6 <u>Rights of Legal Representatives</u>. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Certificate or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his or her legal representative or successor.

8.7 <u>No Effect to Transfers in Violation of Agreement</u>. Upon any Transfer of a Membership Interest in violation of this Article VIII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Assignee and thereafter shall only



XET Holding Co., LLC Operating Agreement

BV00316



receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Company's legal counsel, a Transfer in violation of this Article VIII would cause the Company to (a) be treated as a corporation pursuant to Code Section 7704 or Regulations Section 1.7704-1, or (b) be terminated for tax purposes under IRC Section 708(b)(1)(B), the Transfer shall be null and void and the purported transferee shall not become either a Member or an Assignee. On and contemporaneously with any Transfer of a Member's Economic Interest which does not at the same time Transfer the balance of the rights associated with the Membership Interest Transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of $100, all remaining rights and interests retained by the Member (including voting and inspection rights) that immediately before the Transfer were associated with the Transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member. Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who Transfers a Membership Interest in violation of this Article VIII is not unreasonable under the circumstances existing as of the date hereof.

8.8 <u>Right of First Refusal</u>. This Section 8.8 shall apply proposed transfers by Members who have been approved for Transfer under Section 8.1 above, Class B Members holding at least 5% of the Units of the Company, Class A Members holding at least twenty-five percent (25%) of the Units of the Company and Class C Members. Each time such a Member proposes to transfer all or any part of his or her Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 8.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A. <u>Notice of Proposed Transfer</u>. Such Member shall deliver a written notice ("Option Notice") to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the Membership Interest to be transferred; (iii) the purchase price and terms of payment for which the Member proposes to transfer such Membership Interest; (iv) the nature of the proposed transfer (e.g., sale or pledge); and (iv) the name and address of the proposed transferee.

B. <u>Company Option</u>. Within thirty (30) days after receipt of the Option Notice, the Company shall have the right, but not the obligation, to elect to purchase all or any part of the Membership Interest upon the price and terms of payment designated in the Option Notice. If the Option Notice provides for the payment of non-cash consideration, the Company may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Managers. If the Company exercises such right within such thirty (30)-day period, the Managers shall give written notice of that fact to the transferring and non-transferring Members.

C. <u>Members' Option</u>. If the Company fails to elect to purchase the entire Membership

BV00317

Interest proposed to be transferred within the thirty (30)-day period described in Section 8.8B, the non-transferring Members shall have the right, but not the obligation, to elect to purchase any remaining share of such Membership Interest upon the price and terms of payment designated in the Option Notice. If the Option Notice provides for the payment of non-cash consideration, such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Managers. Within sixty (60) days after receipt of the Option Notice, each non-transferring Member shall notify the Managers in writing of his or her desire to purchase a portion of the Membership Interest proposed to be so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his or her pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share.

     D. <u>Closing</u>. If the Company and the other Members elect to purchase or obtain any or all of the Membership Interest designated in the Option Notice, then the closing of such purchase shall occur within ninety (90) days after the Company's receipt of the Option Notice. The Transferring Member, the Company and/or the other Members shall execute such documents and instruments and make such deliveries as may be reasonably required to consummate such purchase.

     E. <u>Failure to Exercise Options</u>. If the Company and the other Members elect not to purchase or obtain, or default in their obligation to purchase or obtain, all of the Membership Interest designated in the Option Notice, then the transferring Member may transfer the portion of the Membership Interest described in the Option Notice not so purchased, to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest; (ii) is made on terms no less favorable to the transferring Member than as designated in the Option Notice; and (iii) complies with Sections 8.1, 8.2 and 8.3; it being acknowledged by the Members that compliance with Sections 8.8 and 8.9A-D does not modify any of the transfer restrictions in Article VIII or otherwise entitle a Member to transfer his or her Membership Interest other than in the manner prescribed by Article VIII. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

     8.9 Transfer between Class B Member and Class A Member. Under a separate agreement between the parties, the Class A Member has the right in certain circumstances to acquire some or all the Class B shares. If such purchase is effected, the Class B shares will be reduced and the Class A shares will be increased and the provisions of section 8.8 shall not apply.

### ARTICLE IX
### FORFEITURE OF UNITS; OPTIONAL PURCHASE EVENTS; MANDATORY PURCHASE

BV00318

9.1 <u>Rights Provided for by Separate Contract</u>. The Company and/or the other Members of the Company may be given the right to purchase Units held by Members upon the occurrence of certain events, and/or Members may forfeit Units upon the occurrence of certain events, under terms and conditions provided for in any separate written contract entered into between a Member and the Company

9.2 <u>Purchase Terms Varied by Agreement</u>. Subject to the other provisions of this Agreement, nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

9.3 <u>Right to Invoke Buy Sell Procedure</u>. At any time following the 3rd anniversary of the date of formation of the Company, if the Members cannot agree any action requiring a majority or greater consent of the general meeting of the Members, as reflected in the minutes of any Company meeting, and following a sixty (60) day period during which the Members shall work in good faith to overcome the disagreement, any majority of the Class A Members (as determined by way of holding a majority of the Class A Units) or majority of the Class B Members as determined by way of holding a majority of the Class B Units), in either case holding at least 10% of the Company Units (the "Offeror Member") may offer to purchase in whole (and not in part) the Units of majority of the Class A Members for majority of the Class B Members as the case might be (the "Offeree Member") for a price determined pursuant to the conditions and procedures herein specified.

A. <u>Procedure to Invoke Buy Sell</u>. The Offeror Member shall commence the buy-sell procedure hereunder by giving written notice to the Offeree Member (the "Offer Notice"). The Offer Notice shall specify an amount that the Offeror Member, in its sole discretion, considers to be the value of the Company Interest of the Offeree Member as of the date of the Offer Notice (the "Stipulated Value"). The Offer Notice shall also specify (x) the amount of all outstanding Member Loans and/or Company Loans to such Offeror Member, and (y) any distributions required to be made to Members through the anticipated date of sale; the Stipulated Value less the sum of these two items is hereafter referred to as the "Stipulated Amount". Any distribution received by the Offeror or the Offeree eventually selling pursuant to this Section 9 as the case may be shall be deemed as initial payments of the purchase amound due under this Section 9,

B. <u>Right to Accept Offer; Irrevocable Counteroffer if Declined</u>. The Offeree Member shall have the right, for a period of ninety days (90) days after the date of the Offer Notice, to accept or decline the Offer Notice by notice in writing to the Offeror Member. If the Offeree Member fails to give notice either accepting or declining the Offer Notice within such period, then such Offeree Member shall be deemed to have accepted the Offer Notice. If the Offeree Member declines to accept the Offer Notice within such period, then such Offeree Member shall be deemed to have made an irrevocable counteroffer to the Offeror Member for the purchase, on the same terms and conditions provided for in the Offer Notice (except, if the Offeror Member is a Class B Member, then the Class A Member shall have the right to pay as described in paragraph (D) of this Section, below), of the whole Offeror Member's Company Interest, including the amount of all outstanding Members Loan or Company Loan, and the Offeror

BV00319

Member shall be deemed to have accepted such counteroffer, it being understood that if the proportional ownership interests and outstanding Member Loans of the Offeree Member and the Offeror Member are different, the Stipulated Amount shall be considered as correspondingly decreased or increased, as the case may be. Upon acceptance of the Offer, the purchasing party shall have the voting rights of the selling party under this Agreement.

C. Formation of Agreement. The written acceptance by the Offeree Member of the Offer Notice (or the failure of the Offeree Member to act, which is deemed acceptance of the Offer Notice), or the counteroffer deemed made by the Offeree Member and acceptance thereof deemed made by the Offeror Member, as herein specified, shall constitute a binding agreement between the Members for the purchase and sale by the purchasing Member (the "Purchasing Member") of the Company Units (and the outstanding amount of any Members Loan Company Loans, if any) of the selling Member (the "Selling Member") upon the terms and conditions herein specified. The purchase price for the Selling Member's percentage interest in the Company shall be the Stipulated Amount (adjusted, as necessary, to reflect the percentage of Company Units actually owned by the Selling Members). The purchase price, as so determined, shall be paid by wire transfer of immediately available funds as directed by the Purchasing Members within one hundred eighty (180) days from the agreement closing date (which is the first to occur of the date of a written offer of acceptance or decline of an offer or the expiration of the ninety day period specified above) in favour of the Selling Member of the Company Units.

D. Election to Defer Payment. If Selling Member is a Class A Member, then Purchasing Member and Company may elect to pay the purchase price and Member Loans by delivering a Promissory Note for the purchase price all due and payable on the first anniversary of the agreement closing date. Such Promissory Note shall not accrue interest for the first six (6) months, but will accrue interest at the simple rate of 10% per annum thereafter. In addition to any other rights to interest, any failure to pay shall result in the immediate forfeiture of all rights

E. Failure to Make Payment. If either the Purchasing Member or Company fails to make any payment pursuant to the obligations under subsections C or D above, the obligations of such Purchasing Member or Company shall be accelerated and become immediately due and payable. In addition to the accelerated payments, there shall be a late payment penalty equal to fifteen percent (15%) of the outstanding obligations of the Purchasing Member or Company added to the amount due the seller.

**ARTICLE X**
**ACCOUNTING, RECORDS AND REPORTS**

10.1 Books and Records. The accounting records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office, as determined by the Board of Managers from time to time, all of the following:

A. A current list of the full name and last known business or residence address of each



BV00320

Member and Assignee set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Assignee;

B. A current list of the full name and business or residence address of each Manager;

C. A copy of the Certificate and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed;

D. Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E. A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F. Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G. The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

10.2 <u>Delivery to Members and Inspection.</u>



A. Upon the request of any Member or Assignee for purposes reasonably related to the interest of that Person as a Member or Assignee, the Managers shall promptly deliver to the requesting Member or Assignee, at the expense of the Company, a copy of the information required to be maintained under Sections 10.1A, B and D, and a copy of this Agreement.

B. Each Member, Manager and Assignee has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Assignee, to:

(i) inspect and copy during normal business hours any of the Company records described in Sections 10.1A through G; and

(ii) obtain from the Managers, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

(iii) Members representing at least five percent (5%) of the Percentage Interests, or three or more Members, may make a written request to the Managers for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager that the statement was

BV00321

prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

C. Any request, inspection or copying by a Member or Assignee under this Section 10.2 may be made by that Person or that Person's agent or attorney.

D. The Managers shall promptly furnish to a Member a copy of any amendment to the Certificate or this Agreement executed by a Manager pursuant to a power of attorney from the Member.

E. The provisions of this Section 10.2 shall apply only to the extent that such provisions are made mandatory pursuant to applicable law. If applicable law is changed at any time in a manner that limits or restricts the inspection or informational rights of Members, such more limited or restricted provisions shall be applicable.

10.3 <u>Annual Statements</u>.

A. If the Company has more than thirty-five (35) Members, the Managers shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) days after the close of the Fiscal Year. The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager that the financial statements were prepared without audit from the books and records of the Company.

B. The Managers shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Assignees' federal and state income tax returns. The Managers shall send or cause to be sent to each Member or Assignee within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C. The Managers shall cause to be filed at least annually with the Delaware Secretary of State all required reporting and statements.

10.4 <u>Financial and Other Information</u>. The Managers shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Managers shall distribute to the Members, promptly after the preparation or receipt thereof by the Managers, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

10.5 <u>Filings</u>. The Managers, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Managers, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If a Manager required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the Delaware Secretary of State.

10.6 <u>Bank Accounts</u>. The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

10.7 <u>Accounting Decisions and Reliance on Others</u>. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers. The Managers may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.8 <u>Tax Matters for the Company Handled by Managers and Tax Matters Partner</u>. The Managers shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. The Company's initial Tax Matters Partner shall be **Martin N. Lettunich**. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding the Required Percentage or a majority of the Managers then serving as such may designate another to be Tax Matters Partner.



## ARTICLE XI
## DISSOLUTION AND WINDING UP

11.1 <u>Dissolution</u>. The Company shall dissolve, its assets disposed of, and its affairs wound up on the first to occur of the following (each, a "Dissolution Event"):

    A. Upon the entry of a decree of judicial dissolution pursuant to applicable law;

    B. Upon the vote of Members holding the Required Percentage of the Membership Interests, subject to section 4.12;

    C. The sale of all or substantially all of the assets of Company; or

    D. The happening of any event that makes it unlawful or impossible to carry on the business of the Company.

11.2 <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of a Dissolution Event, the Managers who have not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the Delaware Secretary of State and file the Certificate as required by the Act.

11.3 <u>Winding Up</u>. Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Managers who have not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 11.5. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Managers or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

11.4 <u>Distributions in Kind</u>. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Managers or by the Members or if any Member objects by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

11.5 <u>Order of Payment upon Dissolution</u>.

A. After determining that all known debts and liabilities of the Company in the process of winding-up, including, without limitation, debts, and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed in the following order and priority:

(1) First, to the Class B Member and Class C Members in proportion to their Unreimbursed Capital Contributions until each such Class B Member and Class C Members have received total distributions pursuant to this Section 11.5A(1) and pursuant to Section 7.1 equal to such Member's total Capital Contributions;

(2) Second, to Class A Member in proportion to their Percentage Interests until such Class A Members have received total distributions pursuant to this Section 11.5A(2) and pursuant to Section 7.1 equal to One Hundred Thirty Seven Million Five Hundred Thousand ($137,500,000);

BV00324


(3)  Third, to all Members with positive Capital Accounts in proportion to their positive Capital Accounts until each of such Members Capital Accounts have been reduced to zero; and

(4)  The, balance, if any, to all Members in proportion to their Percentage Interests.

Such liquidating distributions shall be made by the end of the Company taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.  The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment thereof has been has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the person, was determined in good faith and with reasonable care by the members or managers to be adequate at the time of any distribution of the assets pursuant to this section.

This Section 11.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

11.6  <u>Limitations on Payments Made in Dissolution</u>. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managers or any other Member.

11.7  <u>Certificate of Cancellation</u>. The Managers or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a Certificate of Cancellation of the Certificate upon the completion of the winding up of the affairs of the Company.

11.8  <u>No Action for Dissolution</u>. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 11.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Managers have failed to liquidate the Company as required by this Article XI, each Member hereby waives and renounces his or her right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Certificate or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 11.8 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

BV00325



## ARTICLE XII
## INDEMNIFICATION AND INSURANCE

12.1 <u>Indemnification of Agents</u>. The Company shall defend and indemnify any Manager and may indemnify any other Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she or it is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Managers shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Managers deem appropriate in their business judgment.

12.2 <u>Insurance</u>. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 12.1 or under applicable law.

## ARTICLE XIII
## INVESTMENT REPRESENTATIONS

13.1 <u>Investment Representation Statement</u>. As a condition to the issuance of a Membership Interest to a prospective Member of the Company, each such prospective Member shall sign and deliver to the Company an Investment Representation Statement, Questionnaire, or other similar document, in form and substance required by the Managers.

13.2 <u>Consent of Spouse</u>. Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have his or her spouse execute a consent substantially in the form attached to this Agreement.



# ARTICLE XIV
## MISCELLANEOUS

14.1 <u>Counsel to the Company</u>. Counsel to the Company ("Company Counsel") may also be counsel to any Manager or any Affiliate of a Manager. The Managers may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his or her Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

14.2 <u>Complete Agreement</u>. This Agreement and the Certificate (and any Investment Representation Statement or similar document executed by the Members) constitute the complete and exclusive statement of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managers or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Certificate (or any Investment Representation Statement or similar document executed by the Members) will be binding on the Members or Managers or have any force or effect whatsoever. To the extent that any provision of the Certificate conflict with any provision of this Agreement, the Certificate shall control.

14.3 <u>Binding Effect</u>. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

14.4 <u>Parties in Interest</u>. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Managers and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

14.5 <u>Pronouns; Statutory References</u>. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

BV00327

14.6 <u>Headings</u>. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.7 <u>Interpretation</u>. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of the Company, a particular Member, or its, his or her counsel.

14.8 <u>References to this Agreement</u>. Numbered or lettered Certificate, sections and subsections herein contained refer to Certificate, sections and subsections of this Agreement unless otherwise expressly stated.

14.9 <u>Governing Law; Jurisdiction</u>. This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 14.14 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California. If any legal or equitable action is necessary to enforce the terms of this Agreement, such action shall be brought in the County of Santa Clara, State of California.

14.10 <u>Exhibits</u>. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

14.11 <u>Severability</u>. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

14.12 <u>Specific Performance</u>. The Members agree that irreparable damage will result if this Agreement is not performed in accordance with its terms, and the Members agree that any damages available at law for a breach of this Agreement would not be an adequate remedy. Therefore, the provisions hereof and the obligations of the Members hereunder shall be enforceable in a court of equity, or other tribunal with jurisdiction, by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies and all other remedies provided for in this Agreement shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that a Member may have under this Agreement, at law or in equity.

14.13 <u>Additional Documents and Acts</u>. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.



14.14 <u>Notices</u>. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, "Notice") given under this Agreement shall be in writing and shall be served personally or delivered by first class, registered or certified, return receipt requested U.S. mail, postage prepaid. Notices may also be given by transmittal over electronic transmitting devices such as Telex, facsimile or telecopy machine, if the party to whom the notice is being sent has such a device in its office, provided a complete copy of any notice so transmitted shall also be mailed in the same manner as required for a mailed notice. Notices shall be deemed received at the earlier of actual receipt or three (3) days following deposit in U.S. mail, postage prepaid. Notices shall be directed to the Company at the Company's principal place of business as specified in Section 2.6 of this Agreement, and to at the addresses shown on Exhibit A provided a Member may change such Member's address for notice by giving written notice to the Company and all other Members in accordance with this Section 14.14.

14.15 <u>Amendments</u>. Notwithstanding anything to the contrary in this Agreement, this Agreement may be amended by the Managers without the consent of any Member: (a) to cure any ambiguity, to correct or supplement any provision of this Agreement which may be inconsistent with any other provisions of this Agreement, or to make any other provisions regarding matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; (b) to change any provisions of this Agreement required to be changed by the staff of the Securities and Exchange Commission or other federal or state "Blue Sky" commissioner, a listing agency, or similar official, which change is deemed by the commissioner, agency, or official to be for the benefit or protection of the Members; or (c) to amend the Company's list of Members in accordance with the terms of this Agreement.  Any other amendments to this Agreement shall require the consent of Members holding the Required Percentage; provided, however, that (i) if any provision of this Agreement gives the Members the right to vote with respect to a particular matter, and such provision requires a percentage vote higher than the Required Percentage, then the consent of such higher percentage shall be required for any amendment to such provision, and (ii) if an amendment of this Agreement would adversely affect the rights of any Member in a manner different from other Members, the consent of such Member to such amendment shall be required.

14.16 <u>Reliance on Authority of Person Signing Agreement</u>. If a Member is not a natural person, neither the Company nor any other Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.17 <u>No Interest in Company Property; Waiver of Action for Partition</u>. No Member or Assignee has any interest in specific property of the Company. Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

BV00329

14.18 <u>Multiple Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.19 <u>Remedies Cumulative</u>. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

14.20 <u>Special Power of Attorney</u>.

A. <u>Limited Power</u>. By signing this Agreement, each Class C Member designates and appoints the Managers as that Member's true and lawful attorney in fact, in that Member's name and stead, to make, execute, sign and file such instruments, documents or certificates which may from time to time be required by the laws of the United States of America, the State of Delaware and any political subdivisions thereof (or any other state or political subdivision in which the Company shall do business) to carry out the purposes of this Agreement, except where such action requires the express approval of the Members. The Managers are not granted any authority on behalf of the Members to amend this Agreement except as provided in Section 14.15, and except that the Managers shall have the authority, as attorney in fact for each of the Members, to amend this Agreement and the Certificate as may be necessary or appropriate to give effect to the transactions specified below following any necessary approvals or consents of the Members:

    (i)    admissions of additional Members;
    (ii)   transfers of Membership Interests;
    (iii)  withdrawals or distributions of Capital Contributions or Distributable Cash;
    (iv)  contributions of additional capital;
    (v)   changes in the amount of Capital Contribution or Percentage Interest of any Member; or
    (vi)  admissions of Persons as successor Managers.

Each Member authorizes each such attorney-in-fact to take any action necessary or advisable in connection with the foregoing, hereby giving each attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with the foregoing as fully as such Member might or could do so personally, and hereby ratifying and confirming all that any such attorney-in-fact shall lawfully do or cause to be done by virtue thereof or hereof.

B. <u>Nature of Power Of Attorney</u>. This power of attorney is a special power of attorney coupled with an interest and (a) is irrevocable; (b) may be exercised by any such attorney-in-fact by listing the Member executing any agreement, certificate, instrument, or other document with the single signature of any such attorney in fact acting as attorney in fact for such Members; (c) shall survive the death, disability, legal incapacity, bankruptcy, insolvency, dissolution, or cessation of existence of a Member; and (d) shall survive the delivery of an assignment by a Member of the whole or a portion of his Membership Interest in the Company, except that where the assignment is of such Member's entire Membership Interest in the Company and the Assignee is admitted as a Member under the terms of this Agreement, the power of attorney shall

BV00330

survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution.

C. Signatures. The Managers may exercise the special power of attorney granted in Section 14.20A by a facsimile signature of the Managers or one of the Managers' officers.

14.21 Estoppel Certificate. Each Member shall, within ten (10) days after written request by any Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by such Member, or if there is a default, the nature or extent thereof.

14.22 Waiver. No waiver by any party to this Agreement of any breach of, or default under, this Agreement by any other party shall be construed or deemed a waiver of any other breach of or default under this Agreement, and shall not preclude any party from exercising or asserting any rights under the Agreement with respect to any other breach or default.

14.23 Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (1) post judgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

14.24 Confidentiality. Each Member agrees not to disclose the provisions of this Agreement to any Person not a signatory to this Agreement, except as otherwise approved by the Managers in writing. However, nothing herein shall preclude the Parties from (i) complying with any legal or judicial process that compels disclosure of the provisions of this Agreement; (ii) commencing legal action to enforce the provisions of this Agreement; (iii) discussing the Agreement with their respective attorneys, accountants or financial planners, as long as the parties clearly advise and instruct such individual that all information regarding the terms and conditions of the Agreement is disclosed in strict confidence and must not be repeated or disclosed to others; or (iv) complying with the requests of federal, state or local taxing authorities.



IN WITNESS WHEREOF, the parties have signed this Agreement on the date first written above and each of the individuals signing below warrants that he or she has the authority to sign for and on behalf of the respective parties.

CLASS A Member:

XSLENT TECHNOLOGIES, LLC

By: _____
Martin N. Lettunich, Manager

By: _____
Brian Caffyn, Manager

By: _____
Stefan Matan, Manager

By: _____
David C. Tinsley, Manager

CLASS B MEMBER XS HOLDING B.V.

By: _____
Brian Caffyn, Managing Director

BV00332

## CONSENT OF SPOUSE

I am the spouse of a member of XET Holding Co., LLC, a Delaware limited liability company (the "Company"). I acknowledge that I have carefully read the Company's Operating Agreement and understand its provisions. I am aware that the Operating Agreement restricts the transferability of my spouse's Membership Interest in the Company. I hereby consent to the terms of the Operating Agreement and agree that any community property interest I may have in my spouse's Membership Interest shall be subject to the terms and conditions of the Operating Agreement. I agree not to take action at any time to hinder operation of the Operating Agreement on such Membership Interest or my interest in it.

My spouse's name is:

_____
Printed Name

_____
Signature

Date: _____

BV00333

| Capital Contribution | Number of Units | Percentage of Total Units | Class C Members: |
|---|---|---|---|
| $_____ | _____ | _____ % | By: _____ |

_____
(Print Name)

_____
(Address)

_____
(City, State, Zip Code)

_____
(Social Security No. or Tax Id. Number)

$_____    _____    _____ %    By: _____

_____
(Print Name)

_____
(Address)

_____
(City, State, Zip Code)

_____
(Social Security No. or Tax Id. Number)

$_____    _____    _____ %    By: _____

_____
(Print Name)

_____
(Address)

_____
(City, State, Zip Code)

_____
(Social Security No. or Tax Id. Number)

BV00334

$_____     _____   _____%     By: _____

                                         _____
                                         (Print Name)

                                         _____
                                         (Address)

                                         _____
                                         (City, State, Zip Code)

                                         ___-___-_____
                                         (Social Security No. or Tax Id. Number)


$_____     _____   _____%     By: _____

                                         _____
                                         (Print Name)

                                         _____
                                         (Address)

                                         _____
                                         (City, State, Zip Code)

                                         ___-___-_____
                                         (Social Security No. or Tax Id. Number)


$_____     _____   _____%     By: _____

                                         _____
                                         (Print Name)

                                         _____
                                         (Address)

                                         _____
                                         (City, State, Zip Code)

                                         ___-___-_____
                                         (Social Security No. or Tax Id. Number)


$_____     _____   _____%     By: _____

                                         _____
                                         (Print Name)

                                         _____
                                         (Address)

                                         _____
                                         (City, State, Zip Code)

                                         ___-___-_____
                                         (Social Security No. or Tax Id. Number)


XET Holding Co., LLC Operating Agreement                          50 of 55

BV00335

## EXHIBIT A

### XET HOLDING CO., LLC
### OPERATING AGREEMENT

**Members, Initial Capital Contributions, Units, and Percentages:**

**Class A Members:**

| Name and Address | Capital Contribution | Number of Units | Percentage of Total Units |
|---|---|---|---|
| Xslent Technologies, LLC 233 Oak Meadow Dr. Los Gatos, CA. 95032 | See Section 3.1, above | 9,000,000 | 90% |

**Class B Member:**

| Name and Address | Capital Contribution | Number of Units | Percentage of Total Units |
|---|---|---|---|
| XS Holding B.V. | $7,500,000 | 1,000,000 | 10% |

**Class C Members:**

| Name and Address | Capital Contribution | Number of Units | Percentage of Total Units |
|---|---|---|---|
| None | 0 | 0 | 0 |

BV00336

**EXHIBIT B**

**LIST OF CONTRIBUTED**
**INTELLECTUAL PROPERTIES**

| U.S. Serial Number | Title | Named Inventor(s) | Filing Date | Status |
|---|---|---|---|---|
| 60-867, 342 | XSLENT Power Extraction Technology - XPX | Matan, Besser | 11/27/2006 | Provisional application filed; New features include improvements in coupling, power conversion methods, control methods, and low power extraction; external communications processor, real time transmission of sensor data, algorithms under remote control; conversion of DC power to AC |
| 60/888, 486 | XPX Power Converter | Matan | 02/6/2007 | Provisional Application - The XPX Converter is an algorithmically operated non-linear current mode power converter that uses a geometric structure or topology to perform its current switching. The current switching topology technology converts DC electricity into AC electricity. This is done under microprocessor control without the use of transformers or inverters. |
| To be determined | Transformer Core Retainer | Besser | April 2007 | Provisional Application – methods and apparatus claims about how to layer the XPX transformers |
| To be determined | Current Source Conversion | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims about voltage controlled current source regulation. |
| To be determined | Power Transfer and Regulation | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims about how we regulate power from any unstable voltage source and how power is regulated going into the transformer core. |
| To be determined | Synchronous Rectification | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims utilizing a synchronous rectifier (an electronic switch that improves power-conversion efficiency by placing a low-resistance conduction path across the diode rectifier in a switch-mode regulator) to enable solar panels to be connected in parallel. |
| To be determined | PWM Generation of Alternating Current | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims for power conversion using PWM under microprocessor control to direct the control of the flux density of the magnetic core of the transformer using PWM itself in a control loop. If the output voltage is high the current is low, if the output voltage is low the current is high. The regulation of input power into the core is controlled by the microprocessor sensing the rate of change of the flux density of the magnetic core. |
| To be determined | Micro-XPX | Matan | 3Q2007 | Provisional Application – methods and apparatus claims for the fabrication of a micro version of XPX integrated with the fabrication of a solar cell. |
| To be determined | Burst Data Methodology | Matan | 2Q2007 | Rate of change and virtual algorithmic control of electronic devices. Preliminary filing embodied in XPX provisional filing; 60-867, 342 |
| To be determined | Hydrogen Battery and Solar Cell | Matan | 3Q2007 | $H_2$ production using XPX technology. |
| To be determined | Thermal Charging System | Matan | 3Q2007 | Piezoelectric unstable voltage capabilities integrated into XPX. |
| To be determined | High Voltage Transformer | Matan | 4Q2007 | XPX AC for high voltage applications. |

BV00337

**EXHIBIT C**

LICENCE AGREEMENT

BV00339

## CONSENT OF SPOUSE

I am the spouse of a member of XET Holding Co., LLC; a Delaware limited liability company (the "Company"). I acknowledge that I have carefully read the Company's Operating Agreement and understand its provisions. I am aware that the Operating Agreement restricts the transferability of my spouse's Membership Interest in the Company. I hereby consent to the terms of the Operating Agreement and agree that any community property interest I may have in my spouse's Membership Interest shall be subject to the terms and conditions of the Operating Agreement. I agree not to take action at any time to hinder operation of the Operating Agreement on such Membership Interest or my interest in it.

My spouse's name is:

*NEDRA T. LEHUNCH*
Printed Name

*[signature]*
Signature

Date: *4-7-07*



BV00340

## CONSENT OF SPOUSE

    I am the spouse of a member of XET Holding Co., LLC; a Delaware limited liability company (the "Company"). I acknowledge that I have carefully read the Company's Operating Agreement and understand its provisions. I am aware that the Operating Agreement restricts the transferability of my spouse's Membership Interest in the Company. I hereby consent to the terms of the Operating Agreement and agree that any community property interest I may have in my spouse's Membership Interest shall be subject to the terms and conditions of the Operating Agreement. I agree not to take action at any time to hinder operation of the Operating Agreement on such Membership Interest or my interest in it.

My spouse's name is:

Margaret M. Tinsley
_____
Printed Name

Margaret M. Tinsley
_____
Signature

Date: 4/7/07



BV00341

## CONSENT OF SPOUSE

I am the spouse of a member of XET Holding Co., LLC; a Delaware limited liability company (the "Company"). I acknowledge that I have carefully read the Company's Operating Agreement and understand its provisions. I am aware that the Operating Agreement restricts the transferability of my spouse's Membership Interest in the Company. I hereby consent to the terms of the Operating Agreement and agree that any community property interest I may have in my spouse's Membership Interest shall be subject to the terms and conditions of the Operating Agreement. I agree not to take action at any time to hinder operation of the Operating Agreement on such Membership Interest or my interest in it.

My spouse's name is:

_Stefan Matan_
Printed Name _Maria Matan_

_[signature]_
Signature

Date: _4 / 9 / 07_

XET Holding Co., LLC Operating Agreement

55 of 55

BV00342

# EXHIBIT 2

# OPERATING AGREEMENT
## FOR
## XSLENT TECHNOLOGIES LLC
### a Delaware Limited Liability Company

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.



EXHIBIT

2

PENGAD 800-631-6989

OPERATING AGREEMENT
FOR
XSLENT TECHNOLOGIES, LLC

This **Operating Agreement** (this "Agreement") is made as of April 11, 2007, by and among the parties listed on the signature pages hereof.

<u>Recitals</u>

A.   The members identified below have formed the limited liability company named above (the "Company") under the laws of the State of Delaware.

B.   The parties desire to adopt and approve an operating agreement for the Company.

<u>Agreement</u>

Based upon the mutual covenants below, with the intent to be legally bound, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings specified below or elsewhere in this Agreement and when not so defined shall have the meanings specified in the Act:

1.1 "<u>Act</u>" shall mean Delaware Liability Company Act, 6 Del. C. Section 18-101 et seq., as amended from time to time.  It is the intention of the parties hereto that in the event that there is any conflict between the terms and conditions of this Agreement and the Act, that the terms of this Agreement shall control to the extent permitted by the Act; and if not so permitted, then the terms of the Act shall control.

1.2 "<u>Affiliate</u>" of a Member or Manager shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member or Manager, as applicable. The term "control," as used above shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.3 "<u>Agreement</u>" shall mean this Operating Agreement, as originally executed and as amended from time to time.

BV00355

1.4 "<u>Assignee</u>" shall mean the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Article VIII.

1.5 "<u>Capital Account</u>" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.6 "<u>Capital Contribution</u>" shall mean the total amount of cash contributed by a Member and, if the Managers determine to accept capital contributions in such other forms, the fair market value of property contributed and/or services rendered or to be rendered to the Company by a Member.

1.7 "<u>Certificate of Formation</u>" shall mean the Certificate of Formation of the Company to be filed with the Office of the Secretary of State of Delaware in accordance with the Act. Delaware Secretary of State means the Office of the Secretary of State of the State of Delaware.

1.8 "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.9 "<u>Company</u>" shall mean the Delaware Limited Liability Company named on the first page of this Agreement.

1.10 "<u>Company Minimum Gain</u>" shall have the meaning ascribed to the term "Minimum Gain" in the Regulations Section 1.704-2(d).

1.11 "<u>Corporations Code</u>" shall mean Chapter 86 of the Delaware Revised Statutes, as amended from time to time, and the provisions of succeeding law.

1.12 "<u>Dissolution Event</u>" shall have the meaning ascribed to that term in Section 11.1.

1.13 "<u>Distributable Cash</u>" shall mean the amount of cash which the Managers deem available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Managers deem necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.14 "<u>Economic Interest</u>" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management or any right to information concerning the business and affairs of Company.

1.15 "<u>Effective Date</u>" shall have the meaning ascribed to that term in Section 2.1.

1.16 "<u>Fiscal Year</u>" shall mean the Company's fiscal year, which shall be the calendar year.

1.17 "<u>Majority Interest</u>" shall mean those Members who hold a majority of the Units which all Members hold.

BV00356

1.18 "Managers" shall mean each of the person(s) identified as the Managers in Section 5.1(a) hereto, or any other persons that succeed any of them as a manager of the Company from time to time.

1.19 "Member" shall mean each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Certificate or this Agreement or is an Assignee who has become a Member in accordance with Article VIII, and (b) has not ceased to be a Member in accordance with Article IX or for any other reason. There shall be two (2) classes of Members: Class A Members and Class B Members. A single Person may hold some or all of the classes of Membership Interests. The term "Members" means, collectively, Class A Members and Class B Members.

1.20 "Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.21 "Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.22 "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management of the Company, and the right to receive information concerning the business and affairs, of the Company.

1.23 "Net Profits" and "Net Losses" shall mean the income, gain, loss and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes.

1.24 "Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.25 "Percentage Interest" shall mean the number of Units held by a Member, as a percentage of the total number of Units held by all Members at any given time.

1.26 "Permitted Transfer" shall have the meaning ascribed to that term in Section 8.4.

1.27 "Person" shall mean an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.28 "Prime Rate" as of a particular date shall mean the prime rate of interest as published on that date in the Wall Street Journal, and generally defined therein as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." If the Wall Street Journal is not published on a date for which the Prime Rate must be determined, the Prime Rate shall be the prime rate published in the Wall Street Journal on the nearest-preceding date on which the Wall Street Journal was published.

BV00357

1.29 "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

1.30 "Required Percentage" shall mean more than fifty percent (50%) of the total Percentage Interests held by all Members.

1.31 "Secretary of State" shall mean the Delaware Secretary of State.

1.32 "Tax Matters Partner" (as defined in Code Section 6231) shall be the person identified as such on Exhibit A, or his or her successor as designated pursuant to Section 10.8.

1.33 "Transfer" or "Transferred" shall mean any sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition voluntarily or involuntarily, by operation of law, with or without consideration, or otherwise (including, without limitation, by way of intestacy, will, gift, bankruptcy, receivership, levy, execution, charging order or other similar sale or seizure by legal process) of all or any portion of any Membership Interest. Without limiting the generality of the foregoing, the sale or exchange of more than twenty percent (20%) of the voting stock of a Member, if a Member is a corporation, or the Transfer of an interest or interests of more than twenty percent (20%) in the capital or profits of a Member (whether accomplished by the sale or exchange of interests or by the admission of new partners or members), if a Member is a partnership or limited liability company, or the cumulative Transfer of such interests in a Member which effectively equal the foregoing (including Transfer of interests followed by the incorporation of a Member and subsequent stock Transfers, or Transfers of stock followed by the liquidation of a Member and subsequent Transfers of interests) will be deemed to constitute a Transfer of the Member's entire Membership Interest.

1.34 "Units" shall mean the units issued by the Company to its Members, which represent their interests in the Company. Units held by Class A Members are "Class A Units", and Units held by Class B Members are "Class B Units." The term "Units" means, collectively, all Class A Units and Class B Units. A single Person may hold some or all of the classes of Membership Interests.

1.35 "Unreimbursed Capital Contribution" of a Member means such Member's total Capital Contributions less distributions to such Member of Distributable Cash pursuant to Section 7.1 and less distributions of assets to such Member upon liquidation of the Company pursuant to Section 11.5.

1.36 "Warrant Agreement" shall mean that certain warrant agreement by and between XET Holding Co., LLC and XS Holding B.V. dated as of the same date hereof.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1 Formation. The Members have formed a Delaware limited liability company by filing the Certificate with the Secretary of State and entering into this Agreement. This Agreement shall be

BV00358

deemed effective as of the date the Certificate was filed ("Effective Date"). The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different because of any provision of this Agreement than those rights or obligations would be in the absence of such provision, this Agreement shall control to the extent permitted by the Act.

2.2 Name. The name of the Company shall be **Xslent Technologies, LLC**. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managers deem appropriate or advisable. The Managers shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managers consider appropriate or advisable. The Company's name shall be the exclusive property of the Company, and no Member shall have any rights in the name or any derivation thereof.

2.3 Term. The Company's existence commenced on the Effective Date and shall continue until terminated as hereinafter provided.

2.4 Registered Office and Agent. The Company shall continuously maintain an office and registered agent in the State of Delaware as required by the Act. The principal office of the Company shall be as the Managers may determine. The Company also may have such offices, anywhere within and without the State of Delaware, as the Managers from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Certificate or as otherwise determined by the Managers.

2.5 Principal Place of Business. The Company's principal place of business shall be as indicated on Exhibit A. The Company may also have such offices, anywhere within and without the State of Delaware, as the Managers may determine from time to time, or the business of the Company may require.

2.6 Member and Manager Information. The name, address and number of Units held of each Member, and the name and address of each Manager are set forth in Exhibit A. A Member may change his or her address in the Company's books and records upon notice thereof to the Managers.

2.7 Purpose and Business of the Company. The purpose of the Company is to do research and development of new software architecture and other Intellectual Property development and to license market and sell said Intellectual Propertyand such other activities directly related to and in furtherance of the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Managers, and (ii) engage in any lawful activity for which a limited liability company may be organized under the Act. Notwithstanding the foregoing, without the consent of Members holding the Required Percentage, the Company shall not engage in any business other than the business described in subsection (i) herein.

2.8 Tax Classification. The Members acknowledge that pursuant to Regulation Section 301.7701-3, the Company shall be classified as a partnership for federal income tax purposes until the effective date of any election ("Election") to change its classification on IRS Form

BV00359

8832, Entity Classification Election. The Members agree the Managers shall have, with the consent of Members holding the Required Percentage, the authority to file and make the Election on behalf of the Company and each Member at such time as the Managers determine such a change is in the Company's best interests.

2.9 No State-Law Partnership. The Company's classification as a partnership will apply only for federal (and, as appropriate, state and local) income tax purposes. This characterization does not create or imply a general partnership, limited partnership or joint venture among the Members for state law or any other purpose. Instead, the Members acknowledge the Company's status as a limited liability company formed under the Act.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1 Capital Contributions. Each Member shall contribute to the Company the money, property and/or services specified below:

3.1.1. Xslent Technologies, LLC, Class A Member. Within two (2) days of the execution of this Agreement, Xslent Technologies, LLC, a Delaware limited liability company ("Xslent Tech") shall contribute the intellectual property listed on Exhibit B attached hereto to Company, and assume the loan to Martin N. Lettunich from XS Holdings B.V. ("XS Holdings") or its Affiliate the principal sum of $1,137,000 (the "**ML Loans**") which has been guaranteed by Xslent, LLC, a Nevada limited liability company (the "**ML Loan Guarantee**"), and the assumption of approximately $1,000,000 of loans made to Atira, LLC, Xslent, LLC, or Martin N. Lettunich described on Schedule 3.1.1 hereto. Class A Member shall be issued the number of Class A Units specified on Exhibit A.

3.1.2 XS Holdings Class B Member. Within two (2) days of the execution of this Agreement, Class B Member shall contribute $3,500,000, and the balance of $4,000,000 due from Class B Member shall (at Class B Members option) be contributed to the Company in monthly payments of $500,000 at the first day of each month thereafter, commencing May 1, 2007 for a total of $7,500,000. In partial satisfaction of the initial $3,500,000 Capital Contribution, Class B Member may cause to be applied and set-off, to the extent outstanding, the principal of the ML Loans. Class B Member shall be issued the number of Class B Units specified on Exhibit A.

3.2 Additional Capital Contributions. No Member shall be required to make any additional Capital Contributions. To the extent approved by the Managers, from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire, and if the Managers determine that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business, including without limitation, expansion or diversification. In that event, the Members will have the opportunity, but not the obligation, to participate in the additional Capital Contribution on a pro rata basis in accordance with the number of Units held by each. Each Member will receive a Capital Account credit in the amount of any additional capital that the Member contributes to the Company, and, subject to Section 3.9, the Member will receive an additional number of Units, which shall be Class A Units,

BV00360

# OPERATING AGREEMENT
## FOR
## XSLENT TECHNOLOGIES LLC
### a Delaware Limited Liability Company

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

determined by the value of the additional Capital Contribution in relation to the value of the Company as a whole. The value of the Company as a whole will be determined by the Managers at the time the additional Capital Contribution is requested, and the Managers shall inform the Members of such value, and the resulting price per new Class A Unit to be issued. Immediately following these Capital Contributions, the Managers will update the Company's ledger of outstanding Units to reflect the issuance of the additional Class A Units in accordance with this Section.

3.3 Intentionally Left Blank

3.4 Capital Accounts.

   A. Maintenance. Separate capital accounts shall be maintained and be current for distribution and contributions at all times for each Member in accordance with Treasury Regulation Section 1.704-1(b). Each Member's capital account shall consist of the capital that such member has contributed to the Company, increased by any income allocable to that member, and decreased by any loss or deduction allocable to, distributions to, and withdrawals of capital by the Member under this Agreement and in accordance with any applicable requirements of federal income tax law. Such accounts shall be closed at least annually.

   B. Assignment. On the Transfer of all or any part of a Member's Membership Interest as permitted by this Agreement, the Capital Account of the transferor, or portion thereof that is attributable to the Transferred interest, shall carry over to the transferee as prescribed in Regulations Section 1.704-1(b)(2)(iv).

   C. Revaluation. At such times as may be required or permitted by Code Section 704 and any Regulations thereunder, the Capital Accounts shall be revalued and adjusted to reflect the then fair market value of the Company's property. The Capital Accounts shall be maintained in compliance with Regulation Section 1.704-1(b)(2)(iv)(f). All allocations of gain resulting from such revaluation shall be made consistently with regulation Section 1.704-1(b)(2)(iv)(f) and, to the extent not inconsistent therewith, provisions of Section 6.1 on the allocation of Net Profit.

3.5    Class B Failure to Make Contributions. If a Class B Member does not timely contribute all of the capital pursuant to section 3.1.2 in accordance with the schedule specified therein, the Class A Members or Managers shall send the Class B Member written notice of such failure to contribute, giving him or her fourteen (14) days from the date such notice is given to contribute the entire amount the capital contribution required at that time ("Capital Notice"). If the Class B Member does not contribute his or her required capital to the Company pursuant to Section 3.1.2 above within said fourteen (14) day period, a majority of the Class A Members or majority of the Managers (other than Brian Caffyn) may elect any one or more of the following remedies within 60 days of such Capital Notice:

   3.5.1. Declare some or all of the Warrants of Class B Members described in the Warrant Agreement as null and void by way of written notice to the Class B Member within 60 days after the failure to contribute.

BV00362

3.5.2.  The Percentage Interests and the number of Class B Units of Class B Member shall be adjusted, in which event the Class B Member's Percentage Interest and Units shall be a fraction, the numerator of which represents the amount of such Member's Capital Contributions  and the denominator of which represents $7,500,000.  The total number of the reduction in the Class B Units determined pursuant to the previous sentence shall be added to the Units of Class A Member as Class A Units

3.5.3.  Provided that the Percentage Interest has not been adjusted under Section 3.5.2, above then Class B Member shall have no right to receive any distributions from the Company until the Class B Member has contributed the full $7,500,000 of capital. All withheld distributions to Class B Member shall be deemed applied to the latest capital contribution required under Section 3.1.2., above (ie – the final month shall be paid in first).

3.5.4.  Class B Member shall lose its approval rights under Section 4.12 of this Agreement.

3.5.5.  Class B Member shall lose his or her ability to elect a Manager.

Each Member acknowledges and agrees that the remedies described in this Section 3.5 bear a reasonable relationship to the damages which the Members estimate may be suffered by the Company and the other Member by reason of the failure of a Class B Member to make an additional Capital Contribution and the election of any or all of the above described remedies is not unreasonable under the circumstances existing as of the date hereof.

3.6 Withdrawal and Return of Capital. No Member shall be entitled to withdraw or to demand the return of any or all of that Member's Capital Contribution, except as specifically provided in this Agreement.

3.7 No Interest. No Member shall be entitled to receive interest on that Member's Capital Contributions or the balance of that Member's Capital Account without the Managers' prior written consent.

3.8 No Priority Return. Except as otherwise provided in this Agreement, no Member shall have priority over any other Member regarding the return of a Capital Contribution.

3.9 Member Loans.

Any Member or an Affiliate of a Member may, subject to the other provisions of this Agreement, lend money to the Company with the Managers' prior written consent.  The loan shall not be treated as a Capital Contribution by that Member or entitle the Member to an increase in that Member's Percentage Interest. The loan amount shall be a debt due from the Company, repayable out of the Company's assets, and shall be on such terms as the Company and the Member agree.  Notwithstanding the foregoing, no Member shall be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

B. Members acknowledge that any Member, Manager or Affiliate of a Member or Manager (each, a " Lender" ) who loans money to the Company pursuant to this Section 3.8 shall

BV00363

have rights (" Rights" ), the exercise of which may be in conflict with the Company's best interests. In that regard, the Members hereby authorize, agree and consent to the Lender's exercise of any of Lender's Rights under any promissory note, security agreement or other loan document, even though the Lender's exercise of those rights may be detrimental to the Company or the Company's business. Further, the Members agree that any Lender's proper exercise of the Rights shall not be deemed a breach of that Lender's fiduciary duties (if any) to the Company.

3.10 <u>Maximum number of Units</u>. Notwithstanding any other provisions of this Agreement, the Company shall issue no more than the "Authorized Number of Units" established from time to time. The Authorized Number of Units shall initially shall be 10 million (10,000,000) Units.. The Authorized Number of Units may be changed from time to time only by approval of the Managers and approval of Members holding the Required Percentage. The Authorized Number of Units shall be proportionally adjusted for any split or reverse split of outstanding Units that are affected by the Company from time to time. Upon any change in the Authorized Number of Units, the Managers shall attach an addendum to this Agreement specifying the new Authorized Number of Units.

## ARTICLE IV
### MEMBERS

4.1 <u>Limited Liability</u>. Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2 <u>Issuance of Additional Membership Interests; Admission of Additional Members</u>. The Managers may cause the Company to issue Membership Interests to, and to admit any Person as, a Member on such terms and conditions as the Managers deem appropriate, subject to Section 4.12. Such new Members shall be issued a number of Units, and shall make such Capital Contributions, as the Managers determine to be appropriate. The Members understand and agree that, pursuant to this Section, the Managers may cause additional Units in the Company to be issued to employees, consultants, advisors, investors, or other Persons, for such consideration as the Managers deem appropriate, which may consist of cash, property, promissory notes, services rendered, or other consideration.

4.3 <u>Withdrawals or Resignations</u>. No Member may withdraw as a Member from the Company, except as may be otherwise provided in a written agreement entered into between the Company and such Member.

4.4 <u>Termination of Membership Interest</u>. Upon (a) the Transfer of a Member's Membership Interest in violation of Article VIII, or (b) the withdrawal, resignation or retirement of a Member in violation of Section 4.3, the Membership Interest of a Member shall be terminated by the Managers and thereafter that Member shall be an Assignee only. Each Member acknowledges and agrees that such termination of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.



BV00364

4.5 Deliberately Not Used

4.6 <u>Transactions with The Company</u>. Subject to any limitations set forth in this Agreement and with the prior approval of the Managers, a Member or an Affiliate of a Member may transact business with the Company so long as the transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those terms and conditions that are generally available in similar transactions from Persons operating at arm's length and, in the case of services, from Persons capable of performing similar services. Subject to other applicable laws, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.7 <u>Remuneration to Members</u>. Except as otherwise specifically provided in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or an Affiliate of a Member is entitled to remuneration for services rendered or goods provided to, or on behalf of, the Company.

4.8 <u>Members Are Not Agents</u>. Pursuant to Section 5.1 and the Certificate, the management of the Company is vested in the Managers. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Certificate and except as expressly required by the Act. No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by a Manager or Managers, have any power or authority to (a) bind or act on behalf of the Company in any way, (b) pledge its credit, (c) execute any instrument on its behalf, or (d) render it liable for any purpose. Each Member shall indemnify, defend and hold harmless the Company and the other Members from and against any and all loss, cost, expense, liability or damage arising from or relating to any action by such Member in contravention of this Section 4.8.

4.9 <u>Voting Rights</u>. Except as expressly provided in this Agreement, the Certificate or as required by law, Members shall have no voting, approval or consent rights and, to the extent permitted by applicable law, each Member waives that Member's right to vote on any matters other than those set forth in Section 5.3B. In all matters in which a vote, approval or consent of the Members is required, a vote, consent or approval of Members holding the Required Percentage shall be sufficient to authorize or approve such act. Except as otherwise specifically provided in this Agreement, all votes, approvals or consents of the Members may be given or withheld, conditioned or delayed as the Members may determine in their sole and absolute discretion.

4.10 <u>Member Meetings; Written Consents</u>. No annual or regular meetings of the Members are required. However, if such meetings are held, written notice of a meeting of Members shall be sent or otherwise given to each Member not less than ten (10) nor more than sixty (60) days before the date of the meeting and shall otherwise comply with the Act. The notice shall specify the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to a Manager by any person entitled to call a meeting of members, the Managers shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the

BV00365

person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice. Any action that may be taken by Members under this Agreement may be taken by a written consent executed by Members having not less than the aggregate Percentage Interests that would be necessary to take that action at a meeting at which all Members entitled to vote thereon were present and voted. Action taken by written consent shall be effective as of the date set forth in the consent.

4.11. Deliberately Not Used

4.12  Class B Member Consent.  The parties agree that neither the Company nor its Subsidiaries of Company shall take, or be permitted to take, any of the actions set forth in this Section 4.12 (the "Major Actions") without the prior written consent of the Class B Member. In the event of any conflict between this Section 4.12 and the other provisions of this Agreement, this Section 4.12 shall control.  The following actions constitute Major Actions, whether by the Company or any Subsidiary:

A. The amendment to or waiver of any of the provisions of the organizational documents of the Company or any Subsidiary, or this Agreement as it relates to any of the Class B Member rights and preferences and privileges herein;

B. The commencement of any liquidation, dissolution or voluntary bankruptcy, administration, recapitalization or reorganization of the Company or any Subsidiary in any form of transaction, make any arrangements with creditors, or consent to the entry of an order for relief in an involuntary case, or take the conversion of an involuntary case to a voluntary case, or consent to the appointment or taking possession by a receiver, trustee or other custodian for all or substantially all of its property, or otherwise seek the protection of any applicable bankruptcy or insolvency law;

C. The merger or consolidation of the Company or any of its Subsidiaries (other than a merger or consolidation of the Company with any of its wholly-owned Subsidiaries or of any of the Company's wholly-owned Subsidiaries with any other of the Company's wholly-owned Subsidiaries), whether to effect an acquisition, divestiture or otherwise;

D. Entering into any corporate transactions, including any joint venture, investment (other than an investment in, contract with or acquisition of any securities or assets of any of the Company's wholly-owned Subsidiaries), recapitalization, reorganization or contract with any other Person or acquisition of any securities or assets of another Person, whether in a single transaction or series of related transactions, in excess of the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) in any year, ten percent (10%) of the last twelve months total distributions to the Members;

E. Making any loans or advances to or guarantees or granting security in excess of the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) ten

BV00366

percent (10%) of the last twelve months total distributions to the Members in the aggregate for all such loans, advances and guarantees, other than routine advances to cover expenses incurred on behalf of the Company or its Subsidiaries;

F. Other than in the ordinary course of business, any sale, lease or other conveyance of assets of the Company or its Subsidiaries in any transaction or series of related transactions (other than any sale, lease or other conveyance of assets of any wholly-owned Subsidiary of the Company to the Company or any of the Company's other wholly-owned Subsidiaries), in each case outside the ordinary course of business or any assets (other than obsolete inventory or inventory sold in the ordinary course of business), except for sales, leases or other conveyances of assets in a single transaction or series of related transactions with a fair market value (as determined in good faith on a reasonable basis by the Board of Managers and agreed to by the Class B Member) of less than or equal to the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) in any year, ten percent (10%) of the last twelve months total distributions to the Members;

G. The guarantee, assumption or incurrence of indebtedness for borrowed money by the Company or any of its Subsidiaries (including indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of, or substantially all of its business and assets were acquired by, the Company or such Subsidiary and indebtedness secured by a lien encumbering any asset acquired by the Company or such Subsidiary) in excess of the greater of (i) $1,000,000 per year prior to the 3rd anniversary of the formation of the Company or $10,000,000 per year after the 3rd anniversary of the formation of the Company, or (ii) in any year, ten percent (10%) of the last twelve months total distributions to the Members in the aggregate;

H. Entering into any arrangement, contract or order which by its terms would restrict the Company from complying with its obligations under this Agreement.

I. Selling, encumbering, assigning, licensing or otherwise disposing of any the Company's intellectual property, other than in the ordinary course of business;

J. Appointing, discharging, terminating, determining or changing the remuneration including by way of a discretionary bonus or conditions of employment or otherwise of any of Martin Lettunich, David Tinsley or Stefan Matan other than commercially reasonable compensation;

K. Entering into, cancelling, varying or waiving any rights under or releasing any restrictions contained in any agreements, contracts or arrangements with (i) any of the Beneficial Owners or their Affiliates; or (ii) any Affiliate of the company except for wholly owned subsidiaries of the Company or an Affiliate of which the company is a wholly owned subsidiary;

L. The entering into of any agreement to do any of the foregoing.

4.13 Certificate of Membership Interest.

BV00367

A. <u>Certificate</u>. A Membership Interest may be represented by a certificate of membership, in the discretion of the Managers. Subject to applicable law, the form and content of the certificate of membership shall be determined by the Managers.

B <u>Cancellation of Certificate</u>. Except as herein provided with respect to lost, stolen, or destroyed certificates, no new certificates of membership shall be issued in lieu of previously issued certificates of membership until former certificates for a like number of Membership Interests shall have been surrendered and canceled. All certificates of membership surrendered to the Company for transfer shall be canceled.

C. <u>Replacement of Lost, Stolen, or Destroyed Certificate</u>. Any Member claiming that his or her certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Managers, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen, or destroyed.

**ARTICLE V**
**MANAGEMENT AND CONTROL OF THE COMPANY**

5.1 <u>Management of the Company by Board of Managers</u>.

A. <u>Exclusive Management by Managers</u>. Subject to the provisions of the Certificate and this Agreement relating to actions required to be approved by the Members, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Board of Managers.

B. <u>Approval Required</u>. If there is more than one Manager, then except as otherwise expressly provided in this Agreement, all actions of the Managers may be taken only by the approval of a majority of the votes of the Board of Managers. Each Manager shall have one (1) vote each, except Brian Caffyn shall have two (2) votes at any meeting of the Board of Managers where more than three Managers attend so long as (i) he is a member of the Board of Managers, (ii) Class B Member owns at least a Percentage Interest of five percent (5%) or more and Class B Member is not in default of its obligation to make its Capital Contribution described in Section 3.1.2, and (iii) Class B Member shall have fully paid all amounts then due under Section 3.1.2 of this Agreement. If Brian Caffyn is not a Member of the Board of Managers by reason of death, incompetence, resignation or for any other reason, the replacement Manager for Brian Caffyn will only have one (1) vote.

C. <u>Agency Authority of Managers</u>. Subject to Section 5.3B, no Manager, acting alone, shall be authorized to sign checks, documents, contracts and other instruments on behalf of the. Company, except as authorized by the Board of Managers. Subject to Section 5.3B, either the Chairperson, President or officer of the Company authorized by the Board of Managers acting alone, shall be authorized to sign checks, documents, contracts and other instruments on behalf of the Company; provided, however, that (a) prior to taking any actions on behalf of the Company that are outside of the ordinary course of business of the Company, the Managers must

BV00368

approve such action as provided in this Agreement, or (b) the Managers, in their discretion, may direct specific action or require the signature of more than one person on checks over a certain dollar amount.

D. Meetings of Board of Managers. Meetings of the Managers may be called by any Manager, or by the chairperson, president, any vice-president or the secretary, if any such officers have been appointed. All meetings shall be held upon four (4) days notice by mail or forty-eight (48) hours notice delivered personally or by telephone, telegraph or facsimile. A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting. A majority of the votes of the Managers present, whether or not a quorum is present, may adjourn any meeting to another time and place. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment shall be given prior to the time of the adjourned meeting to the Managers who are not present at the time of the adjournment. Meetings of the Managers may be held at any place within or without the State of Delaware which has been designated in the notice of the meeting or at such place as may be approved by the majority of the votes of the Managers. Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers participating in such meeting can hear one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. A majority of the authorized number of votes of the Managers constitutes a quorum of the Managers for the transaction of business. Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the votes of the Managers present at a meeting duly held at which a quorum is present is the act of the Managers. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of Managers, if any action taken is approved by at least a majority of votes of the required quorum for such meeting.

Any action required or permitted to be taken by the Managers may be taken by the Managers without a meeting, if a majority of the votes of the Managers individually or collectively consent in writing to such action, unless this Agreement specifically provides that the particular action requires the unanimous vote of the Managers, in which case all Managers must consent in writing. Such action by written consent shall have the same force and effect as a majority vote or unanimous vote, as applicable, of such Managers.

The provisions of this Section 5.1D govern meetings of the Managers if the Managers elect, in their discretion, to hold a meeting. However, nothing in this Section 5.1D or in this Agreement is intended to require that meetings of Managers be held, it being the intent of the Members that meetings of Managers are not required. Actions may be taken by the Managers without a meeting, and without action by written consent in lieu of a meeting, if otherwise approved by a majority of the Managers.

E. Observers. Class A Member or Class B Member may each designate an observer to

BV00369

attend all meetings of the Board of Managers and committees thereof (an "**Observer**"). The Company shall give to the Observer the same notice given to members of the Board of, and permit the Observer to attend, all meetings of its Board of Managers and all committee meetings thereof. The Observer will be entitled to receive all written materials and other information given to members of the Board of Managers in connection with such meeting at the same time such materials or information are given to such other members of the Board unless legal counsel of the Company believes such written materials and other information should be kept confidential. Observers shall be allowed to participate fully in the meeting except for voting at, and attending, sessions involving litigation and employment termination matters.

5.2 <u>Election of Managers</u>.

A. <u>Number, Term, and Qualifications</u>. The Company shall initially have the number of Managers indicated on Exhibit A. The number of Managers of the Company shall be fixed from time to time by the affirmative vote or written consent of Members holding the Required Percentage, provided that in no instance shall there be less than one Manager. Unless he or she resigns or is removed, each Manager shall hold office until a successor shall have been elected and qualified. Managers shall be elected by the affirmative vote or written consent of Members holding the Required Percentage other than in the case of any replacement to Mr. Caffyn who shall be appointed by the vote of the majority of the Class B Members so long as the Class B members hold at least 5% of the total voting Units outstanding of the Company. A Manager need not be a Member, an individual, a resident of the State of Delaware, or a citizen of the United States. The Company shall initially have four (4) Managers. The initial Manager of the Board of Managers shall be:

> MARTIN N. LETTUNICH
> BRIAN E. CAFFYN
> DAVID C. TINSLEY,
> STEFAN MATAN,

B. <u>Resignation</u>. Any Manager may resign at any time by giving written notice to the Members and remaining Managers without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party. The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not (i) affect the Manager's rights as a Member; (ii) constitute a withdrawal of a Member; or (iii) affect any rights a Manager or a Manager's Affiliate may have under any written agreement with the Company.

C. <u>Removal</u>. Any Manager, other than Mr. Caffyn or any subsequent Class B appointed Manager so long as the Class B Members hold at least 5% of the outstanding voting Units of the Company, may be removed at any time, with or without cause, by the affirmative vote of Members holding the Required Percentage at a meeting called expressly for that purpose, or by the written consent of Members holding the Required Percentage. Any removal shall be without prejudice to the rights, if any, of the Manager under any employment contract and, if the Manager is also a Member, shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member. A Manager also may be removed by the affirmative vote or written

BV00370

consent of a majority of the remaining Managers if such Manager becomes incapable of fulfilling his or her obligations under this Agreement because of injury or physical or mental illness and such incapacity shall exist for thirty (30) working days in the aggregate during any consecutive six (6) month period.

D. <u>Vacancies</u>. Any vacancy occurring for any reason in the number of Managers may be filled by the affirmative vote or written consent of Members holding the Required Percentage or by a majority of the votes of the remaining Managers other than in the case of any replacement to Mr. Caffyn who shall be appointed by the vote of the majority of the Class B Members so long as the Class B Members hold at least 5% of the total voting Units outstanding of the Company.

5.3 <u>Powers of Managers</u>.

A. <u>Powers of Managers</u>. Without limiting the generality of Section 5.1, but subject to Section 5.3B and to the express limitations set forth elsewhere in this Agreement, the Managers shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 18-402 including, without limitation, the power to:

(i) Acquire, purchase, renovate, improve, alter, rebuild, demolish, replace, and own real property and any other property or assets that the Managers determine is necessary or appropriate or in the interest of the business of the Company, and to acquire options for the purchase of any such property;

(ii) Sell, exchange, lease, or otherwise dispose of the real property and other property and assets owned by the Company, or any part thereof, or any interest therein;

(iii) Borrow money from any party including the Managers and their Affiliates, issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend, or change the terms of, or extend the time for the payment of any indebtedness or obligation of the Company, and secure such indebtedness by mortgage, deed of trust, pledge, security interest, or other lien on Company assets;

(iv) Guarantee the payment of money or the performance of any contract or obligation of any Person;

(v) Sue on, defend, or compromise any and all claims or liabilities in favor of or against the Company; submit any or all such claims or liabilities to arbitration; and confess a judgment against the Company in connection with any litigation in which the Company is involved; and

(vi) Retain legal counsel, auditors, and other professionals in connection with the Company business and to pay therefor such remuneration as the Managers may determine.

BV00371

B. <u>Limitations on Power of Managers</u>. The Managers shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding the Required Percentage:

(i) The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a 12-month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution;

(ii) The conversion of the Company into, or the merger of the Company with, another limited liability company or limited partnership;

(iii) The merger of the Company with, or conversion into, a corporation or a general partnership or other Person;

(iv) The establishment of new classes of Members;

(v) An alteration of the primary purpose or business of the Company as set forth in Section 2.7;

(vi) Any act which would make it impossible to carry on the ordinary business of the Company;

(vii) Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members;

5.4 <u>Devotion of Time</u>. The Managers are not obligated to devote all of their time or business efforts to the affairs of the Company. The Managers shall devote whatever time, effort, and skill they deem appropriate for the operation of the Company.

5.5 <u>Deliberately not used</u>.

5.6 <u>Transactions between the Company and the Managers</u>. Notwithstanding that it may constitute a conflict of interest, the Managers may, and may cause their Affiliates to, engage in any transaction, including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those terms and conditions that are generally available in similar transactions from Persons operating at arm's length and, in the case of services, from Persons capable of performing similar services. A transaction between the Managers and/or their Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if a Majority Interest of the Members having no interest in such

BV00372

transaction (other than their interests as Members) affirmatively vote or consent in writing to approve the transaction. Notwithstanding the foregoing, the Managers shall not have any obligation, in connection with any such transaction between the Company and the Managers or an Affiliate of the Managers, to seek the consent of the Members.

5.7 Payments to Managers.

A. Management Fee. The Company may pay the Managers a management fee in consideration for their service as Managers, in such amount and at such times as the Managers may determine from time to time.

B. Services Performed by Managers or Affiliates. The Company shall pay the Managers or Affiliates of the Managers for services rendered or goods provided to the Company to the extent that the Managers are not required to render such services or goods themselves without charge to the Company, and to the extent that the fees paid to such Managers or Affiliates do not exceed the fees that would be payable to an independent responsible third party that is willing to perform such services or provide such goods.

C. Expenses. The Company shall pay or reimburse the Managers for all reasonable and necessary business expenses incurred or paid by the Managers in connection with the Managers' performance of services on the Company's behalf, upon presentation to the Company of invoices or other acceptable documentation substantiating such expenses. Additionally, the Company shall also pay or reimburse the Managers or their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare and file the Certificate and this Agreement.

5.8 Officers.

A. Appointment of Officers. The Managers may appoint officers at any time. The officers of the Company, if deemed necessary by the Managers, may include a chairperson, president, vice president, secretary, chief financial officer, chief technical officer, and any other officers the Managers may designate from time to time. The officers shall serve at the pleasure of the Managers, subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. No officer need be a resident of the State of Delaware or citizen of the United States. If a Manager is not an individual, such Manager's officers may serve as officers of the Company if elected by the Managers. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Managers.

B. Removal, Resignation and Filling of Vacancy of Officers. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Managers at any time. Any officer may resign at any time by giving written notice to the Managers. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is

BV00373

a party. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

C. Salaries of Officers. The salaries of all officers and agents of the Company shall be as may be determined by the Managers from time to time.

D. Duties and Powers of the Chairperson. The chairperson, if such an officer be appointed, shall, if present, preside at meetings of the Members and the Managers, and exercise and perform such other powers and duties as may be from time to time assigned to him by the Managers or prescribed by this Agreement. If there is no president, the chairperson shall in addition be the chief executive officer of the Company and shall have the powers and duties prescribed in Section 5.8E.

The Company shall initially have a Chairperson, who initially shall be **Martin N. Lettunich**. Unless he resigns or is removed, he shall hold office until a successor shall have been elected Chairperson. Chairperson shall be elected or removed by the affirmative vote or written consent of vote of the majority of the Managers.

E. Duties and Powers of the President. Subject to such supervisory powers, if any, as may be given by the Managers to the chairperson, if there be such an officer, the president shall be the chief executive officer of the Company, and shall, subject to the control of the Managers, have general and active management of the business of the Company and shall see that all orders and resolutions of the Members and Managers are carried into effect. He or she shall have the general powers and duties of management usually vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Agreement. The president shall execute bonds, mortgages and other contracts, except where required or permitted by law to be otherwise signed and executed, and except where the signing and execution thereof shall be expressly delegated by the Managers to some other officer or agent of the Company

F. Duties and Powers of Vice-President. The vice-president, or if there shall be more than one, the vice-presidents in the order determined by a resolution of the Managers, shall, in the absence or disability of the president, perform the duties and exercise the powers of the president and shall perform such other duties and have such other powers as the Managers by resolution may from time to time prescribe.

G. Duties and Powers of Secretary. The secretary shall attend all meetings of the Managers and all meetings of the Members, and shall record all the proceedings of the meetings in a book to be kept for that purpose, and shall perform like duties for the standing committees when required. The secretary shall give, or cause to be given, notice of all meetings of the Members [and Managers] and shall perform such other duties as may be prescribed by the Managers. The secretary shall have custody of the seal, if any, and the secretary shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature. The Managers may give general authority to any other officer to affix the seal of the Company, if any, and to attest the affixing by his or her signature. The secretary shall

BV00374

keep, or cause to be kept, at the principal executive office or at the office of the Company's transfer agent or registrar, as determined by resolution of the Managers, a register, or a duplicate register, showing the names of all Members and their addresses, their Percentage Interests, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation. The secretary shall also keep all documents described in Section 10.1 and such other documents as may be required under the Act. The secretary shall perform such other duties and have such other authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The secretary shall have the general duties, powers and responsibilities of a secretary of a corporation. If the Managers choose to appoint an assistant secretary or assistant secretaries, the assistant secretaries, in the order of their seniority, in the absence, disability or inability to act of the secretary, shall perform the duties and exercise the powers of the secretary, and shall perform such other duties as the Managers may from time to time prescribe.

H. <u>Duties and Powers of Chief Financial Officer</u>. The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, Membership Interests and Economic Interests. The books of account shall at all reasonable times be open to inspection by any Manager. The chief financial officer shall have the custody of the funds and securities of the Company, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company, and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managers. The chief financial officer shall disburse the funds of the Company as may be ordered by the Managers, taking proper vouchers for such disbursements, and shall render to the president and the Managers, at their regular meetings, or when Members so require, at a meeting of the members an account of all his or her transactions as treasurer and of the financial condition of the Company. The chief financial officer shall perform such other duties and shall have such other responsibility and authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The chief financial officer shall have the general duties, powers and responsibility of a chief financial officer of a corporation, and shall be the chief financial and accounting officer of the Company. If the Managers choose to elect an assistant treasurer or assistant treasurers, the assistant treasurers in the order of their seniority shall, in the absence, disability or inability to act of the chief financial officer, perform the duties and exercise the powers of the chief financial officer, and shall perform such other duties as the Managers shall from time to time prescribe.

I. <u>Signing Authority of Officers</u>. The officers of the Company shall have such signature authority as the Managers may delegate to each officer from time to time.

5.9 <u>Membership Interests of Managers</u>. Except as otherwise provided in this Agreement, Membership Interests held by the Managers as Members shall entitle each Manager to all the rights of a Member, including without limitation the economic, voting, information and inspection rights of a Member.

5.10 <u>Fiduciary Duties</u>. The only fiduciary duties a Manager owes to the Company and the

BV00375

Members are the duty of loyalty and the duty of care set forth in subsections (i) and (ii) below:

(i) A Manager's duty of loyalty to the Company and the Members is limited to the following:

(a) To account to the Company and hold as trustee for the Company any property, profit, or benefit derived by the Manager in the conduct or winding up of the Company's business or derived from any use by the Manager of Company property, including the appropriation of a Company opportunity, without the consent of the Members;

(b) Except as otherwise provided in this Agreement, to refrain from competing with the Company in the conduct of the Company business before the dissolution of the Company without the consent of the Members.

(ii) A Manager's duty of care to the Company and the Members in the conduct and winding up of the Company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law by the Manager.

5.10 Limitation of Liability.

A. Liability of Manager Limited to Manager's Assets. Under no circumstances will any director, officer, shareholder, member, manager, partner, employee, agent or Affiliate of any Manager, or any member of an Advisory Board established by the Company, have any personal responsibility for any liability or obligation of the Manager (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Manager will be limited to the assets of the Manager as they may exist from time to time.

B. Limited For Company Obligations. A Person who is a Manager or officer or both a Manager and an officer of the Company, or a member of an Advisory Board established by the Company, shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer, or both a Manager and an officer, or Advisory Board member.

5.11 Advisory Board. The Managers may establish an advisory board ("Advisory Board"), whose function shall be to provide advice and assistance to the Managers with respect to the business of the Company. The Managers shall be entitled to appoint and remove members of the Advisory Board from time to time, in their discretion. Members of the Advisory Board shall not be Members of the Company, or have any rights of Members, except with respect to any Units that may be issued to such Advisory Board members.

## ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES

6.1 Allocations of Net Profit and Net Loss.

    A. Net Loss. Net Loss shall be allocated to the Member as follows:

        (a) First, to the Members in accordance with, and to the extent of, their Capital Accounts.

        (b) Thereafter, to the Members in accordance with their Percentage Interests.

    B. Net Profit. After giving effect to the special allocations set forth in this Agreement, for any taxable year of the Company, Net Profit shall be allocated to the Members as follows:

        (a) First, Net Profit shall be allocated to the Members in accordance with their Percentage Interests to the extent that Net Loss previously allocated to the Members has not been recovered by virtue of the allocation of Net Profit required by this paragraph.

        (b) Thereafter, the remainder of the Net Profit, if any, shall be allocated in accordance with their Percentage Interest.

    C. Reallocations. Notwithstanding anything to the contrary in Section 6.1A, Net Loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain. Any Net Loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 6.1C). Any loss reallocated under this Section 6.1C shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article VI, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article VI, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI if no reallocation of losses had occurred under this Section 6.1C.

6.2 Special Allocations. Notwithstanding Section 6.1:

    A. Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

BV00377

B. <u>Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt</u>. If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

C. <u>Nonrecourse Deductions</u>. Any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D. <u>Member Nonrecourse Deductions</u>. Those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

E. <u>Qualified Income Offset</u>. If a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.2E if such unexpected adjustments, allocations, or distributions had not occurred.

6.3 <u>Section 754 Adjustments</u>. Regulations Section 1.704-1(b)(2)(iv)(m) may require the Company to adjust the Members' Capital Accounts if the Company adjusts the tax bases of its assets pursuant to Code Sections 734(b) or 743(b) following an election pursuant to Code Section 754. Any such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis). Such gain or loss shall be specially allocated among the Members in a manner consistent with the manner in which their

BV00378

Capital Accounts are required to be adjusted. Such gain or loss shall also be included in any calculation of the aggregate Net Profit or Net Loss allocated to a Member for the purpose of determining the amount of any subsequent allocation that Member is to receive pursuant to this Agreement.

6.4 <u>Member Services; Interest Payments</u>. Notwithstanding any other provision of this Agreement, if a final determination, assessment, or adjudication is made or conceded to on behalf of the Company that any amount paid to a Member or an Affiliate of a Member for services authorized to be rendered by such Person, or interest authorized to be paid to such Person, under this Agreement is not deductible for income tax purposes during any Fiscal Year of the Company, the Company shall specially allocate items of income and gain, for that Fiscal Year or subsequent Fiscal Years as necessary, to the Member in the amount of the disallowed payment. Notwithstanding any other provision of this Agreement, such items of income and gain shall not be included in any calculation of the aggregate amount of Net Profit and Net Loss allocated to such Member.

6.5 <u>Curative Allocations</u>. The allocations set forth in this Agreement are intended to comply with certain requirements of Regulation Section 1.704-1(b). Because it is not possible to foresee every possible future event during the term of the Company, the Allocations might not be consistent with the manner in which the Members intend to share Company distributions in all situations. Accordingly, the Managers may allocate income, gain, loss and deductions among the Members in a manner to prevent the allocations from distorting the manner in which Company distributions are intended to be shared among the Members. The Managers shall have the discretion to accomplish this result in any reasonable manner.

6.6 <u>Other Allocation Rules</u>.

A. Unless otherwise herein expressly provided to the contrary, all allocations to the Members pursuant to this Article VI shall be divided among the Members in proportion to their respective Percentage Interests.

B. For purposes of determining Net Profit, Net Loss, or any other items allocable to any period, Net Profit, Net Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Tax Matters Partner using any permissible method under Section 706 of the Code and the Treasury Regulations thereunder.

C. Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Regulations, the Members' interests in Net Profit shall be in accordance with their respective Percentage Interests.

D. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair

BV00379

market value on the date of contribution. Allocations pursuant to this Section 6.6 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

6.7 Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Economic Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, Net Profit or Net Loss for such Fiscal Year shall be assigned pro rata to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member or Assignee based upon his or her respective Economic Interest at the close of such day. However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, an Economic Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month). Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Economic Interests as of the date such sale or other disposition occurs.

6.8 Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE VII
## INTERIM DISTRIBUTIONS

7.1 Discretionary Distributions. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Managers shall distribute Distributable Cash to Member pursuant to Section 7.1(a) below and may elect from time to time to distribute Distributable Cash to the Members pursuant to Sections 7.1(b) and 7.1(c) below, which distributions shall be in the following order and priorities:

      (a)    First, the Managers shall distribute Distributable Cash to the Members pro rata based on the number of Units owned by the Members in an amount equal to the product of (i) the Tax Percentage and (ii) the Company's taxable income for such Fiscal Year determined in accordance with Section 703(a) of the Code as reflected on the Schedule K-1's in respect of each Unit (reduced by distributions made to such Member during such Fiscal Year pursuant to Sections this Sections 7.1(b) and Section 7.1(c), below and any liquidating distributions pursuant to Section 11.5. For purposes hereof, "Tax Percentage" shall mean initially fifty percent (50%) and shall be adjusted from time to time by the Managers in response to changes in the tax rates applicable to individuals under the Code

BV00380

and under the state income tax laws of the State of California and in response to any other factors which cause the distributions under this Section to be less than a Member's tax liability in respect of each Unit;

(b)    Second, the remaining Distributable Cash after application in accordance with Section 7.1(a) shall be distributed fifty percent (50%) to Class B Member until such Class B Member has received total distributions of Distributable Cash equal to such Class B Members' then Unreimbursed Capital Contributions, and fifty percent (50%) to the Class A Members in proportion to their Percentage Interest; and

(c)    The balance, if any, to all of the Members in proportion to their Percentage Interest;

All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests on the actual date of distribution. Neither the Company nor any Manager shall incur any liability for making distributions in accordance with this Section 7.1.

7.2 <u>Mandatory Distributions</u>. Subject to applicable law and any limitations contained elsewhere in this Operating Agreement, and to the extent the Company has available Distributable Cash to do so, each tax year of the Company, the Managers shall distribute Distributable Cash to the Members pro rata based on the number of Units owned by the Members in an amount equal to the product of (i) the Tax Percentage and (ii) the Company's taxable income for such Fiscal Year determined in accordance with Section 703(a) of the Code as reflected on the Schedule K-1's in respect of each Unit (reduced by distributions made to such Member during such Fiscal Year pursuant to Sections this Sections 7.1(b) and Section 7.1(c), below and any liquidating distributions pursuant to Section 11.5. For purposes hereof, "Tax Percentage" shall mean initially fifty percent (50%) and shall be adjusted from time to time by the Managers in response to changes in the tax rates applicable to individuals under the Code and under the state income tax laws of the State of California and in response to any other factors which cause the distributions under this Section to be less than a Member's tax liability in respect of each Unit.

7.3 <u>Form of Distribution</u>. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. Except as provided in Section 11.4, no Member may be compelled to accept from the Company (a) a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members, or (b) a distribution of any asset in kind.

7.4 <u>Restriction on Distribution</u>.

A. No distribution shall be made if, after giving effect to the distribution:

(i) The Company would not be able to pay its debts as they become due in the usual course of business; or

(ii) The Company's total assets would be less than the sum of its total liabilities

BV00381

plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B. The Managers may base a determination that a distribution is not prohibited on any of the following:

(i) Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances;

(ii) A fair valuation; or

(iii) Any other method that is reasonable in the circumstances.

Except as provided in the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days of the date of authorization.

C. A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 7.4 or Section 11.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable; and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

7.5 <u>Return of Distributions</u>. Members and Assignees who receive distributions made in violation of the Act or this Agreement shall return such distributions to the Company. Except for those distributions made in violation of the Act or this Agreement, no Member or Assignee shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Assignee or paid by a Member or Assignee for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Assignee.

7.6 <u>Tax Withholding</u>. If any federal, foreign, state or local jurisdiction requires the Company to withhold taxes or other amounts with respect to any Member's allocable share of Net Profits, taxable income or any portion thereof, or with respect to distributions, the Company shall withhold from distributions or other amounts then due to such Member (or shall pay to the relevant taxing authority with respect to amounts allocable to such Member) an amount necessary to satisfy the withholding responsibility. In such a case, the Member for whom the Company has paid the withholding tax shall be deemed to have received the withheld distribution or other amount so paid, and to have paid the withholding tax directly. If it is

BV00382

anticipated that at the due date of the Company's withholding obligation the Member's share of cash distributions or other amounts due is less than the amount of the withholding obligation, the Member to which the withholding obligation applies shall have the option to pay to the Company the amount of such shortfall. In the event a Member fails to make such payment and the Company nevertheless pays the full amount to be withheld, the amount paid by the Company shall be deemed a nonrecourse loan from the Company to such Member bearing interest at the lower of the Prime Rate or the maximum rate permitted by law, and the Company shall apply all distributions or payments that would otherwise be made to such Member toward payment of the loan and interest, which payments or distributions shall be applied first to interest and then to principal until the loan is repaid in full. Each Member agrees to cooperate fully with the Company's efforts to comply with the Company's tax withholding and information reporting obligations and agrees to provide the Company with such information as the Company may reasonably request from time to time in connection with such obligations.

## ARTICLE VIII
## TRANSFER OF INTERESTS

8.1 <u>Restrictions on Transfer</u>. Except as provided in Section 8.4 and 8.8, no Member shall Transfer all or any part of that Member's Membership Interest except with the prior written consent of the Members holding the Required Percentage, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreements or the Act), as the Members may determine in their sole and absolute discretion. Transfers in violation of this Article VIII shall be effective only to the extent set forth in Section 8.7. After the consummation of any Transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

8.2 <u>Further Restrictions on Transfer of Interests</u>. In addition to other restrictions found in this Agreement, no Member shall Transfer all or any part of that Member's Membership Interest: (i) without compliance with applicable securities laws; (ii) if the Transfer would cause the Company's tax termination within the meaning of Code Section 708(b)(1)(B); or (iii) if the Transfer would cause the Company to be treated as a corporation pursuant to Code Section 7704 or Regulations Section 1.7704-1.

8.3 <u>Substitution of Members</u>. An Assignee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 8.1 and 8.2 are met; (ii) the Members holding the Required Percentage have consented to such substitution in their sole and absolute discretion; (iii) the Assignee executes an instrument satisfactory to the Managers accepting and adopting the terms and provisions of this Agreement; and (iv) the Assignee pays any reasonable expenses in connection with such Assignee's admission as a new Member. The admission of an Assignee as a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

8.4 <u>Permitted Transfers</u>. Subject to compliance with Section 8.2, a Member may Transfer that Member's Membership Interest (a "Permitted Transfer") to any Affiliate of the Member if that

BV00383

Member is in voting control of the Affiliate, and such Affiliate shall be a substitute Member. At such time as the Member is no longer in voting control of such Affiliate, a "Transfer" shall be deemed to have occurred and the consent of the Members holding the Required Percentage shall be required in order for the Affiliate to remain a substitute Member.

8.5 <u>Effective Date of Transfers</u>. Any Transfer of all or any portion of an Economic Interest which complies with this Article VIII shall be effective as of the date provided in Section 6.7 following the date upon which the requirements of Sections 8.1, 8.2 and 8.3 (collectively, "Transfer Requirements") have been met. The Company shall provide the Members with written notice of such Transfer as promptly as possible after the Transfer Requirements have been met. Any transferee of a Membership Interest shall take subject to the restrictions on Transfer imposed by this Agreement.

8.6 <u>Rights of Legal Representatives</u>. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Certificate or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his or her legal representative or successor.

8.7 <u>No Effect to Transfers in Violation of Agreement</u>. Upon any Transfer of a Membership Interest in violation of this Article VIII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Company's legal counsel, a Transfer in violation of this Article VIII would cause the Company to (a) be treated as a corporation pursuant to Code Section 7704 or Regulations Section 1.7704-1, or (b) be terminated for tax purposes under IRC Section 708(b)(1)(B), the Transfer shall be null and void and the purported transferee shall not become either a Member or an Assignee. On and contemporaneously with any Transfer of a Member's Economic Interest which does not at the same time Transfer the balance of the rights associated with the Membership Interest Transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of $100, all remaining rights and interests retained by the Member (including voting and inspection rights) that immediately before the Transfer were associated with the Transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member. Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who Transfers a Membership Interest in violation of this Article VIII is not unreasonable under the circumstances existing as of the date hereof.

BV00384

8.8 <u>Right of First Refusal</u>. This Section 8.8 shall apply proposed transfers by Members who have been approved for Transfer under Section 8.1 above, Class B Members holding at least 5% of the Units of the Company, Class A Members holding at least twenty-five percent (25%) of the Units of the Company and Class C Members. Each time such a Member proposes to transfer all or any part of his or her Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 8.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A. <u>Notice of Proposed Transfer</u>. Such Member shall deliver a written notice ("Option Notice") to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the Membership Interest to be transferred; (iii) the purchase price and terms of payment for which the Member proposes to transfer such Membership Interest; (iv) the nature of the proposed transfer (e.g., sale or pledge); and (iv) the name and address of the proposed transferee.

B. <u>Company Option</u>. Within thirty (30) days after receipt of the Option Notice, the Company shall have the right, but not the obligation, to elect to purchase all or any part of the Membership Interest upon the price and terms of payment designated in the Option Notice. If the Option Notice provides for the payment of non-cash consideration, the Company may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Managers. If the Company exercises such right within such thirty (30)-day period, the Managers shall give written notice of that fact to the transferring and non-transferring Members.

C. <u>Members' Option</u>. If the Company fails to elect to purchase the entire Membership Interest proposed to be transferred within the thirty (30)-day period described in Section 8.8B, the non-transferring Members shall have the right, but not the obligation, to elect to purchase any remaining share of such Membership Interest upon the price and terms of payment designated in the Option Notice. If the Option Notice provides for the payment of non-cash consideration, such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Managers. Within sixty (60) days after receipt of the Option Notice, each non-transferring Member shall notify the Managers in writing of his or her desire to purchase a portion of the Membership Interest proposed to be so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his or her pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share.

D. <u>Closing</u>. If the Company and the other Members elect to purchase or obtain any or all of the Membership Interest designated in the Option Notice, then the closing of such purchase

BV00385

shall occur within ninety (90) days after the Company's receipt of the Option Notice. The Transferring Member, the Company and/or the other Members shall execute such documents and instruments and make such deliveries as may be reasonably required to consummate such purchase.

E. Failure to Exercise Options. If the Company and the other Members elect not to purchase or obtain, or default in their obligation to purchase or obtain, all of the Membership Interest designated in the Option Notice, then the transferring Member may transfer the portion of the Membership Interest described in the Option Notice not so purchased, to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest; (ii) is made on terms no less favorable to the transferring Member than as designated in the Option Notice; and (iii) complies with Sections 8.1, 8.2 and 8.3; it being acknowledged by the Members that compliance with Sections 8.8 and 8.9A-D does not modify any of the transfer restrictions in Article VIII or otherwise entitle a Member to transfer his or her Membership Interest other than in the manner prescribed by Article VIII. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

## ARTICLE IX
### FORFEITURE OF UNITS; OPTIONAL PURCHASE EVENTS, MANDATORY PURCHASE

9.1 Rights Provided for by Separate Contract. The Company and/or the other Members of the Company may be given the right to purchase Units held by Members upon the occurrence of certain events, and/or Members may forfeit Units upon the occurrence of certain events, under terms and conditions provided for in any separate written contract entered into between a Member and the Company

9.2 Purchase Terms Varied by Agreement. Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

.9.3 Right to Invoke Buy Sell Procedure. At any time following the 3rd anniversary of the date of formation of the Company, if the Members cannot agree any action requiring a majority or greater consent of the general meeting of the Members, as reflected in the minutes of any Company meeting, and following a sixty (60) day period during which the Members shall work in good faith to overcome the disagreement, any majority of the Class A Members (as determined by way of holding a majority of the Class A Units) or majority of the Class B Members as determined by way of holding a majority of the Class B Units), in either case holding at least 10% of the Company Units (the "Offeror Member") may offer to purchase in whole (and not in part) the Units of majority of the Class A Members for majority of the Class B Members as the case might be (the "Offeree Member") for a price determined pursuant to the conditions and procedures herein specified.



A. <u>Procedure to Invoke Buy Sell</u>. The Offeror Member shall commence the buy-sell procedure hereunder by giving written notice to the Offeree Member (the "Offer Notice"). The Offer Notice shall specify an amount that the Offeror Member, in its sole discretion, considers to be the value of the Company Interest of the Offeree Member as of the date of the Offer Notice (the "Stipulated Value"). The Offer Notice shall also specify (x) the amount of all outstanding Member Loans and/or Company Loans to such offeror Member, and (y) any distributions required to be made to Members through the anticipated date of sale; the Stipulated Value less the sum of these two items is hereafter referred to as the "Stipulated Amount". The giving of any Offer Notice hereunder shall suspend any requirement to distribute dividends for up to ninety (90) days.

B. <u>Right to Accept Offer; Irrevocable Counteroffer if Declined</u>. The Offeree Member shall have the right, for a period of one hundred eighty (180) days after the date of the Offer Notice, to accept or decline the Offer Notice by notice in writing to the Offeror Member. If the Offeree Member fails to give notice either accepting or declining the Offer Notice within such one hundred eighty (180) day period, then such Offeree Member shall be deemed to have accepted the Offer Notice. If the Offeree Member declines to accept the Offer Notice within such one hundred eighty (180) day period, then such Offeree Member shall be deemed to have made an irrevocable counteroffer to the Offeror Member for the purchase, on the same terms and conditions provided for in the Offer Notice (except, if Offeror Member is Class B, Member Class 'A Member shall have the right to pay as described in paragraph (E) of this Section, below), of the whole Offeror Member's Company Interest, including the amount of all outstanding Members Loan or Company Loan, and the Offeror Member shall be deemed to have accepted such counteroffer, it being understood that if the proportional ownership interests and outstanding Member Loans of the Offeree Member and the Offeror Member are different, the Stipulated Amount shall be considered as correspondingly decreased or increased, as the case may be.

C. <u>Formation of Agreement</u>. The written acceptance by the Offeree Member of the Offer Notice (or the failure of the Offeree Member to act, which is deemed acceptance of the Offer Notice), or the counteroffer deemed made by the Offeree Member and acceptance thereof deemed made by the Offeror Member, as herein specified, shall constitute a binding agreement between the Members for the purchase and sale by the purchasing Member (the "Purchasing Member") of the Company Units (and the outstanding amount of any Members Loan Company Loans, if any) of the selling Member (the "Selling Member") upon the terms and conditions herein specified. The purchase price for the Selling Member's percentage interest in the Company shall be the Stipulated Amount (adjusted, as necessary, to reflect the percentage of Company Units actually owned by the Selling Members). The purchase price, as so determined, shall be paid by wire transfer of immediately available funds as directed by the Purchasing Members within one hundred eighty (180) days from the agreement Closing Date in favor of the Selling Member of the Company Units .

D. <u>Election to Defer Payment</u>. If Selling Member is Class A Member, then Purchasing Member and Company may elect to pay the purchase price and Member Loans by making delivering a Promissory Note for purchase price all due and payable on the anniversary of from

BV00387

the Closing Date such Promissory Note Principal of such Promissory Note shall not accrue interest for the first six (6) months, but will accrue interest at the simple rate of 10% thereafter.

E. Failure to Make Payment. If either the Purchasing Member or Company fails to make any payment pursuant to the obligations under subsections C or D above, the obligations of such Purchasing Member or Company shall be accelerated and become immediately due and payable. In addition to the accelerated payments, there shall be a payment equal to fifteen percent (15%) of the outstanding obligations of the Purchasing Member or Company.

## ARTICLE X
## ACCOUNTING, RECORDS AND REPORTS

10.1 Books and Records. The accounting records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office determined by Board of Managers from time to time all of the following:

A. A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Assignee;

B. A current list of the full name and business or residence address of each Manager;

C. A copy of the Certificate and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed;

D. Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E. A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F. Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G. The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

10.2 Delivery to Members and Inspection.

A. Upon the request of any Member or Assignee for purposes reasonably related to the interest of that Person as a Member or Assignee, the Managers shall promptly deliver to the

BV00388

requesting Member or Assignee, at the expense of the Company, a copy of the information required to be maintained under Sections 10.1A, B and D, and a copy of this Agreement.

B. Each Member, Manager and Assignee has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Assignee, to:

(i) inspect and copy during normal business hours any of the Company records described in Sections 10.1A through G; and·

(ii) obtain from the Managers, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

(iii) Members representing at least five percent (5%) of the Percentage Interests, or three or more Members, may make a written request to the Managers for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

C. Any request, inspection or copying by a Member or Assignee under this Section 10.2 may be made by that Person or that Person's agent or attorney.

D. The Managers shall promptly furnish to a Member a copy of any amendment to the Certificate or this Agreement executed by a Manager pursuant to a power of attorney from the Member.

E. The provisions of this Section 10.2 shall apply only to the extent that such provisions are made mandatory pursuant to applicable law.  If applicable law is changed at any time in a manner that limits or restricts the inspection or informational rights of Members, such more limited or restricted provisions shall be applicable.

10.3 Annual Statements.

A. If the Company has more than thirty-five (35) Members, the Managers shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) days after the close of the Fiscal Year. The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager that the financial statements were prepared without audit from the books and records of the Company.

BV00389

B. The Managers shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Assignees' federal and state income tax returns. The Managers shall send or cause to be sent to each Member or Assignee within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C. The Managers shall cause to be filed at least annually with the Delaware Secretary of State all required reporting and statements.

10.4 <u>Financial and Other Information</u>. The Managers shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Managers shall distribute to the Members, promptly after the preparation or receipt thereof by the Managers, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

10.5 <u>Filings</u>. The Managers, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Managers, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If a Manager required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the Delaware Secretary of State.

10.6 <u>Bank Accounts</u>. The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

10.7 <u>Accounting Decisions and Reliance on Others</u>. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers. The Managers may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.8 <u>Tax Matters for the Company Handled by Managers and Tax Matters Partner</u>. The Managers shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the

BV00390

Company. The Company's initial Tax Matters Partner shall be **Martin N. Lettunich**. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding the Required Percentage or a majority of the Managers then serving as such may designate another to be Tax Matters Partner.

## ARTICLE XI
## DISSOLUTION AND WINDING UP

11.1 <u>Dissolution</u>. The Company shall dissolve, its assets disposed of, and its affairs wound up on the first to occur of the following (each, a "Dissolution Event"):

    A. Upon the entry of a decree of judicial dissolution pursuant to applicable law;

    B. Upon the vote of Members holding the Required Percentage of the Membership Interests subject to section 4.12;

    C. The sale of all or substantially all of the assets of Company; or

    D. The happening of any event that makes it unlawful or impossible to carry on the business of the Company.

11.2 <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of a Dissolution Event, the Managers who have not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the Delaware Secretary of State and file the Certificate as required by the Act.

11.3 <u>Winding Up</u>. Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Managers who have not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 11.5. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Managers or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

11.4 <u>Distributions in Kind</u>. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Managers or by the Members or if any Member objects by

BV00391

an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

11.5 Order of Payment upon Dissolution.

A. After determining that all known debts and liabilities of the Company in the process of winding-up, including, without limitation, debts, and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed in the following order and priority:

(1) First, to the Class B Members in proportion to their Unreimbursed Capital Contributions until each such Class B Members have received total distributions pursuant to this Section 11.5A(1) and pursuant to Section 7.1 equal to such Class B Member's total Capital Contributions;

(2) Second, to Class A Member in proportion to their Percentage Interests until such Class A Members have received total distributions pursuant to this Section 11.5A(2) and pursuant to Section 7.1 equal to One Hundred Forty Three Million Five Hundred Thousand ($143,500,000);

(3) Third, , to all Members with positive Capital Accounts in proportion to their positive Capital Accounts until each of such Members Capital Accounts have been reduced to zero; and

(4) The balance, if any, to all Members, pro-rata in proportion to their Percentage Interests.

Such liquidating distributions shall be made by the end of the Company taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B. The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment thereof has been has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the person, was determined in good faith and with reasonable care by the members or managers to be adequate at the time of any distribution of the assets pursuant to this section.

This Section 11.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

11.6 Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managers or any other Member.

BV00392

11.7 <u>Certificate of Cancellation</u>. The Managers or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a Certificate of Cancellation of the Certificate upon the completion of the winding up of the affairs of the Company.

11.8 <u>No Action for Dissolution</u>. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 11.1. This Agreement has been drawn carefully to provide fair treatment of all parties and causes equitable payment in liquidation of the Economic Interests. Accordingly, except where the Managers have failed to liquidate the Company as required by this Article XI, each Member hereby waives and renounces his or her right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Certificate or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 11.8 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE XII
## INDEMNIFICATION AND INSURANCE

12.1 <u>Indemnification of Agents</u>. The Company shall defend and indemnify any Manager and may indemnify any other Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Managers shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Managers deem appropriate in their business judgment.

12.2 <u>Insurance</u>. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 12.1 or under applicable law.

BV00393

## ARTICLE XIII
### INVESTMENT REPRESENTATIONS

13.1 <u>Investment Representation Statement</u>. As a condition to the issuance of a Membership Interest to a prospective Member of the Company, each such prospective Member shall sign and deliver to the Company an Investment Representation Statement, Questionnaire, or other similar document, in form and substance required by the Managers.

13.2 <u>Consent of Spouse</u>. Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have his or her spouse execute a consent substantially in the form attached to this Agreement.

## ARTICLE XIV
### MISCELLANEOUS

14.1 <u>Counsel to the Company</u>. Counsel to the Company ("Company Counsel") may also be counsel to any Manager or any Affiliate of a Manager. The Managers may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his or her Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

14.2 <u>Complete Agreement</u>. This Agreement and the Certificate (and any Investment Representation Statement or similar document executed by the Members) constitute the complete and exclusive statement of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managers or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Certificate (or any Investment Representation Statement or similar document executed by the Members) will be binding on the Members or Managers or have any force or effect whatsoever. To the extent that any provision of the Certificate conflict with any provision of this Agreement, the Certificate shall control.

14.3 <u>Binding Effect</u>. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

14.4 <u>Parties in Interest</u>. Except as expressly provided in the Act, nothing in this Agreement shall

BV00394

confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Managers and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

14.5 Pronouns; Statutory References. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.6 Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.7 Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of the Company, a particular Member, or its, his or her counsel.

14.8 References to this Agreement. Numbered or lettered Certificate, sections and subsections herein contained refer to Certificate, sections and subsections of this Agreement unless otherwise expressly stated.

14.9 Governing Law; Jurisdiction. This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 14.14 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California. If any legal or equitable action is necessary to enforce the terms of this Agreement, such action shall be brought in the County of Santa Clara, State of California.

14.10 Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

14.11 Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

14.12 Specific Performance. The Members agree that irreparable damage will result if this Agreement is not performed in accordance with its terms, and the Members agree that any

BV00395

damages available at law for a breach of this Agreement would not be an adequate remedy. Therefore, the provisions hereof and the obligations of the Members hereunder shall be enforceable in a court of equity, or other tribunal with jurisdiction, by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies and all other remedies provided for in this Agreement shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that a Member may have under this Agreement, at law or in equity.

14.13 Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.14 Notices. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, "Notice") given under this Agreement shall be in writing and shall be served personally or delivered by first class, registered or certified, return receipt requested U.S. mail, postage prepaid. Notices may also be given by transmittal over electronic transmitting devices such as Telex, facsimile or telecopy machine, if the party to whom the notice is being sent has such a device in its office, provided a complete copy of any notice so transmitted shall also be mailed in the same manner as required for a mailed notice. Notices shall be deemed received at the earlier of actual receipt or three (3) days following deposit in U.S. mail, postage prepaid. Notices shall be directed to the Company at the Company's principal place of business as specified in Section 2.6 of this Agreement, and to at the addresses shown on Exhibit A provided a Member may change such Member's address for notice by giving written notice to the Company and all other Members in accordance with this Section 14.14.

14.15 Amendments. Notwithstanding anything to the contrary in this Agreement, this Agreement may be amended by the Managers without the consent of any Member: (a) to cure any ambiguity, to correct or supplement any provision of this Agreement which may be inconsistent with any other provisions of this Agreement, or to make any other provisions regarding matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; (b) to change any provisions of this Agreement required to be changed by the staff of the Securities and Exchange Commission or other federal or state "Blue Sky" commissioner, a listing agency, or similar official, which change is deemed by the commissioner, agency, or official to be for the benefit or protection of the Members; or (c) to amend the Company's list of Members in accordance with the terms of this Agreement. Any other amendments to this Agreement shall require the consent of Members holding the Required Percentage; provided, however, that (i) if any provision of this Agreement gives the Members the right to vote with respect to a particular matter, and such provision requires a percentage vote higher than the Required Percentage, then the consent of such higher percentage shall be required for any amendment to such provision, and (ii) if an amendment of this Agreement would adversely affect the rights of any Member in a manner different from other Members, the consent of such Member to such amendment shall be required.

14.16 Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any other Member will (a) be required to determine the authority of the

individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.17 No Interest in Company Property; Waiver of Action for Partition. No Member or Assignee has any interest in specific property of the Company. Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

14.18 Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.19 Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

14.20 Estoppel Certificate. Each Member shall, within ten (10) days after written request by any Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by such Member, or if there is a default, the nature or extent thereof.

14.21 Waiver. No waiver by any party to this Agreement of any breach of, or default under, this Agreement by any other party shall be construed or deemed a waiver of any other breach of or default under this Agreement, and shall not preclude any party from exercising or asserting any rights under the Agreement with respect to any other breach or default.

14.22 Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (1) post judgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

14.23 Confidentiality. Each Member agrees not to disclose the provisions of this Agreement to any Person not a signatory to this Agreement, except as otherwise approved by the Managers in writing. However, nothing herein shall preclude the Parties from (i) complying with any legal or

BV00397

judicial process that compels disclosure of the provisions of this Agreement; (ii) commencing legal action to enforce the provisions of this Agreement; (iii) discussing the Agreement with their respective attorneys, accountants or financial planners, as long as the parties clearly advise and instruct such individual that all information regarding the terms and conditions of the Agreement is disclosed in strict confidence and must not be repeated or disclosed to others; or (iv) complying with the requests of federal, state or local taxing authorities.

BV00398

IN WITNESS WHEREOF, the parties have signed this Agreement on the date first written above and each of the individuals signing below warrants that he or she has the authority to sign for and on behalf of the respective parties.

CLASS A MEMBERS:

XSLENT, LLC

By: _____

Martin N. Lettunich, Manager

ATIRA, LLC

By: _____

Martin N. Lettunich, Manager

CLASS B MEMBER:

XS HOLDING B.V.

By: _____

Brian Caffyn, Managing Director

BV00399

## EXHIBIT A

### XSLENT TECHNOLOGIES., LLC
### OPERATING AGREEMENT

**Members, Initial Capital Contributions, Units, and Percentages:**

Class A Members:

| Name and Address | Capital Contribution | Number of Units | Percentage of Total Units |
|---|---|---|---|
| Xslent, LLC<br>233 Oak Meadow Dr.<br>Los Gatos, CA. 95032 | See Section 3.1, above | 9,000,000 | 90% |

Class B Members:

| Name and Address | Capital Contribution | Number of Units | Percentage of Total Units |
|---|---|---|---|
| XS Holding B.V. | $7,500,000 | 1,000,000 | 10% |



EXHIBIT B

LIST OF XSLENT TECHNOLOGIES IP

Intellectual Property Table

| U.S. Serial Number | Title | Named Inventor(s) | Filing Date | Status |
|---|---|---|---|---|
| 6,744,729 | Intelligent Fabric | Tinsley; Patton | 8/17/2001 | Granted. An intelligent switch for routing data through a network fabric in accordance with a requested quality of service (QOS), comprising a processor, a network interface coupled to the processor and the network fabric; and a means for predicting load and redistributing traffic to deliver the data at the requested QOS. |
| 11/428, 202 | Global Information Architecture | Busalacchi; Skinner; Tinsley; Bressler; Yarbrough | 6/30/2006 | Filed. The Global Information Architecture (GIA) creates an object-oriented, software based modeling environment for the modeling of various data sources and allowing queries and transactions across those sources. GIA deals with any possible data sources including relational databases, object oriented databases, flat files, web streams, and sensor data streams (including video streams). |
| 60-867, 342 | XSLENT Power Extraction Technology - XPX | Matan, Besser | 11/27/2006 | Provisional application filed; New features include improvements in coupling, power conversion methods, control methods, and low power extraction; external communications processor, real time transmission of sensor data, algorithms under remote control; conversion of DC power to AC |
| 60/888, 486 | XPX Power Converter | Matan | 02/6/2007 | Provisional Application - The XPX Converter is an algorithmically operated non-linear current mode power converter that uses a geometric structure or topology to perform its current switching. The current switching topology technology converts DC electricity into AC electricity. This is done under microprocessor control without the use of transformers or inverters. |
| To be determined | Transformer Core Retainer | Besser | April 2007 | Provisional Application – methods and apparatus claims about how to layer the XPX transformers |
| To be determined | Current Source Conversion | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims about voltage controlled current source regulation. |
| To be determined | Power Transfer and Regulation | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims about how we regulate power from any unstable voltage source and how power is regulated going into the transformer core. |
| To be determined | Synchronous Rectification | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims utilizing a synchronous rectifier (an electronic switch that improves power-conversion efficiency by placing a low-resistance conduction path across the diode rectifier in a switch-mode regulator) to enable solar panels to be connected in parallel. |
| To be determined | PWM Generation of Alternating Current | Matan, Besser | 2Q2007 | Provisional Application – methods and apparatus claims for power conversion using PWM under microprocessor control to direct the control of the flux density of the magnetic core of the transformer using PWM itself in a control loop. If the output voltage is high the current is low, if the output voltage is low the current is high. The regulation of input power into the core is controlled by the microprocessor sensing the rate of change of the flux density of the magnetic core. |

BV00401

| U.S. Serial Number | Title | Named Inventor(s) | Filing Date | Status |
|---|---|---|---|---|
| To be determined | Micro-XPX | Matan | 3Q2007 | Provisional Application – methods and apparatus claims for the fabrication of a micro version of XPX integrated with the fabrication of a solar cell. |
| To be determined | Burst Data Methodology | Matan | 3Q2007 | Rate of change and virtual algorithmic control of electronic devices. Preliminary filing embodied in XPX provisional filing; 60-867, 342 |
| To be determined | Hydrogen Creation Using XPX | Matan | 3Q2007 | $H_2$ production using XPX technology. |
| To be determined | Thermal Charging System | Matan | 3Q2007 | Piezoelectric unstable voltage capabilities integrated into XPX. |
| To be determined | High Voltage Transformer | Matan | 4Q2007 | XPX AC for high voltage applications. |

BV00402

## CONSENT OF SPOUSE

I am the spouse of a member of Xslent Technologies LLC; a Delaware limited liability company (the "Company"). I acknowledge that I have carefully read the Company's Operating Agreement and understand its provisions. I am aware that the Operating Agreement restricts the transferability of my spouse's Membership Interest in the Company. I hereby consent to the terms of the Operating Agreement and agree that any community property interest I may have in my spouse's Membership Interest shall be subject to the terms and conditions of the Operating Agreement. I agree not to take action at any time to hinder operation of the Operating Agreement on such Membership Interest or my interest in it.

My spouse's name is: _____

_____
Printed Name

_____
Signature

Date: _____

BV00403

# EXHIBIT 3

## MEMBERS' AGREEMENT

**THIS MEMBERS' AGREEMENT** (this "Agreement") is made and entered into as of April 7, 2007 by and among XET Holding Co., LLC, a Delaware limited liability company (the "Company"); Xslent Technologies, LLC, a Delaware limited liability company ("XT") and XS Holdings B.V. ("XS Holding").

## RECITALS

**WHEREAS,** XT desires to have Mr. Caffyn's companies and expertise as a business partner and as an investor (through Mr Caffyn's majority owned entity, XS Holding) and whereas XT has allowed to buy a 10% ownership position in Company at what XT believes is a discount to market and XT desires to assure it will have the ongoing interest and attention of Mr. Caffyn though his investment in XS Holding; and

**WHEREAS,,** XS Holding is willing to provide XT with a purchase option for its Units under certain conditions; and

**WHEREAS,** XS Holding, is purchasing certain Class B Units of the Company at a lower offer price than XT would otherwise agree and is being allowed to pay over time instead of upfront;

## AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. As used herein, the terms below shall have the following meanings or the meanings ascribed to them in the Operating Agreement for XET Holding Co.,LLC dated as of the date hereof. Any such term, unless the context otherwise requires, may be used in the singular or plural, depending on reference.

"Affiliate" means, as applied to any specified Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of the foregoing, "control," when used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of Voting Equity, by contract or otherwise, and the terms "controlled" and "controlling" shall have meanings correlative to the foregoing.

"Board of Managers" means the Board of Managers of the Company, as constituted from time to time.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in California.

"Certificate" means the Certificate of Formation of the Company, as it may be amended from time to time.

"Company" shall have the meaning ascribed to it in the forepart of this Agreement.

"Equity Interests" of any Person means Units of such Person or warrants, options or other rights to acquire Units of such Person.

"Family Members" means, with respect to any natural Person, such Person's spouse, children, parents and lineal descendants of such Person's parents (in each case, natural or adopted).

"Family Trusts" means, with respect to any natural Person, a trust benefiting solely such Person or the Family Members of such Person.

"Governmental Authority" means any United States federal, state or local or any foreign or multinational government (including the European Union), governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body (or any subdivision of any of the foregoing) having jurisdiction or authority with respect to the particular matter at issue in its context.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"IPO" means the first firm commitment underwritten public offering pursuant to a Registration Statement that became effective after the date hereof covering a U.S. or non-U.S. offer and sale of Units for the account of the Company or the Members to the public.

"Operating Agreement" means the Operating Agreement of the Company.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Purchase Date" means the date of the purchase of the Class B Units or Restricted Units, as the case might be, which shall occur on the first Business Day that falls 15 Business Days after the Purchase Notice Date.

"Purchase Notice" means the written notice given by XT of the intent to purchase the Class B Units or the Restricted Units, as the case might be, provided for hereunder.

"Purchase Notice Date" means the date of the Purchase Notice.

"Units" means the Units of the Company.

1.2    Rules of Interpretations. Unless the context otherwise clearly requires: (a) a term has the meaning assigned to it; (b) "or" is not exclusive; (c) wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, feminine or neuter shall include the masculine, feminine and neuter; (d) provisions apply to successive events and transactions; (e) all references in this Agreement to "including" shall be deemed to be followed by the phrase "without limitation"; (f) all references in this Agreement to designated "Articles," "Sections," "paragraphs," "clauses" and other subdivisions are to the designated Articles, Sections, paragraphs, clauses and other subdivisions of this Agreement, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, paragraph, clause or other subdivision; and (g) any definition of or reference to any agreement, instrument, document, statute or regulation herein shall be construed as referring to such agreement, instrument, document, statute or regulation as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

## ARTICLE II
## PURCHASE OPTION

2.1    Xslent Technologies' Purchase Option.    XT or its assignees, shall have the option to purchase all of the Class B Units of XS Holding or the Restricted Units (as defined below) on the terms and conditions set forth in this Section.

2.1.1    If XS Holding does not fully fund its expected $7,500,000 capital contribution for Class B Units, then XT shall have the right to purchase all of the Class B Units (whether Restricted Units or Unrestricted Units) then held by XS Holding for the amount originally paid by XS Holding for those Units by giving a Purchase Notice within 90 days of a Capital Notice and purchasing and paying for such Class B Units by wire transfer of immediately available funds on the Purchase Date.

2.1.2.    Unrestricted and Restricted Units.    All, or in the case where Mr. Martin Lettunich is no longer Chairman of XT, then Five Hundred Thousand (500,000), of the One Million (1,000,000) Class B Units originally purchased by XS Holding are restricted under this agreement (the *"Restricted Units"*).    Class B Units that are Restricted Units and then become unrestricted pursuant to the terms set forth herein are *"Unrestricted Units"*.    Restricted Units may not be sold or otherwise transferred by XS Holding B.V. except as provided in this Agreement.    Until 1 January, 2008, Zero (0) of the Restricted Units will be Unrestricted Units. On 1 January 2008,  20% of the Restricted Units will become Unrestricted Units; and thereafter, an additional One and Two Thirds Percent (1 2/3%) of the Units will become Unrestricted Units upon the expiration of each full calendar month elapsed thereafter, provided that no Restricted Units will become Unrestricted Units after the Purchase Notice Date.  If the application of the Restriction percentage results in a fractional Unit, such Unit shall be rounded down to the nearest whole Unit for each month, except for the last month when all Restricted Units shall become fully Unrestricted Units.

2.1.3   Acceleration; Change of Control.  Notwithstanding any provision of Section 2.1.2 to the contrary, in the event of or upon the intention to proceed with, the consummation of (i) any sale or exchange of Units by any or all of the Members of the Company in one transaction or series of related transactions where more than 50% of the outstanding voting power of the Company is acquired by a person or entity or group of related persons or entities; or (ii) any reorganization, consolidation or merger of the Company where the outstanding voting Units or securities of the Company immediately before the transaction represent or are converted into less than fifty percent 50% of the outstanding voting power of the surviving entity (or its parent corporation) immediately after the transaction; or (iii) any transaction or series of related transactions that results in the sale of all or substantially all of the assets of the Company, followed by the distribution of the proceeds to the Company's Members, the Restriction schedule shall fully accelerate and all of the Units shall become Unrestricted Units.

2.1.4   Intentionally blank.


2.1.5   Exercise of Purchase Option at Original Price.  At any time prior to 31 December 2008, XT may elect to purchase any or all of the Restricted Units by giving XS Holding B.V. the Purchase Notice.  XT, will then be obliged to purchase from XS Holding all of the Restricted Units at the purchase price per Unit originally paid by XS Holding,(the **"Purchase Option Price"**).

2.1.6   Payment of Purchase Price.  The Purchase Option Price will be payable, by wire transfer of immediately available funds on the Purchase Date.


## ARTICLE III
## MISCELLANEOUS

3.1   Successors and Assigns.  Whether or not an express assignment has been made pursuant to the terms of this Agreement, the terms and conditions of this Agreement shall inure to the benefit of, and be binding upon, the respective successors and permitted assigns of the Company and each Member.

3.2   Right to Assign.  None of the parties may assign any of its rights or obligations in whole or in part hereunder except in accordance with this Agreement.

3.3   Termination.  Upon:

(a)  Any party to, or Person who is subject to, this Agreement ceasing to own any Units or any interest therein in accordance with the terms of this Agreement, they shall cease to be a party to, or Person who is subject to, this Agreement and thereafter shall have no rights or obligations hereunder, provided that any Transfer of Units by any Member in breach of this Agreement shall not relieve such Member of liability for any such breach;

(b)  the occurrence of an IPO, this Agreement shall terminate, and no party shall have any rights or obligations hereunder save in respect of any antecedent breach.

3.4    <u>Restructuring, Exchanges, etc., Affecting the Units</u>.  Except as expressly provided herein, the provisions of this Agreement shall apply to any and all Units of the Company or any successor or assignee of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or in substitution for the Units, by reason of any Unit dividend, split, reverse split, combination, restructuring, reclassification, merger, consolidation, or otherwise in such a manner as to reflect the intent and meaning of the provisions hereof.  Upon the occurrence of any of such events, the number of Units and amounts hereunder and any other appropriate terms shall be appropriately adjusted, as determined in good faith by the Board of Managers.

3.5    <u>Conflict with Certificate and Operating Agreement of the Company</u>.  The Members agree that the Certificate and Operating Agreement and any of its subsidiaries from time to time should conform to the provisions of this Agreement and, in the event any term or provision of such Certificate or Operating Agreement conflict with this Agreement, this Agreement shall control and all Members shall take all action reasonably necessary to amend the Certificate and Operating Agreement so that they shall not conflict, including voting in favor of such amendments thereto as shall be reasonably necessary to conform the Certificate and Operating Agreement to the provisions of this Agreement.

3.6    <u>No Third Party Beneficiaries</u>.  Except as otherwise provided herein, this Agreement is not intended to confer upon any Person, except for the parties hereto, any rights or remedies hereunder.

3.7    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by and construed under the laws of Delaware without regard to conflicts of law.

3.8    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

3.9    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

3.10    <u>Notices</u>.  Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified or upon delivery by confirmed facsimile transmission or nationally recognized overnight courier service and addressed to the party to be notified at the address indicated for such party on the signature page hereof, or at such other address as such party may designate by 10 days' advance written notice to the other parties.

3.11    <u>Expenses</u>.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

3.12    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement constitutes the full and entire understanding and agreement among the parties with regard to the

subject matter hereof. Any term of this Agreement may be amended only with the written consent of the holders of a majority of the Units held by all Members of the Company. Any amendment or waiver effected in accordance with this Section 3.12 shall be binding upon each Member. The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the party against whom enforcement of any such waiver is sought. No amendment to or waiver under this Agreement that increases the obligations of the Company, reduces or waives any rights of the Company or modifies or changes the limitations and obligations that are subject to the fiduciary duties of the Board of Managers shall be effective unless the same shall have been duly authorized by the consent of a majority of the independent Managers of the Company.

      3.13   Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement which cannot be amicably resolved among the parties, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Santa Clara County, California, before a panel of three arbitrators, in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect on the date of commencement of the arbitration (or subsequent, equivalent JAMS rules). The decision in writing of any two arbitrators, when delivered to the parties, shall be final and binding on the parties. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. The arbitrators and the parties shall maintain the confidentiality of the arbitration and dispute resolution proceedings and shall have the authority to make appropriate rulings to safeguard that confidentiality, unless the parties agree otherwise. The arbitrators shall, in the award, allocate all of the costs of the arbitration, including the fees of the arbitrators and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

      3.14   Severability. If one or more provisions of this Agreement are held to be unenforceable under Applicable Law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

      The remainder of this page has been intentionally left blank.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

COMPANY:
XET HOLDING CO., LLC


By:    Martin N. Lettunich
Title:  Chairperson


Xslent Technologies, LLC
a Delaware limited liability company


By:    Martin N. Lettunich
Its:    Chief Executive Officer


XS Holdings B.V.


By:    Brian Caffyn
Its:    Managing Director