1   **CHRISTOPHER ASHWORTH (SBN 54889)**
    **SILICON VALLEY LAW GROUP**
2   **A Law Corporation**
    **25 Metro Drive, Suite 600**
3   **San Jose, CA  95110**
    **Telephone:    (408) 573-5700**
4   **Facsimile:    (408) 573-5701**

5   **Attorneys for Defendants Xslent,**
    **LLC [Xslent]**
6

7

8                   **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10  XS HOLDING B.V., et al.              )      **Case No. C08 02282 PVT**
                                         )
                    Plaintiffs,          )      **SUGGESTION OF PROBABLE**
11                                       )      **ABSENCE OF SUBJECT**
          v.                             )      **MATTER JURISDICTION**
12                                       )      **FOLLOWING PLAINTIFFS'**
    COOL EARTH SOLAR, INC., et al.,      )      **FILING OF THE FIRST**
13                                       )      **AMENDED COMPLAINT**
                    Defendants.          )            **AND**
14  _____ )      **NOTICE OF PENDENCY OF**
                                                **OTHER ACTION (LOCAL RULE**
15                                              **3-13)**

16  Defendant Xslent respectfully shows:

17      **1. Jurisdiction.  The citizenship of the parties.**  Jurisdiction in this case is founded

18  solely upon diversity of citizenship pursuant to 28 U.S.C. §1332.  According to the first amended

19  complaint (¶9) plaintiff XS Holding BV [XS] is a Dutch corporation and plaintiffs Xslent

20  Technologies, LLC [XT] and XET Holdings, LLC [XET] are Californians.

21          ● **Plaintiff XT.**  Plaintiff XT is an LLC and is owned by its members: (1)  XS (a

22  Dutch corporation)(¶18); (2), Atira; and (3) Xslent.  The membership of Atira and Xslent are

23  predominantly Californian.  See, e.g. ¶16 and the declaration of Martin Lettunich, showing

24  Martin Lettunich, a Californian, as a member of both Atira and Xslent.  For diversity purposes,

25  LLC's such as XT are citizens of *all* of the places of citizenship of *each* of their members.

26  *Johnson v. Columbia Properties* (9th Cir. 2006) 437 Fed. 3rd 894, 899.  See also the thoughtful

27  and succinct analysis by Judge Jenkins of this court in *Thiara v. Kiernan* (2006) 2006 WL

28

1  3065568.

2      Atira is a member of XT.  So is Xslent.  If either defendant Atira or defendant Xslent are

3  Californians, then so is XT.  Both Atira and Xslent are Californians for diversity purposes

4  because their members include Californians.  In sum: Plaintiff XT is a Californian because two

5  of its members are Californians.  Indeed, numerous (actually all) of the named defendants are

6  Californians for diversity purposes.   Complete diversity is lacking between plaintiff XT and the

7  defendants.

8      ● **Plaintiff XET.**  A substantially identical analysis just set out applies to XET as well.

9  XET's members are XS (a Dutch corporation) and XT which, for diversity purposes, is a

10  California entity.  Complete diversity is lacking between plaintiff XET and the defendants.

11      **2.  Notice of Pendency of other action.**  Notwithstanding the clear guidance set forth in

12  local Rule 3-13, plaintiff XS have failed to file with this court a notice of pendency of other

13  action.  That notice is proffered herewith.

14      (A) The other action pends in the Santa Clara Superior Court.  In that action, the

15  plaintiffs there (Atira, Xslent, XET and XT) have sued XS and its sole shareholder Brian Caffyn

16  for a number of wrongs including breach of contract, breach of fiduciary duty and the like.

17  XS/Caffyn have cross-complained seeking substantially identical relief sought in this action.  If

18  this action were to proceed, Atira/Xslent/XET/XT would counterclaim raising all of its state-

19  court issues and would also raise those same and additional issues defensively.  Attached (minus

20  exhibits) are the Second Amended Complaint of XET, et al. The Second Amended Cross-

21  Complaint of XS/Caffyn, et al.

22      Additionally, XS/CAffyn have brought on three intermediate appeals which are still

23  pending, two petitions for extraordinary writs (summarily denied), and numerous applications for

24  TRO's.

25      (B) The title and location of the other action are:  *XET Holdings, LLC, et al v. XS*

26  *Holding B.V., et al* (and related cross-actions) Case No. 107 CV 092388.  Judge Brian Walsh has

27  been appointed the judge for all purposes, thus replicating this aspect of federal practice.

28

**SUGGESTION OF PROBABLE ABSENCE OF SUBJECT MATTER JURISDICTION**
**AND**
**NOTICE OF PENDENCY OF OTHER ACTION**
2

1    (C)  Save for the parties identified in the footnote[1], all of the parties in this action

2    and in the state action are identical.  The parties identified in the footnote are the subject of serial

3    attempts at TRO and preliminary injunctive relief (all failed with one presently under submission

4    with Judge Brian Walsh of the Superior Court).

5    (D) This action should be stayed pending the outcome of the trial of the state

6    action set for trial in October, 2008.  The defendants here will seek such a stay in the next few

7    days.

8    **3.  Conclusion.**  This court lacks subject matter jurisdiction because there is not complete

9    diversity of citizenship between the plaintiffs (including XET and XT) on the one hand, and the

10    defendants, at least two of whom are Californians.  XS Holding, B.V. should bring any such

11    claims as it may have in the substantially identical action pending in Santa Clara Superior Court,

12    Case No. 107 CV 092388, styled *XET Holdings, LLC, et al v. XS Holding B.V., et al* (and related

13    cross-actions) set for trial in October of 2008.

14

15    DATED: MAY 7, 2008                                    SILICON VALLEY LAW GROUP

16                                                          By: /s/ Christopher Ashworth
                                                               CHRISTOPHER ASHWORTH
17

18

19

20

21

22

23

24

25

26

27
      _____
28    [1]Cool Earth Solar, Inc., Rob Lamkin, Lawrence Asuncion, Solar Components, LLC.,
      Nathan Schulhof, and M. James Bullen.

1  **CHRISTOPHER ASHWORTH (SBN 54889)**
   **KATHRYN E. BARRETT (SBN 162100)**
2  **SILICON VALLEY LAW GROUP**
   **A Law Corporation**
3  **25 Metro Drive, Suite 600**
   **San Jose, CA  95110**
4  **Telephone:    (408) 573-5700**
   **Facsimile:     (408) 573-5701**
5
   **Attorneys for Plaintiffs, XET Holdings Co., LLC,**
6  **Xslent Technologies, LLC, and Xslent, LLC,**

7  **FRANK R. UBHAUS (SBN 46085)**
   **BERLINER COHEN**
8  **Ten Almaden Boulevard, 11th Floor**
   **San Jose, CA 95113**
9  **Telephone:    (408) 286-5800**
   **Facsimile:     (408) 998-5388**
10                                                      BY FAX
   **Attorneys for Plaintiff, Atira Technologies, LLC,**
11

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                       **COUNTY OF SANTA CLARA**

14  XET Holdings Co., LLC, a limited liability        )   **Case No.  107CV092388**
    company; Xslent Technologies, LLC, a limited     )
15  liability company; Xslent, LLC, a limited liability )
    company; and Atira Technologies, LLC, a limited  )
16  liability company                                 )   **SECOND AMENDED COMPLAINT FOR**
                                                       )   **DECLARATORY AND OTHER RELIEF**
17                       Plaintiffs,                   )
                                                       )
18          v.                                         )
                                                       )
19  XS Holding B.V, a corporation; Brian Caffyn, an  )
    individual; David Tinsley, an individual and Does )
20  1 through 100; inclusive,                          )
                                                       )
21                       Defendants.                   )
    _____       )
22                                                      )
    AND RELATED CROSS-CLAIMS.                          )
23  _____       )

24

25

26

27

28

Silicon Valley
Law Group ·
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

Plaintiffs complain of defendants XS Holding B.V. ("XS"), Brian Caffyn ("Caffyn") and David Tinsley ("Tinsley") as follows:

## ALLEGATIONS COMMON TO ALL CLAIMS

1.      Plaintiff XET Holdings Co., LLC ("XET") is a limited liability company with its principal place of business in this county.

2.      Plaintiff Xslent Technologies, LLC ("XT") is a limited liability company with its principal place of business in this county.

3.      Plaintiff Xslent, LLC ("Xslent") is a limited liability company with its principal place of business in this county.

4.      Plaintiffs XT and XET collectively either own outright·or possess license rights to intellectual property including patented devices (the "Solar Technology") which permit solar collector panels to extract higher amounts of useable electricity than is ordinarily the case and patented devices (the "Software Technology").  The Solar Technology is generally acknowledged to be "cutting-edge" and extremely valuable.

5.      Defendant XS is a Dutch corporation whose principal place of business is in Heerlen, The Netherlands.  XS does business in this county.  The conduct of XS complained of herein was done in part in this county.  Plaintiffs are informed and believe that Defendant Caffyn controls and owns XS.

6.      Defendant Caffyn is an individual residing variously in the United Kingdom, Massachusetts, Florida, Monaco, California and elsewhere. Caffyn dominates and controls the affairs of XS.  The conduct of Caffyn complained of herein was done in part in this county.  At all times material, Caffyn was and is a manager[1] of both XET and XT, and owed and owes fiduciary duties to, *inter alia*, those entities and their members.  Caffyn also has ownership and managerial interests in several other "alternative" energy concerns, especially those involving solar and wind generation of electricity.  For convenience, unless th context otherwise requires, Caffyn and XS will be referred to collectively as "XS/Caffyn".

---

[1] In Limited Liability Companies, "managers" are the equivalent of "directors" in a corporation.

Page 2

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

ilicon Valley
aw Group
5 Metro Drive
uite 600
an Jose, CA 95110
08) 573-5700

7.    Defendant Tinsley is an individual residing in this county.  Until not-later-than August 15, 2007, Tinsley was a manager of both XET and XT, and owed and continues to owe fiduciary duties to, *inter alia*, those entities and their members.

Plaintiffs are informed and believe that each of the defendants is the employee or agent of each of the other defendants.

8.    Plaintiffs are uninformed respecting the identities and capacities of Does 1 through 100, but will suitably amend this second amended complaint when the same are ascertained.  All of the defendants are the agents/servants/employees of the other defendants and acred in such capacity(ies) at all times material.

9.    On April 7, 2007 Caffyn, on behalf of XS, executed a document styled "Operating Agreement for XET Holding Co., LLC" ("XET Operating Agreement").  The XET Operating Agreement was also executed by, *inter alia* Martin Lettunich and Stefan Matan on behalf of XT, the only "Class A" member of XET.  XS is the only "Class B" member.  A true copy of the XET Operating Agreement is attached hereto as **Exhibit "A."**

10.    On April 7, 2007 Caffyn, on behalf of XS, executed a document styled "Operating Agreement for Xslent Technologies, LLC" ("XT Operating Agreement").  The Original XT Operating Agreement was executed by, *inter alia*, Martin Lettunich on behalf of both Xslent and Altira.  Xslent and Atira are the only "Class A" members of XT.  At the time of the execution of the XT Operating Agreement, Atira was the 67.5 percent Class A unit holder in XT and Xslent was the 22.5 percent Class A unit holder in XT.  By later agreement of the parties, Atira is now the owner of 89 percent of the A units in XT and Xslent is now the owner of 11 percent of the A units in XT.  XS is the only "Class B" member of XT.  A true copy of the XT Operating Agreement is attached hereto as **Exhibit "B"**.  Unless otherwise required for clarity, the XT and XET Operating Agreements will be referred to collectively as the "Agreements".

11.    The Agreements provided that the A Class unit holders, Xslent and Atira, transfer all of their assets to XT and XET.  It was intended by the parties that the Atira intellectual property would reside in XET.  XS/Caffyn represented to Plaintiffs and to Atira investors that they would, in exchange for its contribution of Atira intellectual property to XET, fund XET's further development of the

licon Valley
w Group
5 Metro Drive
uite 600
an Jose, CA 95110
08) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1 intellectual property. XS and Caffyn further represented to Atira investors that XT would be the

2 majority, 67.5 percent, unit holders in XT.

3   12. Section 3.1.2 of both Agreements calls for cash contributions from XS in favor of XET

4 and XT respectively in the amount of $7,500,000 *each,* payable at $2,500,000 "down" (as to XET) and

5 $3,500,000 "down" (as to XT) and the balance payable at agreed monthly intervals as set forth in the

6 Agreements. For this investment of funds, XS was to receive a 10 percent interest in XT and a 10

7 percent interest in XET.

8   13. Plaintiffs are informed and believe that in May of 2007 Caffyn, while he was the CEO of

9 XET, was also a controlling interest holder in UPC Solar. Without authorization, he installed UPC

10 Solar references on the XET website thereby "hi-jacking" the site to the advantage of UPC Solar. He

11 also, without authorization, added XET intellectual property materials that had not yet been patented in

12 his UPC Solar sales brochure, risking patent rights for the valuable intellectual property. When XET

13 discovered this conduct, it demanded that he immediately remove XET intellectual property materials

14 from UPC Solar sales materials. Additionally, Caffyn staffed the companies by "renting" his UPC Solar

15 employees for a mark up that included (1) UPC Solar's costs for wages, benefits and vacation, plus (2)

16 30 percent over the cost to UPC Solar. Caffyn caused the companies to also pay for transportation and

17 lodging of his Chicago-based, rented, UPC employees. The conduct, among other things, was concealed

18 from XET and was self dealing by XS/Caffyn.

19   14. Also in May of 2007 Caffyn demanded that XET execute a broad, exclusive licence of its

20 intellectual property in his favor which licence XET deemed to be unfavorable to XET's interests.

21 When XET sought to negotiate more reasonable terms, XS and Caffyn, on June 30, 2007, informed

22 XET and XT by email that XS would no longer continue to fund XET and XT as required under the

23 Agreements.

24   In fact, XS did cut off funding. Plaintiffs are informed and believe that the funding was cut off in

25 an effort to starve the company of funds to force it to capitulate to Caffyn's license demands. In late

26 July, 2007, having cut off funding, Caffyn proposed an even more onerous exclusive license deal.

27 Again, XET sought more commercially reasonable terms and Caffyn failed to timely pay his August

28 funding as well.

Silicon Valley
Law Group
5 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

15.     Section 3.5 of both Agreements declares in material part:

> "if a Class B member [XS] does not timely contribute all of the capital
> pursuant to [the agreed amounts set out in] section 3.1.2 in accordance
> with the schedule specified therein, the Class A Member(s) ... shall send
> the Class B Member written notice of such failure to contribute, giving
> him or her fourteen (14) days from the date such notice is given to
> contribute the entire amount of the capital contribution required at that
> time ("Capital Notice")....".

16.     When XS failed to make the payments to XET and XT that were due on July 1, 2007 as Caffyn had threatened, on July 6, 2007, the Class A Member(s) of XET and XT respectively sent the written Capital Notices required by sections 3.1.2 and 3.5 to XS. On July 9, 2007, Caffyn on behalf of XS gave a written acknowledgment of the receipt of the section 3.5 and 3.1.2 notices. A copy of such written acknowledgment is attached as **Exhibit "C"**.

17.     XS did not make the contributions due on July 1, 2007, within the 14 days permitted by section 3.5 nor at any time thereafter.

18.     Section 3.5 of the Agreements provides: "if the Class B Member [XS] does not contribute his or her required capital...within said fourteen (14) day period, a majority of the Class A Members... may elect any one or more of the following remedies within 60 days of such Capital Notice:

> **3.5.1.** Declare some or all of the Warrants of Class B Member described in
> Section 3.1.5 and in the Warrant Agreement as null and void by way of
> written notice of the Class B Member within 60 days after such failure to
> contribute.
>
> **3.5.2.** The Percentage Interests and the number of Class B Units of Class B
> Member shall be adjusted, in which even the Class B Member's
> Percentage Interest and Units shall be a fraction, the numerator of which
> represents the amount of such Member's Capital Contributions and the
> denominator of which represents $7,500,000. The total number of the

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    reduction in the Class B Units determined pursuant to the previous

2    sentence shall be added to the Units of Class A Member as Class A Units.

3    **3.5.3.** Provided that the Percentage Interest has not been adjusted under

4    Section 3.5.2, above then Class Be Member shall have no right to receive

5    any distributions from the Company until the Class B Member has

6    contributed the full $7,500,000 of capital. All withheld distributions to

7    Class B Member shall be deemed applied to the latest capital contribution

8    required under Section 3.1.2., above (i.e. – the final month shall be paid in

9    first).

10    **3.5.4.** Class B Member shall lose its approval rights under Section 4.12 of

11    this Agreement.

12    **3.5.5.** Class B Member shall lose its ability to elect a Manager".

13    Remedies such as those set forth above are meant to discourage or prevent an economically

14    stronger LLC member (such as XS) from effectuating a "starve-out" of the company and its less wealthy

15    members by the simple expedient of withholding promised capital and thereafter attempting to re-

16    negotiate the stronger member's power position in the company – all to the advantage of the stronger

17    member and to the detriment of the less wealthy members. As to which, see the 2nd Claim for Relief.

18    19.    On August 13, 2007, more than 40 days late – and realizing that XS had made an horrific

19    strategic mistake – Caffyn attempted to wire-tender contributions for XS from a personal Goldman-

20    Sachs account in Florida[2]. But by then, XET and XT had already (1) sent their Capital Notices to XS, (2)

21    proceeded to seek other capital elsewhere, and (3) had commenced exercising their anti starve-out

22    remedies as provided for in Section 3.5 of the Agreements.

23    20.    Specifically, XET and XT exercised the following agreed-upon remedies vis a vis XS: (1)

24    "Declar[ing] all of the Warrants of Class B Member ...as null and void by way of a written notice to the

25    Class B Member"; (2) "Class B member shall lose its approval rights under section 4.12 of the

26    [Agreement] .."; and (3) "Class B Member shall lose its ability to elect a Manager".

27

28    ────────────────

[2] XS had also failed to timely tender its August 1, 2007 payment and also attempted to tardily wire-tender the August 1, 2007 contributions on August 13.

ilicon Valley
aw Group
5 Metro Drive
uite 600
an Jose, CA 95110
408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1      Written notices of the election of Remedies of the Class A Member(s) were sent to XS and are

2  attached as **Exhibit "D"**. Additionally, because XS was in default respecting its capital contributions, it

3  lost the ability to confer upon its nominee, defendant Caffyn, the power to cast two manager votes at

4  Board of Managers meetings.[3]

5      21.    On August 15, 2007, following notification to XS/Caffyn as described above, XET and

6  XT informed defendant Tinsley that he was terminated as a Manager of both XET and XT.  As such,

7  Tinsley lost his position as a manger of both XET and XT.   Copies of the written notice of Tinsley's

8  discharge are attached collectively as **Exhibit "E"**.

9      22.    On August 16, 2007 XET and XT conducted Board of Managers meetings (the same

10  demanded by and noticed by XS).   Defendant Caffyn participated by telephone – assertedly from

11  Boston. Managers Martin Lettunich and Stefan Matan participated in person. Though specifically asked

12  not to join in by telephone or otherwise, defendant Tinsley was given the conference call "call-in"

13  number by Caffyn, called in and refused to withdraw. Caffyn insisted that, notwithstanding the removal

14  of his two votes by the Companies due to his refusal to timely fund the Companies as required under the

15  Agreements,  he was entitled to cast two Manager votes.   Tinsley insisted that he was entitled to cast a

16  manager vote. No company business was concluded by either XET or XT due to the disruptive behavior

17  of Tinsley and Caffyn, although Caffyn and Tinsley thereafter purported to hold a "vote" of their own.

18      23.    For some weeks prior to the advent of this litigation, plaintiffs had come to suspect that

19  Tinsley, at the behest of and in concert with, Caffyn, had "hacked" into the computers and computer

20  systems of plaintiffs to view, alter, destroy and otherwise make use of data and programs.

21      24.    **The Canary Trap.**  On July 27, 2007, Lisa Gallagher, an employee of plaintiff XT

22  authored an e-mail and sent it to Martin Lettunich.  The e-mail, by agreement, contained incorrect

23  business data.  Such communications are familiarly called false flags or "canary traps".  They are

24  designed to entice wrongdoers into (a) viewing and thereafter (b) disseminating the incorrect matter in a

25  way that discloses who the unauthorized viewer is. The Canary Trap e-mail recites as follows:

26        **From:** Lisa Gallagher <LGallagher@xslent.net>

27        **Date:** July 27, 2007 1:40:49 PM PDT

28

[3] See section 5.1 B. of the Agreements.

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    **To:** Martin Lettunich <marty@xslent.net>

2    **Subject: Update**

3    Marty:

4    The meeting went extremely well. We can sell all the rights to the GINA

5    technology @ FMV (equivalent to your capital account). They would then enter

6    into a new & separate partnership with us whereby they fund all the development

7    with a new engineering team. Once GINA is really developed, the partnership can

8    flip GINA for a very very nice profit. No more Open Source, Bechtel or Shiny BS.

9    This will also help mend that wound in my back.  Kindest Regards, Your Favorite

10   Shining Star.

11        Within just a few days of the sending of the Canary Trap e-mail, rumors began to abound in the

12   principal offices of the plaintiffs to the effect that significant intellectual property belonging to the

13   plaintiffs was about to be sold.  When queried about the source of the rumors, all of the affected

14   employees identified Tinsley as the person who informed them of the 'sale' of plaintiffs intellectual

15   property.  Plaintiffs infer that Tinsley has improperly gained access to the e-mail accounts of, at a

16   minimum, Gallagher and Lettunich.

17        25.     Immediately after the advent of this litigation, counsel for XS and Caffyn posed a

18   document demand phrased in the following lugubrious prose:

19        REQUEST FOR PRODUCTION No. 10.  All communications...with third parties

20        RELATED TO the actual or potential sale, transfer, licensing AND assignment of

21        ALL PLAINTIFFS' IP to AND from PLAINTIFFS".

22        26.     Plaintiffs infer that Tinsley has shared with Caffyn the Canary Trap e-mail.

23        27.     Plaintiffs are further informed and believe that, in addition to hacking into the e-mails

24   accounts of plaintiffs, Tinsley in concert with Caffyn, have invaded the computer systems of plaintiffs

25   and have deleted, destroyed, and copied proprietary data.  Plaintiffs are further informed and believe that

26   Tinsley, who formerly had unfettered access to the computer systems has left for himself a "back-door"

27   access to plaintiffs' computer systems despite plaintiffs having changed passwords.

28

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    Additionally, Plaintiffs are informed and believe that XS and Caffyn, themselves and/or through

2    their agents, have interfered with the business of XT and XET, including, *inter alia*, contacting potential

3    customers and telling them that if they do business without Caffyn's explicit consent, any agreement will

4    be "ultra vires" and subject to undoing by Caffyn.

5    This threat to customers (or potential customers) of XET in order to continue the starve-out

6    strategy by XS/Caffyn with the objective of keeping XET from obtaining funds so it would capitulate to

7    Caffyn's unfavorable license demand. This conduct has been willful and malicious and oppressive and

8    has interfered with XET's ability to do business.

9                            **FIRST CLAIM FOR RELIEF**

10                        **(Declaratory Relief against all Defendants)**

11    28.    Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

12    incorporate each paragraph and allegation by reference as though fully set forth herein.

13    29.    Defendants claim that Plaintiffs' exercise of their anti starve-out rights under section 3.5

14    of the Agreements was wrongful. Defendants also claim that Plaintiffs' termination of Tinsley was

15    wrongful. Defendants also claim that XS is entitled to appoint a manager who has two votes at the Board

16    of Manager Meetings of both XET and XT.

17    30.    Plaintiffs claim that their exercise of their anti starve-out rights under section 3.5 of the

18    Agreements was entirely proper. Plaintiffs also claim that their termination of Tinsley was entirely

19    proper. Plaintiffs also claim that XS is not entitled to appoint a manager who has two votes at the Board

20    of Manager Meetings of both XET and XT.

21    31.    An actual controversy exists as to as to the rights of Plaintiffs to exercise their anti starve-

22    out remedies, to terminate Tinsley and to not suffer XS or its nominee to exercise two votes at Board of

23    Managers meetings. Plaintiffs desire a judicial determination and declaration concerning the rights

24    asserted by Defendants.

25                            **SECOND CLAIM FOR RELIEF**

26                    **(Breach of Fiduciary duty against XS, Caffyn and Tinsley)**

27    32.    Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

28    incorporate each paragraph and allegation by reference as though fully set forth herein.

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

33.     XS, Caffyn and Tinsley owe fiduciary duties to XET and XT and their constituent members including Atira and Xslent pursuant to California Corporations Code §§ 17153 and 16404. These duties include, *inter alia*, a duty of loyalty to the LLC's and their members, including the duty to discharge duties or obligations and exercise any rights consistently with the obligation of good faith and fair dealing.

34.     XS and Caffyn breached their fiduciary duties and/or duties of loyalty by among other things alleged herein, (a) initially promising to contribute capital to XET and XT in the aggregate amount of $15,000,000, and then (b) suddenly withholding capital contributions as described above in order to gain leverage to re-negotiate and gain additional rights and perquisites in connection with XS's membership position and Caffyn's manager position in XET and XT. Among other things, Caffyn, using XS as a stalking horse, intends to siphon away the intellectual property and other assets of XET for the advantage of other business entities in which Caffyn/XS have an interest. Caffyn has also made unauthorized use of XET intellectual property, secretly including his UPC Solar company on the XET website and secretly including the yet-unpatented XET intellectual property information in his sales brochures for UPC Solar.  Moreover, he used XET funds to benefit UPC Solar by "renting" at a significant mark-up (and adding travel costs) Chicago-based employees to staff XET.  Defendant Tinsley has aided and abetted XS and Caffyn at every step in the matters complained of herein.

35.     As a result of the conduct of Caffyn's, XS's and Tinsley's breaches of their fiduciary duties, Plaintiffs have been damaged in an amount to be proven at trial.

36.     Plaintiffs are informed and believe that the aforementioned acts of XS, Caffyn and Tinsley were willful, wanton, malicious, oppressive and in conscious disregard of the rights and interests of Plaintiffs and Plaintiffs therefore seek punitive damages in an amount to be determined according to proof.

### THIRD CLAIM FOR RELIEF

### (Tortious Interference with Business Advantage against Tinsley)

37.     Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and incorporate each paragraph and allegation by reference as though fully set forth herein.

Silicon Valley
Law Group
5 Metro Drive
Suite 600
San Jose, CA 95110
408) 573-5700

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

38.     For several weeks preceding the filing of this complaint, defendant Tinsley has manifested bizarre behaviors in the joint offices of XET/XT.  Such behavior included insisting that he was a DOD Agent, that he had flown high-performance fighter aircraft in the "military" (known not to be true), that he had just bought two sidearms and that he had just obtained a concealed weapons permit.  Additionally, Tinsley publicly brandished and then hung up in his office shooting range targets showing close groupings of bullet strikes purportedly attesting to his skill as a marksman.  Additionally, Tinsley posted a threatening photograph of himself, brandishing two side arms, in the office and "Skyped" the same to a number of co-workers at XET and XT in Los Gatos. A copy of the offending photograph  is attached as Exhibit "F". Lastly, Tinsley threatens to come upon the business premises of XET/XT "anytime I want to" notwithstanding that he has no employment relationship with either XET or XT.

39.     As a result of Tinsley's bizarre behavior, other employees of XET and XT are frightened and upset in their workplace. Several employees have expressed concern for their safety and requested action be taken.

40.     Proximately caused by the conduct of Tinsley, plaintiffs have lost worker productivity and have been damaged in an amount to be proved at trial.

## FOURTH CLAIM FOR RELIEF

### (Interference with Business Advantage against XS/Caffyn)

41.     Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and incorporate each paragraph and allegation by reference as though fully set forth herein.

42.     XS/Caffyn are aware that XET has been negotiating with various companies, including Solar Components and Cool Earth concerning licensing  of XET intellectual property which licenses would result in revenue to the company.  XS/Caffyn, having failed to extract a broad, exclusive license to the XET intellectual property for himself, sought to stop XET from entering into the licences by way of application for temporary restraining orders.  When XS/Caffyn did not succeed in obtaining such TRO's he then caused his agent to contact Cool Earth in order to attempt to intimidate it and keep it from advancing funds to XET. XS/Caffyn, through its agent, told Cool Earth that this court was going to, within a week, remove the management (with whom Cool Earth was dealing, from XET) and install Caffyn as manager and the funds would be lost.  Caffyn, through his agent, told Cool Earth that the

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

1  management was dishonest and had misappropriated money, intending to cause Cool Earth to cease its

2  relationship with XET, an event that would allow Caffyn to continue his starve out strategy.

3  Additionally, on April 30, 2008, Paul Riehle, an agent of XS/Caffyn, informed Cool Earth that any deal

4  it (Cool Earth) signed with XET would be *ultra vires* and would be attacked and slowed down by

5  XS/Caffyn. On Cool Earth, in fact, delayed its funding of XET based upon Caffyn's tactics. Both XET

6  (in its guise as an inventor of solar technology) and XT (as the majority owner of XET) have been

7  harmed in their business due tothe acts of XS/Caffyn.

8      43.    XET and XT have been damaged by the interference of Caffyn/XS in an amount to be

9  proved at trial.

10     44.    Plaintiffs are informed and believe that the aforementioned acts of XS, Caffyn were

11  willful, wanton, malicious, oppressive and in conscious disregard of the rights and interests of Plaintiffs

12  and Plaintiffs therefore seek punitive damages in an amount to be determined according to proof.

**FIFTH CLAIM FOR RELIEF**

**(Fraud against XS/Caffyn)**

15     45.    Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

16  incorporate each paragraph and allegation by reference as through fully set forth herein.

17     46.    XS./Caffyn represented to XET and XET that it would fund the companies as provided in

18  the operating agreements.  As consideration for its investment in the companies, XS/Caffyn were to

19  receive a ten percent interest in each company.   The plaintiffs reasonably believed the representations

20  of XS/Caffyn.  Plaintiffs are informed and believe that XS/Caffyn intended Plaintiffs to rely on the

21  funding promises, but that Caffyn/XS  never intended to invest the funds as required under the

22  Agreements.  Plaintiff are informed and believe that XS/Caffyn then caused the Companies to quickly

23  spend the funds (particularly XET, under the stewardship of Caffyn) and then intended to cut off the

24  funding as part of a starve out strategy all the better to extract more benefits for XS/Caffyn.

25     47.    In fact, XS/Caffyn cut off funding of the companies when Caffyn was unable to extract an

26  exclusive and broad licence for himself and his UPC Solar company.  XS/Caffyn thereafter, having

27  starved the company for a period of time, again commenced negotiations to extract a license for Caffyn

28  that was wholly unfavorable to XET.

ilicon Valley
aw Group
5 Metro Drive
uite 600
an Jose, CA 95110
408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    48.    Plaintiffs had no reason to believe that XS/Caffyn were intending to engage in the starve

2  out strategy after promising to fund the companies.  Plaintiffs have been damaged by the conduct of

3  XS/CAffyn in an amount to be proved at trial.

4    49.    Plaintiffs are informed and believe that the aforementioned acts of XS, Caffyn were

5  willful, wanton, malicious, oppressive and in conscious disregard of the rights and interests of Plaintiffs

6  and Plaintiffs therefore seek punitive damages in an amount to be determined according to proof.

7  ### SIXTH CLAIM FOR RELIEF

8  **(Unauthorized Access to Computer Data under Penal Code § 502[4] against Tinsley and Caffyn )**

9    50.    Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

10  incorporate each paragraph and allegation by reference as though fully set forth herein.

11    51.    By virtue of the foregoing, defendants are liable to plaintiffs for their violations of Penal

12  Code § 502, including such damages as may be proved at trial, but in no event less than $20,000,000.

13    52.    Defendants' actions complained of herein were conscious, intentional, wanton and

14  malicious, entitling plaintiffs to an award of punitive damages.

15    53.    Plaintiffs have no adequate remedy at law for defendants' continued violation of

16  Penal Code § 502 and thus are entitled to preliminary and permanent injunctive relief as set forth in the

17  prayer hereto.

18

19  ### WHEREFOR PLAINTIFFS PRAY

20    1.    For judgment against defendants in an amount to be proved at trial, but not less than

21  $7,500,000;

22    2.    For punitive damages in an amount to be proved at trial;

23    3.    For a declaration that (a) Plaintiffs claim that their exercise of their anti starve-out rights

24  under section 3.5 of the Agreements was entirely proper; (b) Plaintiffs claim that their termination of

25  Tinsley was entirely proper; and (c) XS is not entitled to appoint a manager who has two votes at the

26  Board of Manager Meetings of both XET and X-Tech;

27

28

ilicon Valley
aw Group
5 Metro Drive
uite 600
an Jose, CA 95110
08) 573-5700

[4] A civil action for violations of penal Code §502 is contemplated by §502 (e)(1).

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    4.    For a temporary restraining order and thereafter a preliminary injunction enjoining Caffyn

2    (a) from exercising or attempting to exercise any managerial power in XET or X-Tech beyond what a

3    manager with a single vote may do under the Operating Agreements of XET and X-Tech; and (b)

4    representing to any third parties that he is the CEO or Chairman of XET or X-Tech.

5    5.    For a preliminary injunction and thereafter a permanent injunction enjoining Tinsley and

6    Caffyn from doing any act in violation Penal Code § 502 in derogation of the rights of the plaintiffs

7    herein;

8    6.    That XS be stripped of its member status and reduced to a mere economic stake holder;

9    7.    For costs of suit;

10   8.    For interest at the lawful rate;

11   9.    For attorneys fees according to both contract and statute; and

12   10.   For such further relief as may be proper.

13
DATED:  May 1, 2008                                SILICON VALLEY LAW GROUP
14

15                                                 By
16                                                    CHRISTOPHER ASHWORTH

17
                                                   BERLINER/COHEN
18

19                                                 By
20                                                    FRANK X. UBHAUS

21

22

23

24

25

26

27

28

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

1  SEDGWICK, DETERT, MORAN & ARNOLD LLP
   PAUL RIEHLE  Bar No. 115199
2  RANDALL BLOCK  Bar No. 121330
   JIA-MING SHANG  Bar No. 233326
3  One Market Plaza
   Steuart Tower, 8th Floor
4  San Francisco, California 94105
   Telephone: (415) 781-7900
5  Facsimile: (415) 781-2635

6  Attorneys for Defendants and Cross-Complainants
   Brian Caffyn and XS Holding B.V.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF SANTA CLARA

10

11  XET HOLDING CO., LLC, et al.,           CASE NO. 107CV092388

12         Plaintiffs,
                                            **DEFENDANTS AND CROSS-**
13     v.                                   **COMPLAINANTS BRIAN CAFFYN'S AND**
                                            **X.S. HOLDING B.V.'S SECOND AMENDED**
14  XS HOLDING B.V., et al.,                **CROSS-COMPLAINT**

15         Defendants.

16

17  ──────────────────────────────

18  XS HOLDING B.V. and BRIAN               JUDGE:    Hon. Brian Walsh
    CAFFYN,                                 DEPT.:    9
19
           Cross-Complainants,              ACTION FILED:   August 20, 2007
20                                          TRIAL DATE:     October 6, 2008
       v.
21
    XSLENT, LLC, ATIRA
22  TECHNOLOGIES, LLC, MARTIN N.
    LETTUNICH and ROES 1–50, inclusive,
23
           Cross-Defendants.
24
    ──────────────────────────────
25  And Related Cross-Action.

26

27

28

1        Defendant and Cross-Complainant XS HOLDING B.V. ("XS Holding"), a Dutch

2    corporation, and Defendant and Cross-Complainant BRIAN CAFFYN ("Mr. Caffyn"), an

3    individual, (collectively "Cross-Complainants") allege in this Second Amended Cross-Complaint

4    against Cross-Defendant MARTIN N. LETTUNICH, an individual, Cross-Defendant STEFAN

5    MATAN, an individual, Cross-Defendant LISA GALLAGHER, an individual, Plaintiff and

6    Cross-Defendant XSLENT, LLC ("Xslent"), a limited liability company, Plaintiff and Cross-

7    Defendant ATIRA TECHNOLOGIES, LLC ("Atira Technologies"), a limited liability company,

8    and Cross-Defendants ROES 1-50, inclusive ("Roe Cross-Defendants") (collectively "Cross-

9    Defendants"), as follows:

10                    JURISDICTION AND PARTIES

11        1.       Cross-Complainant XS Holding is a Dutch corporation with its principal place of

12    business in Amsterdam, The Netherlands.

13        2.       Cross-Complainant Mr. Caffyn is an individual residing in Miami Beach, Florida.

14    At all times material, Mr. Caffyn was a Manager of Plaintiff XET Holdings Co., LLC ("XET")

15    and Plaintiff and Cross-Defendant Xslent Technologies, LLC ("XT") (collectively, the

16    "Companies").

17        3.       Cross-Defendant Lettunich is an individual residing in Los Gatos, California.  At

18    all times material, Cross-Defendant Lettunich was a Manager of Cross-Defendant Xslent, Cross-

19    Defendant Atira Technologies, as well as XET and XT.  Cross-Defendant Lettunich is an

20    attorney licensed to practice law in the State of California.

21        4.       Cross-Defendant Stefan Matan is an individual residing in Novato, California.  At

22    all times material, Cross-Defendant Matan was a manager of Cross-Defendant Xslent, Cross-

23    Defendant Atira Technologies, as well as XET and XT.

24        5.       Cross-Defendant Lisa Gallagher is an individual of unknown residence.  Cross-

25    Defendant Gallagher is an attorney licensed to practice in Florida, but not licensed to practice in

26    California.  Cross-Defendant Gallagher has been counsel for Xslent and XT and has occupied the

27    position of the Secretary of the Board of Managers of both XET and XT since the Companies

28    were formed until the Board of Managers meeting on August 16, 2007 when she was removed.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-2-
SECOND AMENDED CROSS-COMPLAINT

1  Cross-Defendant Gallagher formerly acted as counsel for Wind City Oil & Gas Management,

2  LLC ("Wind City"), one of Mr. Caffyn's companies.

3        6.    Cross-Defendant Xslent is a limited liability company with its principal place of

4  business in Santa Clara County.

5        7.    Cross-Defendant Atira Technologies is a limited liability company with its

6  principal place of business in Santa Clara County.

7        8.    Kore Technologies, LLC ("Kore") is a California limited liability company and a

8  member of Cross-Defendant Xslent.

9        9.    The names and capacities, whether individual, corporate, associate or otherwise,

10  of Roe Cross-Defendants, are unknown to Cross-Complainants, who therefore sue such Cross-

11  Defendants by fictitious names.  Cross-Complainants will amend this Cross-Complaint to show

12  their true names and capacities when the names have been ascertained.  Cross-Complainants are

13  informed and believe and thereon allege that each of the Defendants designated herein as Roe is

14  responsible in some manner for the events and happenings herein referred to, and that such

15  Cross-Defendants caused injuries and damages by such conduct, as herein alleged.

16  FACTUAL ALLEGATIONS

17      Introduction

18        10.    In late 2006, Cross-Defendant Lettunich, Cross-Defendant Matan, and others,

19  sought out Mr. Caffyn as a potential business partner.  Mr. Caffyn had a successful track record

20  of more than 20 years in the development, funding and growth of alternative energy industries.

21  Indeed, Mr. Caffyn has served, and continues to serve, in high level positions of several such

22  companies.  Mr. Caffyn has grown and developed such companies from their founding to

23  thriving businesses worth hundreds of millions of dollars and in one case over $1 billion in less

24  than 6 years.  Attached hereto as Exhibit 1 is a true and correct copy of Mr. Caffyn's curriculum

25  vitae listing some of his accomplishments.

26        11.    Mr. Caffyn is the Managing Director of XS Holding.  On or about December 12,

27  2006, Brian Caffyn in a hand shake deal caused $500,000 to be loaned to Cross-Defendant

28  Martin Lettunich to invest in developing certain proprietary technologies related to the solar

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-3-
SECOND AMENDED CROSS-COMPLAINT

1  power industry and certain software applications. On January 10, 2007, a memorandum of

2  understanding ("MOU") was entered into for purposes of beginning the process of developing

3  and marketing those technologies. On April 7, 2007, two companies – XET and XT – were

4  formed to that end. Mr. Caffyn, through his affiliated entities, funded the parties' endeavor

5  beginning December 2006 and until Cross-Defendant Lettunich improperly returned

6  $1.75 million in August 2007. In January 2008, XS Holding loaned XET another $250,000.

7  Total funding to date is in excess of $10 million (inclusive of $1.75 million in funds improperly

8  returned to XS Holding by Cross-Defendant Lettunich). A total of $8.5 million has been

9  provided exclusive of the $1.75 million improperly returned by Lettunich.

10      12.    Shortly after the start of funding from Mr. Caffyn, and just days before the

11  Companies were formed, Cross-Defendant Lettunich set in motion a plot to misappropriate

12  company assets by diverting them to an otherwise unrelated company named WorldSpace, LLC

13  ("WorldSpace"), a company that Cross-Defendant Lettunich solely owns. Cross-Defendant

14  Lettunich also schemed to transfer the right to intellectual property ("IP") of XET and XT into

15  WorldSpace.

16      13.    Beginning less than a month after the Agreements were signed, Cross-Defendants

17  Lettunich and Matan acted in concert to (a) strip Mr. Caffyn and his company XS Holding of

18  their bargained-for rights and protections under the Agreements, and (b) remove Mr. Caffyn and

19  David Tinsley from the Board of Managers of the Companies in violation of the Agreements.

20      14.    Cross-Defendant Lettunich, with Cross-Defendants Matan, have induced XS

21  Holding's and Mr. Caffyn's actions with fraudulent misrepresentations, have engaged in

22  undisclosed self-dealing, have taken numerous actions with respect to the Companies in excess

23  of their authority, have violated the Agreements themselves and, Mr. Lettunich and Mr. Matan,

24  by virtue of their roles as Managers of Class A Member Xslent and Atira, have caused those

25  entities to breach the Agreements. Lettunich has refused to explain discrepancies in the

26  Companies' financial records. According to his own financial reconciliation, Lettunich has taken

27  millions more from the companies than he put in, while refusing to take cash from XS resulting

28  in XT firing all of its essential employees and thereby driving XT into the ground and forcing it

SEDGWICK
DETERT, MORAN & ARNOLD LLP

-4-
SECOND AMENDED CROSS-COMPLAINT

into a divestiture of its IP to an entity it does not control and with reduced ownership, and leaving both XT and XET with current liabilities in excess of its assets and potentially bankrupt. Cross-Defendants Lettunich's and Matan's misconduct includes the following:

- <u>Self-Dealing</u>: Cross-Defendant Lettunich owns WorldSpace and planned for Cross-Defendants Matan to have an equity interest in that Company as well. When Cross-Defendants Lettunich and Matan signed the Agreements on April 7, 2007, they were scheming to transfer the right to much of the XET and XT IP to WorldSpace. They planned through a licensing agreement to transfer the economic benefit of the XET and XT technologies to Cross-Defendants Lettunich and Matan through this vehicle as well. Funds provided by XS Holdings for XT were transferred to WorldSpace, as well as to pay WorldSpace bills.

- <u>Material Misrepresentations</u>: Cross-Defendants Lettunich and Matan have made numerous fraudulent misrepresentations to the detriment of Mr. Caffyn and XS Holding. For example, they misrepresented their investment in the companies which had created the technology and the test results of the solar technology one of those companies developed. They prepared minutes of a purported June 28, 2007 meeting (there was no quorum), stating that Mr. Caffyn and Mr. Tinsley had resigned from the Board of Managers; in fact, neither had done so. Cross-Defendants Lettunich and Matan fraudulently urged Mr. Caffyn to resign as CEO and President ("CEO/President") of XET, stating it would be "for the good" of the company, because Mr. Caffyn had been named, along with dozens of others, in a "Not in my back yard" ("Nimby") letter sent by some New York State property owners to the Department of Justice opposing a wind power project. As even Cross-Defendant Lettunich himself later admitted, the Nimby letter was a pretext.

- <u>Failure to Provide Company Records and to Explain Financial Record Discrepancies</u>: As Members and Managers of XET and XT, Mr. Caffyn and XS Holding are entitled under the Agreements to examine Company records at their request. The few Company records that Plaintiffs have produced demonstrate serious financial discrepancies and reveal that Lettunich has misappropriated company funds for his personal use.

- <u>Starving the Companies</u>: According to his own Financial Reconciliation, Lettunich has taken millions from investors more than has gone into the companies. He also returned $1.75 million from XS Holding in August 2007 solely to advance his position in this litigation. Ironically, and apparently as an attempt to inoculate himself against this serious charge, Lettunich has claimed that XS Holding is involved in this litigation, which he started, to starve out the companies.

- <u>Other Ultra Vires Acts and Violations of the Agreements</u>: Cross-Defendants Lettunich and Matan, have engaged in a variety of ultra vires activities and have violated the Agreements in numerous ways. For example, they purported to terminate Tinsley without Mr. Caffyn's knowledge, let alone his approval, as required by the Agreements. Moreover, they claimed that, and have acted as though, XS Holding has lost its two votes on the Companies' Boards of Managers, and its consent rights as to major actions by the Companies despite the provisions in the Agreements to the contrary.

SEDGWICK
DETERT, MORAN & ARNOLD LLP

SF/1506669v1

15.     For these reasons, and the numerous additional reasons detailed below, Mr. Caffyn and XS Holding are entitled to the damages, declaratory relief and injunctive relief sought in this Cross-Complaint.

<u>Formation and Capitalization of XET and XT and Operating Agreements of XET Holding Co., LLC and Xslent Technologies, LLC</u>

16.     Beginning in late 2006, Mr. Caffyn, Cross-Defendants Lettunich and Matan, as well as others, began talks and negotiations regarding the formation of certain technology companies. Mr. Caffyn's affiliated company began funding in December 2006. Those talks resulted in the consummation of a MOU on January 10, 2007 and an amended MOU on February 25, 2007, and ultimately in the formation of XET and XT after Mr. Lettunich significantly renegotiated the deal to the detriment of XS.

17.     As part of the negotiations, it was agreed that Mr. Caffyn would be CEO/President of XET Technologies, LLC and offered a 5% management carry in connection with his engagement.

18.     XS Holding invested significant amounts of money into XET and XT based on the representations and assurances from Cross-Defendant Lettunich that Mr. Caffyn would manage the business of XET and ensure its successful growth.

19.     Before the Companies' operating agreements were signed, Mr. Caffyn made clear that he wanted to have the ability to influence the global strategy of XET or XT by persuading only one of the other three Managers – Cross-Defendants Lettunich and Matan, as well as David Tinsley – to vote with him on major issues. Mr. Caffyn asked for and received the assurance from each of Messrs. Lettunich, Matan and Tinsley that they would be open to Mr. Caffyn persuading each of them individually to Mr. Caffyn's position.

20.     As partial compensation for being the sole initial provider of the operating capital, Mr. Caffyn negotiated with Cross-Defendants Lettunich and Matan, as well as others, for the following four rights and protections (among other rights and protections) for Mr. Caffyn and XS Holding, which are memorialized in the Companies' Agreements: (1) for the Companies to take any of certain "Major Actions" under the XET and XT operating agreements, XS Holding must give its written consent; (2) XS Holding has two votes on each of the Companies' Boards of

SEDGWICK
DETERT, MORAN & ARNOLDLLP

1  Managers; and (3) Mr. Caffyn would be CEO/President of XET. and (4) the investment would be

2  made over time and XS was not obliged to make any investments beyond the initial investment

3  of $6 million in total. As a counterbalance to these extensive rights of XS even in the event in

4  which XS did not fully fund all of the originally envisioned investment, Mr. Lettunich negotiated

5  in a related document (the Members Agreement attached as **Exhibit 9**) signed at the same time

6  that in the event that XS stopped funding that the company would have the ability to repay XS in

7  full within 90 days and repay XS at par and thereby eliminate all of XS Holding's rights in the

8  event that XS did not complete the full investment of $7.5 million in each company.

9      21.    In order to better focus his time and energies working on, creating and leading the

10  Companies, Mr. Caffyn  forwent certain other lucrative business opportunities, including

11  conducting fire sales of his interests in two companies

12      22.    Unbeknownst to Mr. Caffyn, before the Agreements were signed, former

13  employee and in-house counsel for Wind City, Cross-Defendant Gallagher, betrayed Mr. Caffyn

14  and XS Holding by disclosing their confidential bargaining positions with respect to certain

15  agreements that ultimately were consummated.  This occurred after Cross-Defendant Lettunich

16  hired Cross-Defendant Gallagher away from her job working for Mr. Caffyn's company by

17  offering Ms. Gallagher, a first year lawyer, the following:  a 30% pay raise; an equity interest in

18  her choice of XET, XT or WorldSpace; and a job title of Executive Vice President.  Cross-

19  Defendant Lettunich did not disclose the stock option arrangement to Mr. Caffyn and he had no

20  authority to offer it to Cross-Defendant Gallagher as relates to XT and XET because such

21  transfers are not permitted without the consent of XS Holding.

22      23.    On or about April 7, 2007, XS Holding and XT entered into an agreement entitled

23  "Operating Agreement for XET Holding Co., LLC" (the "XET Operating Agreement").

24  According to the XET Operating Agreement prepared by Lettunich, XET is comprised of

25  Class A Member XT and Class B Member XS Holding.  Mr. Caffyn executed the XET Operating

26  Agreement on behalf of XS Holding.  Cross-Defendants Lettunich and Matan, as well as

27  Mr. Tinsley, signed on behalf of XT.  A true and correct copy of the fully executed XET

28  Operating Agreement is attached hereto as Exhibit 2.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-7-
SECOND AMENDED CROSS-COMPLAINT

24.     According to Exhibit A to the XET Operating Agreement, Class B Member XS Holding is the minority member in XET because Class A Member XT owns 90% of the total units of stock in XET, and Class B Member XS Holding owns 10% of the total membership units in XET.

25.     On April 7, 2007, XS Holding, Xslent and "Atira, LLC" entered into an agreement entitled "Operating Agreement for Xslent Technologies LLC" (the "XT Operating Agreement"). According to the signature page of the XT Operating Agreement, XT is comprised of Class A Member "Atira, LLC," Class A Member Xslent and Class B Member XS Holding. Mr. Caffyn executed the XT Operating Agreement on behalf of XS Holding and Cross-Defendant Lettunich signed the XT Operating Agreement on behalf of Xslent and Atira, LLC. A fully executed copy of the XT Operating Agreement is attached hereto as Exhibit 3.

26.     According to Exhibit A to the XT Operating Agreement, Class A Member Xslent owns 90% of the total membership units in XT and Class B Member XS Holding owns 10% of the total membership units in XT.

27.     Despite Atira, LLC being listed on the signature page as a Class A Member in XT, no ownership interest is listed for Atira, LLC in Schedule A to the XT Operating Agreement: only Xslent has a Class A ownership interest. Moreover, there is no company by the name of "Atira, LLC" registered as a Nevada limited liability company, which is where Cross-Defendant Lettunich has represented that Atira, LLC is registered.

28.     According to Cross-Defendant Lettunich, the proper party to the Agreement should have been "Atira Technologies, LLC" and Atira Technologies, LLC should be listed under Schedule A as having a 67.5% ownership interest in XT. Cross-Defendant Lettunich and his attorneys were responsible for preparing Schedule A. Lettunich had previously told members of Xslent that a new entity would be formed with Xslent owning 75% of the new entity and Atira 25% of the new entity. Put another way, Lettunich told different things to different people on the same subject of the basic issue of ownership interests.

29.     The dispute over relative ownerships by Xslent and Atira was resolved in part by a settlement agreement dated on or about April 21, 2008. Key provisions of the parties'

SECOND AMENDED CROSS-COMPLAINT

SEDGWICK
DETERT, MORAN & ARNOLDLLP

SF/1506669v1

1  agreement were that : (1) the XT intellectual property was transferred to a new entity named Big

2  Kahuna Technologies, LLC, not managed or controlled at all by Lettunich, and which is owned

3  89.9% by Xslent, .1% by David Tinsley, and 10% by XS Holding; (2) Martin Lettunich was

4  removed from control over Xslent; and (3) XT would be owned 10% by XS Holding as Class B

5  Member, and the remaining 90% to be held as Class A units and the Class A units in turn would

6  be held 89% by Atira and 11% by Xslent.

7       30.    Section 3.1.2 of the Agreements provide, inter alia, that XS Holding might make

8  certain capital contributions totaling $7.5 million to both XET and XT according to a schedule

9  set forth therein.  Pursuant to the Agreements, after the initial payments in April 2007, XS

10  Holding's decision to not to fund the balance of payments were "at Class B Member's option"

11  (See Section 3.1.2 of the Operating Agreements).  After the initial payment to XET and XT, not

12  funding according to that schedule is not a breach of the Agreements; rather, if XS Holding did

13  not fund according to that schedule, the Class A members of the Companies would have the

14  opportunity to elect certain remedies in the Agreements and in a related Member's Agreement

15  also executed on April 7, 2007, assuming that the Class A members were not themselves in

16  material breach of the Agreements.  XS Holding was required to contribute $2.5 million to XET

17  within two days of the execution of the XET Operating Agreement, with the balance of

18  $5 million payable "at Class B Member's option" beginning May 1, 2007 and continuing on the

19  first day of each month thereafter in increments of $500,000 until the remainder of the

20  $7.5 million was paid.  XS Holding was required to contribute $3.5 million to XT within two

21  days of the execution of XT Operating Agreement, which it did, with the balance "at Class B

22  Member's option" payable beginning May 1, 2007 and continuing on the first day of each month

23  thereafter in increments of $500,000 until the remainder of the $7.5 million was paid.

24       31.    XS Holding has contributed a total of $10,000,001 to the Companies (inclusive of

25  the $1.75 million in funds improperly returned to XS Holding by Cross-Defendant Lettunich, in

26  concert with Cross-Defendant Matan).  A total of $8.5 million has been provided exclusive of the

27  $1.75 million improperly returned by Lettunich.  An affiliate of XS Holding began funding the

28  Companies before the Agreements were consummated in April of 2007.  On each of the

SEDGWICK
DETERT, MORAN & ARNOLD LLP

SF/1506669v1

1  following dates, an affiliate of XS Holding contributed $500,000: December 12, 2006;

2  January 22, 2007; and February 21, 2007. On March 14, 2007, Mr. Caffyn's affiliate company

3  contributed $250,000, and on March 16, 2007, XS Holding or its affiliate contributed another

4  $150,000. Sections 3.1.1 and 3.1.2 of the Operating Agreements provide that XT and XET

5  would assume the preformation loans made by XS Holding's affiliate and that XS Holding could

6  apply those loans to satisfy in part its initial capital contribution, which it did. XS Holding

7  contributed $125,000 on April 12, 2007 and $30,645 on April 13, 2007. On April 12, 2007, XS

8  Holding contributed $2,363,000 to XT. On April 13, 2007, XS Holding contributed $1,581,356

9  to XET. On May 1, 2007, XS Holding contributed $500,000 to XT and $500,000 to XET. On

10  May 30, 2007, XS Holding contributed $500,000 to XT and $500,000 to XET. On July 17, XS

11  Holding contributed $250,000 to XET. On August 13, XET contributed $1 million to XT and

12  $750,000 to XET. On August 13, XS Holding funded $1 million to XT and $750,000 to XET,

13  the total scheduled amount under each of the Operating Agreements. Lettunich, however,

14  returned the $1.75 million from XS Holding in August 2007 solely to advance his position in this

15  litigation, resulting in both XT and XET becoming insolvent.

16      <u>Cross-Defendants Lettunich and Matan Never Intended to Honor the Operating</u>
           <u>Agreements</u>

17

18      32.    In an e-mail dated April 17, 2007 – just ten days after the Agreements were

19  signed – a John Stewart e-mailed Cross-Defendant Lettunich stating that "Per our discussion, we

20  will begin the process to find better money". Thus, Cross-Defendants Lettunich and Matan never

21  intended to honor the Agreements if a better funding source than Mr. Caffyn and XS Holding

22  could be found. Attached hereto as Exhibit 4 is a copy of the 04/17/07 e-mail.

23      33.    In addition, unbeknownst to Mr. Caffyn, sometime in early 2007, Cross-

24  Defendants Lettunich and Matan, as well as Mr. Tinsley, secretly agreed to vote as a block on all

25  issues of significance with respect to the Companies. This secret agreement is reflected, inter

26  alia, in a series of April 14, 2007 e-mails. The April 14 e-mails are attached hereto as Exhibit 5.

27  That agreement nullified Mr. Caffyn's and XS Holding's bargained-for right to influence global

28  decision making for the Companies.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

34.    In late May or early June, 2007, unbeknownst to XS Holding and Brian Caffyn, Lettunich prepared or caused to be prepared voting agreements between himself, on the one hand, and David Tinsley or Stefan Matan, on the other hand. Those voting agreements later were executed by Mr. Tinsley and Mr. Matan in or about mid-June 2007. Lettunich has used those agreements to claim "One Man Rule" over XET and XT.

### Undisclosed Self-Dealing by Cross-Defendants Lettunich and Matan

35.    In April 2007, Cross-Defendant Lettunich retained Walter Groteke to become CEO of WorldSpace, a company that Cross-Defendant Lettunich owned and had already incorporated. Cross-Defendant Matan was to acquire an ownership interest in WorldSpace. WorldSpace was formed to develop products, marketing plans and sales programs for software applications and power conversion technologies for solar energy and other energy conversion applications. Cross-Defendant Lettunich repeatedly advised Mr. Groteke that XT and XET would assign the exclusive sales, marketing, and distribution rights of much of their respective technologies to WorldSpace. Through those assignments, which included a possible licensing agreement between the Companies and WorldSpace, Cross-Defendant Lettunich schemed to transfer most of the economic benefit to themselves through WorldSpace. Thus, while Mr. Caffyn pursued an aggressive strategy to conduct product and market research, and to develop engineering, sales and marketing programs for the XET products to be sold, marketed and distributed by XET (including XT products under license), Mr. Groteke and WorldSpace were doing the same thing. Neither Mr. Caffyn nor Mr. Groteke was aware of the other's activities.

36.    Attached hereto as Exhibit 6 is the April WorldSpace CEO offer letter, effective April 1, 2007, from Cross-Defendant Lettunich as Chairman of WorldSpace to Mr. Groteke, including an accompanying employee agreement. The employee agreement identifies XT and XET as owners of IP with which WorldSpace would be working. Mr. Groteke moved forward based on the understanding that WorldSpace had or would have an exclusive license for all XET and XT technologies. Since Mr. Groteke became CEO of WorldSpace, everything that WorldSpace has worked on has involved XT- or XET-related IP and technologies.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-11-
SECOND AMENDED CROSS-COMPLAINT

37.    After Mr. Groteke became CEO of WorldSpace effective April 1, 2007, he hired experienced personnel to conduct product and market research, program and product management, and to develop sales and sales engineering programs for the XT and XET products to be sold, marketed, and distributed by WorldSpace. For example, effective May 1, 2007, Mr. Groteke hired a Director of Product and Market Research and effective May 7, 2007 he hired the Director of Product and Product Management.

38.    To pay for its operating costs, WorldSpace received $200,000 from Cross-Defendant Lettunich by wire transfer on April 30, 2007 and $100,000 by cashier's check in June 2007. Cross-Defendant Lettunich has admitted that the $300,000 paid to WorldSpace came from funds provided by XS Holding.

39.    Cross-Defendant Gallagher, an attorney, at all times acted as corporate secretary for WorldSpace.

40.    SpamEvaders is a Florida corporation founded by Wes Skinner, Walter Groteke and others about two and a half years ago.   Martin Lettunich has a 12-15% interest in SpamEvaders.

41.    "Kahuna" is intellectual property owned by XT. Kahuna is used in SpamEvaders' anti-spam application. Cross-Defendant Lettunich stated on several occasions that SpamEvaders could use the Kahuna technology in its anti-spam application without cost. SpamEvaders has used Kahuna and has never paid a licensing fee for the technology. According to Cross-Defendant Lettunich, he planned to have SpamEvaders license XT technology. Cross-Defendant Lettunich never obtained approval from XT's Board of Managers to provide Kahuna to WorldSpace.

42.    Beginning on or about May 2007, at the direction of Cross-Defendant Lettunich, XT personnel began working on SpamEvaders' network clustering technology. SpamEvaders was not charged by XT for the time spent by the XT employees. In addition, XT paid SpamEvaders money for SpamEvaders' work on XT products.

43.    Beginning in April 2007 and continuing thereafter, Cross-Defendant Lettunich and Mr. Groteke discussed WorldSpace purchasing SpamEvaders. The deal would result in

SEDGWICK
DETERT, MORAN & ARNOLD LLP

1   SpamEvaders becoming a subsidiary of WorldSpace. SpamEvaders' shareholders would then

2   own 10% of WorldSpace. Cross-Defendant Lettunich would then own 85 – 90% of WorldSpace.

3        44.   Further, Cross-Defendant Lettunich caused XT to incur legal expenses for (1)

4   work related to Cross-Defendants Lettunich's and Matan's negotiations of the Companies'

5   Agreements and (2) WorldSpace's legal fees. These fees were incurred despite the fact that (1)

6   neither of the Companies' Agreements provided for the payment of such legal fees and (2)

7   Mr. Caffyn and Cross-Defendant Lettunich expressly agreed that their companies would pay their

8   own legal fees incurred in connection with the negotiation of the Companies' Agreements.

9        45.   Cross-Defendant Lettunich never disclosed to Mr. Caffyn or XS Holding the

10   dealings between the Companies and WorldSpace or SpamEvaders, or that XT paid legal fees in

11   connection with the negotiation of the Agreements and for WorldSpace.

12        <u>Pertinent Provisions of the Agreements</u>

13        46.   On behalf of the Class B Member XS Holding, Mr. Caffyn signed the XET

14   Operating Agreement and the XT Operating Agreement based on certain promises,

15   representations and agreements that Minority Member XS Holding would have certain rights and

16   protections. Chief among them were that (1) regardless of any conflict with any other part of the

17   Agreements, Minority Class B Member XS Holding retained its veto power over any Major

18   Actions under Section 4.12; (2) if it funded to the requisite level, Class B Minority Member

19   XS Holding would have two votes on the Companies' five member Boards of Managers under

20   Section 5.1B; and (3) Mr. Caffyn would be CEO/President of XET under Section 5.8E of the

21   XET Operating Agreement. Even before the Agreements were signed, the Class A Member, led

22   by Cross-Defendants Lettunich and Matan conspired to try to eviscerate those rights.

23        47.   Section 4.6 of the Agreements provides that Members or Members' affiliates may

24   transact business with the company so long as, inter alia, the transactions are made with the

25   "prior approval of the Managers." Section 4.6 and Section 5.6 of the Agreements require that

26   any transaction between the Company and its Managers or Members (or their affiliates) be at

27   arms length and on commercially reasonable terms.

28        48.   Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-13-
SECOND AMENDED CROSS-COMPLAINT

1  Operating Agreement prohibit all related party transactions without the prior written consent of

2  Class B Member XS Holding.

3      49.    Section 3.1.1 of the Agreements requires that within two days of execution,

4  Xslent and Atira Technologies were to contribute their intellectual property to XT.

5      50.    Section 3.1.1 of the XT Operating Agreement also provides for "the assumption

6  of approximately $1,000,000 of loans made to Atira, LLC, Xslent, LLC, or Martin N. Lettunich

7  described on Schedule 3.1.1 hereto."

8      51.    Section 5.1 of the XT Operating Agreement provides that Messrs. Caffyn,

9  Lettunich, Tinsley and Matan are the initial Managers on the Board of Managers of XET and XT.

10     52.    Section 5.1B of the Agreements provides, inter alia, that "If there is more than one

11 Manager, then except as otherwise expressly provided in this Agreement, all actions of the

12 Managers may be taken only by the approval of a majority of the votes of the Board of

13 Managers." Section 5.1B of the Agreements also provides, inter alia, that "Each member shall

14 have one (1) vote each, except Brian Caffyn shall have two (2) votes at any meeting of the Board

15 of Managers where more than three Managers attend so long as (i) he is a member of the Board

16 of Managers, (ii) Class B Member owns at least a Percentage Interest of five percent (5%) or

17 more and Class B Member is not in default of its obligation to make its Capital Contribution

18 described in Section 3.1.2, and (iii) Class B Member shall have fully paid all amounts then due

19 under Section 3.1.2 of [the Agreements]."

20     53.    Section 5.1C of the Agreements provides, inter alia, that "no Manager, acting

21 alone, shall be authorized to sign checks, documents, contracts or other instruments on behalf of

22 the Compan[ies], except as authorized by the Board of Managers."

23     54.    Section 5.1D of the Agreements provides, inter alia, that "A majority of the

24 authorized number of votes of the Managers constitutes a quorum of the Managers for the

25 transaction of business. Except to the extent that [the Agreements] expressly require[ ] the

26 approval of all Managers, every act or decision done or made by a majority of the votes of the

27 Managers present at a meeting duly held at which a quorum is present is the act of the

28 Managers." Section 5.1D further provides in pertinent part: "Any action required or permitted to

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  be taken by the Managers may be taken by the Managers without a meeting, if a majority of the

2  votes of the Managers individually or collectively consent in writing to such action." Section

3  5.1D concludes: "Actions may be taken by the Managers without a meeting, and without action

4  by written consent in lieu of a meeting, if otherwise approved by a majority of the Managers."

5      55.    Section 5.2C of the Agreements provides, inter alia, that "Any Manager, other

6  than Mr. Caffyn . . . may be removed at any time, with or without cause." (Emphasis added.)

7      56.    Section 5.3A(v) of the Agreements provides, inter alia, that majority Manager

8  approval is required to "Sue on, defend, or compromise any and all claims or liabilities in favor

9  of or against the Company." Section 5.3A(vi) requires Board of Managers approval to retain

10  legal counsel.

11     57.    Section 5.8G of the Agreements requires, inter alia, that the Secretary prepare and

12  maintain the minutes for Board of Managers meetings.

13     58.    Section 5.10 of the Agreements provides that the Managers owe the Companies

14  and the Members the duties of loyalty and care.

15     59.    Sections 10.1 and 10.2 of the Agreements provides that Members and Managers

16  have the right to inspect and obtain the records of the Companies, including, but not limited to,

17  the following: financial statements (Section 10.1F); "books and records as they relate to the

18  internal affairs of the Compan[ies] (Section 10.1G); and income statements (Section 10.2B(iii)).

19     60.    Section 10.3B of the Agreements provides that the managers shall cause to be

20  prepared all information necessary to prepare members' tax returns and that within 90 days of the

21  end of each taxable year the managers shall cause to be sent such information as is necessary to

22  complete the members' income tax returns.

23     61.    Section 10.8 of the Agreements provides that a "Tax Matters Partner" shall

24  oversee the Companies' affairs and that the Company's initial Tax Matters Partner shall be

25  Martin Lettunich.

26     62.    Nowhere in the XT Operating Agreement or otherwise did Cross-complainants

27  agree to pay for the pre-formation liabilities of XT. Further, it was agreed that each party would

28  pay its own legal costs related to the entities to be formed.

In Furtherance of Their Self-Dealing and Secret Scheme to Use Mr. Caffyn's Money but Deny Him any Leadership Role in the Companies, Cross-Defendants Lettunich and Matan (1) Violated and Caused Xslent and Atira Technologies to Breach the Agreements,  (2) Made Material Misrepresentations and Omissions, (3) Breached Their Fiduciary Duties, and (4) Committed Numerous Ultra Vires Acts

63.    On April 24, 2007, the Companies conducted Board of Managers Meetings, which were attended by Mr. Caffyn and Cross-Defendants Lettunich, Matan and Gallagher.  The minutes of the April 24 meeting were recorded by Cross-Defendant Gallagher.  On or about June 4, 2007, Mr. Caffyn notified Cross-Defendants Gallagher, Lettunich and Matan that the April 24 meeting minutes were inaccurate because they reflected votes that were never taken and actions that the Boards never decided.  In addition, the minutes of the April 24 meeting were taken by Cross-Defendant Gallagher in a manner that favored Cross-Defendant Lettunich to the detriment of Mr. Caffyn.  In light of those inaccuracies, Mr. Caffyn requested that Ms. Gallagher step down as Secretary.

64.    In late May or early June 2007, Mr. Caffyn, as a Manager of XT, asked for a budget and other financial information from Cross-Defendant Lettunich, as well as information about the Companies' IP registration with the U.S. Patents and Trademark Office.  Cross-Defendants Lettunich, Matan and others responded by making a series of material misrepresentations to Mr. Caffyn to remove him from the CEO/President position at XET and eviscerate the Class B Member's minority rights under the Agreements.

65.    In May or early June 2007, Mr. Tinsley attended a meeting with Cross-Defendants Lettunich, Matan and Gallagher.  At that meeting, Cross-Defendants Lettunich Matan notified Mr. Tinsley that Mr. Caffyn was being voted out of his position as CEO/President of XET, and eventually removed as a manager of XET and XT.  Mr. Tinsley asked where they would obtain money to run the Companies if Mr. Caffyn's financing was no longer available.  Cross-Defendant Lettunich told Mr. Tinsley that if Mr. Caffyn stopped funding, Mr. Caffyn's warrants in XET would come back to the company and could be sold to other investors on more favorable terms.

66.    Mr. Tinsley questioned Cross-Defendant Lettunich about why such a high-risk

1    plan was being pursued when the Companies already secured funding from Mr. Caffyn and

2    needed that money to operate.  Cross-Defendant Lettunich responded that Mr. Caffyn's other

3    companies would make far more money than the rest of "us".  Mr. Tinsley stated that he was not

4    happy with Cross-Defendant Lettunich's proposed course of action and that the amount of

5    potential earnings was enough for everyone and would allow them to continue to pursue the

6    software development business model.  Over Mr. Tinsley's objections and concerns, Cross-

7    Defendants Lettunich and Matan determined that removing Mr. Caffyn was the correct plan to

8    pursue, and that Mr. Caffyn was to be voted out as CEO/President of at the next Board meeting.

9            67.      On or about June 5, 2007, Cross-Defendant Matan scoured the internet for

10    negative information regarding Mr. Caffyn.  During that search, Cross-Defendant Matan found

11    the Nimby letter, sent by 94 residents of towns that were supposedly impacted by the

12    development of wind farms in which they claimed antitrust violations and complained that they

13    would be negatively impacted by the construction of nearby wind farms.  Cross-Defendant Matan

14    then showed the Nimby letter to Cross-Defendant Lettunich.  Cross-Defendant Lettunich said he

15    would use these allegations to get Mr. Caffyn to step down as CEO/President.  Cross-Defendant

16    Lettunich then told Mr. Tinsley that he had a way to get Mr. Caffyn to voluntarily resign as

17    CEO/President, but continue funding.  To that end, Cross-Defendants Lettunich, Matan and

18    Gallagher showed Mr. Tinsley the Nimby letter.  Cross-Defendant Lettunich told Mr. Tinsley

19    these allegations would affect the due diligence that Bechtel Corporation was supposed to

20    conduct for the purpose of establishing that XT could do business with them for the United

21    States government.  Cross-Defendants Lettunich, Matan and Gallagher never did any due

22    diligence to determine whether any of the assertions made in the Nimby letter were true, or, if

23    true, were of any significance to the Justice Department.

24            68.      Prior to the June 7, 2007 meetings for the Board of Managers of the Companies,

25    Cross-Defendants Lettunich, Matan and Gallagher, as well as Mr. Tinsley, met with Mr. Caffyn.

26    During that meeting, Cross-Defendants Lettunich, Matan and Gallagher presented the allegations

27    to Mr. Caffyn and asked that Mr. Caffyn resign as CEO/President of XET for the "good" of the

28    Companies.  Mr. Caffyn disagreed that the allegations would affect the operations of the

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1   Companies or any due diligence proposed by Bechtel Corporation. However, Mr. Caffyn said

2   that he would step down as CEO/President and resign as Manager for both Companies provided

3   certain conditions were met.

4          69.    Mr. Caffyn's conditions for resigning and continuing funding included

5   (a) amendment of the Agreements to provide that the Class B member, XS Holding, would have

6   two votes at Board of Manager meetings even if the manager was not Mr. Caffyn, (b) the Board

7   of Managers' appointment of a competent CEO/President to replace Mr. Caffyn, and/or (c) a

8   going forward business arrangement (e.g., a licensing agreement to sell XET products in Europe).

9   Rather than fulfilling these conditions, Cross-Defendant Lettunich failed to act to amend the

10  Agreements on the two vote issue, took the XET CEO/President position himself and persisted

11  with a scheme to take the Companies' IP to WorldSpace.

12         70.    On or about August 5, 2007, Mr. Tinsley told Mr. Caffyn that the Nimby letter

13  was a pretext to get Mr. Caffyn to resign as CEO/President of XET. Indeed, eight days later, on

14  August 13, 2007, even Cross-Defendant Lettunich admitted that the Nimby letter was a pretext

15  for ousting Mr. Caffyn from his position as CEO/President of XET. And at the September 24,

16  2007 hearing on the parties' cross-motions for preliminary injunction, when the Court asked

17  whether the Nimby letter was a pretext, Cross-Defendant Lettunich tellingly responded,

18  "Depending on your definition of pretext."

19         71.    The XET Operating Agreement was breached by causing Mr. Caffyn to agree to

20  resign as CEO/President of XET. Because of the Nimby letter pretext, Mr. Caffyn was unable to

21  discuss the true reasons for the request for his resignation and, as a result, did not have the

22  opportunity to convince one of the other Managers to vote with him.

23         72.    In June 2007, Mr. Tinsley began inquiring to Cross-Defendant Lettunich about

24  XT's finances. Shortly thereafter, Cross-Defendant Lettunich, in concert with Cross-Defendants

25  Matan and Gallagher, ordered Mr. Tinsley to stay away from the Companies because of a

26  complaint of harassment by Cross-Defendant Gallagher. This complaint of harassment was a

27  pretext by Cross-Defendants Lettunich and Matan to remove Mr. Tinsley from the Companies.

28  Then, on June 28, 2007, Cross-Defendants Lettunich and Matan purported to hold a meeting of

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-18-
SECOND AMENDED CROSS-COMPLAINT

1     the Board of Managers of XET and XT, and purported to issue minutes from that meeting. In

2     fact, no XT Board of Managers meeting occurred on June 28, 2007 because there was no quorum

3     as required by Section 5.1 D of the Agreements. During the purported meeting, Cross-Defendant

4     Lettunich, in concert with Cross-Defendants Matan, falsely represented that Mr. Tinsley and

5     Mr. Caffyn resigned as Managers of XET and XT when in fact they had not resigned. Cross-

6     Defendants Lettunich's and Matan's misrepresentations constituted a breach of their fiduciary

7     duties, as well as a breach of Section 5.10, and other provisions, of the Agreements.

8         73.     On July 3, 2007, XS Holding notified Cross-Defendant Lettunich of a potential

9     material breach of Section 3.1.1 of the Agreements for failing to cause Xslent and Atira

10    Technologies IP to be contributed to XT.

11        74.     On July 6, 2007 Mr. Caffyn sent a memorandum to Cross-Defendants Lettunich

12    and Matan, inter alia, (a) requesting a budget at the next XT and XET Board of Managers

13    meetings because none had been prepared thus far; (b) requesting an explanation regarding why

14    Mr. Tinsley resigned as reflected in the Board of Managers meeting minutes of June 28, 2007;

15    and (c) reflecting that Mr. Caffyn would resign as Manager if certain conditions were met.

16        75.     Also on July 6, 2007, Cross-Defendants Lettunich and Matan purported to send

17    Capital Notices under Sections 3.1.2 and 3.5 of the Agreements stating that XS Holding was late

18    in making its capital contributions. Section 3.5 of the Agreements provides that if a Class B

19    Member does not timely make the capital contributions required by Section 3.1.2, then the

20    Class A Members or Managers may personally deliver or send by U.S. Mail to the Class B

21    Member written notice of the failure to contribute, "giving him or her fourteen (14) days from the

22    date such notice is given to contribute the entire amount the capital contribution required at that

23    time." Section 3.5 goes on to state that if the Class B Member does not contribute during that 14

24    day period, "a majority of the Class A Members or majority of the Managers (other than Brian

25    Caffyn) may elect any one or more of the following remedies within 60 days after the failure to

26    contribute" including causing Class B Member XS Holding to lose its consent rights under

27    Section 4.12 and its ability to "elect" a Manager.

28        76.     Sending the Capital Notices and then claiming them to be effective to cause XS

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-19-

SECOND AMENDED CROSS-COMPLAINT

1    Holding to lose its 4.12 consent rights was a breach of sections 4.12 and 5.10 of the Agreements.

2    Section 4.12 states in relevant part as follows: "In the event of any conflict between this

3    Section 4.12 and the other provisions of this Agreement, this Section 4.12 shall control." Indeed,

4    Mr. Caffyn insisted on the inclusion of the preemption provision in Section 4.12 in the final

5    Agreements in order to nullify other provisions of the Agreements that purported to limit the

6    powers and rights of Class B Member XS Holding and its Manager Mr. Caffyn. Moreover, as to

7    XET, the notice is defective because in order for Xslent Technologies, LLC to act – here to sign

8    the Capital Notice – Section 5.10D requires a majority vote at a meeting with the Board of

9    Managers or a majority of the votes of the Managers; here, neither occurred. Indeed, the day

10   before the Capital Notices were sent, Lettunich's own counsel – Bernard Vogel III – confirmed

11   that written XT Manager approval was required to properly issue the XET Capital Notice when

12   he advised Cross-Defendant Lettunich via e-mail that the "Xslent Technologies, LLC Managers

13   will have to sign a written consent authorizing this Capital Notice." Finally, in all events,

14   performance by XS Holding was excused by Cross-Defendants' prior material misrepresentations

15   and breaches of the Agreements.

16       77.    On July 13, 2007, Cross-Defendants Lettunich and Matan purported to terminate

17   Mr. Tinsley from his position with XT. That alleged termination was ultra vires and a breach of

18   Section 4.12J of the XT Operating Agreement, which provide that Mr. Tinsley cannot be

19   terminated without the consent of the Class B Member. No consent was requested and it would

20   not have been given under the circumstances. The purported termination also was ultra vires and

21   constituted a breach of Section 5.1B of the XT Operating Agreement because Mr. Tinsley's

22   termination was not effectuated pursuant to a vote of the majority of the Board of Managers.

23   Additionally, the alleged termination was a breach of Cross-Defendants Lettunich's and Matan's

24   fiduciary duties, and therefore a breach of Section 5.10 of the Agreement.

25       78.    On or about August 5, 2007, Mr. Caffyn learned from Mr. Tinsley that

26   Mr. Tinsley had not resigned as a Manager contrary to the record presented in minutes of the

27   purported June 28, 2007 Board of Managers meetings. In fact, Cross-Defendant Lettunich has

28   admitted that Mr. Tinsley has never resigned in writing as a Manager from XET and XT as

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  required by Section 5.2B of the Agreements.

2      79.    On or about August 12, 2007, Mr. Caffyn learned from Mr. Tinsley that the

3  Nimby letter was a pretext to remove Mr. Caffyn as CEO/President of XET. Mr. Tinsley is a

4  Manager of XET, XT, Atira Technologies, and Xslent. On August 12, 2007, while believing in

5  the primacy of his and XS Holding's Section 4.12 rights, not believing that he or XS Holding

6  was in breach of the Agreements, believing that no 3.5 rights to reduce XS Holding's rights had

7  been effected and believing that they would not be valid if then attempted to be exercised and

8  concerned about what other wrongful acts Cross-Defendant Lettunich had committed and that

9  Cross-Defendant Lettunich would run the Companies into the ground, Mr. Caffyn, in a belt and

10  suspenders approach, requested, and Mr. Tinsley agreed as a Manager of those Companies to

11  waive any remedies under Section 3.5 of the Operating Agreements so long as XS Holdings

12  agreed to fund its outstanding Capital Contributions.

13      80.    On August 13, 2007, XS Holding made capital contributions of $750,000 to XET

14  and $1 million to XT.

15      81.    On August 14, 2007, in furtherance of his scheme, Cross-Defendant Lettunich, in

16  concert with Cross-Defendant Matan, attempted to return to Mr. Caffyn and XS Holding the

17  $1.75 million in capital contributions paid by XS Holding despite the fact that Cross-Defendants

18  claimed that XET and XT were, and continue to be, in danger of running out of capital. The

19  reason that Cross-Defendants Lettunich and Matan attempted to return the funds was to advance

20  their position in this dispute. That attempted return constituted a breach of Cross-Defendants

21  Lettunich's and Matan's fiduciary duties, and therefore a breach of Section 5.10 of the

22  Agreements.

23      82.    On August 15, 2007 – two days after XS Holding paid the outstanding amounts

24  due – and in furtherance of his scheme, Cross-Defendants Lettunich and Matan sent by e-mail a

25  "Notice of Elections Under Section 3.5 to Class B Member" ("Notices of Elections") on behalf

26  of both XT and XET. In breach of the Agreements, including Section 4.12, these notices

27  purported to strip XS Holding and Mr. Caffyn of their rights and protections, including (1) XS

28  Holding's Section 4.12 rights, and (2) XS Holding's ability to "elect" a Manager. The sending of

SEDGWICK
DETERT, MORAN & ARNOLD LLP

-21-

SECOND AMENDED CROSS-COMPLAINT

1    the notices also constituted a breach of Cross-Defendants Lettunich's and Matan's fiduciary

2    duties, and therefore a breach of Section 5.10 of the Agreements.  The Notices of Elections were

3    ineffective to cause XS Holdings to lose its consent rights and its ability to "elect" a Manager.

4    On August 16, 2007, the Notices of Election were sent by U.S. Mail.  Moreover, as to XET, since

5    the Capital Notice was defective, so too is the Notice of Election.  Further, any performance due

6    by XS Holding was excused by Cross-Defendants' misrepresentations and each of their prior

7    material breaches of the Agreements.  In addition, there is no available remedy under Section 3.5

8    of the Agreements to strip Mr. Caffyn of his two votes because XS Holding had funded and

9    owned at least a 5% interest in the Companies.  Also, the Notices of Election were not effective

10   in any event until after the August 16, 2007 Board of Managers meetings at which Mr. Caffyn

11   was elected Chairman, President and CEO and Cross-Defendant Lettunich was removed from

12   those positions; according to Section 14.14 of the Agreements, "Notice" is effective the earlier of

13   receipt by U.S. Mail or three days after mailing.

14        83.    Also on August 15, 2007, in furtherance of their scheme, Cross-Defendants

15   Lettunich and Matan purported to remove Mr. Tinsley as Manager of XET and XT.  That

16   claimed removal was a breach of Section 4.12 of the Agreements, which require the Class B

17   Member's consent to discharge Mr. Tinsley.  Moreover, the purported removal of Mr. Tinsley as

18   a Manager was not effective until after the August 16, 2007 Board of Managers meeting because

19   it was sent by U.S. Mail on August 16; pursuant to section 14.14, the "Notice" was effective

20   when received by mail or three days after mailing.

21        84.    On August 15, 2007, counsel for XS Holding sent to XT and Xslent a litigation

22   hold letter notifying Xslent to preserve all documents relevant to potential disputes between XT,

23   XET, Atira Technologies, Xslent, XS Holding and others.  The Litigation Hold Letter is attached

24   hereto as Exhibit 7.

25        85.    On August 16, 2007, there was a meeting of the Board of Managers of XET and a

26   meeting of the Board of Managers of XT.  All four Managers were present at each meeting:

27   Mr. Caffyn with two votes; Mr. Tinsley, Mr. Lettunich and Mr. Matan.  By a vote of a majority

28   of the votes of the Managers, Mr. Caffyn was approved as CEO/President and Chairman of XET

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-22-
SECOND AMENDED CROSS-COMPLAINT

1   and of XT. In further effort to avoid their misdeeds coming to light, Cross-Defendants Lettunich

2   and Matan denied that the meeting and vote were effective to make Mr. Caffyn CEO/President

3   and Chairman of the Board of both of the Companies.

4        86.    On the evening of August 16, 2007, in furtherance of their scheme, Cross-

5   Defendant Lettunich, in concert with Cross-Defendant Matan, caused the $750,000 capital

6   contribution to XET to be returned by wire to XS Holding. The return of that money breached

7   the XET Operating Agreement because no Capital Notice was given, the act was not approved by

8   the Managers as required by Section 5.1D of the Agreements, it was not approved by the Class B

9   Member as required under Section 4.12, and was a breach of fiduciary duty under Section 5.10.

10        87.    On August 17, 2007, in furtherance of their scheme, Cross-Defendant Lettunich,

11   in concert with Cross-Defendant Matan, attempted to cause the $1 million capital contribution to

12   XT to be returned by a check to XS Holding dated August 17, 2007, and then succeeded in

13   causing that amount to be returned by wire on August 30, 2007 despite the fact that Cross-

14   Defendant Lettunich claimed that XT was, and continues to be, in danger of running out of

15   capital. These actions were ultra vires and breached the Agreement because they were not

16   approved by the Managers, they were not approved by the Class B Member as required under

17   Section 4.12, and they were a breach of fiduciary duty under Section 5.10.

18        88.    On August 20, 2007, five days after the litigation hold letter was sent, Cross-

19   Defendants Lettunich and Matan caused this lawsuit to be filed on behalf of XET and XT. The

20   retention of the Silicon Valley Law Group and initiation of this suit by Cross-Defendants

21   Lettunich and Matan was ultra vires and a breach of Sections 5.3A(v), (vi) of the Agreements

22   because it was not approved by a majority of the Board of Managers of either of the Companies.

23   The filing of this lawsuit also was a breach of Cross-Defendants Lettunich's and Matan's

24   fiduciary duties, and therefore a breach of Section 5.10 of the Agreements.

25        89.    As discussed above, Cross-Defendant Lettunich, in concert with Cross-Defendant

26   Matan, have engaged in undisclosed, self-dealing with respect to the Companies. These acts of

27   self-dealing were without the prior approval of the Managers or of a majority interest of

28   Managers, and thus in breach of, inter alia, Sections 4.6 and 5.6 of both Agreements, as well as

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating

2  Agreement.

3      90.    Both before and after this litigation commenced, Cross-Defendant Lettunich

4  repeatedly has not permitted Mr. Caffyn and XS Holding to inspect the vast majority of financial

5  and other documentation of XT and XET in breach of Sections 10.1 and 10.2 of the Agreements.

6  Cross-Defendant Lettunich did not permit Mr. Caffyn to inspect the vast majority of documents

7  despite Mr. Caffyn's repeated requests to do so as a Manager, and pursuant to XS Holding's

8  rights to do so as a Member, of those entities.  Those failures to provide access to the

9  Companies' records also are a breach of Cross-Defendant Lettunich's fiduciary duties, and

10  therefore a breach of Section 5.10 of the Agreements.

11     91.    Cross-Defendant Lettunich's failure to provide Company documents also is a

12  breach of the November 14, 2007 contract, as detailed below.

13     92.    The Company records that Cross-Defendant Lettunich has allowed to be produced

14  demonstrate very serious financial discrepancies, Cross-Defendant Lettunich's mismanagement

15  of the Companies, breaches of the Agreements, breaches of fiduciary duty and fraud.

16     93.    The financial records of XT show a "Notes Receivable" of $1 million.  Cross-

17  Defendant Lettunich recently admitted that he took $1 million from XT, including some for

18  personal use, all without providing any documentation, including without providing Schedule

19  3.1.1 as required by the XT Operating Agreement.  Cross-Defendant Lettunich has never

20  produced a "note" documenting the receivable.  The note terms, such as interest rate and

21  repayment date, were never specified.  Cross-Defendant Lettunich also has offered numerous and

22  conflicting statements regarding the $1 million.

23     94.    Mr. Lettunich has admitted that he took $1.4 million from XT and gave it to

24  Xslent, LLC, a company in that he controlled at the time of the transfers.  It was not until August

25  when plaintiffs and cross-defendants produced a balance sheet for XT that Mr. Caffyn learned of

26  the approximately $1.4 million in transfers by Mr. Lettunich from XT to Xslent, LLC.

27  Mr. Lettunich has testified that the $1.4 million was "used to pay the preexisting debts of Xslent,

28  LLC."  Mr. Caffyn did not approve any transfers from XT to Xslent, LLC and there is no

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  provision for any such transfers in the XT operating agreement. While the transfers of funds for

2  payroll for XT employees most likely would have been approved, the remaining amounts have

3  never been documented nor approved. According to Lettunich's Financial Reconciliation dated

4  on or about February 13, 2008, $442,000 is unaccounted for. On or about April 21, 2008,

5  Lettunich agreed to indemnify Xslent for up to $602,000 regarding the transfers from XT to

6  Xslent.

7      95.    The balance sheet for XET as of July 31, 2007 reflects that $500,010 worth of

8  Class C shares in XET have been issued. Assuming that there was in fact an issuance of Class C

9  shares, it was not done pursuant to an amended version of the XET Operating Agreement signed

10  by the Class C member, as is required. Nor was any amended private placement memorandum

11  issued.

12      96.    Cross-Defendant Lettunich has failed to correct, explain or otherwise properly

13  account for these financial discrepancies. Cross-Defendant Lettunich's causing of the financial

14  discrepancies, and his failure to explain and/or correct them, constitute breaches of the

15  Agreements, including Sections 10.10 and 5.10 of the Agreements, as well as a breach of his

16  fiduciary duties.

17      97.    No K-1's or other tax information necessary for XS Holding to complete its taxes

18  for 2007 have been provided as required by Section 10.3 of the Agreements.

19      98.    XS Holding has duly performed all of its material obligations, conditions and

20  duties under the Agreements by, inter alia, causing capital contributions of XS Holding to be paid

21  in full as of the date of the initiation of this litigation by Plaintiffs and otherwise substantially

22  complied with the terms of the Agreements. To the extent that any material obligation may not

23  have been performed, such performance has been excused by Cross-Defendants' material

24  breaches of the Agreements.

FIRST CAUSE OF ACTION

(Breach of Written Contract – Against Cross-Defendants Xslent and Atira Technologies)

27      99.    Cross-Complainants reallege and incorporate by reference each of the allegations

28  made herein at paragraphs 1 to 96 inclusive.

SF/1506669v1

-25-

SECOND AMENDED CROSS-COMPLAINT

100.    Except where excused by Plaintiffs' and Cross-Defendants' material breaches of the Agreements, Mr. Caffyn and XS Holding have duly performed all of their obligations, conditions and duties under the Agreements by, inter alia, causing capital contributions of XS Holding to be paid pursuant to Section 3.1.2 of the Agreements up to the date of initiation of this litigation against XS Holding and Mr. Caffyn and otherwise complying with the terms of the Agreements.

101.    Xslent and Atira Technologies (to the extent a proper party), through their Managers Cross-Defendants Lettunich and Matan breached, violated and aided and abetted the breach of, the Agreements in numerous ways, including, but not limited to, doing the following:

1.    Breaching and violating Sections 4.6 and 5.6 of the Agreements, as well as Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating Agreement, by engaging in, and aiding and abetting, the self-dealing, detailed above, regarding WorldSpace, a company owned by Cross-Defendant Lettunich;

2.    Breaching and violating Sections 4.6 and 5.6 of the Agreements, as well as Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating Agreement, by engaging in, and aiding and abetting, the self-dealing, detailed above, regarding Xslent, LLC and Atira, both owned in part and controlled by Cross-Defendant Lettunich;

3.    Breaching and violating Sections 4.6 and 5.6 of both Agreements, as well as Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating Agreement, by undisclosed self-dealing, detailed above, regarding SpamEvaders, a company in which Cross-Defendant Lettunich owns approximately a 15% equity interest;

4.    Causing XS Holding not to receive the benefit of the bargain in breach and violation of the Agreements by, inter alia, interfering with the negotiated rights and protections to which XS Holding and Mr. Caffyn were entitled under the Agreements, including, but not limited to, the requirement that XS Holding give its written consent for the Companies to take any of the "Major Actions" (Section 4.12 of the Agreements) and the requirement that the Class B Member have two votes on the Companies' Boards of Managers (Section 5.1B of the Agreements);

SEDGWICK
DETERT, MORAN & ARNOLD LLP

1       5.    Causing the April 24, 2007 Board of Managers meeting minutes to be

2  prepared in a biased, inaccurate manner that favored Cross-Defendant Lettunich to the detriment

3  of Mr. Caffyn and XS Holding, in breach and violation of Section 10.1 of the Agreements;

4       6.    Falsely stating at the June 28, 2007 board meeting, and causing the

5  minutes of that meeting to falsely reflect, that Mr. Caffyn and Mr. Tinsley resigned as Managers

6  of XET and XT when in fact they had not, in breach and violation of Section 10.1 of the

7  Agreements;

8       7.    Purporting to have held a meeting of the Board of Managers of XT on

9  June 28, 2007 when no such meeting occurred because it was attended only by Cross-Defendants

10  Lettunich and Matan, and, as such, there was no quorum in breach and violation of Section 5.1D

11  of the Agreements;

12       8.    Atira Technologies and Xslent failing to contribute intellectual property to

13  XT and/or failing to properly document those transfers, in breach and violation of Section 3.1.1

14  of the XET Operating Agreement, as well as Sections 5.10, 10.1 and 10.2 of both Agreements;

15       9.    Purporting to send the XET Capital Notice without approval of the Board

16  of Managers of XT, in breach and violation of Section 5.1D of the XT Operating Agreement;

17       10.    Purporting to terminate Mr. Tinsley from his position with XT on July 13,

18  2007 in breach and violation of Section 4.12J of the XT Operating Agreement and in breach and

19  violation of Section 4.12P of the XET Operating Agreement;

20       11.    Purporting to remove Mr. Tinsley as Manager of XET and XT by e-mail

21  on August 15, 2007 and by mail on August 16, 2007, in breach and violation of Section 4.12 of

22  the Agreements;

23       12.    Claiming that the August 16, 2007 Meeting of the Board of Managers of

24  the Companies did not elect Mr. Caffyn and remove Mr. Lettunich as Chairperson, President and

25  CEO, in breach and violation of Sections 5.1D and 14.14 of the Agreements;

26       13.    Attempting to return and returning $1.75 million in capital contributions,

27  which was a breach and violation of the Agreements because no valid Capital Notices were given

28  to XS Holding, the acts were not approved by the Managers as required by Section 5.1D, it

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-27-

SECOND AMENDED CROSS-COMPLAINT

1   required the Class B Member's consent under section 4.12 and was a breach of fiduciary duty

2   under Section 5.10;

3           14.    Retaining the Silicon Valley Law Group in connection with this lawsuit, in

4   breach and violation of Section 5.3A(vi) of the Agreements;

5           15.    Causing this lawsuit to be filed on August 20, 2007 on behalf of XET and

6   XT in breach and violation of Section 5.3A(v) of the Agreements;

7           16.    Failing to provide all company records to Mr. Caffyn and XS Holding in

8   breach and violation of Sections 10.1 and 10.2 of the Agreements;

9           17.    Causing without proper authorization, and failing to adequately explain,

10  various financial discrepancies in the financial records of the Companies including, but not

11  limited to, the $1 million taken by Cross-Defendant Lettunich from XT, the transfer of

12  $1.4 million from XT to Xslent, LLC and the records reflecting that a Class C Member has

13  shares in XET without an amended private placement memorandum or an amended XET

14  Operating Agreement, as required;

15          18.    Causing, without proper authorization, XT to transfer $1 million to Cross-

16  Defendant Lettunich, to transfer $1.4 million to Xslent, LLC and to incur and pay legal fees

17  related to WorldSpace and work performed on behalf of Cross-Defendants Lettunich's and

18  Matan's negotiation of the Companies' Agreements; and

19          19.    Causing the Companies' IP to be made available to WorldSpace without

20  approval of XT's Board of Managers and without approval by XS Holding.

21          20.    Permitting Lettunich and Matan to vote as a block and Lettunich to claim

22  "One Man Rule" in violation of Section 5.1 of the Operating Agreements providing for

23  management of XET and XT by their respective Board of Managers.

24          21.    Failing to provide K-1's and other tax information necessary for XS

25  Holding to complete its 2007 taxes in violation of Section 10.3B of the Agreements.

26          102.   Xslent and Atira Technologies (to the extent a proper party), through their

27  Managers Cross-Defendants Lettunich and Matan, and Cross-Defendants Lettunich, Matan and

28  Gallagher individually, also breached and violated the Agreements through their conduct in the

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

SECOND AMENDED CROSS-COMPLAINT

1   immediately preceding paragraph and sub-paragraphs in that most, if not all, of those acts

2   constituted breaches of fiduciary duty, which also runs afoul of Section 5.10 of the Agreements.

3       103.    As a direct and proximate result of Cross-Defendants Xslent's and Atira

4   Technologies' breaches and violations of the Agreements, XS Holding and Mr. Caffyn have

5   suffered damages as alleged herein and in an amount to be proven at trial.

6                           SECOND CAUSE OF ACTION

7   (Breach of the Covenant of Good Faith and Fair Dealing – Against Cross-Defendants Xslent and
                              Atira Technologies)

8
9       104.    Cross-Complainants reallege and incorporate by reference each of the allegations

10  made herein at paragraphs 1 to 101 inclusive.

11      105.    As part of the Agreements, there existed a covenant of good faith and fair dealing

12  that requires that each party will refrain from arbitrary and unreasonable conduct which has the

13  effect of preventing the other parties to the Agreements from receiving the fruits of the bargain.

14      106.    Xslent and Atira Technologies, through their Managers Cross-Defendants

15  Lettunich and Matan, individually breached the covenant of good faith and fair dealing in

16  numerous ways, including, but not limited to, doing the following:

17      1.      Engaging in undisclosed self-dealing, as well as aiding and abetting self-

18  dealing, including, inter alia, the following:  before and simultaneous with signing the

19  Agreements on April 7, 2007, Cross-Defendant Lettunich, in concert with Cross-Defendants

20  Matan and Gallagher, schemed to transfer all of the XET and XT IP to WorldSpace, as well as

21  used Cross-Complainant XS Holding's capital to fund WorldSpace and pay WorldSpace's legal

22  bills;

23      2.      Never intending to honor the Agreements (i) if a better source of funding

24  than Mr. Caffyn and XS Holding could be found and (ii) by agreeing that Cross-Defendants

25  Lettunich and Matan, as well as Mr. Tinsley, would vote as a block at Board of Managers

26  meetings on issues of significance;

27      3.      Scheming to cause and causing Mr. Caffyn, a current and former chairman

28  and CEO of several other companies with over 20 years experience in the alternative energy

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  business, to be replaced as CEO of XET by making misrepresentations to Mr. Caffyn regarding

2  the Nimby letter;

3          4.     Scheming to gain control of the Companies by falsely stating in the

4  purported June 28, 2004 meeting minutes that Mr. Caffyn and Mr. Tinsley had resigned as

5  managers;

6          5.     Falsely claiming that Mr. Caffyn and XS Holding do not have two votes

7  on the Board of Managers based on alleged untimely funding when the two vote rights provided

8  under Section 5.1B apply regardless of when the funding occurs so long as it has occurred;

9          6.     Claiming that the Class B member consent rights under Section 4.12 were

10  lost despite the express preemption provision in Section 4.12 that the consent rights control over

11  all other provisions in the Agreement; and

12          7.     Refusing to recognize the propriety of the August 16, 2007 Board of

13  Managers meeting at which Mr. Caffyn was elected and Mr. Lettunich removed as Chairperson,

14  President and CEO of the Companies.

15          8.     Permitting Lettunich and Matan to vote as a block and Lettunich to claim

16  "One Man Rule" in violation of Section 5.1 of the Operating Agreements providing for

17  management of XET and XT by their respective Board of Managers.

18      107.    As a direct and proximate result of Cross-Defendants Xslent's and Atira

19  Technologies' breaches of the covenant of good faith and fair dealing, XS Holding and

20  Mr. Caffyn have suffered damages as alleged herein and in an amount to be proven at trial.

21  <u>THIRD CAUSE OF ACTION</u>

22  (Breach of Fiduciary Duties – Against Cross-Defendants Lettunich, Matan, Xslent, and Atira
Technologies)

23

24      108.    Cross-Complainants reallege and incorporate by reference each of the allegations

made herein at paragraphs 1 to 105 inclusive.

25

26      109.    Cross-Defendants Lettunich and Matan, as Managers of XET and XT, owe XS

Holding, as a Member of the Companies, certain fiduciary duties, including those of loyalty and

27  care. Cross-Defendants Lettunich's and Matan's duty of loyalty requires, inter alia, that they

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP  28

-30-
SECOND AMENDED CROSS-COMPLAINT

1   account to the Companies and hold as trustee for the Companies its property, profit, or benefit

2   derived by the Managers in the conduct of the business of the Companies.  Cross-Defendants

3   Lettunich's and Matan's duty of care requires, inter alia, that they refrain from engaging in

4   undisclosed self-dealing, negligent and reckless conduct, intentional misrepresentations and other

5   misconduct, and/or a knowing violation of the law with respect to their management of the

6   Companies.

7          110.    XT, the majority member of XET, and Xslent and Atira Technologies, majority

8   members of XT, owes XS Holding, the minority member of XET and XT, the fiduciary duties

9   that a majority member owes a minority member, including to not use majority power to oppress

10  and prejudice the minority's rights and interests.  Xslent and Atira Technologies,  as majority

11  members of XT, would thereby owe XS Holding, the minority member of XT, the fiduciary

12  duties that a majority member owes a minority member, including not to use majority power to

13  oppress and prejudice the minority's rights and interests.  Cross-Defendants Lettunich and

14  Matan, as Managers of majority members Xslent and Atira Technologies, owe the same fiduciary

15  duties to minority member XS Holding.

16         111.    Cross-Defendants Lettunich and Matan individually, as well as Xslent and Atira

17  Technologies, by and through Cross-Defendants Lettunich and Matan, breached these fiduciary

18  duties in numerous ways, including, but not limited to, doing the following:

19         1.      Engaging in undisclosed self-dealing, as well as aiding and abetting self-

20  dealing, including, inter alia, the following:  before and simultaneous with signing the

21  Agreements on April 7, 2007, Cross-Defendant Lettunich, in concert with Cross-Defendant

22  Matan, schemed to transfer all of the XET and XT IP to WorldSpace, as well as used Cross-

23  Complainant XS Holding's capital to fund WorldSpace and pay WorldSpace's legal bills;

24         2.      Never intending to honor the Agreements (i) if a better source of funding

25  than Mr. Caffyn and XS Holding could be found and (ii) by agreeing that Cross-Defendants

26  Lettunich and Matan, as well as Mr. Tinsley, would vote as a block at Board of Managers

27  meetings on issues of significance;

28         3.      Interfering with the negotiated rights and protections to which XS Holding

**SEDGWICK**
DETERT, MORAN & ARNOLDLLP

1  and Mr. Caffyn were entitled under the Agreements, including, but not limited to, the

2  requirement that XS Holding give its written consent for the Companies to take any of the

3  "Major Actions" (Section 4.12 of the Agreements), the requirement that the Class B Member

4  have two votes on the Companies' Boards of Managers (Section 5.1B of the Agreements) and the

5  requirement that Mr. Caffyn be CEO/President of XET (Section 5.8E of the XET Operating

6  Agreement);

7          4.      Making material misrepresentations to XS Holding through Mr. Caffyn as

8  described herein;

9          5.      Causing Mr. Caffyn, a current and former chairman and CEO of several

10  other companies with over 20 years experience in the alternative energy business, to be replaced

11  as CEO of XET;

12          6.      Stating that Mr. Caffyn and Mr. Tinsley resigned as Managers of XET and

13  XT when they had not;

14          7.      Failing to endeavor to even attempt to find and appoint a competent

15  CEO/President for either of the Companies;

16          8.      Attempting to return and returning to XS Holding and Mr. Caffyn the

17  payment of $1.75 million that XS Holding made as part of its capital contributions to the

18  Companies, despite the fact that the Companies were stated to be in danger of running out of

19  capital;

20          9.      Attempting to send Notices of Elections to XS Holding to strip XS

21  Holding of its warrants, its Section 4.12 rights and its ability to elect a Manager;

22          10.    Causing over hundreds of thousands of dollars to be transferred from XT

23  to Xslent, and likely Mr. Lettunich or a related party, despite the fact that XT was in dire need of

24  capital at the time of the transaction;

25          11.    Causing this baseless lawsuit to be filed and making false claims against

26  Messrs. Caffyn and Tinsley;

27          12.    Failing to provide XS Holding and Mr. Caffyn with all requested

28  Company records;

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

13.    Failing to cause the intellectual property to be assigned to XT and properly registering such transfers;

14.    Attempting to damage XS Holding and Mr. Caffyn by exercising non-existent remedies under the Agreements;

15.    By failing to follow proper corporate governance and record keeping.

16.    Lettunich transferred $1 million to himself under false pretenses by misrepresenting the amount of monies he had put into Atria and Xslent and that he would provide a schedule showing the notes to be assumed.

17.    Without authorization, Lettunich transferred $1.4 million into Xslent which, at the time, he controlled; based on his own Financial Reconciliation, over $442,000 of that money is unaccounted for.

18.    Permitting Lettunich and Matan to vote as a block and Lettunich to claim "One Man Rule" in violation of Section 5.1 of the Operating Agreements providing for management of XET and XT by their respective Board of Managers.

19.    Failing to provide K-1's and other tax information necessary for XS Holding to complete its 2007 taxes in violation of Section 10.3.B of the Agreements.

112.    As a direct and proximate result of Cross-Defendants Xslent's, Atira Technologies', Lettunich's and Matan's breaches of fiduciary duties, Mr. Caffyn and XS Holding have suffered damages as alleged herein and in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

(Breach of Fiduciary Duty – By XS Holding and Mr. Caffyn Against Cross-Defendant Gallagher)

113.    Cross-Complainants reallege and incorporate by reference each of the allegations made herein at paragraphs 1 to 110 inclusive.

114.    Cross-Defendant Gallagher owes the Companies, Mr. Caffyn and XS Holding certain fiduciary duties by virtue of her role as counsel for XT and XET, as the former Secretary of the Boards of Managers for XET and XT, and her role as former in-house counsel for Mr. Caffyn's company Wind City.  Those fiduciary duties include (1) the duty of undivided loyalty, (2) the duty of confidentiality, (3) the duty of care and (4) the duty to use the skill,

1  prudence and diligence that members of the legal profession commonly possess.

2      115.    Cross-Defendant Gallagher has breached her fiduciary duties to the Companies,

3  Mr. Caffyn and XS Holding by engaging in the following conduct set forth herein.

4      116.    As a direct and proximate result of Cross-Defendant Gallagher's breaches of her

5  fiduciary duties, Mr. Caffyn and XS Holding have suffered damages as alleged herein and in an

6  amount to be proven at trial.

7                                FIFTH CAUSE OF ACTION

8          (Intentional Misrepresentation – Against Cross-Defendants Lettunich and Matan)

9      117.    Cross-Complainants reallege and incorporate by reference each of the allegations

10  made herein at paragraphs 1 to 114 inclusive.

11      118.    Cross-Defendants Lettunich and Matan in numerous ways, (a) made material

12  misrepresentations to Mr. Caffyn and XS Holding through Mr. Caffyn, as well as deliberately

13  concealed from Mr. Caffyn, and from XS Holding through Mr. Caffyn, material past and present

14  facts, including being silent in the face of a duty to speak; (b) acted with scienter; (c) intended to

15  induce Mr. Caffyn's and XS Holding's reliance on the concealment; (d) caused Mr. Caffyn and

16  XS Holding to rely on the concealment; and (e) caused Mr. Caffyn and XS Holding to suffer

17  damages as a result.

18      119.    Cross-Defendants Lettunich and Matan intentionally concealed from XS Holding

19  and Mr. Caffyn the material fact that the actual reasons Mr. Caffyn was asked to step down as

20  CEO/President of XET, namely that (a) Cross-Defendants were fearful that Mr. Caffyn's

21  inquiries into the finances and management of the Companies would limit or reveal Cross-

22  Defendants' self-dealing, (b) Cross-Defendants Lettunich and Matan found what they perceived

23  to be a better source of funding for the Companies, and/or (c) Cross-Defendants wished to oust

24  Mr. Caffyn from management because they believed that Mr. Caffyn's powers should be

25  diminished to prevent him from making too much profit from the Companies.  Cross-Defendants

26  Lettunich and Matan failed to fulfill their fiduciary and other duties to Mr. Caffyn by not

27  revealing the true reasons why they wanted Mr. Caffyn to step down as CEO/President of XET.

28  Cross-Defendants intended to induce, and in fact caused, Mr. Caffyn and XS Holding to

SEDGWICK
DETERT, MORAN & ARNOLD LLP

SF/1506669v1

-34-

SECOND AMENDED CROSS-COMPLAINT

1    detrimentally rely on the concealments and misrepresentations by stepping down from the

2    CEO/President positions of XET.

3         120.    Cross-Defendants Lettunich and Matan misrepresented in the June 28, 2007

4    Board of Managers meeting minutes that Mr. Caffyn and Mr. Tinsley resigned as Managers for

5    the Companies when they in fact had not done so. Cross-Defendants Lettunich and Matan

6    intended to induce, and in fact induced, Mr. Caffyn and XS Holding to detrimentally rely on

7    those misrepresentations by causing Mr. Caffyn and XS Holding to not earlier discover that and

8    other misdeeds by Cross-Defendants.

9         121.    Cross-Defendants Lettunich and Matan failed to disclose that Cross-Defendant

10   Gallagher betrayed XS Holding's and Mr. Caffyn's confidential bargaining positions to Cross-

11   Defendant Lettunich, and perhaps others. Cross-Defendants Lettunich and Matan intended to

12   induce, and in fact induced, Mr. Caffyn and XS Holding to detrimentally rely on those omissions

13   by Mr. Caffyn and XS Holding entering into contract negotiations with Cross-Defendant

14   Lettunich believing that Cross-Defendant Lettunich was not aware of Mr. Caffyn's confidential

15   bargaining positions.

16        122.    Cross-Defendants Lettunich and Matan failed to disclose that they were seeking

17   better sources of funding than Mr. Caffyn and XS Holding at the time the Agreements were

18   signed. Cross-Defendants Lettunich and Matan intended to induce, and in fact induced,

19   Mr. Caffyn and XS Holding to detrimentally rely on that failure to disclose by Mr. Caffyn's and

20   XS Holding's entering into the Agreements under false pretenses.

21        123.    Cross-Defendants Lettunich and Matan failed to disclose that Messrs. Lettunich,

22   Matan and Tinsley had agreed to vote as a block with respect to the issues of major significance

23   with respect to the Companies. Cross-Defendants Lettunich and Matan intended to induce, and

24   in fact induced, Mr. Caffyn and XS Holding to detrimentally rely on that failure to disclose by

25   entering into the Agreements under false pretenses.

26        124.    Cross-Defendants Lettunich and Matan failed to disclose to Mr. Caffyn and XS

27   Holding their plans to engage in self-dealing with respect to WorldSpace, SpamEvaders and

28   Xslent, LLC. Cross-Defendants Lettunich and Matan intended to induce, and in fact induced,

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-35-

SECOND AMENDED CROSS-COMPLAINT

1    Mr. Caffyn and XS Holding to detrimentally rely on that failure to disclose by entering into the

2    Agreements under false pretenses.

3         125.    Without authorization, Lettunich transferred $1 million to himself under false

4    pretenses by misrepresenting the amount of money that he had put into Atria and Xslent and that

5    he would provide a schedule showing the notes to be assumed.  Lettunich also transferred

6    without authorization $1.4 million from XT into Xslent which, at the time, he controlled; based

7    on his own Financial Reconciliation, over $442,000 of that money is unaccounted for.

8         126.    In December of 2006 through March of 2007, Lettunich persuaded Mr. Caffyn,

9    through his affiliate company Wind City Inc., to lend Lettunich personally $1.9 million to be

10    used to develop the technologies and IP that ultimately were transferred to XET and XT.  Based

11    on Lettunich's Financial Reconciliation and the Companies' expenditure rate, the full $1.9

12    million was not used for the agreed purpose of developing the Companies' technology and IP and

13    it appears that Lettunich never intended to fulfill the agreement to do so.

14         127.    Cross-Defendants Lettunich and Matan, prior to XS's investments into XT and

15    XET, also made a number of misrepresentations designed to convince Mr. Caffyn that XT and

16    XET had a higher valuation than warranted by the technology.

17         128.    Photovoltaic Power Converter (PvPC) is technology invented by Stefan Matan for

18    conversion of solar energy from photovoltaic panels.  Prior to April 7, 2007, during the period in

19    which Lettunich and Matan were attempting to convince XS Holding and Brian Caffyn to invest

20    in XT and XET, Lettunich and Matan, on behalf of themselves and Atira, provided to Mr. Caffyn

21    copies of various reports published by third parties, including a report from the Naval

22    Postgraduate School in 2005 ("NPS Reports")  that asserted that PvPC technology "enables a

23    solar power system to convert between 30.39% and 48.60% more solar energy into power than an

24    identical system without the PVPC."  In December 2006, Mr. Caffyn was told by Lettunich and

25    Matan that the PvPC performance improvement of 30.39% - 48.6% as compared to a "system

26    without the PVPC," referenced in the NPS Reports, as being relative to the "best available"

27    technology on the market, known as MPPT. These representations were false.

28         129.    In fact, the NPS Report was comparing PvPC to antiquated technology, thereby

SEDGWICK
DETERT, MORAN & ARNOLD LLP

-36-
SECOND AMENDED CROSS-COMPLAINT

1  overstating the improvements by PvPC.  In January 2007, another testing group called Exponent

2  reported similar results, stating that PvPC produced 41% more energy in their tests.  Matan was

3  involved in the Exponent testing.

4    130.    XPX is technology invented primarily by Stefan Matan, and other Atira

5  employees, subsequent to the PvPC technology which was developed in a company called ISG

6  Solar, LLC ("ISGS").  Lettunich and Matan, on behalf of themselves and Atira, represented to

7  Mr. Caffyn that XPX technology performed 7- 15% better than PvPC technology for the direct

8  current ("DC") version of the product and that AC conversion of the XPX-AC device could be

9  done at a 10% higher  efficiency compared to typical DC to AC inverters.  Based on these

10  representations, XS Holding and Mr. Caffyn expected the minimum performance improvement

11  over the best available technologies for a system which would produce alternating current ("AC")

12  to be at least 50%, as calculated in the table below:

| | Represented Performance Range | | Actual Performance Range | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| Baseline Technology | DC with MPPT | | DC w/o MPPT | |
| Baseline Performance (W-hours) | 650 | | 500 | |
| | | | | |
| PvPC Performance | | | | |
| PvPC Improvement % (range) | 30% | 50% | 30% | 50% |
| PvPC Relative Performance Level | 845 | 975 | 650 | 750 |
| | | | | |
| XPX-DC Performance | | | | |
| XPX Improvement over PvPC % (range) | 7% | 15% | 7% | 15% |
| XPX Relative Performance Level | 904 | 1121 | 696 | 863 |
| Expected XPX Performance vs DC w/o MPPT | 81% | 124% | 39% | 73% |
| *Expected XPX Performance vs MPPT* | 39% | 73% | 7% | 33% |
| | | | | |
| XPX-AC Performance | | | | |
| XPX-AC Improvement over Typical Inverter Weighted Efficiency | 10% | | 10% | |
| *Expected XPX-AC Performance vs MPPT %* | 49% | 83% | 17% | 43% |

27    131.    Because Matan was intimately involved in the setup and testing arrangement for

28  the Exponent report, and visited the test location and met with the people conducting the tests, he

SEDGWICK
DETERT, MORAN & ARNOLD LLP

-37-

SECOND AMENDED CROSS-COMPLAINT

1 │ had full knowledge of the equipment being used and knew that the Exponent Report comparisons

2 │ of PvPC and XPX were to antiquated technology, and not the "best available" technology on the

3 │ market. Since Mr. Caffyn had no knowledge of the details of the technology, he trusted Matan

4 │ and Lettunich to truthfully set forth their technologies' capabilities. However, Lettunich and

5 │ Matan continued to use the Exponent and NPS Reports' comparisons to overstate the

6 │ performance of PvPC and XPX, as discussed below.

7 │     132.   As of December 2006, Lettunich, and Matan, on behalf of themselves and Atira

8 │ did not present to Mr. Caffyn any test results comparing PvPC performance compared to the

9 │ "best available" on the market. In fact, when asked directly by Caffyn if the comparison was

10 │ against the "best available" MPPT technology, Matan and Lettunich represented that it was,

11 │ despite knowing that the comparisons were to older, antiquated solar conversion technology.

12 │     133.   The value of a solar energy product in the market is directly proportional to the

13 │ amount of energy that it can produce. The higher the energy output, the higher the price. If a

14 │ product can produce 50% more energy than comparable products, it would command a higher

15 │ price. Prior to XS Holding's investment in XET, Mr. Caffyn developed a business plan in

16 │ reliance on claims by Lettunich and Matan, made on behalf of themselves and Atira, that the

17 │ XPX and PvPC technology would generate 50% more energy than the "best available"

18 │ comparable products on the market for the primary AC product. These claims were

19 │ memorialized in Mr. Caffyn's business plan of April 2, 2007 where he stated "Current

20 │ expectations are that XPX-AC will double the output from a convention grid-connected PV

21 │ system in sunny locations." This higher energy generation created a business valuation that

22 │ justified XS Holding's investment and ownership percentage.

23 │     134.   As the creators of the PvPC and XPX technology and with their familiarity of the

24 │ "best available" technology then on the market as well as their familiarity with the older types of

25 │ solar conversion technology, Lettunich and Matan knew, individually and as managers of Atira,

26 │ that their claims of PvPC's and XPX's superiority over other technologies were false, and that

27 │ Mr. Caffyn's belief of XET's valuation was inflated as a result. However, Lettunich and Matan

28 │ also knew that if Mr. Caffyn learned of the XPX and PvPC technologies' true performance, it

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1 would result in a lower valuation of XET.

2    135.    Lettunich, and Matan therefore knowingly and deliberately misled XS Holding

3 and Mr. Caffyn as to the performance output of these technologies. Furthermore, when presented

4 with Mr. Caffyn's business plan on which they were asked to comment and amend as required,

5 they did not correct any of his assumptions concerning the technologies, and in fact allowed him

6 to confirm the belief of Mr. Caffyn and XS Holding in the product performance, and ultimately

7 the company valuation, prior to XS Holding's investment and Mr. Caffyn's commitment to act as

8 CEO of the companies.

9    136.    In reliance on Lettunich's and Matan's misrepresentations about the abilities of

10 their technology and based on the valuation calculated from those misrepresentations, XS

11 Holding was persuaded to accept a smaller ownership interest in exchange for its investment than

12 XS Holding otherwise would have had it known of the technologies' limitations. In fact, XPX's

13 actual increase in performance was only 7% to 33% better than the "best available" technology

14 on the market as has been confirmed in recent third party testing, and not 39% to 73% higher as

15 Lettunich and Matan represented it to be. The XPX AC performance is therefore expected to be

16 was only 20%-48% higher, not the expected 55%-93% improvement that Lettunich and Matan

17 represented. The specific performances and representations are set forth in the chart above.

18    137.    In addition to the exaggerated performance claims, Mr. Caffyn was also lead to

19 believe that the XPX-DC and XPX-AC products were nearly ready for production. In

20 Mr. Caffyn's business plan of April 2, 2007, he plans for the products to begin shipping by

21 August 2007. The proposed shipment dates were based on the representations of Matan and

22 when put in the business plan were not challenged by Lettunich or Matan in any way. The chart

23 below from Mr. Caffyn's April 2, 2007 business plan summarizes his beliefs at that time:

24

25

26

27

| Name | Initial Design | Prototype | UL Certified | Initial Availability | General Availability |
|---|---|---|---|---|---|
| XPX C | Complete | Complete | March 2007 | April 2007 | April 2007 |
| XPX DC | Complete | Complete | May 2007 | May 2007 | August 2007 |
| XPX$^{aDC}$ | September 2007 | Jan 2008 | N/A | September 2008 | To be determined |
| XPX AC | Complete | March 2007 | June 2007 | June 2007 | September 2007 |
| XPX AC (HV) | Complete | March 2007 | June 2007 | June 2007 | September 2007 |
| XPX$^{aAC}$ | Dec 2007 | January 2008 | N/A | September 2008 | To be determined |

**SEDGWICK** 28
DETERT, MORAN & ARNOLD LLP

-39-

SECOND AMENDED CROSS-COMPLAINT

138.    Matan, Lettunich and Atira also misrepresented the production costs of the solar products XET would be producing as well as available inventory.  Based on representations by Matan, Lettunich and Atira, the April 2, 2007 business plan states that "XET has already produced 1,000 XPX-DC units which are now ready for deployment and testing. Initial Units will cost approximately $50 to manufacture for the AC and DC units."  Lettunich and Matan again did not challenge or correct the XS Holding's and Mr. Caffyn's belief that production costs would be approximately $50.  In fact, later data indicates that initial production costs are $75 per unit or more, and that unrealistically high volumes will need to be reached before $50 per unit costs can be achieved.

139.    Based on the representations by Lettunich and Matan to XS Holding and Mr. Caffyn concerning (1) performance of the PvPC and XPX technology, (2) the  timing for bringing products to market, and (3) the production costs of goods , a business plan was developed that demonstrated a short-term positive cash flow leading to XS Holding's and Mr. Caffyn's valuation of the company.

140.    However, XS Holding and Mr. Caffyn have discovered that Lettunich's and Matan's representations of the PvPC and XPX technology's abilities, their representations of the time needed for bringing the products to market, and their representations of production costs and inventory were all false.

141.    Furthermore, as individuals familiar with this technology and with experience in start up businesses familiar with production costs and market timing, Lettunich and Matan knew that these representations were false.  Lettunich and Matan made these representations because they knew that without them, XS Holding and Mr. Caffyn might demand additional equity in the companies to compensate for their lower valuations.

142.    They also knew that XS Holding and Mr. Caffyn would rely on Lettunich and Matan to provide truthful and accurate information regarding the technologies' performance, the time for bringing the products to market, and the costs of production.  In fact, XS Holding and Mr. Caffyn did rely on these representations and XS Holding ultimately made its investments,

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-40-
SECOND AMENDED CROSS-COMPLAINT

1   and Mr. Caffyn made certain personal commitments, based on the inflated valuations of the

2   companies created by Lettunich's and Matan's misrepresentations.

3       143.    As a result, Cross-Complainants have been injured by receiving less equity for

4   their investment than would be the case absent Lettunich's and Matan's fraudulent statements.

5       144.    As a direct and proximate result of Cross-Defendants Lettunich's and Matan's

6   intentional misrepresentations, XS Holding and Mr. Caffyn have suffered damages as alleged

7   herein and in an amount to be proven at trial.

8                              SIXTH CAUSE OF ACTION

9       (Negligent Misrepresentation – Against Cross-Defendants Lettunich and Matan)

10      145.    Cross-Complainants reallege and incorporate by reference each of the allegations

11  made herein at paragraphs 1 to 142 inclusive.

12      146.    Cross-Defendants Lettunich and Matan (a) had a pecuniary duty to provide

13  Mr. Caffyn, and XS Holding through Mr. Caffyn, with accurate information to XS Holding and

14  Mr. Caffyn, (b) but nevertheless supplied false information, (c) failed to exercise reasonable care

15  in obtaining or communicating that information, and (d) caused XS Holding and Mr. Caffyn to

16  suffer a pecuniary loss caused by justifiable reliance upon the false information.

17      147.    Cross-Defendants Lettunich and Matan had a pecuniary duty to provide

18  Mr. Caffyn, and XS Holding through Mr. Caffyn, with accurate information with respect to

19  strategic management, financial and other material governance issues for the Companies.

20      148.    Cross-Defendants Lettunich and Matan provided Mr. Caffyn with false

21  information regarding the actual reasons that they urged Mr. Caffyn to step down as

22  CEO/President of XET.  At the very least, Cross-Defendants Lettunich and Matan failed to

23  exercise reasonable care in obtaining and communicating the information regarding Mr. Caffyn's

24  stepping down.  Mr. Caffyn and XS Holding justifiably relied on those misrepresentations and

25  suffered damages.

26      149.    Cross-Defendants Lettunich and Matan provided false information in the June 28,

27  2007 Board of Managers meeting minutes that Mr. Caffyn and Mr. Tinsley resigned as Managers

28  for the Companies when they in fact had not done so.  At the very least, Cross-Defendants

**SEDGWICK**
DETERT, MORAN & ARNOLDLLP

1  Lettunich and Matan failed to exercise reasonable care in obtaining and communicating that

2  information.  Mr. Caffyn and XS Holding justifiably relied on those misrepresentations and

3  suffered damages.

4     150.  Cross-Defendants Lettunich and Matan failed to disclose that Cross-Defendant

5  Gallagher betrayed XS Holding's and Mr. Caffyn's confidential bargaining positions to Cross-

6  Defendant Lettunich, and perhaps others.  At the very least, Cross-Defendants Lettunich and

7  Matan failed to exercise reasonable care in not communicating that information.  Mr. Caffyn and

8  XS Holding justifiably relied on those omissions and suffered damages.

9     151.  Cross-Defendants Lettunich and Matan failed to disclose that they were seeking

10  better sources of funding than Mr. Caffyn and XS Holding at the time the Agreements were

11  signed.  At the very least, Cross-Defendants Lettunich and Matan failed to exercise reasonable

12  care in by not communicating that information.  Mr. Caffyn and XS Holding justifiably relied on

13  those omissions and suffered damages.

14     152.  Cross-Defendants Lettunich and Matan failed to disclose that Messrs. Lettunich,

15  Matan and Tinsley had agreed to vote as a block with respect to the issues of major significance

16  with respect to the Companies.  At the very least, Cross-Defendants Lettunich and Matan failed

17  to exercise reasonable care in not communicating that information.  Mr. Caffyn and XS Holding

18  justifiably relied on those omissions and suffered damages.

19     153.  Cross-Defendants Lettunich and Matan failed to disclose to Mr. Caffyn and XS

20  Holding their plans to engage in self-dealing with respect to WorldSpace, SpamEvaders and

21  Xslent, LLC.  At the very least, Cross-Defendants Lettunich and Matan failed to exercise

22  reasonable care in not communicating that information.  Mr. Caffyn and XS Holding justifiably

23  relied on those omissions and suffered damages.

24     154.  Without authorization, Lettunich transferred $1 million to himself under false

25  pretenses by misrepresenting the amount of money he had put into Atria and Xslent and that he

26  would provide a schedule showing the notes to be assumed.

27     155.  Without authorization, Lettunich transferred $1.4 million into Xslent which, at the

28  time, he controlled, based on his own Financial Reconciliation, over $442,000 of that money is

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

SF/1506669v1

-42-

SECOND AMENDED CROSS-COMPLAINT

1    unaccounted for.

2         156.    As a direct and proximate result of Cross-Defendants Lettunich's and Matan's

3    negligent misrepresentations and omissions, XS Holding and Mr. Caffyn have suffered damages

4    as alleged herein and in an amount to be proven at trial.

5                            SEVENTH CAUSE OF ACTION

6    (Declaratory and Other Relief – Against Cross-Defendants Lettunich Matan, Xslent and
                                    Atira Technologies)
7

8         157.    Cross-Complainants reallege and incorporate by reference each of the allegations

9    made herein at paragraphs 1 to 154 inclusive.

10        158.    Cross-Complainants XS Holding and Mr. Caffyn request declaratory relief against

11   Cross-Defendants Xslent, Atira Technologies , Lettunich, and Matan.

12        159.    An actual controversy has arisen and now exists between Cross-Complainants and

13   Cross-Defendants concerning those parties' respective rights and duties under the Agreements.

14        160.    On the one hand, Cross-Complainants allege as follows:  (a) Cross-Defendants

15   had no right or power under Section 3.5 of the Agreements, or other any other provision, to

16   attempt to strip XS Holding of its warrants and its ability to elect a Manager, as well as to cause

17   Mr. Caffyn to lose his approval rights under Section 4.12 and his two Board votes under

18   Section 5.1B because, inter alia, (i) Section 4.12 provides that if there is any conflict between

19   that Section and any other provisions of the agreement "this Section 4.12 shall control" and, in

20   any event, (ii) XET paid its outstanding capital contributions before Cross-Defendants attempted

21   to seek any remedies under Section 3.5; (b) Cross-Defendants' purported termination of

22   Mr. Tinsley was improper under Section 5.2C of the Agreements because, inter alia, there was no

23   Board of Managers meeting held on the issue and there was no majority vote of the Managers to

24   terminate; and (c) Mr. Caffyn, rather than Cross-Defendant Lettunich, should occupy the position

25   of Chairman and CEO/President of XET and XT.

26        161.    On the other hand, Cross-Defendants contend as follows:  (a) they properly relied

27   on Section 3.5 of the Agreements to attempt to strip XS Holding of its warrants and its ability to

28   elect a manager, as well as to cause Mr. Caffyn to lose his approval rights under Section 4.12 and

SEDGWICK
DETERT, MORAN & ARNOLDLLP

                                       -43-
                          SECOND AMENDED CROSS-COMPLAINT

1    his two votes under Section 5.1B; (b) their purported termination of Mr. Tinsley was proper

2    under the Agreements; and (c) Cross-Defendant Lettunich, rather than Mr. Caffyn, should occupy

3    the position of Chairman of CEO/President of XET and XT.

4         162.   Cross-Complainants therefore desire a judicial determination of their rights and

5    duties and a declaration that Cross-Defendants are in breach of the Agreements, and therefore

6    that:

7           1.   Mr. Caffyn, rather than Cross-Defendant Lettunich, occupies the position

8    of Chairman and CEO/President of XET and XT.

9           2.   Mr. Caffyn maintains his approval rights under Section 4.12;

10           3.   Mr. Caffyn and XS Holding maintain their two votes under Section 5.1B;

11           4.   Mr. Tinsley is still a Manager of the Companies;

12           5.   XS Holding has two votes at the Companies' Board of Managers

13    meetings; and

14           6.   XS Holding maintains its warrants and its ability to elect a Manager;

15         163.   Cross-Complainants also desire declaratory relief that the following conduct by

16    Cross-Defendants Lettunich and Matan were ultra vires and/or a breach of the Agreements:

17           1.   each of the acts of self-dealing described above;

18           2.   filing this suit on behalf of XET and XT against Mr. Caffyn and XS

19    Holding;

20           3.   purporting to cause Mr. Tinsley to be terminated from his position with

21    XT and as Manager of XET and XT;

22           4.   causing over $1.4 million to be transferred from XT to Xslent and causing

23    XT to have an outstanding note in the amount of $1 million;

24           5.   sending Capital Notices and Notices of Election to XS Holding on behalf

25    of XT regarding XET; and

26           6.   attempting to, and causing, XS Holding's capital contributions to be

27    returned.

28         164.   Cross-Complainants further desire the issuance of a preliminary and permanent

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-44-

SECOND AMENDED CROSS-COMPLAINT

1  injunction prohibiting Cross-Defendants from engaging in any further ultra vires acts and from

2  denying that:

3         1.     Mr. Caffyn, rather than Cross-Defendant Lettunich, occupies the position

4  of CEO/President of XET and XT;

5         2.     Mr. Caffyn maintains his approval rights under Section 4.12;

6         3.     Mr. Caffyn and XS Holding maintain their two votes under Section 5.1B;

7         4.     Mr. Tinsley still is an employee of XT and a Manager of XET and XT;

8         5.     XS Holdings has two votes at the Companies' Board of Managers

9  meetings;

10        6.     XS Holding maintains its warrants and its ability to elect a Manager;

11        7.     Cross-Defendant Lettunich is prohibited from taking any further action in

12 connection with or on behalf of XET or XT other than as  a Manager at a Board of Managers

13 meeting; and

14        8.     Cross-Defendant Lettunich, Atira Technologies (to the extent a proper

15 party) and Xslent must cause all IP to be assigned to XET as required by the Agreements.

16 EIGHTH CAUSE OF ACTION

17 (Violations of Business & Professions Code § 17200 – Against Cross-Defendants Lettunich,<br>Matan,  Xslent and Atira Technologies)

18

19 165.    Cross-Complainants reallege and incorporate by reference each of the allegations

20 made herein at paragraphs 1 to 162 inclusive.

21 166.    California Business & Professions Code § 17200 prohibits acts of unfair

22 competition, which includes "any unlawful, unfair or fraudulent business practice."

23 167.    Cross-Defendants have engaged in unlawful, unfair and fraudulent business

24 practices as alleged above.

25 168.    As a direct and proximate result of Cross-Defendants Atira Technologies',

26 Xslent's, Lettunich's, and Matan's violations of Business and Professions Code § 17200, XS

27 Holding and Mr. Caffyn are entitled to injunctive and other equitable relief, including

28 disgorgement of any ill-gotten gains, as alleged herein and in an amount to be proven at trial.

SEDGWICK
DETERT, MORAN & ARNOLD

SF/1506669v1

-45-<br>SECOND AMENDED CROSS-COMPLAINT

## NINTH CAUSE OF ACTION

(Breach of Written Contract – Against Cross-Defendants Lettunich, Xslent, and Atira Technologies)

169.    Cross-Complainants reallege and incorporate by reference each of the allegations made herein at paragraphs 1 to 166 inclusive.

170.    On November 14, 2007, Lettunich, Xslent, and Atira entered into a written agreement ("November 14 Contract") with, among others, XS Holding and Brian Caffyn.  A true and correct copy of the November 14 contract is attached hereto as Exhibit 8.

The November 14 Contract provides for, inter alia,

(a).    Lettunich, Xslent and Atira would, on or before November 21, 2007, would provide to XS Holding and Caffyn an accounting of the ownership interests in Xslent and Atira, including the names of owners, contact information, units, percentage interests, and nature and date of contribution including the pertinent documents such as certificates of interests and underlying agreements; and

(b)    that Caffyn would be given full access to the books and records of XT and XET, and Tinsley will be given full access to the books and records of Xslent and Atira.

171.    On numerous occasions since the formation of the November 14 Contract, Lettunich, Xslent and Atira has breached the November 14 Contract, including by: (a) failing to provide information regarding Lettunich's ownership interests in various companies, (b) failing to provide Mr. Caffyn access to the books and records of XT and XET, (c) failing to keep Mr. Caffyn informed as to the affairs of Xslent and Atira.

172.    Cross-Complainants have fulfilled all their obligations under the November 14 Contract.

173.    Cross-Complainants have been damaged by Lettunich's breach by, without limitation, incurring additional legal fees that would not have been necessary absent the breach, and by suffering adverse consequences of board actions that would have had a different outcome if Lettunich had provided the information about the Companies he was obligated to provide.

1

TENTH CAUSE OF ACTION

2

(Accounting – Against Cross-Defendant Lettunich and Xslent)

3      174.    Cross-Complainants reallege and incorporate by reference each of the allegations

4   made herein at paragraphs 1 to 171 inclusive.

5      175.    As a manager of XT and XET, Lettunich owed XS Holding fiduciary duties,

6   including those of loyalty and candor.

7      176.    As detailed above, Lettunich has engaged in self dealing by engaging in numerous

8   transactions with interested parties using or involving the assets of XT and/or XET.

9      177.    Although an individual with complete control over XT and XET's finances, bank

10  accounts, and operations, Lettunich has failed and refused to provide XS Holding with an

11  accounting of the use of XT and XET's money.

12     178.    Because XS Holding has been denied access to the financial records of XT and

13  XET, and because Lettunich has engaged in multiple interested transactions and breaches of

14  fiduciary duties, XS Holding is unable to ascertain the amounts misappropriated by Lettunich as

15  a result of his transactions involving XT and XET.

16     179.    An accounting is required to determine the amounts owed by Lettunich

17  personally, or as a result of Lettunich's misappropriations of XT and XET assets, to XS Holding.

18

ELEVENTH CAUSE OF ACTION

19

(Declaratory Relief – Against Lettunich, Matan, Xslent and Atira)

20     180.    Cross-Complainants reallege and incorporate by reference each of the allegations

21  made herein at paragraphs 1 to 177 inclusive.

22     181.    In July of 2007, Kore and Lettunich entered into a written agreement for a five

23  manager board to govern Xslent, two of which would be Kore representatives.  On September

24  17, 2007, a vote was held by the members of Xslent holding a majority of Xslent's units and a

25  majority of its capital contributions appointing to the board of managers Ken Dickinson and

26  Frank Busalacchi as the two representatives of Kore.  On January 4, 2008, the majority of the

27  Board of Mangers of Xslent voted, through written consent, to adopt certain resolutions that had

28  the effect of, among other things, removing Lettunich as an officer of Xslent.  Shortly thereafter,

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

SECOND AMENDED CROSS-COMPLAINT

1  on January 7, 2008 and as a direct result of the January 4, 2008 vote by the Xslent board,

2  Lettunich was removed as manager and chairman of XET.

3      182.    Lettunich has refused to recognize the legitimacy of the September 2007 vote

4  establishing the existence of the five manager board with Dickson and Busalacchi as members or

5  acknowledge the January 4, 2008 vote removing him as an officer of Xslent and removing him as

6  a manager of XT.  As a result of Lettunich's denial of the validity of these two votes on

7  September 17, 2007 and January 4, 2008, Lettunich has been able to leverage his false control

8  over Xslent (as the majority member of XT) to assert control over XT and XET, to the detriment

9  of Cross-Complainants.

10     183.    Cross-Complainants XS Holding and Mr. Caffyn seek declaratory relief against

11  Cross-Defendants Xslent and Lettunich as to the validity of the votes on September 17, 2007 and

12  January 4,  2008 concerning the managers and officers of Xslent.  Cross-Complainants assert that

13  the votes appointing Dickinson and Busalacchi as managers and removing Lettunich as an officer

14  were valid, stripped him of authority to represent Xslent, and barred him from acting on behalf of

15  XT and XET.  Cross-Defendants Lettunich and, nominally, Xslent, assert that the vote was

16  invalid and that Lettunich possessed authority to act on behalf of XT and XET as a result.

17     184.    An actual controversy has arisen and now exists between Cross-Complainants and

18  Cross-Defendant Xslent and Lettunich concerning the legitimacy of the two votes in September

19  2007 and January 2008.

20     185.    Cross-Complainants therefore desire a judicial determination of their rights and

21  duties and a declaration that Cross-Defendants Lettunich has no control over Xslent and that as a

22  consequence, Mr. Caffyn, rather than Cross-Defendant Lettunich, occupies the position of

23  Chairman and CEO/President of XET and XT.

24     186.    Cross-Complainants also desire declaratory relief that any and all conduct by

25  Cross-Defendants Lettunich stemming from his purported control over Xslent was *ultra vires* and

26  without effect.

27                              PRAYER

28     WHEREFORE, Cross-Complainants pray for judgment as follows:

SEDGWICK
DETERT, MORAN & ARNOLD LLP

SF/1506669v1

SECOND AMENDED CROSS-COMPLAINT

1       1.     For general damages, special damages, consequential damages, restitution and

2 disgorgement according to proof, including, but not limited to lost opportunity and lost profit

3 damages;

4       2.     For declaratory relief that the conduct by Cross-Defendants Lettunich, Matan and

5 Gallagher as set forth above were ultra vires;

6       3.     For the issuance of a preliminary and permanent injunction prohibiting Cross-

7 Defendants Lettunich, Matan and Gallagher from engaging in any further ultra vires acts as set

8 forth above;

9       4.     For satisfaction of Cross-Defendants' obligations pursuant to the Agreements;

10       5.     For judicial declarations as set forth above;

11       6.     For costs of suit;

12       7.     For attorneys' fees and the disbursements of counsel;

13       8.     For an order that Cross-Complainants are entitled to prejudgment interest of ten

14 percent (10%) or the maximum amount allowed by law;

15       9.     For exemplary damages; and

16       10.     For other and further relief as the Court may deem just and proper.

17

18 DATED: May 1, 2008             SEDGWICK, DETERT, MORAN & ARNOLD LLP

19

20                   By: _____

21                     PAUL J. RIEHLE

22                     Attorneys for Defendants and

                    Cross-Complainants

23                     XS HOLDING B.V. and

                    BRIAN CAFFYN

24

25

26

27

SEDGWICK
DETERT, MORAN & ARNOLD LLP 28

1

**PROOF OF SERVICE**

2

    I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Sedgwick, Detert, Moran & Arnold LLP, One Market Plaza, Steuart Street Tower, 8th Floor, San Francisco, California 94105.  On May 1, 2008 I served the within document(s):

3

4

**DEFENDANTS AND CROSS-COMPLAINANTS BRIAN CAFFYN'S AND X.S. HOLDING B.V.'S SECOND AMENDED CROSS-COMPLAINT**

5

6

    ☐    MAIL **-** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed to parties below.

7

8

    ☒    **EMAIL** - by electronically transmitting document(s) via Outlook email to the below.

9

    ☐    MESSENGER - by causing delivery of the document(s) listed above via County Legal Services to Silicon Valley Law Group, DeSouza Law Firm, Martin Lettunich, Esq., Berliner Cohen. and Linda McPharlin at addresses listed below.

10

11

    ☐    OVERNIGHT COURIER - by placing document(s) listed above via Federal Express to the addresses below.

12

    ☐    HAND DELIVERY – I caused hand delivery of the above-referenced document(s) via Jia-Ming Shang of Sedgwick, Detert, et al., while at the Santa Clara Superior Court.

13

14

**SEE ATTACHED SERVICE LIST**

15

16

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

17

18

19

    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on May 1, 2008, at San Francisco, California.

20

21

22

_____
                   Phyllis Flynn

23

24

25

26

27

28

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

PROOF OF SERVICE
*Re XET Holding Inc., et al.*

CASE NO.: 107CV092388

1

2

3

<u>**SERVICE LIST RE**</u>

<u>**XET HOLDINGS, LLC, et al. v. XS HOLDING, B.V., et al.**</u>

| | |
|---|---|
| *Attorneys for Xslent, LLC, Xslent Technology, LLC and XET Holding Co., LLC*<br>Christopher Ashworth<br>SILICON VALLEY LAW GROUP<br>A Law Corporation<br>25 Metro Drive, Suite 600<br>San Jose, CA 95110<br>Telephone: (408) 573-5700<br>Facsimile: (408) 573-5701<br>Email: *CA@svlg.com*<br>      *keb@svlg.com*<br>*cc:*   *dls@svlg.com*<br>      *amt@svlg.com* | *Co-Counsel for Defendant David Tinsley*<br>Todd A. Duplanty<br>ACKERET – SHERON LLP<br>890 Lamont Ave., Suite 202<br>Novato, CA 94945-4100<br>Telephone: (415) 898-3200<br>Facsimile: (415) 897-6526<br>Email: *todd@sheronlaw.com* |
| *In Pro Per*<br>Martin Lettunich<br>Xslent Technologies, LLC<br>233 Oak Meadow Drive<br>Los Gatos, CA 95032-7650<br>Telephone: (408) 354-9800<br>Facsimile: (408) 395-3120<br>Email: *marty@xetsolar.com;*<br>      *xslentmarty@gmail.com*<br>*cc:*   *jsato2@yahoo.com* | *Co-Counsel for Defendant David Tinsley*<br>Lisa C. Roberts, Esq.<br>REHON & ROBERTS<br>Ten Almaden Blvd., Suite 550<br>San Jose, CA 95113-3238<br>Telephone: (408) 494-0900<br>Facsimile: (408) 494-0909<br>Email: *lroberts@rehonroberts.com*<br>*cc:*   *nwong@rehonroberts.com* |
| *Attorneys for Lisa Gallagher*<br>Linda Hendrix McPharlin, Esq.<br>McPharlin Sprinkles & Thomas LLP<br>Ten Almaden Blvd., Suite 1460<br>San Jose, CA 95113<br>Telephone: (408) 293-1900<br>Facsimile: (408) 293-1999<br>Email: *lmcpharlin@mstpartners.com*<br>*cc:*   *nalejandro@mstpartners.com* | *Attorneys for Atira Technologies, LLC*<br>Frank R. Ubhaus, Esq.<br>Christine Long, Esq.<br>Berliner Cohen<br>Ten Almaden Blvd., 11th Floor<br>San Jose, CA 95113-2233<br>Telephone: (408) 286-5800<br>Facsimile: (408_998-5388<br>Email: *ubhaus@berliner.com*<br>      *christine.long@berliner.com*<br>      *pstallings@berliner.com* |
| *Attorneys for Stefan Malan, Martin Lettunich and Xslent, LLC*<br>Jacqueline DeSouza, Esq.<br>DeSouza Law Offices, P.C.<br>2397 Shattuck Avenue, Suite 202<br>Berkeley, CA 94704<br>Telephone: (510) 649-3420<br>Facsimile: (510) 649-1711<br>Email: *jdesouza@dlawcorp.com* | |

PROOF OF SERVICE
*Re XET Holding Inc., et al.*

CASE NO.: 107CV092388