1  **CHRISTOPHER ASHWORTH (SBN 54889)**
   **KATHRYN E. BARRETT (SBN 162100)**
2  **SILICON VALLEY LAW GROUP**
   **A Law Corporation**
3  **25 Metro Drive, Suite 600**
   **San Jose, CA  95110**
4  **Telephone:    (408) 573-5700**
   **Facsimile:    (408) 573-5701**
5
   **Attorneys for Defendant Xslent, LLC**
6

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11  XS HOLDING B.V., et al.              )    **Case No. C08 02282 RMW**
                                         )
12              Plaintiffs,              )
                                         )    **EXHIBITS TO DEFENDANT**
13      v.                               )    **XSLENT, LLC'S *EX PARTE***
                                         )    **APPLICATION FOR ALL**
14  COOL EARTH SOLAR, INC., et al.,      )    **DEFENDANTS TO BE RELIEVED**
                                         )    **OF THE OBLIGATIONS OF FRCP**
15              Defendants.              )    **RULE 26 UNTIL FURTHER**
    _____)    **ORDER OF THIS COURT**

16

17        Defendant XSLENT, LLC ["Xslent] hereby submits the Exhibits to its *ex Parte*

18  Application for All Defendants' to Be Relieved of the Obligations of FRCP Rule 26 Until

19  Further Order of this Court.  Attached hereto are true and correct copies of the following

20  documents (less exhibits):

21        **Exhibit A:** The Second Amended Complaint of XET Holdings Co., LLC, Xslent

22  Technologies, LLC, and Xslent, LLC  [the "107" Case"];

23        **Exhibit B:** The Second Amended Cross-complaint of XS Holding B.V. and Brian Caffyn

24  [the "107" Case"];

25        **Exhibit C:** The Verified Complaint of Atira Technologies [the "108 Case"]; and

26  //

27  //

28

1    **Exhibit D:** The Second Amended Cross-Complaint of XS Holding B.V. and Brian

2    Caffyn [the "108" Case"].

3

4    Dated: June 17, 2008                          SILICON VALLEY LAW GROUP
                                                    A Law Corporation
5
                                                    By:    /s/ Christopher Ashworth
6                                                          CHRISTOPHER ASHWORTH

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT A

1  | **CHRISTOPHER ASHWORTH (SBN 54889)**
2  | **KATHRYN E. BARRETT (SBN 162100)**
   | **SILICON VALLEY LAW GROUP**
   | **A Law Corporation**
3  | **25 Metro Drive, Suite 600**
   | **San Jose, CA 95110**
4  | **Telephone:    (408) 573-5700**
   | **Facsimile:     (408) 573-5701**
5  |
6  | **Attorneys for Plaintiffs, XET Holdings Co., LLC,**
   | **Xslent Technologies, LLC, and Xslent, LLC,**
7  |
   | **FRANK R. UBHAUS (SBN 46085)**
8  | **BERLINER COHEN**
   | **Ten Almaden Boulevard, 11th Floor**
9  | **San Jose, CA 95113**
   | **Telephone:    (408) 286-5800**
   | **Facsimile:     (408) 998-5388**



ENDORSED
FILED
MAY – 1 2008

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
by _____
C. FUJIHARA

BY FAX

**Attorneys for Plaintiff, Atira Technologies, LLC,**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SANTA CLARA

XET Holdings Co., LLC, a limited liability
company; Xslent Technologies, LLC, a limited
liability company; Xslent, LLC, a limited
liability company; and Atira Technologies, LLC, a limited
liability company

                    Plaintiffs,

        v.

XS Holding B.V, a corporation; Brian Caffyn, an
individual; David Tinsley, an individual and Does
1 through 100; inclusive,

                    Defendants.

_____

AND RELATED CROSS-CLAIMS.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.  107CV092388**

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

Silicon Valley
Law Group ·
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

Page 1

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    Plaintiffs complain of defendants XS Holding B.V. ("XS"), Brian Caffyn ("Caffyn") and David

2  Tinsley ("Tinsley") as follows:

3                          **ALLEGATIONS COMMON TO ALL CLAIMS**

4    1.    Plaintiff XET Holdings Co., LLC ("XET") is a limited liability company with its

5  principal place of business in this county.

6    2.    Plaintiff Xslent Technologies, LLC ("XT") is a limited liability company with its

7  principal place of business in this county.

8    3.    Plaintiff Xslent, LLC ("Xslent") is a limited liability company with its principal place of

9  business in this county.

10    4.    Plaintiffs XT and XET collectively either own outright·or possess license rights to

11  intellectual property including patented devices (the "Solar Technology") which permit solar collector

12  panels to extract higher amounts of useable electricity than is ordinarily the case and patented devices

13  (the "Software Technology"). The Solar Technology is generally acknowledged to be "cutting-edge"

14  and extremely valuable.

15    5.    Defendant XS is a Dutch corporation whose principal place of business is in Heerlen, The

16  Netherlands. XS does business in this county. The conduct of XS complained of herein was done in

17  part in this county. Plaintiffs are informed and believe that Defendant Caffyn controls and owns XS.

18    6.    Defendant Caffyn is an individual residing variously in the United Kingdom,

19  Massachusetts, Florida, Monaco, California and elsewhere. Caffyn dominates and controls the affairs of

20  XS. The conduct of Caffyn complained of herein was done in part in this county. At all times material,

21  Caffyn was and is a manager[1] of both XET and XT, and owed and owes fiduciary duties to, *inter alia*,

22  those entities and their members. Caffyn also has ownership and managerial interests in several other

23  "alternative" energy concerns, especially those involving solar and wind generation of electricity. For

24  convenience, unless th context otherwise requires, Caffyn and XS will be referred to collectively as

25  "XS/Caffyn".

26

27

28

Silicon Valley
Law Group
15 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

[1] In Limited Liability Companies, "managers" are the equivalent of "directors" in a corporation.
Page 2

7.    Defendant Tinsley is an individual residing in this county.  Until not-later-than August 15, 2007, Tinsley was a manager of both XET and XT, and owed and continues to owe fiduciary duties to, *inter alia*, those entities and their members.

Plaintiffs are informed and believe that each of the defendants is the employee or agent of each of the other defendants.

8.    Plaintiffs are uninformed respecting the identities and capacities of Does 1 through 100, but will suitably amend this second amended complaint when the same are ascertained.  All of the defendants are the agents/servants/employees of the other defendants and acred in such capacity(ies) at all times material.

9.    On April 7, 2007 Caffyn, on behalf of XS, executed a document styled "Operating Agreement for XET Holding Co., LLC" ("XET Operating Agreement").  The XET Operating Agreement was also executed by, *inter alia* Martin Lettunich and Stefan Matan on behalf of XT, the only "Class A" member of XET.  XS is the only "Class B" member.  A true copy of the XET Operating Agreement is attached hereto as **Exhibit "A."**

10.    On April 7, 2007 Caffyn, on behalf of XS, executed a document styled "Operating Agreement for Xslent Technologies, LLC" ("XT Operating Agreement").  The Original XT Operating Agreement was executed by, *inter alia*, Martin Lettunich on behalf of both Xslent and Altira.  Xslent and Atira are the only "Class A" members of XT.  At the time of the execution of the XT Operating Agreement, Atira was the 67.5 percent Class A unit holder in XT and Xslent was the 22.5 percent Class A unit holder in XT.  By later agreement of the parties, Atira is now the owner of 89 percent of the A units in XT and Xslent is now the owner of 11 percent of the A units in XT.  XS is the only "Class B" member of XT.  A true copy of the XT Operating Agreement is attached hereto as **Exhibit "B"**.  Unless otherwise required for clarity, the XT and XET Operating Agreements will be referred to collectively as the "Agreements".

11.    The Agreements provided that the A Class unit holders, Xslent and Atira, transfer all of their assets to XT and XET.  It was intended by the parties that the Atira intellectual property would reside in XET.  XS/Caffyn represented to Plaintiffs and to Atira investors that they would, in exchange for its contribution of Atira intellectual property to XET, fund XET's further development of the

Silicon Valley
Law Group
15 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1 | intellectual property. XS and Caffyn further represented to Atira investors that XT would be the
2 | majority, 67.5 percent, unit holders in XT.

3 |   12.  Section 3.1.2 of both Agreements calls for cash contributions from XS in favor of XET
4 | and XT respectively in the amount of $7,500,000 *each,* payable at $2,500,000 "down" (as to XET) and
5 | $3,500,000 "down" (as to XT) and the balance payable at agreed monthly intervals as set forth in the
6 | Agreements. For this investment of funds, XS was to receive a 10 percent interest in XT and a 10
7 | percent interest in XET.

8 |   13.  Plaintiffs are informed and believe that in May of 2007 Caffyn, while he was the CEO of
9 | XET, was also a controlling interest holder in UPC Solar. Without authorization, he installed UPC
10 | Solar references on the XET website thereby "hi-jacking" the site to the advantage of UPC Solar. He
11 | also, without authorization, added XET intellectual property materials that had not yet been patented in
12 | his UPC Solar sales brochure, risking patent rights for the valuable intellectual property. When XET
13 | discovered this conduct, it demanded that he immediately remove XET intellectual property materials
14 | from UPC Solar sales materials. Additionally, Caffyn staffed the companies by "renting" his UPC Solar
15 | employees for a mark up that included (1) UPC Solar's costs for wages, benefits and vacation, plus (2)
16 | 30 percent over the cost to UPC Solar. Caffyn caused the companies to also pay for transportation and
17 | lodging of his Chicago-based, rented, UPC employees. The conduct, among other things, was concealed
18 | from XET and was self dealing by XS/Caffyn.

19 |   14.  Also in May of 2007 Caffyn demanded that XET execute a broad, exclusive licence of its
20 | intellectual property in his favor which licence XET deemed to be unfavorable to XET's interests.
21 | When XET sought to negotiate more reasonable terms, XS and Caffyn, on June 30, 2007, informed
22 | XET and XT by email that XS would no longer continue to fund XET and XT as required under the
23 | Agreements.

24 |   In fact, XS did cut off funding. Plaintiffs are informed and believe that the funding was cut off in
25 | an effort to starve the company of funds to force it to capitulate to Caffyn's license demands. In late
26 | July, 2007, having cut off funding, Caffyn proposed an even more onerous exclusive license deal.
27 | Again, XET sought more commercially reasonable terms and Caffyn failed to timely pay his August
28 | funding as well.

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

15.   Section 3.5 of both Agreements declares in material part:

> "if a Class B member [XS] does not timely contribute all of the capital
> pursuant to [the agreed amounts set out in] section 3.1.2 in accordance
> with the schedule specified therein, the Class A Member(s) ... shall send
> the Class B Member written notice of such failure to contribute, giving
> him or her fourteen (14) days from the date such notice is given to
> contribute the entire amount of the capital contribution required at that
> time ("Capital Notice")....".

16.   When XS failed to make the payments to XET and XT that were due on July 1, 2007 as Caffyn had threatened, on July 6, 2007, the Class A Member(s) of XET and XT respectively sent the written Capital Notices required by sections 3.1.2 and 3.5 to XS. On July 9, 2007, Caffyn on behalf of XS gave a written acknowledgment of the receipt of the section 3.5 and 3.1.2 notices. A copy of such written acknowledgment is attached as **Exhibit "C"**.

17.   XS did not make the contributions due on July 1, 2007, within the 14 days permitted by section 3.5 nor at any time thereafter.

18.   Section 3.5 of the Agreements provides: "if the Class B Member [XS] does not contribute his or her required capital...within said fourteen (14) day period, a majority of the Class A Members... may elect any one or more of the following remedies within 60 days of such Capital Notice:

> **3.5.1.** Declare some or all of the Warrants of Class B Member described in
> Section 3.1.5 and in the Warrant Agreement as null and void by way of
> written notice of the Class B Member within 60 days after such failure to
> contribute.
>
> **3.5.2.** The Percentage Interests and the number of Class B Units of Class B
> Member shall be adjusted, in which even the Class B Member's
> Percentage Interest and Units shall be a fraction, the numerator of which
> represents the amount of such Member's Capital Contributions and the
> denominator of which represents $7,500,000. The total number of the

licon Valley
w Group
) Metro Drive
ite 600
an Jose, CA 95110
08) 573-5790

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    reduction in the Class B Units determined pursuant to the previous

2    sentence shall be added to the Units of Class A Member as Class A Units.

3    **3.5.3.** Provided that the Percentage Interest has not been adjusted under

4    Section 3.5.2, above then Class Be Member shall have no right to receive

5    any distributions from the Company until the Class B Member has

6    contributed the full $7,500,000 of capital. All withheld distributions to

7    Class B Member shall be deemed applied to the latest capital contribution

8    required under Section 3.1.2., above (i.e. – the final month shall be paid in

9    first).

10    **3.5.4.** Class B Member shall lose its approval rights under Section 4.12 of

11    this Agreement.

12    **3.5.5.** Class B Member shall lose its ability to elect a Manager".

13    Remedies such as those set forth above are meant to discourage or prevent an economically

14    stronger LLC member (such as XS) from effectuating a "starve-out" of the company and its less wealthy

15    members by the simple expedient of withholding promised capital and thereafter attempting to re-

16    negotiate the stronger member's power position in the company – all to the advantage of the stronger

17    member and to the detriment of the less wealthy members. As to which, see the 2nd Claim for Relief.

18    19.    On August 13, 2007, more than 40 days late – and realizing that XS had made an horrific

19    strategic mistake – Caffyn attempted to wire-tender contributions for XS from a personal Goldman-

20    Sachs account in Florida[2]. But by then, XET and XT had already (1) sent their Capital Notices to XS, (2)

21    proceeded to seek other capital elsewhere, and (3) had commenced exercising their anti starve-out

22    remedies as provided for in Section 3.5 of the Agreements.

23    20.    Specifically, XET and XT exercised the following agreed-upon remedies vis a vis XS: (1)

24    "Declar[ing] all of the Warrants of Class B Member ...as null and void by way of a written notice to the

25    Class B Member"; (2) "Class B member shall lose its approval rights under section 4.12 of the

26    [Agreement] .."; and (3) "Class B Member shall lose its ability to elect a Manager".

27

28    [2] XS had also failed to timely tender its August 1, 2007 payment and also attempted to tardily
wire-tender the August 1, 2007 contributions on August 13.

Page 6

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

1    Written notices of the election of Remedies of the Class A Member(s) were sent to XS and are

2    attached as **Exhibit "D"**. Additionally, because XS was in default respecting its capital contributions, it

3    lost the ability to confer upon its nominee, defendant Caffyn, the power to cast two manager votes at

4    Board of Managers meetings.[3]

5    21.    On August 15, 2007, following notification to XS/Caffyn as described above, XET and

6    XT informed defendant Tinsley that he was terminated as a Manager of both XET and XT.  As such,

7    Tinsley lost his position as a manger of both XET and XT.    Copies of the written notice of Tinsley's

8    discharge are attached collectively as **Exhibit "E"**.

9    22.    On August 16, 2007 XET and XT conducted Board of Managers meetings (the same

10   demanded by and noticed by XS).  Defendant Caffyn participated by telephone – assertedly from

11   Boston. Managers Martin Lettunich and Stefan Matan participated in person. Though specifically asked

12   not to join in by telephone or otherwise, defendant Tinsley was given the conference call "call-in"

13   number by Caffyn, called in and refused to withdraw. Caffyn insisted that, notwithstanding the removal

14   of his two votes by the Companies due to his refusal to timely fund the Companies as required under the

15   Agreements,  he was entitled to cast two Manager votes.    Tinsley insisted that he was entitled to cast a

16   manager vote. No company business was concluded by either XET or XT due to the disruptive behavior

17   of Tinsley and Caffyn, although Caffyn and Tinsley thereafter purported to hold a "vote" of their own.

18   23.    For some weeks prior to the advent of this litigation, plaintiffs had come to suspect that

19   Tinsley, at the behest of and in concert with, Caffyn, had "hacked" into the computers and computer

20   systems of plaintiffs to view, alter, destroy and otherwise make use of data and programs.

21   24.    **The Canary Trap.** On July 27, 2007, Lisa Gallagher, an employee of plaintiff XT

22   authored an e-mail and sent it to Martin Lettunich. The e-mail, by agreement, contained incorrect

23   business data. Such communications are familiarly called false flags or "canary traps". They are

24   designed to entice wrongdoers into (a) viewing and thereafter (b) disseminating the incorrect matter in a

25   way that discloses who the unauthorized viewer is. The Canary Trap e-mail recites as follows:

26       **From:** Lisa Gallagher <LGallagher@xslent.net>

27       **Date:** July 27, 2007 1:40:49 PM PDT

28

Icon Valley
w Group
Metro Drive
ite 600
n Jose, CA 95110
08) 573-5700

[3] See section 5.1 B. of the Agreements.

Page 7

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

**To:** Martin Lettunich <marty@xslent.net>

**Subject: Update**

Marty:

The meeting went extremely well. We can sell all the rights to the GINA

technology @ FMV (equivalent to your capital account). They would then enter

into a new & separate partnership with us whereby they fund all the development

with a new engineering team. Once GINA is really developed, the partnership can

flip GINA for a very very nice profit. No more Open Source, Bechtel or Shiny BS.

This will also help mend that wound in my back.  Kindest Regards, Your Favorite

Shining Star.

Within just a few days of the sending of the Canary Trap e-mail, rumors began to abound in the

principal offices of the plaintiffs to the effect that significant intellectual property belonging to the

plaintiffs was about to be sold.  When queried about the source of the rumors, all of the affected

employees identified Tinsley as the person who informed them of the 'sale' of plaintiffs intellectual

property.  Plaintiffs infer that Tinsley has improperly gained access to the e-mail accounts of, at a

minimum, Gallagher and Lettunich.

25.    Immediately after the advent of this litigation, counsel for XS and Caffyn posed a

document demand phrased in the following lugubrious prose:

REQUEST FOR PRODUCTION No. 10.  All communications...with third parties

RELATED TO the actual or potential sale, transfer, licensing AND assignment of

ALL PLAINTIFFS' IP to AND from PLAINTIFFS".

26.    Plaintiffs infer that Tinsley has shared with Caffyn the Canary Trap e-mail.

27.    Plaintiffs are further informed and believe that, in addition to hacking into the e-mails

accounts of plaintiffs, Tinsley in concert with Caffyn, have invaded the computer systems of plaintiffs

and have deleted, destroyed, and copied proprietary data.  Plaintiffs are further informed and believe that

Tinsley, who formerly had unfettered access to the computer systems has left for himself a "back-door"

access to plaintiffs' computer systems despite plaintiffs having changed passwords.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Silicon Valley
Law Group
15 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

1         Additionally, Plaintiffs are informed and believe that XS and Caffyn, themselves and/or through

2    their agents, have interfered with the business of XT and XET, including, *inter alia*, contacting potential

3    customers and telling them that if they do business without Caffyn's explicit consent, any agreement will

4    be "ultra vires" and subject to undoing by Caffyn.

5         This threat to customers (or potential customers) of XET in order to continue the starve-out

6    strategy by XS/Caffyn with the objective of keeping XET from obtaining funds so it would capitulate to

7    Caffyn's unfavorable license demand.  This conduct has been willful and malicious and oppressive and

8    has interfered with XET's ability to do business.

9    **FIRST CLAIM FOR RELIEF**

10    **(Declaratory Relief against all Defendants)**

11        28.     Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

12    incorporate each paragraph and allegation by reference as though fully set forth herein.

13        29.     Defendants claim that Plaintiffs' exercise of their anti starve-out rights under section 3.5

14    of the Agreements was wrongful. Defendants also claim that Plaintiffs' termination of Tinsley was

15    wrongful. Defendants also claim that XS is entitled to appoint a manager who has two votes at the Board

16    of Manager Meetings of both XET and XT.

17        30.     Plaintiffs claim that their exercise of their anti starve-out rights under section 3.5 of the

18    Agreements was entirely proper. Plaintiffs also claim that their termination of Tinsley was entirely

19    proper. Plaintiffs also claim that XS is not entitled to appoint a manager who has two votes at the Board

20    of Manager Meetings of both XET and XT.

21        31.     An actual controversy exists as to as to the rights of Plaintiffs to exercise their anti starve-

22    out remedies, to terminate Tinsley and to not suffer XS or its nominee to exercise two votes at Board of

23    Managers meetings. Plaintiffs desire a judicial determination and declaration concerning the rights

24    asserted by Defendants.

25    **SECOND CLAIM FOR RELIEF**

26    **(Breach of Fiduciary duty against XS, Caffyn and Tinsley)**

27        32.     Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

28    incorporate each paragraph and allegation by reference as though fully set forth herein.

ilicon Valley
aw Group
5 Metro Drive
uite 600
an Jose, CA 95110
(08) 573-5700

1    33.    XS, Caffyn and Tinsley owe fiduciary duties to XET and XT and their constituent

2    members including Atira and Xslent pursuant to California Corporations Code §§ 17153 and 16404.

3    These duties include, *inter alia*, a duty of loyalty to the LLC's and their members, including the duty to

4    discharge duties or obligations and exercise any rights consistently with the obligation of good faith and

5    fair dealing.

6    34.    XS and Caffyn breached their fiduciary duties and/or duties of loyalty by among other

7    things alleged herein, (a) initially promising to contribute capital to XET and XT in the aggregate

8    amount of $15,000,000, and then (b) suddenly withholding capital contributions as described above in

9    order to gain leverage to re-negotiate and gain additional rights and perquisites in connection with XS's

10   membership position and Caffyn's manager position in XET and XT. Among other things, Caffyn, using

11   XS as a stalking horse, intends to siphon away the intellectual property and other assets of XET for the

12   advantage of other business entities in which Caffyn/XS have an interest. Caffyn has also made

13   unauthorized use of XET intellectual property, secretly including his UPC Solar company on the XET

14   website and secretly including the yet-unpatented XET intellectual property information in his sales

15   brochures for UPC Solar.  Moreover, he used XET funds to benefit UPC Solar by "renting" at a

16   significant mark-up (and adding travel costs) Chicago-based employees to staff XET.  Defendant Tinsley

17   has aided and abetted XS and Caffyn at every step in the matters complained of herein.

18   35.    As a result of the conduct of Caffyn's, XS's and Tinsley's breaches of their fiduciary

19   duties, Plaintiffs have been damaged in an amount to be proven at trial.

20   36.    Plaintiffs are informed and believe that the aforementioned acts of XS, Caffyn and

21   Tinsley were willful, wanton, malicious, oppressive and in conscious disregard of the rights and interests

22   of Plaintiffs and Plaintiffs therefore seek punitive damages in an amount to be determined according to

23   proof.

24   **THIRD CLAIM FOR RELIEF**

25   **(Tortious Interference with Business Advantage against Tinsley)**

26   37.    Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

27   incorporate each paragraph and allegation by reference as though fully set forth herein.

28

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
408) 573-5700

Page 10

SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

1    38.    For several weeks preceding the filing of this complaint, defendant Tinsley has

2    manifested bizarre behaviors in the joint offices of XET/XT. Such behavior included insisting that he

3    was a DOD Agent, that he had flown high-performance fighter aircraft in the "military" (known not to be

4    true), that he had just bought two sidearms and that he had just obtained a concealed weapons permit.

5    Additionally, Tinsley publicly brandished and then hung up in his office shooting range targets showing

6    close groupings of bullet strikes purportedly attesting to his skill as a marksman. Additionally, Tinsley

7    posted a threatening photograph of himself, brandishing two side arms, in the office and "Skyped" the

8    same to a number of co-workers at XET and XT in Los Gatos. A copy of the offending photograph is

9    attached as Exhibit "F". Lastly, Tinsley threatens to come upon the business premises of XET/XT

10   "anytime I want to" notwithstanding that he has no employment relationship with either XET or XT.

11   39.    As a result of Tinsley's bizarre behavior, other employees of XET and XT are frightened

12   and upset in their workplace. Several employees have expressed concern for their safety and requested

13   action be taken.

14   40.    Proximately caused by the conduct of Tinsley, plaintiffs have lost worker productivity

15   and have been damaged in an amount to be proved at trial.

16   ### FOURTH CLAIM FOR RELIEF

17   **(Interference with Business Advantage against XS/Caffyn)**

18   41.    Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

19   incorporate each paragraph and allegation by reference as though fully set forth herein.

20   42.    XS/Caffyn are aware that XET has been negotiating with various companies, including

21   Solar Components and Cool Earth concerning licensing of XET intellectual property which licenses

22   would result in revenue to the company. XS/Caffyn, having failed to extract a broad, exclusive license

23   to the XET intellectual property for himself, sought to stop XET from entering into the licences by way

24   of application for temporary restraining orders. When XS/Caffyn did not succeed in obtaining such

25   TRO's he then caused his agent to contact Cool Earth in order to attempt to intimidate it and keep it

26   from advancing funds to XET. XS/Caffyn, through its agent, told Cool Earth that this court was going to,

27   within a week, remove the management (with whom Cool Earth was dealing, from XET) and install

28   Caffyn as manager and the funds would be lost. Caffyn, through his agent, told Cool Earth that the

ilicon Valley
aw Group
5 Metro Drive
uite 600
an Jose, CA 95110
108) 573-5700

Page 11

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    management was dishonest and had misappropriated money, intending to cause Cool Earth to cease its

2    relationship with XET, an event that would allow Caffyn to continue his starve out strategy.

3    Additionally, on April 30, 2008, Paul Riehle, an agent of XS/Caffyn, informed Cool Earth that any deal

4    it (Cool Earth) signed with XET would be *ultra vires* and would be attacked and slowed down by

5    XS/Caffyn. On Cool Earth, in fact, delayed its funding of XET based upon Caffyn's tactics. Both XET

6    (in its guise as an inventor of solar technology) and XT (as the majority owner of XET) have been

7    harmed in their business due tothe acts of XS/Caffyn.

8         43.     XET and XT have been damaged by the interference of Caffyn/XS in an amount to be

9    proved at trial.

10         44.     Plaintiffs are informed and believe that the aforementioned acts of XS, Caffyn were

11    willful, wanton, malicious, oppressive and in conscious disregard of the rights and interests of Plaintiffs

12    and Plaintiffs therefore seek punitive damages in an amount to be determined according to proof.

13    **FIFTH CLAIM FOR RELIEF**

14    **(Fraud against XS/Caffyn)**

15         45.     Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and

16    incorporate each paragraph and allegation by reference as through fully set forth herein.

17         46.     XS./Caffyn represented to XET and XET that it would fund the companies as provided in

18    the operating agreements. As consideration for its investment in the companies, XS/Caffyn were to

19    receive a ten percent interest in each company. The plaintiffs reasonably believed the representations

20    of XS/Caffyn. Plaintiffs are informed and believe that XS/Caffyn intended Plaintiffs to rely on the

21    funding promises, but that Caffyn/XS never intended to invest the funds as required under the

22    Agreements. Plaintiff are informed and believe that XS/Caffyn then caused the Companies to quickly

23    spend the funds (particularly XET, under the stewardship of Caffyn) and then intended to cut off the

24    funding as part of a starve out strategy all the better to extract more benefits for XS/Caffyn.

25         47.     In fact, XS/Caffyn cut off funding of the companies when Caffyn was unable to extract an

26    exclusive and broad licence for himself and his UPC Solar company. XS/Caffyn thereafter, having

27    starved the company for a period of time, again commenced negotiations to extract a license for Caffyn

28    that was wholly unfavorable to XET.

Jcon Valley
w Group
- Metro Drive
ite 600
n Jose, CA 95110
08) 573-5700

48.     Plaintiffs had no reason to believe that XS/Caffyn were intending to engage in the starve out strategy after promising to fund the companies. Plaintiffs have been damaged by the conduct of XS/CAffyn in an amount to be proved at trial.

49.     Plaintiffs are informed and believe that the aforementioned acts of XS, Caffyn were willful, wanton, malicious, oppressive and in conscious disregard of the rights and interests of Plaintiffs and Plaintiffs therefore seek punitive damages in an amount to be determined according to proof.

## SIXTH CLAIM FOR RELIEF

### (Unauthorized Access to Computer Data under Penal Code § 502[4] against Tinsley and Caffyn )

50.     Plaintiffs refer to and reallege the allegations set forth in the above paragraphs and incorporate each paragraph and allegation by reference as though fully set forth herein.

51.     By virtue of the foregoing, defendants are liable to plaintiffs for their violations of Penal Code § 502, including such damages as may be proved at trial, but in no event less than $20,000,000.

52.     Defendants' actions complained of herein were conscious, intentional, wanton and malicious, entitling plaintiffs to an award of punitive damages.

53.     Plaintiffs have no adequate remedy at law for defendants' continued violation of Penal Code § 502 and thus are entitled to preliminary and permanent injunctive relief as set forth in the prayer hereto.

## WHEREFOR PLAINTIFFS PRAY

1.     For judgment against defendants in an amount to be proved at trial, but not less than $7,500,000;

2.     For punitive damages in an amount to be proved at trial;

3.     For a declaration that (a) Plaintiffs claim that their exercise of their anti starve-out rights under section 3.5 of the Agreements was entirely proper; (b) Plaintiffs claim that their termination of Tinsley was entirely proper; and (c) XS is not entitled to appoint a manager who has two votes at the Board of Manager Meetings of both XET and X-Tech;

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

---

[4] A civil action for violations of penal Code §502 is contemplated by §502 (e)(1).

Page 13

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1    4.    For a temporary restraining order and thereafter a preliminary injunction enjoining Caffyn

2    (a) from exercising or attempting to exercise any managerial power in XET or X-Tech beyond what a

3    manager with a single vote may do under the Operating Agreements of XET and X-Tech; and (b)

4    representing to any third parties that he is the CEO or Chairman of XET or X-Tech.

5    5.    For a preliminary injunction and thereafter a permanent injunction enjoining Tinsley and

6    Caffyn from doing any act in violation Penal Code § 502 in derogation of the rights of the plaintiffs

7    herein;

8    6.    That XS be stripped of its member status and reduced to a mere economic stake holder;

9    7.    For costs of suit;

10    8.    For interest at the lawful rate;

11    9.    For attorneys fees according to both contract and statute; and

12    10.    For such further relief as may be proper.

13    DATED: May 1, 2008                           SILICON VALLEY LAW GROUP

14

15                                                By_____

16                                                   CHRISTOPHER ASHWORTH

17

18                                                BERLINER/COHEN

19                                                By_____

20                                                   FRANK R. UBHAUS

21

22

23

24

25

26

27

28

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

Page 14

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

1  *XET Holdings, Co., LLC et al. v. XS Holding B. V. et al.*
   <u>**Santa Clara County Superior Court, Case No. 107CV092388**</u>

2

3                          **PROOF OF SERVICE**

        I declare as follows:  I am over eighteen years of age and not a party to the within action; I am
4
   employed in the County of Santa Clara, California; my business address is 25 Metro Drive, Suite 600,
5
   San Jose, CA 95110.
6
        On May 1, 2008, I served a true and correct copy of the following document[s], with all
7
   exhibits, if any:  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER**
8
   **RELIEF** on the following party[ies]:
9

   | | |
   |---|---|
   | Paul Riehle | Todd Duplanty |
10 | Sedgwick, Detert, Moran & Arnold LLP | Ackeret Sheron LLP |
   | One Market Plaza, 8th Floor | 890 Lamont Ave #202 |
11 | San Francisco, CA 94105 | Novato, CA 94945 |
   | Email: paul.riehle@sdma.com | Email: todd@sheronlaw.com |
12
   | Lisa Roberts | Linda Hendrix McPharlin |
13 | Rehon & Roberts | McPharlin Sprinkles & Thomas LLP |
   | 10 Almaden Blvd. #550 | Ten Almaden Blvd. #1460 |
14 | San Jose, CA 95113 | San Jose, CA 95113 |
   | Email: lroberts@rehonroberts.com | Email: lmcpharlin@mstpartners.com |
15
   | Martin Lettunich | Jacqueline DeSouza |
16 | 233 Oak Meadow Drive | Desouza Law Offices, PC |
   | Los Gatos, CA 95032 | 2397 Shattuck Avenue, Suite 202 |
17 | Email: xslentmarty@gmail.com | Berkeley, CA 94704 |
   | | Email: jdesouza@dlawcorp.com |
18

19 Frank R. Ubhaus
   Berliner Cohen
   10 Almaden Blvd. #1100
20 San Jose, CA 95113
   Email: fru@berliner.com



FILED
ENDORSED
MAY – 1 2008
C. FUJIHARA
KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara

21

22 **[XX]  BY U. S. MAIL:**  I am readily familiar with my employer's business practice for collection and processing of
   correspondence for mailing with the United States Postal Service. I served the above document[s] on the party[ies]
23 named above in the above-referenced matter, by following ordinary business practice, placing a true copy thereof
   enclosed in a sealed envelope, for collection and mailing with the United States Postal Service where it would be
   deposited for certified mail, first class delivery, postage fully prepaid, in the United States Postal Service that same day in
24 the ordinary course of business, addressed to the party[ies] at the address[es] listed above.  [C.C.P. §1013(a)]

25 **[ ]  BY EXPRESS MAIL:**  I served the above document[s] on the party[ies] named above, in the above-referenced
   matter, by placing the above-named document[s] in a sealed envelope and depositing them in a mailbox regularly
26 maintained by the United States Postal Service for receipt of Express Mail, at _____ Post Office,
   _____, California, with Express Mail postage thereon fully prepaid, addressed to the party[ies] at the
   address[es] listed above.  [C.C.P. §1013(c)]

27 **[ ]  BY FEDERAL EXPRESS:**  I served the above-named document[s] on the party[ies] named above, in the above-
28 referenced matter, by depositing the above document[s] in a box or other facility regularly maintained by Federal

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

                          **PROOF OF SERVICE**

Express, in an envelope or package designated by Federal Express, with delivery fees paid on prepaid account, addressed to the party[ies] at the address[es] listed above. [C.C.P. §1013(c)]

[ ] **BY FACSIMILE:** On _____, 2007 by use of fax machine number [408] 573-7864 or [408] 573-5720, I served the above-named document[s] on the party[ies] named above, in the above-referenced matter, by transmitting by fax machine to each party's fax machine number listed above. The fax machine I used complied with California Rules of Court, Rule 2003, and no error was reported by the machine. Pursuant to California Rules of Court, Rule 2006(d), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

[ ] **BY PERSONAL DELIVERY:** By personally delivering said document(s) to the party or parties listed above at the addresses listed above.

[XX] **BY ELECTRONIC MAIL:** OnMay 1, 2008, by use of electronic "email" address dla@svlg.com, I served the above-named document[s] on the party[ies] named above, in the above-referenced matter, by transmitting by electronic mail to each party's electronic "email" address listed above. The electronic "email" address I used complied with California Rules of Court, Rule 2.260, and no error was reported by the computer. Pursuant to California Rules of Court, Rule 2.260(c), I caused the computer to print a transmission record of the transmission, a copy of which is attached to this declaration.

I declare under penalty of perjury under the laws of the state of California that the foregoing

is true and correct, and that this declaration was executed on May 1, 2008, at San Jose, California.

_____
Debi Adams

Silicon Valley
Law Group
25 Metro Drive
Suite 600
San Jose, CA 95110
(408) 573-5700

**PROOF OF SERVICE**

# EXHIBIT B

# EXHIBIT B

1   SEDGWICK, DETERT, MORAN & ARNOLD LLP
     PAUL RIEHLE  Bar No. 115199
2   RANDALL BLOCK  Bar No. 121330
     JIA-MING SHANG Bar No. 233326
3   One Market Plaza
     Steuart Tower, 8th Floor
4   San Francisco, California 94105
     Telephone: (415) 781-7900
5   Facsimile: (415) 781-2635

6   Attorneys for Defendants and Cross-Complainants
     Brian Caffyn and XS Holding B.V.

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF SANTA CLARA

10

11   XET HOLDING CO., LLC, et al.,       CASE NO. 107CV092388

12

13         Plaintiffs,           **DEFENDANTS AND CROSS-**
                             **COMPLAINANTS BRIAN CAFFYN'S AND**
      v.                    **X.S. HOLDING B.V.'S SECOND AMENDED**
14                                **CROSS-COMPLAINT**
     XS HOLDING B.V., et al.,
15

16         Defendants.

17

18   XS HOLDING B.V. and BRIAN
     CAFFYN,                   JUDGE:   Hon. Brian Walsh
                           DEPT.:   9
19         Cross-Complainants,

20       v.                  ACTION FILED:   August 20, 2007
                           TRIAL DATE:   October 6, 2008
21   XSLENT, LLC, ATIRA
     TECHNOLOGIES, LLC, MARTIN N.
22   LETTUNICH and ROES 1–50, inclusive,

23         Cross-Defendants.

24

25   And Related Cross-Action.

26

27

28   **SEDGWICK**
     DETERT, MORAN & ARNOLD LLP

1    Defendant and Cross-Complainant XS HOLDING B.V. ("XS Holding"), a Dutch

2  corporation, and Defendant and Cross-Complainant BRIAN CAFFYN ("Mr. Caffyn"), an

3  individual, (collectively "Cross-Complainants") allege in this Second Amended Cross-Complaint

4  against Cross-Defendant MARTIN N. LETTUNICH, an individual, Cross-Defendant STEFAN

5  MATAN, an individual, Cross-Defendant LISA GALLAGHER, an individual, Plaintiff and

6  Cross-Defendant XSLENT, LLC ("Xslent"), a limited liability company, Plaintiff and Cross-

7  Defendant ATIRA TECHNOLOGIES, LLC ("Atira Technologies"), a limited liability company,

8  and Cross-Defendants ROES 1-50, inclusive ("Roe Cross-Defendants") (collectively "Cross-

9  Defendants"), as follows:

10                    JURISDICTION AND PARTIES

11    1.    Cross-Complainant XS Holding is a Dutch corporation with its principal place of

12  business in Amsterdam, The Netherlands.

13    2.    Cross-Complainant Mr. Caffyn is an individual residing in Miami Beach, Florida.

14  At all times material, Mr. Caffyn was a Manager of Plaintiff XET Holdings Co., LLC ("XET")

15  and Plaintiff and Cross-Defendant Xslent Technologies, LLC ("XT") (collectively, the

16  "Companies").

17    3.    Cross-Defendant Lettunich is an individual residing in Los Gatos, California.  At

18  all times material, Cross-Defendant Lettunich was a Manager of Cross-Defendant Xslent, Cross-

19  Defendant Atira Technologies, as well as XET and XT.  Cross-Defendant Lettunich is an

20  attorney licensed to practice law in the State of California.

21    4.    Cross-Defendant Stefan Matan is an individual residing in Novato, California.  At

22  all times material, Cross-Defendant Matan was a manager of Cross-Defendant Xslent, Cross-

23  Defendant Atira Technologies, as well as XET and XT.

24    5.    Cross-Defendant Lisa Gallagher is an individual of unknown residence.  Cross-

25  Defendant Gallagher is an attorney licensed to practice in Florida, but not licensed to practice in

26  California.  Cross-Defendant Gallagher has been counsel for Xslent and XT and has occupied the

27  position of the Secretary of the Board of Managers of both XET and XT since the Companies

28  were formed until the Board of Managers meeting on August 16, 2007 when she was removed.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-2-
SECOND AMENDED CROSS-COMPLAINT

1  Cross-Defendant Gallagher formerly acted as counsel for Wind City Oil & Gas Management,

2  LLC ("Wind City"), one of Mr. Caffyn's companies.

3      6.    Cross-Defendant Xslent is a limited liability company with its principal place of

4  business in Santa Clara County.

5      7.    Cross-Defendant Atira Technologies is a limited liability company with its

6  principal place of business in Santa Clara County.

7      8.    Kore Technologies, LLC ("Kore") is a California limited liability company and a

8  member of Cross-Defendant Xslent.

9      9.    The names and capacities, whether individual, corporate, associate or otherwise,

10  of Roe Cross-Defendants, are unknown to Cross-Complainants, who therefore sue such Cross-

11  Defendants by fictitious names. Cross-Complainants will amend this Cross-Complaint to show

12  their true names and capacities when the names have been ascertained. Cross-Complainants are

13  informed and believe and thereon allege that each of the Defendants designated herein as Roe is

14  responsible in some manner for the events and happenings herein referred to, and that such

15  Cross-Defendants caused injuries and damages by such conduct, as herein alleged.

16                          FACTUAL ALLEGATIONS

17          Introduction

18      10.    In late 2006, Cross-Defendant Lettunich, Cross-Defendant Matan, and others,

19  sought out Mr. Caffyn as a potential business partner. Mr. Caffyn had a successful track record

20  of more than 20 years in the development, funding and growth of alternative energy industries.

21  Indeed, Mr. Caffyn has served, and continues to serve, in high level positions of several such

22  companies. Mr. Caffyn has grown and developed such companies from their founding to

23  thriving businesses worth hundreds of millions of dollars and in one case over $1 billion in less

24  than 6 years. Attached hereto as Exhibit 1 is a true and correct copy of Mr. Caffyn's curriculum

25  vitae listing some of his accomplishments.

26      11.    Mr. Caffyn is the Managing Director of XS Holding. On or about December 12,

27  2006, Brian Caffyn in a hand shake deal caused $500,000 to be loaned to Cross-Defendant

28  Martin Lettunich to invest in developing certain proprietary technologies related to the solar

SF/1506669v1                    -3-
                  SECOND AMENDED CROSS-COMPLAINT

1   power industry and certain software applications. On January 10, 2007, a memorandum of

2   understanding ("MOU") was entered into for purposes of beginning the process of developing

3   and marketing those technologies. On April 7, 2007, two companies – XET and XT – were

4   formed to that end. Mr. Caffyn, through his affiliated entities, funded the parties' endeavor

5   beginning December 2006 and until Cross-Defendant Lettunich improperly returned

6   $1.75 million in August 2007. In January 2008, XS Holding loaned XET another $250,000.

7   Total funding to date is in excess of $10 million (inclusive of $1.75 million in funds improperly

8   returned to XS Holding by Cross-Defendant Lettunich). A total of $8.5 million has been

9   provided exclusive of the $1.75 million improperly returned by Lettunich.

10          12.     Shortly after the start of funding from Mr. Caffyn, and just days before the

11  Companies were formed, Cross-Defendant Lettunich set in motion a plot to misappropriate

12  company assets by diverting them to an otherwise unrelated company named WorldSpace, LLC

13  ("WorldSpace"), a company that Cross-Defendant Lettunich solely owns. Cross-Defendant

14  Lettunich also schemed to transfer the right to intellectual property ("IP") of XET and XT into

15  WorldSpace.

16          13.     Beginning less than a month after the Agreements were signed, Cross-Defendants

17  Lettunich and Matan acted in concert to (a) strip Mr. Caffyn and his company XS Holding of

18  their bargained-for rights and protections under the Agreements, and (b) remove Mr. Caffyn and

19  David Tinsley from the Board of Managers of the Companies in violation of the Agreements.

20          14.     Cross-Defendant Lettunich, with Cross-Defendants Matan, have induced XS

21  Holding's and Mr. Caffyn's actions with fraudulent misrepresentations, have engaged in

22  undisclosed self-dealing, have taken numerous actions with respect to the Companies in excess

23  of their authority, have violated the Agreements themselves and, Mr. Lettunich and Mr. Matan,

24  by virtue of their roles as Managers of Class A Member Xslent and Atira, have caused those

25  entities to breach the Agreements. Lettunich has refused to explain discrepancies in the

26  Companies' financial records. According to his own financial reconciliation, Lettunich has taken

27  millions more from the companies than he put in, while refusing to take cash from XS resulting

28  in XT firing all of its essential employees and thereby driving XT into the ground and forcing it

SEDGWICK
DETERT, MORAN & ARNOLD LLP

into a divestiture of its IP to an entity it does not control and with reduced ownership, and leaving both XT and XET with current liabilities in excess of its assets and potentially bankrupt. Cross-Defendants Lettunich's and Matan's misconduct includes the following:

- <u>Self-Dealing</u>: Cross-Defendant Lettunich owns WorldSpace and planned for Cross-Defendants Matan to have an equity interest in that Company as well. When Cross-Defendants Lettunich and Matan signed the Agreements on April 7, 2007, they were scheming to transfer the right to much of the XET and XT IP to WorldSpace. They planned through a licensing agreement to transfer the economic benefit of the XET and XT technologies to Cross-Defendants Lettunich and Matan through this vehicle as well. Funds provided by XS Holdings for XT were transferred to WorldSpace, as well as to pay WorldSpace bills.

- <u>Material Misrepresentations</u>: Cross-Defendants Lettunich and Matan have made numerous fraudulent misrepresentations to the detriment of Mr. Caffyn and XS Holding. For example, they misrepresented their investment in the companies which had created the technology and the test results of the solar technology one of those companies developed. They prepared minutes of a purported June 28, 2007 meeting (there was no quorum), stating that Mr. Caffyn and Mr. Tinsley had resigned from the Board of Managers; in fact, neither had done so. Cross-Defendants Lettunich and Matan fraudulently urged Mr. Caffyn to resign as CEO and President ("CEO/President") of XET, stating it would be "for the good" of the company, because Mr. Caffyn had been named, along with dozens of others, in a "Not in my back yard" ("Nimby") letter sent by some New York State property owners to the Department of Justice opposing a wind power project. As even Cross-Defendant Lettunich himself later admitted, the Nimby letter was a pretext.

- <u>Failure to Provide Company Records and to Explain Financial Record Discrepancies</u>: As Members and Managers of XET and XT, Mr. Caffyn and XS Holding are entitled under the Agreements to examine Company records at their request. The few Company records that Plaintiffs have produced demonstrate serious financial discrepancies and reveal that Lettunich has misappropriated company funds for his personal use.

- <u>Starving the Companies</u>: According to his own Financial Reconciliation, Lettunich has taken millions from investors more than has gone into the companies. He also returned $1.75 million from XS Holding in August 2007 solely to advance his position in this litigation. Ironically, and apparently as an attempt to inoculate himself against this serious charge, Lettunich has claimed that XS Holding is involved in this litigation, which he started, to starve out the companies.

- <u>Other Ultra Vires Acts and Violations of the Agreements</u>: Cross-Defendants Lettunich and Matan, have engaged in a variety of ultra vires activities and have violated the Agreements in numerous ways. For example, they purported to terminate Tinsley without Mr. Caffyn's knowledge, let alone his approval, as required by the Agreements. Moreover, they claimed that, and have acted as though, XS Holding has lost its two votes on the Companies' Boards of Managers, and its consent rights as to major actions by the Companies despite the provisions in the Agreements to the contrary.

15.    For these reasons, and the numerous additional reasons detailed below, Mr. Caffyn and XS Holding are entitled to the damages, declaratory relief and injunctive relief sought in this Cross-Complaint.

<u>Formation and Capitalization of XET and XT and Operating Agreements of XET Holding Co., LLC and Xslent Technologies, LLC</u>

16.    Beginning in late 2006, Mr. Caffyn, Cross-Defendants Lettunich and Matan, as well as others, began talks and negotiations regarding the formation of certain technology companies. Mr. Caffyn's affiliated company began funding in December 2006. Those talks resulted in the consummation of a MOU on January 10, 2007 and an amended MOU on February 25, 2007, and ultimately in the formation of XET and XT after Mr. Lettunich significantly renegotiated the deal to the detriment of XS.

17.    As part of the negotiations, it was agreed that Mr. Caffyn would be CEO/President of XET Technologies, LLC and offered a 5% management carry in connection with his engagement.

18.    XS Holding invested significant amounts of money into XET and XT based on the representations and assurances from Cross-Defendant Lettunich that Mr. Caffyn would manage the business of XET and ensure its successful growth.

19.    Before the Companies' operating agreements were signed, Mr. Caffyn made clear that he wanted to have the ability to influence the global strategy of XET or XT by persuading only one of the other three Managers – Cross-Defendants Lettunich and Matan, as well as David Tinsley – to vote with him on major issues. Mr. Caffyn asked for and received the assurance from each of Messrs. Lettunich, Matan and Tinsley that they would be open to Mr. Caffyn persuading each of them individually to Mr. Caffyn's position.

20.    As partial compensation for being the sole initial provider of the operating capital, Mr. Caffyn negotiated with Cross-Defendants Lettunich and Matan, as well as others, for the following four rights and protections (among other rights and protections) for Mr. Caffyn and XS Holding, which are memorialized in the Companies' Agreements: (1) for the Companies to take any of certain "Major Actions" under the XET and XT operating agreements, XS Holding must give its written consent; (2) XS Holding has two votes on each of the Companies' Boards of

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  Managers; and (3) Mr. Caffyn would be CEO/President of XET. and (4) the investment would be

2  made over time and XS was not obliged to make any investments beyond the initial investment

3  of $6 million in total. As a counterbalance to these extensive rights of XS even in the event in

4  which XS did not fully fund all of the originally envisioned investment, Mr. Lettunich negotiated

5  in a related document (the Members Agreement attached as **Exhibit 9**) signed at the same time

6  that in the event that XS stopped funding that the company would have the ability to repay XS in

7  full within 90 days and repay XS at par and thereby eliminate all of XS Holding's rights in the

8  event that XS did not complete the full investment of $7.5 million in each company.

9       21.    In order to better focus his time and energies working on, creating and leading the

10  Companies, Mr. Caffyn   forwent certain other lucrative business opportunities, including

11  conducting fire sales of his interests in two companies

12       22.    Unbeknownst to Mr. Caffyn, before the Agreements were signed, former

13  employee and in-house counsel for Wind City, Cross-Defendant Gallagher, betrayed Mr. Caffyn

14  and XS Holding by disclosing their confidential bargaining positions with respect to certain

15  agreements that ultimately were consummated.  This occurred after Cross-Defendant Lettunich

16  hired Cross-Defendant Gallagher away from her job working for Mr. Caffyn's company by

17  offering Ms. Gallagher, a first year lawyer, the following:  a 30% pay raise; an equity interest in

18  her choice of XET, XT or WorldSpace; and a job title of Executive Vice President.  Cross-

19  Defendant Lettunich did not disclose the stock option arrangement to Mr. Caffyn and he had no

20  authority to offer it to Cross-Defendant Gallagher as relates to XT and XET because such

21  transfers are not permitted without the consent of XS Holding.

22       23.    On or about April 7, 2007, XS Holding and XT entered into an agreement entitled

23  "Operating Agreement for XET Holding Co., LLC" (the "XET Operating Agreement").

24  According to the XET Operating Agreement prepared by Lettunich, XET is comprised of

25  Class A Member XT and Class B Member XS Holding.  Mr. Caffyn executed the XET Operating

26  Agreement on behalf of XS Holding.  Cross-Defendants Lettunich and Matan, as well as

27  Mr. Tinsley, signed on behalf of XT.  A true and correct copy of the fully executed XET

28  Operating Agreement is attached hereto as Exhibit 2.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

24.    According to Exhibit A to the XET Operating Agreement, Class B Member XS Holding is the minority member in XET because Class A Member XT owns 90% of the total units of stock in XET, and Class B Member XS Holding owns 10% of the total membership units in XET.

25.    On April 7, 2007, XS Holding, Xslent and "Atira, LLC" entered into an agreement entitled "Operating Agreement for Xslent Technologies LLC" (the "XT Operating Agreement"). According to the signature page of the XT Operating Agreement, XT is comprised of Class A Member "Atira, LLC," Class A Member Xslent and Class B Member XS Holding. Mr. Caffyn executed the XT Operating Agreement on behalf of XS Holding and Cross-Defendant Lettunich signed the XT Operating Agreement on behalf of Xslent and Atira, LLC. A fully executed copy of the XT Operating Agreement is attached hereto as Exhibit 3.

26.    According to Exhibit A to the XT Operating Agreement, Class A Member Xslent owns 90% of the total membership units in XT and Class B Member XS Holding owns 10% of the total membership units in XT.

27.    Despite Atira, LLC being listed on the signature page as a Class A Member in XT, no ownership interest is listed for Atira, LLC in Schedule A to the XT Operating Agreement: only Xslent has a Class A ownership interest. Moreover, there is no company by the name of "Atira, LLC" registered as a Nevada limited liability company, which is where Cross-Defendant Lettunich has represented that Atira, LLC is registered.

28.    According to Cross-Defendant Lettunich, the proper party to the Agreement should have been "Atira Technologies, LLC" and Atira Technologies, LLC should be listed under Schedule A as having a 67.5% ownership interest in XT. Cross-Defendant Lettunich and his attorneys were responsible for preparing Schedule A. Lettunich had previously told members of Xslent that a new entity would be formed with Xslent owning 75% of the new entity and Atira 25% of the new entity. Put another way, Lettunich told different things to different people on the same subject of the basic issue of ownership interests.

29.    The dispute over relative ownerships by Xslent and Atira was resolved in part by a settlement agreement dated on or about April 21, 2008. Key provisions of the parties'

SEDGWICK
DETERT, MORAN & ARNOLD LLP

1   agreement were that : (1) the XT intellectual property was transferred to a new entity named Big

2   Kahuna Technologies, LLC, not managed or controlled at all by Lettunich, and which is owned

3   89.9% by Xslent, .1% by David Tinsley, and 10% by XS Holding; (2) Martin Lettunich was

4   removed from control over Xslent; and (3) XT would be owned 10% by XS Holding as Class B

5   Member, and the remaining 90% to be held as Class A units and the Class A units in turn would

6   be held 89% by Atira and 11% by Xslent.

7           30.    Section 3.1.2 of the Agreements provide, inter alia, that XS Holding might make

8   certain capital contributions totaling $7.5 million to both XET and XT according to a schedule

9   set forth therein.  Pursuant to the Agreements, after the initial payments in April 2007, XS

10  Holding's decision to not to fund the balance of payments were "at Class B Member's option"

11  (See Section 3.1.2 of the Operating Agreements).  After the initial payment to XET and XT, not

12  funding according to that schedule is not a breach of the Agreements; rather, if XS Holding did

13  not fund according to that schedule, the Class A members of the Companies would have the

14  opportunity to elect certain remedies in the Agreements and in a related Member's Agreement

15  also executed on April 7, 2007, assuming that the Class A members were not themselves in

16  material breach of the Agreements.  XS Holding was required to contribute $2.5 million to XET

17  within two days of the execution of the XET Operating Agreement, with the balance of

18  $5 million payable "at Class B Member's option" beginning May 1, 2007 and continuing on the

19  first day of each month thereafter in increments of $500,000 until the remainder of the

20  $7.5 million was paid.  XS Holding was required to contribute $3.5 million to XT within two

21  days of the execution of XT Operating Agreement, which it did, with the balance "at Class B

22  Member's option" payable beginning May 1, 2007 and continuing on the first day of each month

23  thereafter in increments of $500,000 until the remainder of the $7.5 million was paid.

24          31.    XS Holding has contributed a total of $10,000,001 to the Companies (inclusive of

25  the $1.75 million in funds improperly returned to XS Holding by Cross-Defendant Lettunich, in

26  concert with Cross-Defendant Matan).  A total of $8.5 million has been provided exclusive of the

27  $1.75 million improperly returned by Lettunich.  An affiliate of XS Holding began funding the

28  Companies before the Agreements were consummated in April of 2007.  On each of the

SEDGWICK
DETERT, MORAN & ARNOLDLLP

-9-

SECOND AMENDED CROSS-COMPLAINT

1  following dates, an affiliate of XS Holding contributed $500,000: December 12, 2006;

2  January 22, 2007; and February 21, 2007. On March 14, 2007, Mr. Caffyn's affiliate company

3  contributed $250,000, and on March 16, 2007, XS Holding or its affiliate contributed another

4  $150,000. Sections 3.1.1 and 3.1.2 of the Operating Agreements provide that XT and XET

5  would assume the preformation loans made by XS Holding's affiliate and that XS Holding could

6  apply those loans to satisfy in part its initial capital contribution, which it did. XS Holding

7  contributed $125,000 on April 12, 2007 and $30,645 on April 13, 2007. On April 12, 2007, XS

8  Holding contributed $2,363,000 to XT. On April 13, 2007, XS Holding contributed $1,581,356

9  to XET. On May 1, 2007, XS Holding contributed $500,000 to XT and $500,000 to XET. On

10  May 30, 2007, XS Holding contributed $500,000 to XT and $500,000 to XET. On July 17, XS

11  Holding contributed $250,000 to XET. On August 13, XET contributed $1 million to XT and

12  $750,000 to XET. On August 13, XS Holding funded $1 million to XT and $750,000 to XET,

13  the total scheduled amount under each of the Operating Agreements. Lettunich, however,

14  returned the $1.75 million from XS Holding in August 2007 solely to advance his position in this

15  litigation, resulting in both XT and XET becoming insolvent.

16      <u>Cross-Defendants Lettunich and Matan Never Intended to Honor the Operating</u>
        <u>Agreements</u>

17

18      32.    In an e-mail dated April 17, 2007 – just ten days after the Agreements were

19  signed – a John Stewart e-mailed Cross-Defendant Lettunich stating that "Per our discussion, we

20  will begin the process to find better money". Thus, Cross-Defendants Lettunich and Matan never

21  intended to honor the Agreements if a better funding source than Mr. Caffyn and XS Holding

22  could be found. Attached hereto as Exhibit 4 is a copy of the 04/17/07 e-mail.

23      33.    In addition, unbeknownst to Mr. Caffyn, sometime in early 2007, Cross-

24  Defendants Lettunich and Matan, as well as Mr. Tinsley, secretly agreed to vote as a block on all

25  issues of significance with respect to the Companies. This secret agreement is reflected, inter

26  alia, in a series of April 14, 2007 e-mails. The April 14 e-mails are attached hereto as Exhibit 5.

27  That agreement nullified Mr. Caffyn's and XS Holding's bargained-for right to influence global

28  decision making for the Companies.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

34.    In late May or early June, 2007, unbeknownst to XS Holding and Brian Caffyn, Lettunich prepared or caused to be prepared voting agreements between himself, on the one hand, and David Tinsley or Stefan Matan, on the other hand. Those voting agreements later were executed by Mr. Tinsley and Mr. Matan in or about mid-June 2007. Lettunich has used those agreements to claim "One Man Rule" over XET and XT.

Undisclosed Self-Dealing by Cross-Defendants Lettunich and Matan

35.    In April 2007, Cross-Defendant Lettunich retained Walter Groteke to become CEO of WorldSpace, a company that Cross-Defendant Lettunich owned and had already incorporated. Cross-Defendant Matan was to acquire an ownership interest in WorldSpace. WorldSpace was formed to develop products, marketing plans and sales programs for software applications and power conversion technologies for solar energy and other energy conversion applications. Cross-Defendant Lettunich repeatedly advised Mr. Groteke that XT and XET would assign the exclusive sales, marketing, and distribution rights of much of their respective technologies to WorldSpace. Through those assignments, which included a possible licensing agreement between the Companies and WorldSpace, Cross-Defendant Lettunich schemed to transfer most of the economic benefit to themselves through WorldSpace. Thus, while Mr. Caffyn pursued an aggressive strategy to conduct product and market research, and to develop engineering, sales and marketing programs for the XET products to be sold, marketed and distributed by XET (including XT products under license), Mr. Groteke and WorldSpace were doing the same thing. Neither Mr. Caffyn nor Mr. Groteke was aware of the other's activities.

36.    Attached hereto as Exhibit 6 is the April WorldSpace CEO offer letter, effective April 1, 2007, from Cross-Defendant Lettunich as Chairman of WorldSpace to Mr. Groteke, including an accompanying employee agreement. The employee agreement identifies XT and XET as owners of IP with which WorldSpace would be working. Mr. Groteke moved forward based on the understanding that WorldSpace had or would have an exclusive license for all XET and XT technologies. Since Mr. Groteke became CEO of WorldSpace, everything that WorldSpace has worked on has involved XT- or XET-related IP and technologies.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1       37.    After Mr. Groteke became CEO of WorldSpace effective April 1, 2007, he hired

2    experienced personnel to conduct product and market research, program and product

3    management, and to develop sales and sales engineering programs for the XT and XET products

4    to be sold, marketed, and distributed by WorldSpace. For example, effective May 1, 2007,

5    Mr. Groteke hired a Director of Product and Market Research and effective May 7, 2007 he hired

6    the Director of Product and Product Management.

7       38.    To pay for its operating costs, WorldSpace received $200,000 from Cross-

8    Defendant Lettunich by wire transfer on April 30, 2007 and $100,000 by cashier's check in June

9    2007. Cross-Defendant Lettunich has admitted that the $300,000 paid to WorldSpace came from

10    funds provided by XS Holding.

11       39.    Cross-Defendant Gallagher, an attorney, at all times acted as corporate secretary

12    for WorldSpace.

13       40.    SpamEvaders is a Florida corporation founded by Wes Skinner, Walter Groteke

14    and others about two and a half years ago. Martin Lettunich has a 12-15% interest in

15    SpamEvaders.

16       41.    "Kahuna" is intellectual property owned by XT. Kahuna is used in SpamEvaders'

17    anti-spam application. Cross-Defendant Lettunich stated on several occasions that SpamEvaders

18    could use the Kahuna technology in its anti-spam application without cost. SpamEvaders has

19    used Kahuna and has never paid a licensing fee for the technology. According to Cross-

20    Defendant Lettunich, he planned to have SpamEvaders license XT technology. Cross-Defendant

21    Lettunich never obtained approval from XT's Board of Managers to provide Kahuna to

22    WorldSpace.

23       42.    Beginning on or about May 2007, at the direction of Cross-Defendant Lettunich,

24    XT personnel began working on SpamEvaders' network clustering technology. SpamEvaders

25    was not charged by XT for the time spent by the XT employees. In addition, XT paid

26    SpamEvaders money for SpamEvaders' work on XT products.

27       43.    Beginning in April 2007 and continuing thereafter, Cross-Defendant Lettunich

28    and Mr. Groteke discussed WorldSpace purchasing SpamEvaders. The deal would result in

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

SECOND AMENDED CROSS-COMPLAINT

1    SpamEvaders becoming a subsidiary of WorldSpace. SpamEvaders' shareholders would then

2    own 10% of WorldSpace. Cross-Defendant Lettunich would then own 85 – 90% of WorldSpace.

3         44.    Further, Cross-Defendant Lettunich caused XT to incur legal expenses for (1)

4    work related to Cross-Defendants Lettunich's and Matan's negotiations of the Companies'

5    Agreements and (2) WorldSpace's legal fees. These fees were incurred despite the fact that (1)

6    neither of the Companies' Agreements provided for the payment of such legal fees and (2)

7    Mr. Caffyn and Cross-Defendant Lettunich expressly agreed that their companies would pay their

8    own legal fees incurred in connection with the negotiation of the Companies' Agreements.

9         45.    Cross-Defendant Lettunich never disclosed to Mr. Caffyn or XS Holding the

10   dealings between the Companies and WorldSpace or SpamEvaders, or that XT paid legal fees in

11   connection with the negotiation of the Agreements and for WorldSpace.

12        <u>Pertinent Provisions of the Agreements</u>

13        46.    On behalf of the Class B Member XS Holding, Mr. Caffyn signed the XET

14   Operating Agreement and the XT Operating Agreement based on certain promises,

15   representations and agreements that Minority Member XS Holding would have certain rights and

16   protections. Chief among them were that (1) regardless of any conflict with any other part of the

17   Agreements, Minority Class B Member XS Holding retained its veto power over any Major

18   Actions under Section 4.12; (2) if it funded to the requisite level, Class B Minority Member

19   XS Holding would have two votes on the Companies' five member Boards of Managers under

20   Section 5.1B; and (3) Mr. Caffyn would be CEO/President of XET under Section 5.8E of the

21   XET Operating Agreement. Even before the Agreements were signed, the Class A Member, led

22   by Cross-Defendants Lettunich and Matan conspired to try to eviscerate those rights.

23        47.    Section 4.6 of the Agreements provides that Members or Members' affiliates may

24   transact business with the company so long as, inter alia, the transactions are made with the

25   "prior approval of the Managers." Section 4.6 and Section 5.6 of the Agreements require that

26   any transaction between the Company and its Managers or Members (or their affiliates) be at

27   arms length and on commercially reasonable terms.

28        48.    Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

SECOND AMENDED CROSS-COMPLAINT

1  Operating Agreement prohibit all related party transactions without the prior written consent of

2  Class B Member XS Holding.

3      49.    Section 3.1.1 of the Agreements requires that within two days of execution,

4  Xslent and Atira Technologies were to contribute their intellectual property to XT.

5      50.    Section 3.1.1 of the XT Operating Agreement also provides for "the assumption

6  of approximately $1,000,000 of loans made to Atira, LLC, Xslent, LLC, or Martin N. Lettunich

7  described on Schedule 3.1.1 hereto."

8      51.    Section 5.1 of the XT Operating Agreement provides that Messrs. Caffyn,

9  Lettunich, Tinsley and Matan are the initial Managers on the Board of Managers of XET and XT.

10      52.    Section 5.1B of the Agreements provides, inter alia, that "If there is more than one

11  Manager, then except as otherwise expressly provided in this Agreement, all actions of the

12  Managers may be taken only by the approval of a majority of the votes of the Board of

13  Managers." Section 5.1B of the Agreements also provides, inter alia, that "Each member shall

14  have one (1) vote each, except Brian Caffyn shall have two (2) votes at any meeting of the Board

15  of Managers where more than three Managers attend so long as (i) he is a member of the Board

16  of Managers, (ii) Class B Member owns at least a Percentage Interest of five percent (5%) or

17  more and Class B Member is not in default of its obligation to make its Capital Contribution

18  described in Section 3.1.2, and (iii) Class B Member shall have fully paid all amounts then due

19  under Section 3.1.2 of [the Agreements]."

20      53.    Section 5.1C of the Agreements provides, inter alia, that "no Manager, acting

21  alone, shall be authorized to sign checks, documents, contracts or other instruments on behalf of

22  the Compan[ies], except as authorized by the Board of Managers."

23      54.    Section 5.1D of the Agreements provides, inter alia, that "A majority of the

24  authorized number of votes of the Managers constitutes a quorum of the Managers for the

25  transaction of business. Except to the extent that [the Agreements] expressly require[ ] the

26  approval of all Managers, every act or decision done or made by a majority of the votes of the

27  Managers present at a meeting duly held at which a quorum is present is the act of the

28  Managers." Section 5.1D further provides in pertinent part: "Any action required or permitted to

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-14-

SECOND AMENDED CROSS-COMPLAINT

1  be taken by the Managers may be taken by the Managers without a meeting, if a majority of the

2  votes of the Managers individually or collectively consent in writing to such action." Section

3  5.1D concludes: "Actions may be taken by the Managers without a meeting, and without action

4  by written consent in lieu of a meeting, if otherwise approved by a majority of the Managers."

5       55.    Section 5.2C of the Agreements provides, inter alia, that "Any Manager, other

6  than Mr. Caffyn . . . may be removed at any time, with or without cause." (Emphasis added.)

7       56.    Section 5.3A(v) of the Agreements provides, inter alia, that majority Manager

8  approval is required to "Sue on, defend, or compromise any and all claims or liabilities in favor

9  of or against the Company."  Section 5.3A(vi) requires Board of Managers approval to retain

10  legal counsel.

11       57.    Section 5.8G of the Agreements requires, inter alia, that the Secretary prepare and

12  maintain the minutes for Board of Managers meetings.

13       58.    Section 5.10 of the Agreements provides that the Managers owe the Companies

14  and the Members the duties of loyalty and care.

15       59.    Sections 10.1 and 10.2 of the Agreements provides that Members and Managers

16  have the right to inspect and obtain the records of the Companies, including, but not limited to,

17  the following:  financial statements (Section 10.1F); "books and records as they relate to the

18  internal affairs of the Compan[ies] (Section 10.1G); and income statements (Section 10.2B(iii)).

19       60.    Section 10.3B of the Agreements provides that the managers shall cause to be

20  prepared all information necessary to prepare members' tax returns and that within 90 days of the

21  end of each taxable year the managers shall cause to be sent such information as is necessary to

22  complete the members' income tax returns.

23       61.    Section 10.8 of the Agreements provides that a "Tax Matters Partner" shall

24  oversee the Companies' affairs and that the Company's initial Tax Matters Partner shall be

25  Martin Lettunich.

26       62.    Nowhere in the XT Operating Agreement or otherwise did Cross-complainants

27  agree to pay for the pre-formation liabilities of XT.  Further, it was agreed that each party would

28  pay its own legal costs related to the entities to be formed.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

<u>In Furtherance of Their Self-Dealing and Secret Scheme to Use Mr. Caffyn's Money but Deny Him any Leadership Role in the Companies, Cross-Defendants Lettunich and Matan (1) Violated and Caused Xslent and Atira Technologies to Breach the Agreements, (2) Made Material Misrepresentations and Omissions, (3) Breached Their Fiduciary Duties, and (4) Committed Numerous Ultra Vires Acts</u>

63.     On April 24, 2007, the Companies conducted Board of Managers Meetings, which were attended by Mr. Caffyn and Cross-Defendants Lettunich, Matan and Gallagher.  The minutes of the April 24 meeting were recorded by Cross-Defendant Gallagher.  On or about June 4, 2007, Mr. Caffyn notified Cross-Defendants Gallagher, Lettunich and Matan that the April 24 meeting minutes were inaccurate because they reflected votes that were never taken and actions that the Boards never decided.  In addition, the minutes of the April 24 meeting were taken by Cross-Defendant Gallagher in a manner that favored Cross-Defendant Lettunich to the detriment of Mr. Caffyn.  In light of those inaccuracies, Mr. Caffyn requested that Ms. Gallagher step down as Secretary.

64.     In late May or early June 2007, Mr. Caffyn, as a Manager of XT, asked for a budget and other financial information from Cross-Defendant Lettunich, as well as information about the Companies' IP registration with the U.S. Patents and Trademark Office.  Cross-Defendants Lettunich, Matan and others responded by making a series of material misrepresentations to Mr. Caffyn to remove him from the CEO/President position at XET and eviscerate the Class B Member's minority rights under the Agreements.

65.     In May or early June 2007, Mr. Tinsley attended a meeting with Cross-Defendants Lettunich, Matan and Gallagher.  At that meeting, Cross-Defendants Lettunich Matan notified Mr. Tinsley that Mr. Caffyn was being voted out of his position as CEO/President of XET, and eventually removed as a manager of XET and XT.  Mr. Tinsley asked where they would obtain money to run the Companies if Mr. Caffyn's financing was no longer available.  Cross-Defendant Lettunich told Mr. Tinsley that if Mr. Caffyn stopped funding, Mr. Caffyn's warrants in XET would come back to the company and could be sold to other investors on more favorable terms.

66.     Mr. Tinsley questioned Cross-Defendant Lettunich about why such a high-risk

SEDGWICK
DETERT, MORAN & ARNOLD LLP

1  plan was being pursued when the Companies already secured funding from Mr. Caffyn and

2  needed that money to operate.  Cross-Defendant Lettunich responded that Mr. Caffyn's other

3  companies would make far more money than the rest of "us".  Mr. Tinsley stated that he was not

4  happy with Cross-Defendant Lettunich's proposed course of action and that the amount of

5  potential earnings was enough for everyone and would allow them to continue to pursue the

6  software development business model.  Over Mr. Tinsley's objections and concerns, Cross-

7  Defendants Lettunich and Matan determined that removing Mr. Caffyn was the correct plan to

8  pursue, and that Mr. Caffyn was to be voted out as CEO/President of at the next Board meeting.

9       67.    On or about June 5, 2007, Cross-Defendant Matan scoured the internet for

10  negative information regarding Mr. Caffyn.  During that search, Cross-Defendant Matan found

11  the Nimby letter, sent by 94 residents of towns that were supposedly impacted by the

12  development of wind farms in which they claimed antitrust violations and complained that they

13  would be negatively impacted by the construction of nearby wind farms.  Cross-Defendant Matan

14  then showed the Nimby letter to Cross-Defendant Lettunich.  Cross-Defendant Lettunich said he

15  would use these allegations to get Mr. Caffyn to step down as CEO/President.  Cross-Defendant

16  Lettunich then told Mr. Tinsley that he had a way to get Mr. Caffyn to voluntarily resign as

17  CEO/President, but continue funding.  To that end, Cross-Defendants Lettunich, Matan and

18  Gallagher showed Mr. Tinsley the Nimby letter.  Cross-Defendant Lettunich told Mr. Tinsley

19  these allegations would affect the due diligence that Bechtel Corporation was supposed to

20  conduct for the purpose of establishing that XT could do business with them for the United

21  States government.  Cross-Defendants Lettunich, Matan and Gallagher never did any due

22  diligence to determine whether any of the assertions made in the Nimby letter were true, or, if

23  true, were of any significance to the Justice Department.

24       68.    Prior to the June 7, 2007 meetings for the Board of Managers of the Companies,

25  Cross-Defendants Lettunich, Matan and Gallagher, as well as Mr. Tinsley, met with Mr. Caffyn.

26  During that meeting, Cross-Defendants Lettunich, Matan and Gallagher presented the allegations

27  to Mr. Caffyn and asked that Mr. Caffyn resign as CEO/President of XET for the "good" of the

28  Companies.  Mr. Caffyn disagreed that the allegations would affect the operations of the

**SEDGWICK**
DETERT, MORAN & ARNOLDℓℓℓ

-17-
SECOND AMENDED CROSS-COMPLAINT

1   Companies or any due diligence proposed by Bechtel Corporation.  However, Mr. Caffyn said

2   that he would step down as CEO/President and resign as Manager for both Companies provided

3   certain conditions were met.

4          69.     Mr. Caffyn's conditions for resigning and continuing funding included

5   (a) amendment of the Agreements to provide that the Class B member,  XS Holding, would have

6   two votes at Board of Manager meetings even if the manager was not Mr. Caffyn, (b) the Board

7   of Managers' appointment of a competent CEO/President to replace Mr. Caffyn, and/or (c) a

8   going forward business arrangement (e.g., a licensing agreement to sell XET products in Europe).

9   Rather than fulfilling these conditions, Cross-Defendant Lettunich failed to act to amend the

10  Agreements on the two vote issue, took the XET CEO/President position himself and persisted

11  with a scheme to take the Companies' IP to WorldSpace.

12         70.     On or about August 5, 2007, Mr. Tinsley told Mr. Caffyn that the Nimby letter

13  was a pretext to get Mr. Caffyn to resign as CEO/President of XET.  Indeed, eight days later, on

14  August 13, 2007, even Cross-Defendant Lettunich admitted that the Nimby letter was a pretext

15  for ousting Mr. Caffyn from his position as CEO/President of XET.  And at the September 24,

16  2007 hearing on the parties' cross-motions for preliminary injunction, when the Court asked

17  whether the Nimby letter was a pretext, Cross-Defendant Lettunich tellingly responded,

18  "Depending on your definition of pretext."

19         71.     The XET Operating Agreement was breached by causing Mr. Caffyn to agree to

20  resign as CEO/President of XET.  Because of the Nimby letter pretext, Mr. Caffyn was unable to

21  discuss the true reasons for the request for his resignation and, as a result, did not have the

22  opportunity to convince one of the other Managers to vote with him.

23         72.     In June 2007, Mr. Tinsley began inquiring to Cross-Defendant Lettunich about

24  XT's finances.  Shortly thereafter, Cross-Defendant Lettunich, in concert with Cross-Defendants

25  Matan and Gallagher, ordered Mr. Tinsley to stay away from the Companies because of a

26  complaint of harassment by Cross-Defendant Gallagher.  This complaint of harassment was a

27  pretext by Cross-Defendants Lettunich and Matan to remove Mr. Tinsley from the Companies.

28  Then, on June 28, 2007, Cross-Defendants Lettunich and Matan purported to hold a meeting of

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-18-
SECOND AMENDED CROSS-COMPLAINT

1    the Board of Managers of XET and XT, and purported to issue minutes from that meeting. In

2    fact, no XT Board of Managers meeting occurred on June 28, 2007 because there was no quorum

3    as required by Section 5.1 D of the Agreements. During the purported meeting, Cross-Defendant

4    Lettunich, in concert with Cross-Defendants Matan, falsely represented that Mr. Tinsley and

5    Mr. Caffyn resigned as Managers of XET and XT when in fact they had not resigned. Cross-

6    Defendants Lettunich's and Matan's misrepresentations constituted a breach of their fiduciary

7    duties, as well as a breach of Section 5.10, and other provisions, of the Agreements.

8         73.    On July 3, 2007, XS Holding notified Cross-Defendant Lettunich of a potential

9    material breach of Section 3.1.1 of the Agreements for failing to cause Xslent and Atira

10   Technologies IP to be contributed to XT.

11        74.    On July 6, 2007 Mr. Caffyn sent a memorandum to Cross-Defendants Lettunich

12   and Matan, inter alia, (a) requesting a budget at the next XT and XET Board of Managers

13   meetings because none had been prepared thus far; (b) requesting an explanation regarding why

14   Mr. Tinsley resigned as reflected in the Board of Managers meeting minutes of June 28, 2007;

15   and (c) reflecting that Mr. Caffyn would resign as Manager if certain conditions were met.

16        75.    Also on July 6, 2007, Cross-Defendants Lettunich and Matan purported to send

17   Capital Notices under Sections 3.1.2 and 3.5 of the Agreements stating that XS Holding was late

18   in making its capital contributions. Section 3.5 of the Agreements provides that if a Class B

19   Member does not timely make the capital contributions required by Section 3.1.2, then the

20   Class A Members or Managers may personally deliver or send by U.S. Mail to the Class B

21   Member written notice of the failure to contribute, "giving him or her fourteen (14) days from the

22   date such notice is given to contribute the entire amount the capital contribution required at that

23   time." Section 3.5 goes on to state that if the Class B Member does not contribute during that 14

24   day period, "a majority of the Class A Members or majority of the Managers (other than Brian

25   Caffyn) may elect any one or more of the following remedies within 60 days after the failure to

26   contribute" including causing Class B Member XS Holding to lose its consent rights under

27   Section 4.12 and its ability to "elect" a Manager.

28        76.    Sending the Capital Notices and then claiming them to be effective to cause XS

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

SF/1506669v1

-19-

SECOND AMENDED CROSS-COMPLAINT

1    Holding to lose its 4.12 consent rights was a breach of sections 4.12 and 5.10 of the Agreements.

2    Section 4.12 states in relevant part as follows: "In the event of any conflict between this

3    Section 4.12 and the other provisions of this Agreement, this Section 4.12 shall control." Indeed,

4    Mr. Caffyn insisted on the inclusion of the preemption provision in Section 4.12 in the final

5    Agreements in order to nullify other provisions of the Agreements that purported to limit the

6    powers and rights of Class B Member XS Holding and its Manager Mr. Caffyn. Moreover, as to

7    XET, the notice is defective because in order for Xslent Technologies, LLC to act – here to sign

8    the Capital Notice – Section 5.10D requires a majority vote at a meeting with the Board of

9    Managers or a majority of the votes of the Managers; here, neither occurred. Indeed, the day

10   before the Capital Notices were sent, Lettunich's own counsel – Bernard Vogel III – confirmed

11   that written XT Manager approval was required to properly issue the XET Capital Notice when

12   he advised Cross-Defendant Lettunich via e-mail that the "Xslent Technologies, LLC Managers

13   will have to sign a written consent authorizing this Capital Notice." Finally, in all events,

14   performance by XS Holding was excused by Cross-Defendants' prior material misrepresentations

15   and breaches of the Agreements.

16       77.    On July 13, 2007, Cross-Defendants Lettunich and Matan purported to terminate

17   Mr. Tinsley from his position with XT. That alleged termination was ultra vires and a breach of

18   Section 4.12J of the XT Operating Agreement, which provide that Mr. Tinsley cannot be

19   terminated without the consent of the Class B Member. No consent was requested and it would

20   not have been given under the circumstances. The purported termination also was ultra vires and

21   constituted a breach of Section 5.1B of the XT Operating Agreement because Mr. Tinsley's

22   termination was not effectuated pursuant to a vote of the majority of the Board of Managers.

23   Additionally, the alleged termination was a breach of Cross-Defendants Lettunich's and Matan's

24   fiduciary duties, and therefore a breach of Section 5.10 of the Agreement.

25       78.    On or about August 5, 2007, Mr. Caffyn learned from Mr. Tinsley that

26   Mr. Tinsley had not resigned as a Manager contrary to the record presented in minutes of the

27   purported June 28, 2007 Board of Managers meetings. In fact, Cross-Defendant Lettunich has

28   admitted that Mr. Tinsley has never resigned in writing as a Manager from XET and XT as

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-20-

SECOND AMENDED CROSS-COMPLAINT

1  required by Section 5.2B of the Agreements.

2       79.    On or about August 12, 2007, Mr. Caffyn learned from Mr. Tinsley that the

3  Nimby letter was a pretext to remove Mr. Caffyn as CEO/President of XET. Mr. Tinsley is a

4  Manager of XET, XT, Atira Technologies, and Xslent. On August 12, 2007, while believing in

5  the primacy of his and XS Holding's Section 4.12 rights, not believing that he or XS Holding

6  was in breach of the Agreements, believing that no 3.5 rights to reduce XS Holding's rights had

7  been effected and believing that they would not be valid if then attempted to be exercised and

8  concerned about what other wrongful acts Cross-Defendant Lettunich had committed and that

9  Cross-Defendant Lettunich would run the Companies into the ground, Mr. Caffyn, in a belt and

10  suspenders approach, requested, and Mr. Tinsley agreed as a Manager of those Companies to

11  waive any remedies under Section 3.5 of the Operating Agreements so long as XS Holdings

12  agreed to fund its outstanding Capital Contributions.

13       80.    On August 13, 2007, XS Holding made capital contributions of $750,000 to XET

14  and $1 million to XT.

15       81.    On August 14, 2007, in furtherance of his scheme, Cross-Defendant Lettunich, in

16  concert with Cross-Defendant Matan, attempted to return to Mr. Caffyn and XS Holding the

17  $1.75 million in capital contributions paid by XS Holding despite the fact that Cross-Defendants

18  claimed that XET and XT were, and continue to be, in danger of running out of capital. The

19  reason that Cross-Defendants Lettunich and Matan attempted to return the funds was to advance

20  their position in this dispute. That attempted return constituted a breach of Cross-Defendants

21  Lettunich's and Matan's fiduciary duties, and therefore a breach of Section 5.10 of the

22  Agreements.

23       82.    On August 15, 2007 – two days after XS Holding paid the outstanding amounts

24  due – and in furtherance of his scheme, Cross-Defendants Lettunich and Matan sent by e-mail a

25  "Notice of Elections Under Section 3.5 to Class B Member" ("Notices of Elections") on behalf

26  of both XT and XET. In breach of the Agreements, including Section 4.12, these notices

27  purported to strip XS Holding and Mr. Caffyn of their rights and protections, including (1) XS

28  Holding's Section 4.12 rights, and (2) XS Holding's ability to "elect" a Manager. The sending of

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-21-

SECOND AMENDED CROSS-COMPLAINT

1   the notices also constituted a breach of Cross-Defendants Lettunich's and Matan's fiduciary

2   duties, and therefore a breach of Section 5.10 of the Agreements.  The Notices of Elections were

3   ineffective to cause XS Holdings to lose its consent rights and its ability to "elect" a Manager.

4   On August 16, 2007, the Notices of Election were sent by U.S. Mail.  Moreover, as to XET, since

5   the Capital Notice was defective, so too is the Notice of Election.  Further, any performance due

6   by XS Holding was excused by Cross-Defendants' misrepresentations and each of their prior

7   material breaches of the Agreements.  In addition, there is no available remedy under Section 3.5

8   of the Agreements to strip Mr. Caffyn of his two votes because XS Holding had funded and

9   owned at least a 5% interest in the Companies.  Also, the Notices of Election were not effective

10  in any event until after the August 16, 2007 Board of Managers meetings at which Mr. Caffyn

11  was elected Chairman, President and CEO and Cross-Defendant Lettunich was removed from

12  those positions; according to Section 14.14 of the Agreements, "Notice" is effective the earlier of

13  receipt by U.S. Mail or three days after mailing.

14          83.     Also on August 15, 2007, in furtherance of their scheme, Cross-Defendants

15  Lettunich and Matan purported to remove Mr. Tinsley as Manager of XET and XT.  That

16  claimed removal was a breach of Section 4.12 of the Agreements, which require the Class B

17  Member's consent to discharge Mr. Tinsley.  Moreover, the purported removal of Mr. Tinsley as

18  a Manager was not effective until after the August 16, 2007 Board of Managers meeting because

19  it was sent by U.S. Mail on August 16; pursuant to section 14.14, the "Notice" was effective

20  when received by mail or three days after mailing.

21          84.     On August 15, 2007, counsel for XS Holding sent to XT and Xslent a litigation

22  hold letter notifying Xslent to preserve all documents relevant to potential disputes between XT,

23  XET, Atira Technologies, Xslent, XS Holding and others.  The Litigation Hold Letter is attached

24  hereto as Exhibit 7.

25          85.     On August 16, 2007, there was a meeting of the Board of Managers of XET and a

26  meeting of the Board of Managers of XT.  All four Managers were present at each meeting:

27  Mr. Caffyn with two votes; Mr. Tinsley, Mr. Lettunich and Mr. Matan.  By a vote of a majority

28  of the votes of the Managers, Mr. Caffyn was approved as CEO/President and Chairman of XET

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  and of XT.  In further effort to avoid their misdeeds coming to light, Cross-Defendants Lettunich

2  and Matan denied that the meeting and vote were effective to make Mr. Caffyn CEO/President

3  and Chairman of the Board of both of the Companies.

4        86.     On the evening of August 16, 2007, in furtherance of their scheme, Cross-

5  Defendant Lettunich, in concert with Cross-Defendant Matan, caused the $750,000 capital

6  contribution to XET to be returned by wire to XS Holding.  The return of that money breached

7  the XET Operating Agreement because no Capital Notice was given, the act was not approved by

8  the Managers as required by Section 5.1D of the Agreements, it was not approved by the Class B

9  Member as required under Section 4.12, and was a breach of fiduciary duty under Section 5.10.

10       87.     On August 17, 2007, in furtherance of their scheme, Cross-Defendant Lettunich,

11  in concert with Cross-Defendant Matan, attempted to cause the $1 million capital contribution to

12  XT to be returned by a check to XS Holding dated August 17, 2007, and then succeeded in

13  causing that amount to be returned by wire on August 30, 2007 despite the fact that Cross-

14  Defendant Lettunich claimed that XT was, and continues to be, in danger of running out of

15  capital.  These actions were ultra vires and breached the Agreement because they were not

16  approved by the Managers, they were not approved by the Class B Member as required under

17  Section 4.12, and they were a breach of fiduciary duty under Section 5.10.

18       88.     On August 20, 2007, five days after the litigation hold letter was sent, Cross-

19  Defendants Lettunich and Matan caused this lawsuit to be filed on behalf of XET and XT.  The

20  retention of the Silicon Valley Law Group and initiation of this suit by Cross-Defendants

21  Lettunich and Matan was ultra vires and a breach of Sections 5.3A(v), (vi) of the Agreements

22  because it was not approved by a majority of the Board of Managers of either of the Companies.

23  The filing of this lawsuit also was a breach of Cross-Defendants Lettunich's and Matan's

24  fiduciary duties, and therefore a breach of Section 5.10 of the Agreements.

25       89.     As discussed above, Cross-Defendant Lettunich, in concert with Cross-Defendant

26  Matan, have engaged in undisclosed, self-dealing with respect to the Companies.  These acts of

27  self-dealing were without the prior approval of the Managers or of a majority interest of

28  Managers, and thus in breach of, inter alia, Sections 4.6 and 5.6 of both Agreements, as well as

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-23-
SECOND AMENDED CROSS-COMPLAINT

1 Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating

2 Agreement.

3       90.     Both before and after this litigation commenced, Cross-Defendant Lettunich

4 repeatedly has not permitted Mr. Caffyn and XS Holding to inspect the vast majority of financial

5 and other documentation of XT and XET in breach of Sections 10.1 and 10.2 of the Agreements.

6 Cross-Defendant Lettunich did not permit Mr. Caffyn to inspect the vast majority of documents

7 despite Mr. Caffyn's repeated requests to do so as a Manager, and pursuant to XS Holding's

8 rights to do so as a Member, of those entities.  Those failures to provide access to the

9 Companies' records also are a breach of Cross-Defendant Lettunich's fiduciary duties, and

10 therefore a breach of Section 5.10 of the Agreements.

11      91.     Cross-Defendant Lettunich's failure to provide Company documents also is a

12 breach of the November 14, 2007 contract, as detailed below.

13      92.     The Company records that Cross-Defendant Lettunich has allowed to be produced

14 demonstrate very serious financial discrepancies, Cross-Defendant Lettunich's mismanagement

15 of the Companies, breaches of the Agreements, breaches of fiduciary duty and fraud.

16      93.     The financial records of XT show a "Notes Receivable" of $1 million.  Cross-

17 Defendant Lettunich recently admitted that he took $1 million from XT, including some for

18 personal use, all without providing any documentation, including without providing Schedule

19 3.1.1 as required by the XT Operating Agreement.  Cross-Defendant Lettunich has never

20 produced a "note" documenting the receivable.  The note terms, such as interest rate and

21 repayment date, were never specified.  Cross-Defendant Lettunich also has offered numerous and

22 conflicting statements regarding the $1 million.

23      94.     Mr. Lettunich has admitted that he took $1.4 million from XT and gave it to

24 Xslent, LLC, a company in that he controlled at the time of the transfers.  It was not until August

25 when plaintiffs and cross-defendants produced a balance sheet for XT that Mr. Caffyn learned of

26 the approximately $1.4 million in transfers by Mr. Lettunich from XT to Xslent, LLC.

27 Mr. Lettunich has testified that the $1.4 million was "used to pay the preexisting debts of Xslent,

28 LLC."  Mr. Caffyn did not approve any transfers from XT to Xslent, LLC and there is no

**SEDGWICK**
DETERT, MORAN & ARNOLDLLP

-24-

SECOND AMENDED CROSS-COMPLAINT

1  provision for any such transfers in the XT operating agreement. While the transfers of funds for

2  payroll for XT employees most likely would have been approved, the remaining amounts have

3  never been documented nor approved. According to Lettunich's Financial Reconciliation dated

4  on or about February 13, 2008, $442,000 is unaccounted for. On or about April 21, 2008,

5  Lettunich agreed to indemnify Xslent for up to $602,000 regarding the transfers from XT to

6  Xslent.

7       95.    The balance sheet for XET as of July 31, 2007 reflects that $500,010 worth of

8  Class C shares in XET have been issued. Assuming that there was in fact an issuance of Class C

9  shares, it was not done pursuant to an amended version of the XET Operating Agreement signed

10  by the Class C member, as is required. Nor was any amended private placement memorandum

11  issued.

12       96.    Cross-Defendant Lettunich has failed to correct, explain or otherwise properly

13  account for these financial discrepancies. Cross-Defendant Lettunich's causing of the financial

14  discrepancies, and his failure to explain and/or correct them, constitute breaches of the

15  Agreements, including Sections 10.10 and 5.10 of the Agreements, as well as a breach of his

16  fiduciary duties.

17       97.    No K-1's or other tax information necessary for XS Holding to complete its taxes

18  for 2007 have been provided as required by Section 10.3 of the Agreements.

19       98.    XS Holding has duly performed all of its material obligations, conditions and

20  duties under the Agreements by, inter alia, causing capital contributions of XS Holding to be paid

21  in full as of the date of the initiation of this litigation by Plaintiffs and otherwise substantially

22  complied with the terms of the Agreements. To the extent that any material obligation may not

23  have been performed, such performance has been excused by Cross-Defendants' material

24  breaches of the Agreements.

FIRST CAUSE OF ACTION

25

26  (Breach of Written Contract – Against Cross-Defendants Xslent and Atira Technologies)

27       99.    Cross-Complainants reallege and incorporate by reference each of the allegations

28  made herein at paragraphs 1 to 96 inclusive.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1    100.    Except where excused by Plaintiffs' and Cross-Defendants' material breaches of

2    the Agreements, Mr. Caffyn and XS Holding have duly performed all of their obligations,

3    conditions and duties under the Agreements by, inter alia, causing capital contributions of XS

4    Holding to be paid pursuant to Section 3.1.2 of the Agreements up to the date of initiation of this

5    litigation against XS Holding and Mr. Caffyn and otherwise complying with the terms of the

6    Agreements.

7    101.    Xslent and Atira Technologies (to the extent a proper party), through their

8    Managers Cross-Defendants Lettunich and Matan breached, violated and aided and abetted the

9    breach of, the Agreements in numerous ways, including, but not limited to, doing the following:

10    1.    Breaching and violating Sections 4.6 and 5.6 of the Agreements, as well as

11    Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating

12    Agreement, by engaging in, and aiding and abetting, the self-dealing, detailed above, regarding

13    WorldSpace, a company owned by Cross-Defendant Lettunich;

14    2.    Breaching and violating Sections 4.6 and 5.6 of the Agreements, as well as

15    Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating

16    Agreement, by engaging in, and aiding and abetting, the self-dealing, detailed above, regarding

17    Xslent, LLC and Atira, both owned in part and controlled by Cross-Defendant Lettunich;

18    3.    Breaching and violating Sections 4.6 and 5.6 of both Agreements, as well

19    as Section 4.12Q of the XET Operating Agreement and Section 4.12K of the XT Operating

20    Agreement, by undisclosed self-dealing, detailed above, regarding SpamEvaders, a company in

21    which Cross-Defendant Lettunich owns approximately a 15% equity interest;

22    4.    Causing XS Holding not to receive the benefit of the bargain in breach and

23    violation of the Agreements by, inter alia, interfering with the negotiated rights and protections to

24    which XS Holding and Mr. Caffyn were entitled under the Agreements, including, but not

25    limited to, the requirement that XS Holding give its written consent for the Companies to take

26    any of the "Major Actions" (Section 4.12 of the Agreements) and the requirement that the

27    Class B Member have two votes on the Companies' Boards of Managers (Section 5.1B of the

28    Agreements);

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-26-
SECOND AMENDED CROSS-COMPLAINT

1    5.    Causing the April 24, 2007 Board of Managers meeting minutes to be

2    prepared in a biased, inaccurate manner that favored Cross-Defendant Lettunich to the detriment

3    of Mr. Caffyn and XS Holding, in breach and violation of Section 10.1 of the Agreements;

4    6.    Falsely stating at the June 28, 2007 board meeting, and causing the

5    minutes of that meeting to falsely reflect, that Mr. Caffyn and Mr. Tinsley resigned as Managers

6    of XET and XT when in fact they had not, in breach and violation of Section 10.1 of the

7    Agreements;

8    7.    Purporting to have held a meeting of the Board of Managers of XT on

9    June 28, 2007 when no such meeting occurred because it was attended only by Cross-Defendants

10   Lettunich and Matan, and, as such, there was no quorum in breach and violation of Section 5.1D

11   of the Agreements;

12   8.    Atira Technologies and Xslent failing to contribute intellectual property to

13   XT and/or failing to properly document those transfers, in breach and violation of Section 3.1.1

14   of the XET Operating Agreement, as well as Sections 5.10, 10.1 and 10.2 of both Agreements;

15   9.    Purporting to send the XET Capital Notice without approval of the Board

16   of Managers of XT, in breach and violation of Section 5.1D of the XT Operating Agreement;

17   10.   Purporting to terminate Mr. Tinsley from his position with XT on July 13,

18   2007 in breach and violation of Section 4.12J of the XT Operating Agreement and in breach and

19   violation of Section 4.12P of the XET Operating Agreement;

20   11.   Purporting to remove Mr. Tinsley as Manager of XET and XT by e-mail

21   on August 15, 2007 and by mail on August 16, 2007, in breach and violation of Section 4.12 of

22   the Agreements;

23   12.   Claiming that the August 16, 2007 Meeting of the Board of Managers of

24   the Companies did not elect Mr. Caffyn and remove Mr. Lettunich as Chairperson, President and

25   CEO, in breach and violation of Sections 5.1D and 14.14 of the Agreements;

26   13.   Attempting to return and returning $1.75 million in capital contributions,

27   which was a breach and violation of the Agreements because no valid Capital Notices were given

28   to XS Holding, the acts were not approved by the Managers as required by Section 5.1D, it

SEDGWICK
DETERT, MORAN & ARNOLD LLP

-27-

SECOND AMENDED CROSS-COMPLAINT

1  required the Class B Member's consent under section 4.12 and was a breach of fiduciary duty

2  under Section 5.10;

3          14.    Retaining the Silicon Valley Law Group in connection with this lawsuit, in

4  breach and violation of Section 5.3A(vi) of the Agreements;

5          15.    Causing this lawsuit to be filed on August 20, 2007 on behalf of XET and

6  XT in breach and violation of Section 5.3A(v) of the Agreements;

7          16.    Failing to provide all company records to Mr. Caffyn and XS Holding in

8  breach and violation of Sections 10.1 and 10.2 of the Agreements;

9          17.    Causing without proper authorization, and failing to adequately explain,

10  various financial discrepancies in the financial records of the Companies including, but not

11  limited to, the $1 million taken by Cross-Defendant Lettunich from XT, the transfer of

12  $1.4 million from XT to Xslent, LLC and the records reflecting that a Class C Member has

13  shares in XET without an amended private placement memorandum or an amended XET

14  Operating Agreement, as required;

15          18.    Causing, without proper authorization, XT to transfer $1 million to Cross-

16  Defendant Lettunich, to transfer $1.4 million to Xslent, LLC and to incur and pay legal fees

17  related to WorldSpace and work performed on behalf of Cross-Defendants Lettunich's and

18  Matan's negotiation of the Companies' Agreements; and

19          19.    Causing the Companies' IP to be made available to WorldSpace without

20  approval of XT's Board of Managers and without approval by XS Holding.

21          20.    Permitting Lettunich and Matan to vote as a block and Lettunich to claim

22  "One Man Rule" in violation of Section 5.1 of the Operating Agreements providing for

23  management of XET and XT by their respective Board of Managers.

24          21.    Failing to provide K-1's and other tax information necessary for XS

25  Holding to complete its 2007 taxes in violation of Section 10.3B of the Agreements.

26  102.    Xslent and Atira Technologies (to the extent a proper party), through their

27  Managers Cross-Defendants Lettunich and Matan, and Cross-Defendants Lettunich, Matan and

28  Gallagher individually, also breached and violated the Agreements through their conduct in the

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-28-
SECOND AMENDED CROSS-COMPLAINT

1  immediately preceding paragraph and sub-paragraphs in that most, if not all, of those acts

2  constituted breaches of fiduciary duty, which also runs afoul of Section 5.10 of the Agreements.

3      103.    As a direct and proximate result of Cross-Defendants Xslent's and Atira

4  Technologies' breaches and violations of the Agreements, XS Holding and Mr. Caffyn have

5  suffered damages as alleged herein and in an amount to be proven at trial.

6                          SECOND CAUSE OF ACTION

7  (Breach of the Covenant of Good Faith and Fair Dealing – Against Cross-Defendants Xslent and
                              Atira Technologies)

8
9      104.    Cross-Complainants reallege and incorporate by reference each of the allegations

10  made herein at paragraphs 1 to 101 inclusive.

11      105.    As part of the Agreements, there existed a covenant of good faith and fair dealing

12  that requires that each party will refrain from arbitrary and unreasonable conduct which has the

13  effect of preventing the other parties to the Agreements from receiving the fruits of the bargain.

14      106.    Xslent and Atira Technologies, through their Managers Cross-Defendants

15  Lettunich and Matan, individually breached the covenant of good faith and fair dealing in

16  numerous ways, including, but not limited to, doing the following:

17      1.      Engaging in undisclosed self-dealing, as well as aiding and abetting self-

18  dealing, including, inter alia, the following:  before and simultaneously with signing the

19  Agreements on April 7, 2007, Cross-Defendant Lettunich, in concert with Cross-Defendants

20  Matan and Gallagher, schemed to transfer all of the XET and XT IP to WorldSpace, as well as

21  used Cross-Complainant XS Holding's capital to fund WorldSpace and pay WorldSpace's legal

22  bills;

23      2.      Never intending to honor the Agreements (i) if a better source of funding

24  than Mr. Caffyn and XS Holding could be found and (ii) by agreeing that Cross-Defendants

25  Lettunich and Matan, as well as Mr. Tinsley, would vote as a block at Board of Managers

26  meetings on issues of significance;

27      3.      Scheming to cause and causing Mr. Caffyn, a current and former chairman

28  and CEO of several other companies with over 20 years experience in the alternative energy

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

                          -29-
                SECOND AMENDED CROSS-COMPLAINT

1  business, to be replaced as CEO of XET by making misrepresentations to Mr. Caffyn regarding

2  the Nimby letter;

3              4.  Scheming to gain control of the Companies by falsely stating in the

4  purported June 28, 2004 meeting minutes that Mr. Caffyn and Mr. Tinsley had resigned as

5  managers;

6              5.  Falsely claiming that Mr. Caffyn and XS Holding do not have two votes

7  on the Board of Managers based on alleged untimely funding when the two vote rights provided

8  under Section 5.1B apply regardless of when the funding occurs so long as it has occurred;

9              6.  Claiming that the Class B member consent rights under Section 4.12 were

10  lost despite the express preemption provision in Section 4.12 that the consent rights control over

11  all other provisions in the Agreement; and

12              7.  Refusing to recognize the propriety of the August 16, 2007 Board of

13  Managers meeting at which Mr. Caffyn was elected and Mr. Lettunich removed as Chairperson,

14  President and CEO of the Companies.

15              8.  Permitting Lettunich and Matan to vote as a block and Lettunich to claim

16  "One Man Rule" in violation of Section 5.1 of the Operating Agreements providing for

17  management of XET and XT by their respective Board of Managers.

18       107.  As a direct and proximate result of Cross-Defendants Xslent's and Atira

19  Technologies' breaches of the covenant of good faith and fair dealing, XS Holding and

20  Mr. Caffyn have suffered damages as alleged herein and in an amount to be proven at trial.

21  THIRD CAUSE OF ACTION

22  (Breach of Fiduciary Duties – Against Cross-Defendants Lettunich, Matan, Xslent, and Atira<br>Technologies)

23

24       108.  Cross-Complainants reallege and incorporate by reference each of the allegations

25  made herein at paragraphs 1 to 105 inclusive.

26       109.  Cross-Defendants Lettunich and Matan, as Managers of XET and XT, owe XS

27  Holding, as a Member of the Companies, certain fiduciary duties, including those of loyalty and

28  care. Cross-Defendants Lettunich's and Matan's duty of loyalty requires, inter alia, that they

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-30-<br>SECOND AMENDED CROSS-COMPLAINT

1   account to the Companies and hold as trustee for the Companies its property, profit, or benefit

2   derived by the Managers in the conduct of the business of the Companies.  Cross-Defendants

3   Lettunich's and Matan's duty of care requires, inter alia, that they refrain from engaging in

4   undisclosed self-dealing, negligent and reckless conduct, intentional misrepresentations and other

5   misconduct, and/or a knowing violation of the law with respect to their management of the

6   Companies.

7        110.    XT, the majority member of XET, and Xslent and Atira Technologies, majority

8   members of XT, owes XS Holding, the minority member of XET and XT, the fiduciary duties

9   that a majority member owes a minority member, including to not use majority power to oppress

10  and prejudice the minority's rights and interests.  Xslent and Atira Technologies,  as majority

11  members of XT, would thereby owe XS Holding, the minority member of XT, the fiduciary

12  duties that a majority member owes a minority member, including not to use majority power to

13  oppress and prejudice the minority's rights and interests.  Cross-Defendants Lettunich and

14  Matan, as Managers of majority members Xslent and Atira Technologies, owe the same fiduciary

15  duties to minority member XS Holding.

16       111.    Cross-Defendants Lettunich and Matan individually, as well as Xslent and Atira

17  Technologies, by and through Cross-Defendants Lettunich and Matan, breached these fiduciary

18  duties in numerous ways, including, but not limited to, doing the following:

19       1.    Engaging in undisclosed self-dealing, as well as aiding and abetting self-

20  dealing, including, inter alia, the following:  before and simultaneous with signing the

21  Agreements on April 7, 2007, Cross-Defendant Lettunich, in concert with Cross-Defendant

22  Matan, schemed to transfer all of the XET and XT IP to WorldSpace, as well as used Cross-

23  Complainant XS Holding's capital to fund WorldSpace and pay WorldSpace's legal bills;

24       2.    Never intending to honor the Agreements (i) if a better source of funding

25  than Mr. Caffyn and XS Holding could be found and (ii) by agreeing that Cross-Defendants

26  Lettunich and Matan, as well as Mr. Tinsley, would vote as a block at Board of Managers

27  meetings on issues of significance;

28       3.    Interfering with the negotiated rights and protections to which XS Holding

**SEDGWICK**
DETERT, MORAN & ARNOLDᴸᴸᴾ

1  and Mr. Caffyn were entitled under the Agreements, including, but not limited to, the

2  requirement that XS Holding give its written consent for the Companies to take any of the

3  "Major Actions" (Section 4.12 of the Agreements), the requirement that the Class B Member

4  have two votes on the Companies' Boards of Managers (Section 5.1B of the Agreements) and the

5  requirement that Mr. Caffyn be CEO/President of XET (Section 5.8E of the XET Operating

6  Agreement);

7        4.    Making material misrepresentations to XS Holding through Mr. Caffyn as

8  described herein;

9        5.    Causing Mr. Caffyn, a current and former chairman and CEO of several

10  other companies with over 20 years experience in the alternative energy business, to be replaced

11  as CEO of XET;

12        6.    Stating that Mr. Caffyn and Mr. Tinsley resigned as Managers of XET and

13  XT when they had not;

14        7.    Failing to endeavor to even attempt to find and appoint a competent

15  CEO/President for either of the Companies;

16        8.    Attempting to return and returning to XS Holding and Mr. Caffyn the

17  payment of $1.75 million that XS Holding made as part of its capital contributions to the

18  Companies, despite the fact that the Companies were stated to be in danger of running out of

19  capital;

20        9.    Attempting to send Notices of Elections to XS Holding to strip XS

21  Holding of its warrants, its Section 4.12 rights and its ability to elect a Manager;

22        10.   Causing over hundreds of thousands of dollars to be transferred from XT

23  to Xslent, and likely Mr. Lettunich or a related party, despite the fact that XT was in dire need of

24  capital at the time of the transaction;

25        11.   Causing this baseless lawsuit to be filed and making false claims against

26  Messrs. Caffyn and Tinsley;

27        12.   Failing to provide XS Holding and Mr. Caffyn with all requested

28  Company records;

SEDGWICK
DETERT, MORAN & ARNOLD LLP

SF/1506669v1

-32-

SECOND AMENDED CROSS-COMPLAINT

13.      Failing to cause the intellectual property to be assigned to XT and properly registering such transfers;

14.      Attempting to damage XS Holding and Mr. Caffyn by exercising non-existent remedies under the Agreements;

15.      By failing to follow proper corporate governance and record keeping.

16.      Lettunich transferred $1 million to himself under false pretenses by misrepresenting the amount of monies he had put into Atria and Xslent and that he would provide a schedule showing the notes to be assumed.

17.      Without authorization, Lettunich transferred $1.4 million into Xslent which, at the time, he controlled; based on his own Financial Reconciliation, over $442,000 of that money is unaccounted for.

18.      Permitting Lettunich and Matan to vote as a block and Lettunich to claim "One Man Rule" in violation of Section 5.1 of the Operating Agreements providing for management of XET and XT by their respective Board of Managers.

19.      Failing to provide K-1's and other tax information necessary for XS Holding to complete its 2007 taxes in violation of Section 10.3.B of the Agreements.

112.      As a direct and proximate result of Cross-Defendants Xslent's, Atira Technologies', Lettunich's and Matan's breaches of fiduciary duties, Mr. Caffyn and XS Holding have suffered damages as alleged herein and in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

(Breach of Fiduciary Duty – By XS Holding and Mr. Caffyn Against Cross-Defendant Gallagher)

113.      Cross-Complainants reallege and incorporate by reference each of the allegations made herein at paragraphs 1 to 110 inclusive.

114.      Cross-Defendant Gallagher owes the Companies, Mr. Caffyn and XS Holding certain fiduciary duties by virtue of her role as counsel for XT and XET, as the former Secretary of the Boards of Managers for XET and XT, and her role as former in-house counsel for Mr. Caffyn's company Wind City. Those fiduciary duties include (1) the duty of undivided loyalty, (2) the duty of confidentiality, (3) the duty of care and (4) the duty to use the skill,

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-33-

1  prudence and diligence that members of the legal profession commonly possess.

2      115.    Cross-Defendant Gallagher has breached her fiduciary duties to the Companies,

3  Mr. Caffyn and XS Holding by engaging in the following conduct set forth herein.

4      116.    As a direct and proximate result of Cross-Defendant Gallagher's breaches of her

5  fiduciary duties, Mr. Caffyn and XS Holding have suffered damages as alleged herein and in an

6  amount to be proven at trial.

7                          FIFTH CAUSE OF ACTION

8          (Intentional Misrepresentation – Against Cross-Defendants Lettunich and Matan)

9      117.    Cross-Complainants reallege and incorporate by reference each of the allegations

10  made herein at paragraphs 1 to 114 inclusive.

11      118.    Cross-Defendants Lettunich and Matan in numerous ways, (a) made material

12  misrepresentations to Mr. Caffyn and XS Holding through Mr. Caffyn, as well as deliberately

13  concealed from Mr. Caffyn, and from XS Holding through Mr. Caffyn, material past and present

14  facts, including being silent in the face of a duty to speak; (b) acted with scienter; (c) intended to

15  induce Mr. Caffyn's and XS Holding's reliance on the concealment; (d) caused Mr. Caffyn and

16  XS Holding to rely on the concealment; and (e) caused Mr. Caffyn and XS Holding to suffer

17  damages as a result.

18      119.    Cross-Defendants Lettunich and Matan intentionally concealed from XS Holding

19  and Mr. Caffyn the material fact that the actual reasons Mr. Caffyn was asked to step down as

20  CEO/President of XET, namely that (a) Cross-Defendants were fearful that Mr. Caffyn's

21  inquiries into the finances and management of the Companies would limit or reveal Cross-

22  Defendants' self-dealing, (b) Cross-Defendants Lettunich and Matan found what they perceived

23  to be a better source of funding for the Companies, and/or (c) Cross-Defendants wished to oust

24  Mr. Caffyn from management because they believed that Mr. Caffyn's powers should be

25  diminished to prevent him from making too much profit from the Companies. Cross-Defendants

26  Lettunich and Matan failed to fulfill their fiduciary and other duties to Mr. Caffyn by not

27  revealing the true reasons why they wanted Mr. Caffyn to step down as CEO/President of XET.

28  Cross-Defendants intended to induce, and in fact caused, Mr. Caffyn and XS Holding to

SEDGWICK
DETERT, MORAN & ARNOLD LLP

SF/1506669v1                              -34-
                          SECOND AMENDED CROSS-COMPLAINT

1  detrimentally rely on the concealments and misrepresentations by stepping down from the

2  CEO/President positions of XET.

3      120.   Cross-Defendants Lettunich and Matan misrepresented in the June 28, 2007

4  Board of Managers meeting minutes that Mr. Caffyn and Mr. Tinsley resigned as Managers for

5  the Companies when they in fact had not done so.  Cross-Defendants Lettunich and Matan

6  intended to induce, and in fact induced, Mr. Caffyn and XS Holding to detrimentally rely on

7  those misrepresentations by causing Mr. Caffyn and XS Holding to not earlier discover that and

8  other misdeeds by Cross-Defendants.

9      121.   Cross-Defendants Lettunich and Matan failed to disclose that Cross-Defendant

10  Gallagher betrayed XS Holding's and Mr. Caffyn's confidential bargaining positions to Cross-

11  Defendant Lettunich, and perhaps others.  Cross-Defendants Lettunich and Matan intended to

12  induce, and in fact induced, Mr. Caffyn and XS Holding to detrimentally rely on those omissions

13  by Mr. Caffyn and XS Holding entering into contract negotiations with Cross-Defendant

14  Lettunich believing that Cross-Defendant Lettunich was not aware of Mr. Caffyn's confidential

15  bargaining positions.

16      122.   Cross-Defendants Lettunich and Matan failed to disclose that they were seeking

17  better sources of funding than Mr. Caffyn and XS Holding at the time the Agreements were

18  signed.  Cross-Defendants Lettunich and Matan intended to induce, and in fact induced,

19  Mr. Caffyn and XS Holding to detrimentally rely on that failure to disclose by Mr. Caffyn's and

20  XS Holding's entering into the Agreements under false pretenses.

21      123.   Cross-Defendants Lettunich and Matan failed to disclose that Messrs. Lettunich,

22  Matan and Tinsley had agreed to vote as a block with respect to the issues of major significance

23  with respect to the Companies.  Cross-Defendants Lettunich and Matan intended to induce, and

24  in fact induced, Mr. Caffyn and XS Holding to detrimentally rely on that failure to disclose by

25  entering into the Agreements under false pretenses.

26      124.   Cross-Defendants Lettunich and Matan failed to disclose to Mr. Caffyn and XS

27  Holding their plans to engage in self-dealing with respect to WorldSpace, SpamEvaders and

28  Xslent, LLC.  Cross-Defendants Lettunich and Matan intended to induce, and in fact induced,

SEDGWICK
DETERT, MORAN & ARNOLD...

SF/1506669v1

1    Mr. Caffyn and XS Holding to detrimentally rely on that failure to disclose by entering into the

2    Agreements under false pretenses.

3         125.    Without authorization, Lettunich transferred $1 million to himself under false

4    pretenses by misrepresenting the amount of money that he had put into Atria and Xslent and that

5    he would provide a schedule showing the notes to be assumed.  Lettunich also transferred

6    without authorization $1.4 million from XT into Xslent which, at the time, he controlled; based

7    on his own Financial Reconciliation, over $442,000 of that money is unaccounted for.

8         126.    In December of 2006 through March of 2007, Lettunich persuaded Mr. Caffyn,

9    through his affiliate company Wind City Inc., to lend Lettunich personally $1.9 million to be

10    used to develop the technologies and IP that ultimately were transferred to XET and XT.  Based

11    on Lettunich's Financial Reconciliation and the Companies' expenditure rate, the full $1.9

12    million was not used for the agreed purpose of developing the Companies' technology and IP and

13    it appears that Lettunich never intended to fulfill the agreement to do so.

14         127.    Cross-Defendants Lettunich and Matan, prior to XS's investments into XT and

15    XET, also made a number of misrepresentations designed to convince Mr. Caffyn that XT and

16    XET had a higher valuation than warranted by the technology.

17         128.    Photovoltaic Power Converter (PvPC) is technology invented by Stefan Matan for

18    conversion of solar energy from photovoltaic panels.  Prior to April 7, 2007, during the period in

19    which Lettunich and Matan were attempting to convince XS Holding and Brian Caffyn to invest

20    in XT and XET, Lettunich and Matan, on behalf of themselves and Atira, provided to Mr. Caffyn

21    copies of various reports published by third parties, including a report from the Naval

22    Postgraduate School in 2005 ("NPS Reports")  that asserted that PvPC technology "enables a

23    solar power system to convert between 30.39% and 48.60% more solar energy into power than an

24    identical system without the PVPC."  In December 2006, Mr. Caffyn was told by Lettunich and

25    Matan that the PvPC performance improvement of 30.39% - 48.6% as compared to a "system

26    without the PVPC," referenced in the NPS Reports, as being relative to the "best available"

27    technology on the market, known as MPPT. These representations were false.

28         129.    In fact, the NPS Report was comparing PvPC to antiquated technology, thereby

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-36-

SECOND AMENDED CROSS-COMPLAINT

1  overstating the improvements by PvPC.  In January 2007, another testing group called Exponent

2  reported similar results, stating that PvPC produced 41% more energy in their tests.  Matan was

3  involved in the Exponent testing.

4      130.   XPX is technology invented primarily by Stefan Matan, and other Atira

5  employees, subsequent to the PvPC technology which was developed in a company called ISG

6  Solar, LLC ("ISGS").  Lettunich and Matan, on behalf of themselves and Atira, represented to

7  Mr. Caffyn that XPX technology performed 7- 15% better than PvPC technology for the direct

8  current ("DC") version of the product and that AC conversion of the XPX-AC device could be

9  done at a 10% higher  efficiency  compared to typical DC to AC inverters.  Based on these

10 representations, XS Holding and Mr. Caffyn expected the minimum performance improvement

11 over the best available technologies for a system which would produce alternating current ("AC")

12 to be at least 50%, as calculated in the table below:

|  | Represented Performance Range | | Actual Performance Range | |
|---|---|---|---|---|
|  | Min | Max | Min | Max |
| Baseline Technology | DC with MPPT | | DC w/o MPPT | |
| Baseline Performance (W-hours) | 650 | | 500 | |
| PvPC Performance |  |  |  |  |
| PvPC Improvement % (range) | 30% | 50% | 30% | 50% |
| PvPC Relative Performance Level | 845 | 975 | 650 | 750 |
| XPX-DC Performance |  |  |  |  |
| XPX Improvement over PvPC % (range) | 7% | 15% | 7% | 15% |
| XPX Relative Performance Level | 904 | 1121 | 696 | 863 |
| Expected XPX Performance vs DC w/o MPPT | 81% | 124% | 39% | 73% |
| *Expected XPX Performance vs MPPT* | 39% | 73% | 7% | 33% |
| XPX-AC Performance |  |  |  |  |
| XPX-AC Improvement over Typical Inverter Weighted Efficiency | 10% | | 10% | |
| *Expected XPX-AC Performance vs MPPT %* | 49% | 83% | 17% | 43% |

27     131.   Because Matan was intimately involved in the setup and testing arrangement for

28 the Exponent report, and visited the test location and met with the people conducting the tests, he

-37-

SECOND AMENDED CROSS-COMPLAINT

1  had full knowledge of the equipment being used and knew that the Exponent Report comparisons

2  of PvPC and XPX were to antiquated technology, and not the "best available" technology on the

3  market. Since Mr. Caffyn had no knowledge of the details of the technology, he trusted Matan

4  and Lettunich to truthfully set forth their technologies' capabilities. However, Lettunich and

5  Matan continued to use the Exponent and NPS Reports' comparisons to overstate the

6  performance of PvPC and XPX, as discussed below.

7      132.  As of December 2006, Lettunich, and Matan, on behalf of themselves and Atira

8  did not present to Mr. Caffyn any test results comparing PvPC performance compared to the

9  "best available" on the market. In fact, when asked directly by Caffyn if the comparison was

10  against the "best available" MPPT technology, Matan and Lettunich represented that it was,

11  despite knowing that the comparisons were to older, antiquated solar conversion technology.

12      133.  The value of a solar energy product in the market is directly proportional to the

13  amount of energy that it can produce. The higher the energy output, the higher the price. If a

14  product can produce 50% more energy than comparable products, it would command a higher

15  price. Prior to XS Holding's investment in XET, Mr. Caffyn developed a business plan in

16  reliance on claims by Lettunich and Matan, made on behalf of themselves and Atira, that the

17  XPX and PvPC technology would generate 50% more energy than the "best available"

18  comparable products on the market for the primary AC product. These claims were

19  memorialized in Mr. Caffyn's business plan of April 2, 2007 where he stated "Current

20  expectations are that XPX-AC will double the output from a convention grid-connected PV

21  system in sunny locations." This higher energy generation created a business valuation that

22  justified XS Holding's investment and ownership percentage.

23      134.  As the creators of the PvPC and XPX technology and with their familiarity of the

24  "best available" technology then on the market as well as their familiarity with the older types of

25  solar conversion technology, Lettunich and Matan knew, individually and as managers of Atira,

26  that their claims of PvPC's and XPX's superiority over other technologies were false, and that

27  Mr. Caffyn's belief of XET's valuation was inflated as a result. However, Lettunich and Matan

28  also knew that if Mr. Caffyn learned of the XPX and PvPC technologies' true performance, it

SEDGWICK

SF/1506669v1

-38-

SECOND AMENDED CROSS-COMPLAINT

1 would result in a lower valuation of XET.

2     135.   Lettunich, and Matan therefore knowingly and deliberately misled XS Holding

3 and Mr. Caffyn as to the performance output of these technologies. Furthermore, when presented

4 with Mr. Caffyn's business plan on which they were asked to comment and amend as required,

5 they did not correct any of his assumptions concerning the technologies, and in fact allowed him

6 to confirm the belief of Mr. Caffyn and XS Holding in the product performance, and ultimately

7 the company valuation, prior to XS Holding's investment and Mr. Caffyn's commitment to act as

8 CEO of the companies.

9     136.   In reliance on Lettunich's and Matan's misrepresentations about the abilities of

10 their technology and based on the valuation calculated from those misrepresentations, XS

11 Holding was persuaded to accept a smaller ownership interest in exchange for its investment than

12 XS Holding otherwise would have had it known of the technologies' limitations. In fact, XPX's

13 actual increase in performance was only 7% to 33% better than the "best available" technology

14 on the market as has been confirmed in recent third party testing, and not 39% to 73% higher as

15 Lettunich and Matan represented it to be. The XPX AC performance is therefore expected to be

16 was only 20%-48% higher, not the expected 55%-93% improvement that Lettunich and Matan

17 represented. The specific performances and representations are set forth in the chart above.

18     137.   In addition to the exaggerated performance claims, Mr. Caffyn was also lead to

19 believe that the XPX-DC and XPX-AC products were nearly ready for production. In

20 Mr. Caffyn's business plan of April 2, 2007, he plans for the products to begin shipping by

21 August 2007. The proposed shipment dates were based on the representations of Matan and

22 when put in the business plan were not challenged by Lettunich or Matan in any way. The chart

23 below from Mr. Caffyn's April 2, 2007 business plan summarizes his beliefs at that time:

24

25

| Name | Initial Design | Prototype | UL Certified | Initial Availability | General Availability |
|------|----------------|-----------|--------------|----------------------|----------------------|
| XPX C | Complete | Complete | March 2007 | April 2007 | April 2007 |
| XPX DC | Complete | Complete | May 2007 | May 2007 | August 2007 |
| XPX$^{aDC}$ | September 2007 | Jan 2008 | N/A | September 2008 | To be determined |
| XPX AC | Complete | March 2007 | June 2007 | June 2007 | September 2007 |
| XPX AC (HV) | Complete | March 2007 | June 2007 | June 2007 | September 2007 |
| XPX$^{aAC}$ | Dec 2007 | January 2008 | N/A | September 2008 | To be determined |

SEDGWICK
DETERT, MORAN & ARNOLD LLP

138.    Matan, Lettunich and Atira also misrepresented the production costs of the solar products XET would be producing as well as available inventory. Based on representations by Matan, Lettunich and Atira, the April 2, 2007 business plan states that "XET has already produced 1,000 XPX-DC units which are now ready for deployment and testing. Initial Units will cost approximately $50 to manufacture for the AC and DC units." Lettunich and Matan again did not challenge or correct the XS Holding's and Mr. Caffyn's belief that production costs would be approximately $50. In fact, later data indicates that initial production costs are $75 per unit or more, and that unrealistically high volumes will need to be reached before $50 per unit costs can be achieved.

139.    Based on the representations by Lettunich and Matan to XS Holding and Mr. Caffyn concerning (1) performance of the PvPC and XPX technology, (2) the timing for bringing products to market, and (3) the production costs of goods , a business plan was developed that demonstrated a short-term positive cash flow leading to XS Holding's and Mr. Caffyn's valuation of the company.

140.    However, XS Holding and Mr. Caffyn have discovered that Lettunich's and Matan's representations of the PvPC and XPX technology's abilities, their representations of the time needed for bringing the products to market, and their representations of production costs and inventory were all false.

141.    Furthermore, as individuals familiar with this technology and with experience in start up businesses familiar with production costs and market timing, Lettunich and Matan knew that these representations were false. Lettunich and Matan made these representations because they knew that without them, XS Holding and Mr. Caffyn might demand additional equity in the companies to compensate for their lower valuations.

142.    They also knew that XS Holding and Mr. Caffyn would rely on Lettunich and Matan to provide truthful and accurate information regarding the technologies' performance, the time for bringing the products to market, and the costs of production. In fact, XS Holding and Mr. Caffyn did rely on these representations and XS Holding ultimately made its investments,

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1 and Mr. Caffyn made certain personal commitments, based on the inflated valuations of the

2 companies created by Lettunich's and Matan's misrepresentations.

3    143.    As a result, Cross-Complainants have been injured by receiving less equity for

4 their investment than would be the case absent Lettunich's and Matan's fraudulent statements.

5    144.    As a direct and proximate result of Cross-Defendants Lettunich's and Matan's

6 intentional misrepresentations, XS Holding and Mr. Caffyn have suffered damages as alleged

7 herein and in an amount to be proven at trial.

8                        SIXTH CAUSE OF ACTION

9          (Negligent Misrepresentation – Against Cross-Defendants Lettunich and Matan)

10    145.    Cross-Complainants reallege and incorporate by reference each of the allegations

11 made herein at paragraphs 1 to 142 inclusive.

12    146.    Cross-Defendants Lettunich and Matan (a) had a pecuniary duty to provide

13 Mr. Caffyn, and XS Holding through Mr. Caffyn, with accurate information to XS Holding and

14 Mr. Caffyn, (b) but nevertheless supplied false information, (c) failed to exercise reasonable care

15 in obtaining or communicating that information, and (d) caused XS Holding and Mr. Caffyn to

16 suffer a pecuniary loss caused by justifiable reliance upon the false information.

17    147.    Cross-Defendants Lettunich and Matan had a pecuniary duty to provide

18 Mr. Caffyn, and XS Holding through Mr. Caffyn, with accurate information with respect to

19 strategic management, financial and other material governance issues for the Companies.

20    148.    Cross-Defendants Lettunich and Matan provided Mr. Caffyn with false

21 information regarding the actual reasons that they urged Mr. Caffyn to step down as

22 CEO/President of XET.  At the very least, Cross-Defendants Lettunich and Matan failed to

23 exercise reasonable care in obtaining and communicating the information regarding Mr. Caffyn's

24 stepping down.  Mr. Caffyn and XS Holding justifiably relied on those misrepresentations and

25 suffered damages.

26    149.    Cross-Defendants Lettunich and Matan provided false information in the June 28,

27 2007 Board of Managers meeting minutes that Mr. Caffyn and Mr. Tinsley resigned as Managers

28 for the Companies when they in fact had not done so.  At the very least, Cross-Defendants

1  Lettunich and Matan failed to exercise reasonable care in obtaining and communicating that

2  information. Mr. Caffyn and XS Holding justifiably relied on those misrepresentations and

3  suffered damages.

4      150.    Cross-Defendants Lettunich and Matan failed to disclose that Cross-Defendant

5  Gallagher betrayed XS Holding's and Mr. Caffyn's confidential bargaining positions to Cross-

6  Defendant Lettunich, and perhaps others. At the very least, Cross-Defendants Lettunich and

7  Matan failed to exercise reasonable care in not communicating that information. Mr. Caffyn and

8  XS Holding justifiably relied on those omissions and suffered damages.

9      151.    Cross-Defendants Lettunich and Matan failed to disclose that they were seeking

10  better sources of funding than Mr. Caffyn and XS Holding at the time the Agreements were

11  signed. At the very least, Cross-Defendants Lettunich and Matan failed to exercise reasonable

12  care in by not communicating that information. Mr. Caffyn and XS Holding justifiably relied on

13  those omissions and suffered damages.

14      152.    Cross-Defendants Lettunich and Matan failed to disclose that Messrs. Lettunich,

15  Matan and Tinsley had agreed to vote as a block with respect to the issues of major significance

16  with respect to the Companies. At the very least, Cross-Defendants Lettunich and Matan failed

17  to exercise reasonable care in not communicating that information. Mr. Caffyn and XS Holding

18  justifiably relied on those omissions and suffered damages.

19      153.    Cross-Defendants Lettunich and Matan failed to disclose to Mr. Caffyn and XS

20  Holding their plans to engage in self-dealing with respect to WorldSpace, SpamEvaders and

21  Xslent, LLC. At the very least, Cross-Defendants Lettunich and Matan failed to exercise

22  reasonable care in not communicating that information. Mr. Caffyn and XS Holding justifiably

23  relied on those omissions and suffered damages.

24      154.    Without authorization, Lettunich transferred $1 million to himself under false

25  pretenses by misrepresenting the amount of money he had put into Atria and Xslent and that he

26  would provide a schedule showing the notes to be assumed.

27      155.    Without authorization, Lettunich transferred $1.4 million into Xslent which, at the

28  time, he controlled, based on his own Financial Reconciliation, over $442,000 of that money is

**SEDGWICK**
DETERT, MORAN & ARNOLD℠

SECOND AMENDED CROSS-COMPLAINT

1   unaccounted for.

2       156.    As a direct and proximate result of Cross-Defendants Lettunich's and Matan's

3   negligent misrepresentations and omissions, XS Holding and Mr. Caffyn have suffered damages

4   as alleged herein and in an amount to be proven at trial.

5   SEVENTH CAUSE OF ACTION

6   (Declaratory and Other Relief – Against Cross-Defendants Lettunich Matan, Xslent and
Atira Technologies)

7

8       157.    Cross-Complainants reallege and incorporate by reference each of the allegations

9   made herein at paragraphs 1 to 154 inclusive.

10       158.    Cross-Complainants XS Holding and Mr. Caffyn request declaratory relief against

11   Cross-Defendants Xslent, Atira Technologies , Lettunich, and Matan.

12       159.    An actual controversy has arisen and now exists between Cross-Complainants and

13   Cross-Defendants concerning those parties' respective rights and duties under the Agreements.

14       160.    On the one hand, Cross-Complainants allege as follows:  (a) Cross-Defendants

15   had no right or power under Section 3.5 of the Agreements, or other any other provision, to

16   attempt to strip XS Holding of its warrants and its ability to elect a Manager, as well as to cause

17   Mr. Caffyn to lose his approval rights under Section 4.12 and his two Board votes under

18   Section 5.1B because, inter alia, (i) Section 4.12 provides that if there is any conflict between

19   that Section and any other provisions of the agreement "this Section 4.12 shall control" and, in

20   any event, (ii) XET paid its outstanding capital contributions before Cross-Defendants attempted

21   to seek any remedies under Section 3.5; (b) Cross-Defendants' purported termination of

22   Mr. Tinsley was improper under Section 5.2C of the Agreements because, inter alia, there was no

23   Board of Managers meeting held on the issue and there was no majority vote of the Managers to

24   terminate; and (c) Mr. Caffyn, rather than Cross-Defendant Lettunich, should occupy the position

25   of Chairman and CEO/President of XET and XT.

26       161.    On the other hand, Cross-Defendants contend as follows:  (a) they properly relied

27   on Section 3.5 of the Agreements to attempt to strip XS Holding of its warrants and its ability to

28   elect a manager, as well as to cause Mr. Caffyn to lose his approval rights under Section 4.12 and

1  his two votes under Section 5.1B; (b) their purported termination of Mr. Tinsley was proper

2  under the Agreements; and (c) Cross-Defendant Lettunich, rather than Mr. Caffyn, should occupy

3  the position of Chairman of CEO/President of XET and XT.

4       162.    Cross-Complainants therefore desire a judicial determination of their rights and

5  duties and a declaration that Cross-Defendants are in breach of the Agreements, and therefore

6  that:

7           1.    Mr. Caffyn, rather than Cross-Defendant Lettunich, occupies the position

8  of Chairman and CEO/President of XET and XT.

9           2.    Mr. Caffyn maintains his approval rights under Section 4.12;

10           3.    Mr. Caffyn and XS Holding maintain their two votes under Section 5.1B;

11           4.    Mr. Tinsley is still a Manager of the Companies;

12           5.    XS Holding has two votes at the Companies' Board of Managers

13  meetings; and

14           6.    XS Holding maintains its warrants and its ability to elect a Manager;

15       163.    Cross-Complainants also desire declaratory relief that the following conduct by

16  Cross-Defendants Lettunich and Matan were ultra vires and/or a breach of the Agreements:

17           1.    each of the acts of self-dealing described above;

18           2.    filing this suit on behalf of XET and XT against Mr. Caffyn and XS

19  Holding;

20           3.    purporting to cause Mr. Tinsley to be terminated from his position with

21  XT and as Manager of XET and XT;

22           4.    causing over $1.4 million to be transferred from XT to Xslent and causing

23  XT to have an outstanding note in the amount of $1 million;

24           5.    sending Capital Notices and Notices of Election to XS Holding on behalf

25  of XT regarding XET; and

26           6.    attempting to, and causing, XS Holding's capital contributions to be

27  returned.

28       164.    Cross-Complainants further desire the issuance of a preliminary and permanent

SEDGWICK
DETERT, MORAN & ARNOLD LLP

-44-

SECOND AMENDED CROSS-COMPLAINT

1  injunction prohibiting Cross-Defendants from engaging in any further ultra vires acts and from

2  denying that:

3          1.      Mr. Caffyn, rather than Cross-Defendant Lettunich, occupies the position

4  of CEO/President of XET and XT;

5          2.      Mr. Caffyn maintains his approval rights under Section 4.12;

6          3.      Mr. Caffyn and XS Holding maintain their two votes under Section 5.1B;

7          4.      Mr. Tinsley still is an employee of XT and a Manager of XET and XT;

8          5.      XS Holdings has two votes at the Companies' Board of Managers

9  meetings;

10         6.      XS Holding maintains its warrants and its ability to elect a Manager;

11         7.      Cross-Defendant Lettunich is prohibited from taking any further action in

12  connection with or on behalf of XET or XT other than as  a Manager at a Board of Managers

13  meeting; and

14         8.      Cross-Defendant Lettunich, Atira Technologies (to the extent a proper

15  party) and Xslent must cause all IP to be assigned to XET as required by the Agreements.

16                          EIGHTH CAUSE OF ACTION

17  (Violations of Business & Professions Code § 17200 – Against Cross-Defendants Lettunich,
                    Matan,  Xslent and Atira Technologies)

18

19         165.    Cross-Complainants reallege and incorporate by reference each of the allegations

20  made herein at paragraphs 1 to 162 inclusive.

21         166.    California Business & Professions Code § 17200 prohibits acts of unfair

22  competition, which includes "any unlawful, unfair or fraudulent business practice."

23         167.    Cross-Defendants have engaged in unlawful, unfair and fraudulent business

24  practices as alleged above.

25         168.    As a direct and proximate result of Cross-Defendants Atira Technologies',

26  Xslent's, Lettunich's, and Matan's violations of Business and Professions Code § 17200, XS

27  Holding and Mr. Caffyn are entitled to injunctive and other equitable relief, including

28  disgorgement of any ill-gotten gains, as alleged herein and in an amount to be proven at trial.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1

NINTH CAUSE OF ACTION

2

(Breach of Written Contract – Against Cross-Defendants Lettunich, Xslent, and Atira

3

Technologies)

4      169.    Cross-Complainants reallege and incorporate by reference each of the allegations

5   made herein at paragraphs 1 to 166 inclusive.

6      170.    On November 14, 2007, Lettunich, Xslent, and Atira entered into a written

7   agreement ("November 14 Contract") with, among others, XS Holding and Brian Caffyn. A true

8   and correct copy of the November 14 contract is attached hereto as Exhibit 8.

9          The November 14 Contract provides for, inter alia,

10         (a).    Lettunich, Xslent and Atira would, on or before November 21, 2007,

11         would provide to XS Holding and Caffyn an accounting of the ownership interests in

12         Xslent and Atira, including the names of owners, contact information, units,

13         percentage interests, and nature and date of contribution including the pertinent

14         documents such as certificates of interests and underlying agreements; and

15         (b)    that Caffyn would be given full access to the books and records of XT and

16         XET, and Tinsley will be given full access to the books and records of Xslent and

17         Atira.

18     171.    On numerous occasions since the formation of the November 14 Contract,

19   Lettunich, Xslent and Atira has breached the November 14 Contract, including by: (a) failing to

20   provide information regarding Lettunich's ownership interests in various companies, (b) failing

21   to provide Mr. Caffyn access to the books and records of XT and XET, (c) failing to keep

22   Mr. Caffyn informed as to the affairs of Xslent and Atira.

23     172.    Cross-Complainants have fulfilled all their obligations under the November 14

24   Contract.

25     173.    Cross-Complainants have been damaged by Lettunich's breach by, without

26   limitation, incurring additional legal fees that would not have been necessary absent the breach,

27   and by suffering adverse consequences of board actions that would have had a different outcome

28   if Lettunich had provided the information about the Companies he was obligated to provide.

SEDGWICK
DETERT, MORAN & ARNOLD LLP

TENTH CAUSE OF ACTION

(Accounting – Against Cross-Defendant Lettunich and Xslent)

174.    Cross-Complainants reallege and incorporate by reference each of the allegations made herein at paragraphs 1 to 171 inclusive.

175.    As a manager of XT and XET, Lettunich owed XS Holding fiduciary duties, including those of loyalty and candor.

176.    As detailed above, Lettunich has engaged in self dealing by engaging in numerous transactions with interested parties using or involving the assets of XT and/or XET.

177.    Although an individual with complete control over XT and XET's finances, bank accounts, and operations, Lettunich has failed and refused to provide XS Holding with an accounting of the use of XT and XET's money.

178.    Because XS Holding has been denied access to the financial records of XT and XET, and because Lettunich has engaged in multiple interested transactions and breaches of fiduciary duties, XS Holding is unable to ascertain the amounts misappropriated by Lettunich as a result of his transactions involving XT and XET.

179.    An accounting is required to determine the amounts owed by Lettunich personally, or as a result of Lettunich's misappropriations of XT and XET assets, to XS Holding.

ELEVENTH CAUSE OF ACTION

(Declaratory Relief – Against Lettunich, Matan, Xslent and Atira)

180.    Cross-Complainants reallege and incorporate by reference each of the allegations made herein at paragraphs 1 to 177 inclusive.

181.    In July of 2007, Kore and Lettunich entered into a written agreement for a five manager board to govern Xslent, two of which would be Kore representatives. On September 17, 2007, a vote was held by the members of Xslent holding a majority of Xslent's units and a majority of its capital contributions appointing to the board of managers Ken Dickinson and Frank Busalacchi as the two representatives of Kore. On January 4, 2008, the majority of the Board of Mangers of Xslent voted, through written consent, to adopt certain resolutions that had the effect of, among other things, removing Lettunich as an officer of Xslent. Shortly thereafter,

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-47-

SECOND AMENDED CROSS-COMPLAINT

1  on January 7, 2008 and as a direct result of the January 4, 2008 vote by the Xslent board,

2  Lettunich was removed as manager and chairman of XET.

3      182.  Lettunich has refused to recognize the legitimacy of the September 2007 vote

4  establishing the existence of the five manager board with Dickson and Busalacchi as members or

5  acknowledge the January 4, 2008 vote removing him as an officer of Xslent and removing him as

6  a manager of XT.  As a result of Lettunich's denial of the validity of these two votes on

7  September 17, 2007 and January 4, 2008, Lettunich has been able to leverage his false control

8  over Xslent (as the majority member of XT) to assert control over XT and XET, to the detriment

9  of Cross-Complainants.

10      183.  Cross-Complainants XS Holding and Mr. Caffyn seek declaratory relief against

11  Cross-Defendants Xslent and Lettunich as to the validity of the votes on September 17, 2007 and

12  January 4, 2008 concerning the managers and officers of Xslent.  Cross-Complainants assert that

13  the votes appointing Dickinson and Busalacchi as managers and removing Lettunich as an officer

14  were valid, stripped him of authority to represent Xslent, and barred him from acting on behalf of

15  XT and XET.  Cross-Defendants Lettunich and, nominally, Xslent, assert that the vote was

16  invalid and that Lettunich possessed authority to act on behalf of XT and XET as a result.

17      184.  An actual controversy has arisen and now exists between Cross-Complainants and

18  Cross-Defendant Xslent and Lettunich concerning the legitimacy of the two votes in September

19  2007 and January 2008.

20      185.  Cross-Complainants therefore desire a judicial determination of their rights and

21  duties and a declaration that Cross-Defendants Lettunich has no control over Xslent and that as a

22  consequence, Mr. Caffyn, rather than Cross-Defendant Lettunich, occupies the position of

23  Chairman and CEO/President of XET and XT.

24      186.  Cross-Complainants also desire declaratory relief that any and all conduct by

25  Cross-Defendants Lettunich stemming from his purported control over Xslent was *ultra vires* and

26  without effect.

27                        PRAYER

28  WHEREFORE, Cross-Complainants pray for judgment as follows:

**SEDGWICK**
DETERT, MORAN & ARNOLD₁₄

1      1.    For general damages, special damages, consequential damages, restitution and

2  disgorgement according to proof, including, but not limited to lost opportunity and lost profit

3  damages;

4      2.    For declaratory relief that the conduct by Cross-Defendants Lettunich, Matan and

5  Gallagher as set forth above were ultra vires;

6      3.    For the issuance of a preliminary and permanent injunction prohibiting Cross-

7  Defendants Lettunich, Matan and Gallagher from engaging in any further ultra vires acts as set

8  forth above;

9      4.    For satisfaction of Cross-Defendants' obligations pursuant to the Agreements;

10     5.    For judicial declarations as set forth above;

11     6.    For costs of suit;

12     7.    For attorneys' fees and the disbursements of counsel;

13     8.    For an order that Cross-Complainants are entitled to prejudgment interest of ten

14  percent (10%) or the maximum amount allowed by law;

15     9.    For exemplary damages; and

16    10.    For other and further relief as the Court may deem just and proper.

17

18  DATED: May 1, 2008           SEDGWICK, DETERT, MORAN & ARNOLD LLP

19

20                         By: _____

21                            PAUL J. RIEHLE

22                            Attorneys for Defendants and
                              Cross-Complainants

23                            XS HOLDING B.V. and
                            BRIAN CAFFYN

24

25

26

27

28

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Sedgwick, Detert, Moran & Arnold LLP, One Market Plaza, Steuart Street Tower, 8th Floor, San Francisco, California 94105. On May 1, 2008 I served the within document(s):

**DEFENDANTS AND CROSS-COMPLAINANTS BRIAN CAFFYN'S AND X.S. HOLDING B.V.'S SECOND AMENDED CROSS-COMPLAINT**

☐　　MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed to parties below.

☒　　**EMAIL** - by electronically transmitting document(s) via Outlook email to the below.

☐　　MESSENGER - by causing delivery of the document(s) listed above via County Legal Services to Silicon Valley Law Group, DeSouza Law Firm, Martin Lettunich, Esq., Berliner Cohen. and Linda McPharlin at addresses listed below.

☐　　OVERNIGHT COURIER - by placing document(s) listed above via Federal Express to the addresses below.

☐　　HAND DELIVERY – I caused hand delivery of the above-referenced document(s) via Jia-Ming Shang of Sedgwick, Detert, et al., while at the Santa Clara Superior Court.

### SEE ATTACHED SERVICE LIST

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on May 1, 2008, at San Francisco, California.

_____
Phyllis Flynn

PROOF OF SERVICE
*Re XET Holding Inc., et al.*

CASE NO.: 107CV092388

1

2

3

## SERVICE LIST RE

## XET HOLDINGS, LLC, et al. v. XS HOLDING, B.V., et al.

| *Attorneys for Xslent, LLC, Xslent Technology, LLC and XET Holding Co., LLC*<br>Christopher Ashworth<br>SILICON VALLEY LAW GROUP<br>A Law Corporation<br>25 Metro Drive, Suite 600<br>San Jose, CA 95110<br>Telephone: (408) 573-5700<br>Facsimile: (408) 573-5701<br>Email: *CA@svlg.com*<br>      *keb@svlg.com*<br>*cc:*   *dls@svlg.com*<br>      *amt@svlg.com* | *Co-Counsel for Defendant David Tinsley*<br>Todd A. Duplanty<br>ACKERET – SHERON LLP<br>890 Lamont Ave., Suite 202<br>Novato, CA 94945-4100<br>Telephone: (415) 898-3200<br>Facsimile: (415) 897-6526<br>Email: *todd@sheronlaw.com* |
| *In Pro Per*<br>Martin Lettunich<br>Xslent Technologies, LLC<br>233 Oak Meadow Drive<br>Los Gatos, CA 95032-7650<br>Telephone: (408) 354-9800<br>Facsimile: (408) 395-3120<br>Email: *marty@xetsolar.com;*<br>      *xslentmarty@gmail.com*<br>*cc:*   *jsato2@yahoo.com* | *Co-Counsel for Defendant David Tinsley*<br>Lisa C. Roberts, Esq.<br>REHON & ROBERTS<br>Ten Almaden Blvd., Suite 550<br>San Jose, CA 95113-3238<br>Telephone: (408) 494-0900<br>Facsimile: (408) 494-0909<br>Email: *lroberts@rehonroberts.com*<br>*cc:*   *nwong@rehonroberts.com* |
| *Attorneys for Lisa Gallagher*<br>Linda Hendrix McPharlin, Esq.<br>McPharlin Sprinkles & Thomas LLP<br>Ten Almaden Blvd., Suite 1460<br>San Jose, CA 95113<br>Telephone: (408) 293-1900<br>Facsimile: (408) 293-1999<br>Email: *lmcpharlin@mstpartners.com*<br>*cc:*   *nalejandro@mstpartners.com* | *Attorneys for Atira Technologies, LLC*<br>Frank R. Ubhaus, Esq.<br>Christine Long, Esq.<br>Berliner Cohen<br>Ten Almaden Blvd., 11th Floor<br>San Jose, CA 95113-2233<br>Telephone: (408) 286-5800<br>Facsimile: (408_998-5388<br>Email: *ubhaus@berliner.com*<br>      *christine.long@berliner.com*<br>      *pstallings@berliner.com* |
| *Attorneys for Stefan Malan, Martin Lettunich and Xslent, LLC*<br>Jacqueline DeSouza, Esq.<br>DeSouza Law Offices, P.C.<br>2397 Shattuck Avenue, Suite 202<br>Berkeley, CA 94704<br>Telephone: (510) 649-3420<br>Facsimile: (510) 649-1711<br>Email: *jdesouza@dlawcorp.com* | |

PROOF OF SERVICE
*Re XET Holding Inc., et al.*

CASE NO.: 107CV092388

# EXHIBIT C

# EXHIBIT C

1   FRANK R. UBHAUS, CA STATE BAR NO. 46085
    CHRISTINE H. LONG, CA STATE BAR NO. 199676
2   BERLINER COHEN
    TEN ALMADEN BOULEVARD
3   ELEVENTH FLOOR
    SAN JOSE, CALIFORNIA 95113-2233
4   TELEPHONE: (408) 286-5800
    FACSIMILE: (408) 998-5388
5   frank.ubhaus@berliner.com
    christine.long@berliner.com
6

7   ATTORNEYS FOR PLAINTIFF ATIRA TECHNOLOGIES,
    LLC, A LIMITED LIABILITY COMPANY

**(ENDORSED)**
**FILED**

FEB 2 2 2008

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY
A. Ilas

8          SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

9                          108CV106601

10  ATIRA TECHNOLOGIES, LLC, A LIMITED          CASE NO.
    LIABILITY COMPANY,
11
              Plaintiff,                         VERIFIED COMPLAINT FOR:
12
         v.                                      (1)  Declaratory Relief;
13                                               (2)  Reformation;
    XET HOLDINGS CO., LLC; XSELNT               (3)  Rescission for Failure of
14  TECHNOLOGIES, LLC, a limited liability            Consideration
    company; XSLENT, LLC, a limited liability    (4)  Rescission Based Upon Fraud
15  company; XS HOLDINGS B.V., a
    corporation; BRIAN CAFFYN, an individual;
16  and Does 1-20, inclusive,

17            Defendants.

18

19       Plaintiff, Atira Technologies, LLC, a limited liability company ("Atira") hereby alleges:

20       1.   Plaintiff, Atira is a company organized and existing under the laws of the State of

21  Nevada and is qualified to do business in the State of California.

22       2.   Atira has its principal place of business within Santa Clara County.

23       3.   Defendant, XET Holdings Co., LLC ("XET") is a company organized and

24  existing under the laws of the State of Delaware with its principal place of business in Los Gatos,

25  California in the County of Santa Clara.

26       4.   Defendant, XSlent Technologies, LLC, ("X-Tech") is a limited liability company

27  organized and existing under the laws of the State of Delaware.

28

-1-

\CHL\753229.1
021908-16999001

1      5.      X-Tech's principal place of business is in Los Gatos, California in the County of

2  Santa Clara.

3      6.      Defendant, XSlent, LLC ("Xslent") is a limited liability company that has its

4  principal place of business within Santa Clara County.

5      7.      Defendant XS Holdings B.V. (XS) is an entity organized under the laws of The

6  Netherlands, whose "official" principal place of business is in Heerlen, The Netherlands.

7      8.      XS, at all times material, has and had insubstantial assets (less than $1 million), or

8  none.

9      9.      XS has consented to jurisdiction in Santa Clara County.

10      10.      Defendant Bryan Caffyn ("Caffyn") is an individual and Plaintiff is informed and

11  believes that he is a resident of either Florida or Massachusetts.

12      11.      Caffyn is the managing director of XS who consented to the jurisdiction of XS in

13  Santa Clara County.

14      12.      The affairs of XS are dominated and completely controlled by Defendant Caffyn.

15      13.      As between XS and Caffyn there is such a unity of interest and ownership that the

16  individuality, or separateness, of Caffyn and XS has ceased.  Further, the facts are such that an

17  adherence to the fiction of the separate existence of the corporation would, under the particular

18  circumstances of this case, sanction a fraud or promote injustice.

19      14.      Caffyn did the things complained of herein, in part, within Santa Clara County.

20      15.      XS is subject to jurisdiction in this County because at least one of the contracts

21  involved in this litigation was created in this jurisdiction, executed in this jurisdiction, and is to

22  be performed in relevant part in this jurisdiction.

23      16.      Further, one of the contracts involved in this litigation (that described in

24  paragraphs 14 and elsewhere therein) contains a forum selection clause permitting or requiring

25  jurisdiction here.

26      17.      Atira is unaware of the true names or capacities, whether individual, corporate,

27  associate or otherwise, of defendants Does 1 through 20, inclusive, and therefore sues these

28  defendants by their fictitious names.  Plaintiff is informed and believes, and thereon alleges, that

1    each of the fictitiously named defendants is liable to Plaintiff as herein alleged.  Plaintiff will

2    amend this Complaint once the true identities of the Does 1 through 20 are ascertained.

3        18.    Atira is informed and believes, and thereon alleges, that at all times herein

4    mentioned, Defendants XS and Caffyn and each fictitiously named defendant, was the agent,

5    servant, or employee of each other, and in doing or omitting to do the things hereafter alleged,

6    was acting within the course and scope of his, her, or its agency, and with the full knowledge and

7    consent, either expressed or implied, of each of the other defendants.

8        19.    Atira is informed and believes and thereon alleges that Defendants XET, X-Tech

9    and Xslent claim some interest in the matters litigated herein and are therefore included herein as

10   nominal defendants.

11                    **FACTS COMMON TO ALL CAUSES OF ACTION**

12       20.    Within the last two years, Atira, Xslent and XS were interested in forming an

13   entity to, *inter alia*, develop renewable energy and software architecture. The three entities just

14   named agreed to form, inter alia, Xslent Technologies, LLC (X-Tech).

15       21.    Atira, Xslent and XS Holding, in furtherance of the agreement described in

16   paragraph 20, supra, executed an Operating Agreement for X-Tech dated April 7, 2007.  A true

17   copy of the X-Tech Operating Agreement is attached hereto as Exhibit "1".

18       22.    X-Tech's purpose was to, among other things, hold the ownership of a subsidiary

19   company, XET Holdings, LLC (XET).

20       23.    For its part, XET intended to complete development of technologies and products

21   based upon, *inter alia*, the renewable energy intellectual property portfolio contributed to X-Tech

22   by Atira and then by X-Tech to XET Holdings.

23       24.    The members of X-Tech are Xslent, Atira, and XS Holding.

24       25.    The representative ownership of each is as follows: Xslent holds 22.5%; Atira

25   holds 67.5% and XS holds 10%.

26       26.    When the Operating Agreement for X-Tech was drafted, it was reviewed by

27   Martin Lettunich, a member and officer of Atira.

28

-3-

VERIFIED COMPLAINT

\CHL\753229.1
021908-16999001

27.     Defendant Caffyn reviewed the proposed X-Tech Operating Agreement on behalf of XS.

28.     The X-Tech Operating Agreement purports to identify the members in an attached Exhibit "A".

29.     The original draft of the Operating Agreement included an Exhibit "A" that purported to state the ownership interests in X-Tech.

30.     The Exhibit "A" did not include any ownership interest abiding in Atira.

31.     There was, in short, a scrivener's error.

32.     The just-described version of the Operating Agreement was executed by the parties.

33.     The omission of any interest abiding in Atira was later discovered.

34.     Specifically, the omission of any interest abiding in Atira was later discovered in approximately May, 2007 by Caffyn.

35.     On May 3, 2007, Caffyn, via e-mail, sent proposed revisions of the Operating Agreement to attorney Bernie Vogel of Silicon Valley Law Group.

36.     The revisions just referred to included corrections to Exhibit "A" of the Operating Agreement.

37.     The revised Exhibit "A" in Caffyn's e-mail detailed the members of X-Tech and their representative ownership interest.

38.     Caffyn's revisions included a change to Exhibit "A" to reflect a 67.5% ownership interest abiding in Atira.

39.     A true and correct copy of Caffyn's e-mail, and certain relevant portions of his redline version of Exhibit "A" to the Operating Agreement, is attached hereto as Exhibit "2" and incorporated herein by reference.

40.     Thereafter, on or about May 15, 2007, Caffyn reviewed an organizational chart for X-Tech, which included a diagram reflecting a 67.5% ownership interest in Atira.

41.     The organizational chart just referred to was displayed at a meeting of actual and prospective Atira unit-holders.

-4-

\CHLI753229.1
021908-16999001

42.    Present and presenting at such meeting were, inter alia, Caffyn, one David Tinsley, and one Martin Lettunich.

43.    A true and correct copy of the organizational chart just referred to is attached hereto as Exhibit "3" and is incorporated herein by reference.

44.    In and after the month of August 2007, XS, by and through its principal owner Caffyn, took the position that Atira did not own a 67.5% interest in X-Tech.

45.    In and after August, 2007, XS asserted that the version of the X-Tech Operating Agreement, attached as Exhibit "1", including its Exhibit "A", was the true agreement between the parties named therein and reflected the parties' intent.

46.    XS has, following the advent of the litigation styled *XET Holding Co., et al  LLC v. XS Holding, B.V., et al* Santa Clara County Case No. 1-07-CV 092388, contended that Atira did not have a 67.5% ownership interest in X-Tech.

47.    On or about June 30, 2007, XS announced that it would cease honoring its investment commitments to X-Tech and XET

## FIRST CAUSE OF ACTION

### (Declaratory Relief against XS, XET, X-Tech and Xslent )

48.    Plaintiff hereby incorporates by reference paragraphs 1 through 47 of this Complaint as if fully set forth herein.

49.    An actual controversy has arisen and now exists between Atira and Defendants concerning which is the valid and enforceable X-Tech Operating Agreement; and what each of the party's respective rights and duties with respect to the agreements are regarding the agreement.

50.    Atira asserts that it is a 67.5% owner in X-Tech.

51.    Defendants claim that Atira has less than a 67.5% interest in X-Tech.

52.    Atira desires a judicial determination of which is the valid agreement and of Atira rights regarding either agreement.  Such a judicial declaration is necessary and appropriate at this time under the circumstances. Atira desires a determination that it is a 67.5% owner of X-Tech.

WHEREFORE, Atira requests relief as hereafter provided.

\CHL\753229.1
021908-16999001

1

2

### SECOND CAUSE OF ACTION

**(Reformation against XS, XET, X-Tech and Xslent)**

3      53.    Plaintiff hereby incorporates by reference paragraphs 1 through 47 of this

4    Complaint as if fully set forth herein.

5      54.    On or about April 7, 2007, and in the weeks preceding, Atira and Defendant XS

6    negotiated for and mutually orally agreed that Atira would transfer certain intellectual property

7    to X-Tech.

8      55.    The agreed upon consideration for Atira's transfer of intellectual property was a

9    67.5% interest in X-Tech to abide in Atira.

10      56.    The oral agreement was later reduced to writing in the form of the Operating

11    Agreement for X-Tech, a true and correct copy of the written agreement is attached hereto as

12    Exhibit 3.

13      57.    The X-Tech Operating Agreement contains certain written terms that differ from

14    the terms agreed to by the parties, including mistaken terms in Paragraph 3.1.1.

15      58.     The X-Tech Operating Agreement contains certain written terms that differ from

16    the terms agreed to by the parties, including mistaken terms in its Exhibit "A".

17      59.    The above-described failure of the written agreement to reflect the true intent of

18    the parties resulted from a mistake in the final preparation of the documents.

19      60.    The revisions by X.S. and Caffyn referred to in paragraph 39 accurately reflected

20    the parties' true intent.

21      61.    Without knowledge of the mistake in paragraph 3.1.1, Atira executed the X-Tech

22    Operating Agreement.

23      62.    Without knowledge of the mistake or mistake in the Exhibit "A", Atira executed

24    the X-Tech Operating Agreement.

25      63.    Atira is informed and believes that the above-described failure of the written

26    agreement to reflect the true intent of the parties resulted from a mutual mistake of both parties

27    in that simply the wrong Exhibit "A" was attached because the X-Tech Operating Agreement

28    terms closely modeled a related agreement.

-6-

\CHL\753229.1
021908-16999001

1    64.    Atira, although a signatory to the Operating Agreement, is not identified as having

2    an ownership interest, which omission will result in prejudice and/or pecuniary loss unless and

3    until the X-Tech Operating Agreement is reformed.

4    WHEREFORE, Plaintiffs request relief as hereafter provided.

5    **THIRD CAUSE OF ACTION**

6    **(Rescission against XS, XET, X-Tech and Xslent Based Upon Failure Of Consideration)**

7    65.    Atira hereby incorporates by reference paragraphs 1 through 64 of this Complaint

8    as if fully set forth herein.

9    66.    Under the terms of the contract, Atira understood that it had a 67.5% interest in

10   X-Tech.

11   67.    In furtherance of the parties' agreement, Atira transferred certain intellectual

12   property to X-Tech.

13   68.    Atira's transfer of said intellectual property constitutes full performance by Atira.

14   69.    Defendants' failure to acknowledge Atira's interest constitutes non-performance

15   and a breach of the parties' agreement.

16   70.    Atira desires a determination by the Court that the Operating Agreement for

17   Xslent Technologies, LLC has been rescinded and ordering restitution of the consideration paid –

18   and/or given by Atira (i.e. Atira intellectual property), and to the extent that money or profit has

19   been derived from Atira's consideration for restitution of such monies or profit together with

20   interest thereon.

21   71.    Other than having itself identified on Exhibit "A" of the X-Tech Operating

22   Agreement, Atira has received little if any consideration and is unable (and need not) restore

23   anything to XS.

24   **FOURTH CAUSE OF ACTION**

25   **(Rescission Based Upon Fraud in the Inducement against XS and Caffyn)**

26   72.    Atira hereby incorporates by reference paragraphs 1 through 47 and 65-71 of this

27   Complaint as if fully set forth herein.

28

-7-

\CHL\753229.1
021908-16999001

73.    At all times material, XS promised (represented) that it would invest $15 million in the combination of XET and X-Tech; $7.5 Million as to X-Tech and $7.5 Million as to XET.

74.    At all times material, Atira believed the representations of XS outlined in paragraph 73.

75.    At all times material, Atira's belief in the representations outlined in paragraph 73 was reasonable.

76.    When made, XS intended that Atira believe the representations described in paragraph 73 and intended Atira to act upon that belief.

77.    The representations outlined in paragraph 73 were untrue.

78.    When made, XS knew that the representations outlined in paragraph 73 were untrue.

79.    The true facts are that XS intended, at all times material, that it would (a) pay in the first (approximately) $ 4.5 Million as to X-Tech and $ 3.75 Million as to XET and then (b) cease investing in both XET and X-Tech.

80.    At all times material, XS intended to cut off funding to XET and X-Tech when they needed the money most, thereby effecting a "starve-out", rendering XET and X-Tech economically weak and vulnerable.

81.    XS, at all times material, intended that the "starve-out" described in paragraphs 79 and 80 would force XET and X-Tech to cede to XS or Caffyn individually the acquisition of an exclusive license to the technology/intellectual property of Atira.

82.    As noted, on or about June 30, 2007, XS informed XET and X-Tech that it would not invest any further money in either XET or X-Tech, thus triggering the "starve-out" described hereinabove.

WHEREFORE, Plaintiff requests relief as hereafter provided.

## PRAYER

WHEREFORE, Plaintiff prays judgment against Defendants, each of them, as follows:

1.  For special damages according to proof;

2.  For general damages according to proof;

-8-

\CHLI753229.1
021908-16999001

3.  For reformation of the X-Tech Operating Agreement to reflect the true intent of the parties, including Atira's 67.5% interest in X-Tech;

4.  For a determination by the Court that the Operating Agreement of X-Tech has been rescinded and ordering restitution of the consideration and/or given by Atira, and to the extent that money of profit has been derived from Atira's consideration, for restitution of such monies or profits together with interest thereon;

5.  For attorneys fees allowed by law and contract; and

6.  For such other and further relief as is proper.

BERLINER COHEN

DATED: FEBRUARY 19, 2008

BY: _____
    FRANK R. UBHAUS
    CHRISTINE H. LONG
    ATTORNEYS FOR PLAINTIFF ATIRA
    TECHNOLOGIES, LLC, A LIMITED LIABILITY
    COMPANY

-9-

VERIFIED COMPLAINT

\CHLV753229.1
021908-16999001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CORPORATE VERIFICATION</u>

(C.C.P. §§ 446, 2015.5)

I declare that:

I am a manager of ATIRA TECHNOLOGIES, LLC, a limited liability company in this action and am authorized to make this Verification for and on its behalf and I make this Verification for that reason; I have read the foregoing Complaint and know its contents; I am informed and believe, and on that ground, allege that the matters stated in it are true either based on my personal knowledge or based on my inquiry into the facts of this matter.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this Verification was executed this February 21, 2008

ATIRA TECHNOLOGIES, LLC

BY _Martin Lettunich_

MARTIN LETTUNICH

-10-

\CHL753229.1
021908-15999001

# EXHIBIT D

# EXHIBIT D

1  SEDGWICK, DETERT, MORAN & ARNOLD LLP
   PAUL J. RIEHLE  Bar No. 115199
2  JIA-MING SHANG  Bar No. 233326
   One Market Plaza, Steuart Tower, 8th Floor
3  San Francisco, California  94105
   Telephone: (415) 781-7900
4  Facsimile: (415) 781-2635
   Email: *jiaming.shang@sdma.com*

5
   Attorneys for Defendants and Cross-Complainants
6  XS HOLDING B.V. and BRIAN CAFFYN

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF SANTA CLARA

10

11  ATIRA TECHNOLOGIES, LLC, a limited          CASE NO. 108CV106601
    liability company,
12                                              **CROSS-COMPLAINT BY XS HOLDING**
              Plaintiff,                        **B.V. AND BRIAN CAFFYN**
13
         v.
14
    XET HOLDINGS CO., LLC; XSELNT
15  TECHNOLOGIES, LLC, a limited liability
    company; XSLENT, LLC, a limited liability
16  company; XS HOLDINGS B.V., a
    corporation; BRIAN CAFFYN, an individual;
17  and DOES 1-20, inclusive,

18            Defendants.

19  XS HOLDINGS B.V., a corporation; and
    BRIAN CAFFYN, an individual,
20
              Plaintiff,
21
         v.
22
    XET HOLDINGS CO., LLC, a limited
23  liability company; XSLENT
    TECHNOLOGIES, LLC, a limited liability
24  company; XSLENT, LLC, a limited liability
    company; and ATIRA TECHNOLOGIES,
25  LLC, a limited liability company,

26            Defendants.

27

28

SEDGWICK
DETERT, MORAN & ARNOLD LLP

-1-

1    Defendant and Cross-Complainant XS HOLDING B.V. ("XS Holding"), a Dutch

2    corporation, and Defendant and Cross-Complainant BRIAN CAFFYN ("Mr. Caffyn"), an

3    individual, (collectively "Cross-Complainants") allege in this Cross-Complaint against Cross-

4    Defendant XSLENT, LLC ("Xslent"), a limited liability company, Plaintiff and Cross-Defendant

5    ATIRA TECHNOLOGIES, LLC ("Atira Technologies"), a limited liability company, Cross-

6    Defendant XET HOLDINGS CO., LLC; a limited liability company ("XET"), and Cross-

7    Defendant XSLENT TECHNOLOGIES, LLC, a limited liability company ("XT"), (collectively

8    "Cross-Defendants"), as follows:

9                          **JURISDICTION AND PARTIES**

10          1.    Cross-Complainant XS Holding is a Dutch corporation with its principal place of

11   business in Amsterdam, The Netherlands.

12          2.    Cross-Complainant Mr. Caffyn is an individual residing in Miami Beach, Florida.

13   At all times material, Mr. Caffyn was a Manager of Cross-Defendant XET Holdings Co., LLC

14   ("XET") and Cross-Defendant Xslent Technologies, LLC ("XT") (collectively, the

15   "Companies").

16          3.    Cross-Defendant Xslent is a limited liability company with its principal place of

17   business in Santa Clara County.

18          4.    Cross-Defendant Atira Technologies is a limited liability company with its

19   principal place of business in Santa Clara County.

20          5.    Cross-Defendant XET is a limited liability company with its principal place of

21   business in Santa Clara County.

22          6.    Cross-Defendant XT is a limited liability company with its principal place of

23   business in Santa Clara County.

24                          **FIRST CAUSE OF ACTION**

25          (Declaratory Relief – By All Cross-Complainants Against All Cross-Defendants)

26          7.    Cross-Complainants restate every paragraph set forth above.

27          8.    Plaintiff and Cross-Defendant Atira Technologies has filed a complaint for

28   declaratory relief seeking a declaration that it possesses a 67.5% interest in XT as well as alleging

-2-

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  that it entered into the XT Operating Agreement as a result of fraud by Mr. Caffyn and XS

2  Holding and seeking rescission of the agreement.

3        9.        With respect to the claim for "Rescission Based on Fraud" against XS Holding

4  B.V. and Brian Caffyn, Atira claims that XS Holding represented that it would invest $15 million

5  in XET and XT, and that representation was false when made.  Atira's position on this point is

6  directly refuted by Section 3.1.2 of the XT and XET Operating Agreements, as well as the

7  Members Agreement.  Section 3.1.2 of the XT and XET Operating Agreements only require the

8  initial capital contributions made in April 2007; any additional contributions were "at Class B

9  Member's [XS Holding's] option."

10       10.        On or around April 21, 2008, Atira entered into an agreement, to which

11  Defendants and Cross-Complainants consented, with Xslent, LLC and other parties to partially

12  settle claims in related litigation.

13       11.        Pursuant to the April 21, 2008 agreement, the dispute as to the relative ownership

14  interests of Atira and Xslent was resolved.

15       12.        Atira Technologies' request for a judicial declaration of its 67.5% interest in XT is

16  directly contradictory to the April 21, 2008 agreement.

17       13.        Cross-Complainants seek a declaration that the terms of the April 21, 2008

18  agreement supersedes the XT Operating Agreement with respect to the ownership interests of

19  Xslent and Atira in XT and that the XT and XET Operating Agreements permit additional capital

20  contributions beyond the initial contributions to be at XS Holding's option.

21       14.        An actual controversy has arisen and now exists between Cross-Complainants and

22  Cross-Defendants concerning the parties' rights and duties under the XT Operating Agreement

23  and the April 21, 2008 agreement.

24                                    **PRAYER**

25       WHEREFORE, Cross-Complainants pray for judgment as follows:

26       1.        For a judicial declaration that the ownership interests and rights between Atira and

27  Xslent in XT are as set forth in the April 21, 2008 agreement;

28       2.        For a judicial declaration that Atira is not entitled to rescind the XT Operating

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

-3-

1    Agreement;

2         3.     For costs of suit;

3         4.     For attorneys' fees;

4         5.     For any other and further relief as the Court may deem just and proper.

5

6    DATED:  May 13, 2008                  SEDGWICK, DETERT, MORAN & ARNOLD LLP

7

8                                     By:_____
                                          PAUL J. RIEHLE
9                                         JIA-MING SHANG
                                          Attorneys for Defendants and
10                                        Cross-Complainants
                                          XS HOLDING B.V. and BRIAN CAFFYN
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-